1                United States District Court

2            for the Southern District of California

3                                        )
4     SHAVONDA HAWKINS, etc.,            )
                                         )   No. 15cv2320-JM-AHG
5          Plaintiff,                    )
                                         )   April 8, 2020
6              v.                        )
                                         )
7     THE KROGER COMPANY,                )   San Diego, California
                                         )
8          Defendant.                    )
                                         )

9

10               Transcript of Court Proceedings
               BEFORE THE HONORABLE ALLISON H. GODDARD
11                United States Magistrate Judge

12    APPEARANCES:

13    For the Plaintiff:      THE WESTON FIRM
                              GREGORY S. WESTON
14                            ATTORNEY AT LAW

15    For the Defendant:      DAVIS WRIGHT TREMAINE LLP
                              JACOB HARPER
16                            HEATHER CANNER
                              ATTORNEYS AT LAW

17

18

19

20

21    Transcriber:           Dana Peabody, RDR, CRR
                              District Court Clerk's Office
22                            333 West Broadway, Suite 420
                              San Diego, California, 92101
23
      (Transcript prepared from a recording)
24

25

1          San Diego, California, April 8, 2020

2                          *   *   *

3          THE COURT:  Before I talk about where I am with the

4     tentative, I guess my first comment is we are all

5     officers -- you are all officers of the Court.  And when you

6     become an attorney, you swear to a duty -- you agree to a duty,

7     candor with the Court, but you also agree to conduct yourself

8     in proceedings before the Court in a reasonable and good-faith

9     manner and not to unnecessarily duplicate the proceedings of

10    the Court or use the discovery process as a way to actually

11    avoid discovery.  In fact, discovery is supposed to be

12    self-executing.

13         And in order for that to happen, attorneys need to

14    interpret discovery requests reasonably.  Kroger's approach to

15    discovery in this case has been just the opposite of that.

16    Instead, Kroger has interpreted the request in a narrow and

17    technical manner in an effort to take discovery -- to take the

18    discovery process entirely off course.

19         Examples of this include rather than providing responses

20    for all products that Kroger labeled based on Kroger's label as

21    containing PHO, Kroger engaged in a fiction that it needed to

22    go to suppliers to confirm independently whether each product

23    has PHO in spite of what Kroger put on the label.

24         The documents ultimately produced by Kroger after many

25    months, and late, show, as you would expect, that Kroger relies

1  on suppliers to provide the ingredients to products at the

2  outset.  And it's not clear to the Court why Kroger couldn't

3  likewise rely on this information instead of engaging in a

4  multi-month wild goose chase to try and confirm whether what

5  Kroger had put on its labels was, in fact, correct.

6      Another example, Kroger claimed that it was entitled to

7  avoid discovery because suppliers are different from

8  manufacturers, but it would be self-evident to any lawyer who

9  was actually seeking to satisfy discovery obligations in good

10 faith that plaintiff was seeking information about where Kroger

11 gets the product.  And that kind of gets to the heart of this.

12 Instead of actually taking a reasonable approach, 95 percent of

13 plaintiff's requests seek information that is glaringly

14 obvious -- glaringly obviously relevant in this case given the

15 claims of the plaintiff.

16     And Kroger engaged multiple times in activities to avoid

17 providing any information, even the most relevant, without

18 plaintiff having to go through multiple unnecessary steps in

19 order to get that basic information.

20     And what's worse, we're now on the second motion to compel

21 where Kroger has also involved the Court in this trying to get

22 the Court to sanction its unreasonable actions with discovery.

23 All of plaintiff's requests were reasonable and geared towards

24 obvious issues in the case, and to the extent they were

25 overbroad, it was Kroger's obligation to be reasonable and meet

1    and confer in good faith.

2        I'll give you some other examples of the Court's issues

3    with Kroger's responses, including the responses to this

4    motion.  Kroger continues to insist, incredibly, that

5    Judge Major's order included no deadline to complete production

6    even though I specifically informed Kroger's counsel on

7    multiple occasions that that is what the order said.  That

8    insistence continues today.

9        Kroger should be apologetic for the delays it caused, and

10   instead it has doubled down showing no shame or concern for the

11   burden it's now placed on two different magistrate judges.

12       Kroger relied on Judge Major's allowance for a declaration

13   from a knowledgeable employee to limit the discovery period,

14   but then only provided the declaration months late and then

15   provided it by a declaration -- an employee who had no personal

16   knowledge.

17       Kroger failed to serve verifications to its subliminal

18   discovery responses that were due on October 8th.  Inexplicably

19   these verifications were not provided until November 8th,

20   again, requiring plaintiff to actually ask for what Kroger

21   should have done in the first place.

22       Kroger did not produce a privilege log until November 8th

23   with no explanation.  Kroger failed to produce documents by

24   October 7th that were clearly within Kroger's power to produce.

25       I'm going to list some, but the list is too long in this

1  hearing for me to go through them all because the Court has
2  reviewed Kroger's entire production.

3      For example, RFP Number 1 sought Kroger's written document
4  retention policies and procedures.  RFP Numbers 11 and 20
5  sought call center complaints or consumer feedback.  RFP
6  Numbers 2 and 3 sought identification of personnel involved in
7  marketing, manufacturing, and research.  There are multiple
8  other categories of requests where this is the case.

9      Moreover, Kroger claimed that the delay was needed because
10  it was -- it was because it needed to confirm which products
11  contained PHOs, but the insincerity behind this claim is shown
12  by the fact that at the end of the day, Kroger produced
13  documents for breadcrumbs that clearly did not contain PHOs.

14      Of the documents that were produced, almost every document
15  was an internal Kroger document.  Many of the documents
16  included these products that aren't at issue, so it belies
17  Kroger's claim that they had to situate for suppliers to
18  confirm whether PHO was in a product before producing any
19  documents.

20      And worse, worse, 5,186 pages, 92.5 percent of the
21  production were printed spreadsheets.  It's unbelievable to the
22  Court that that would occur in today's age when it's clear to
23  any attorney who is actually trying to fulfill their discovery
24  obligations in good faith that they would produce a spreadsheet
25  as a printed document in a way that is clearly unusable and

1    certainly not how Kroger would use it to do its business.

2        The Court's tentative is to grant the motion to compel.

3        It's not clear, Mr. Weston, and I'll seek clarification

4    later in the hearing, about what exactly is left to produce,

5    but at a minimum, Kroger will need to supplement its response

6    to the RFPs to specify if any documents are being withheld.

7        The Court will grant the motion for sanctions.  At a

8    minimum, the Court will award attorney's fees that the

9    plaintiff incurred in preparing this motion and the

10   meet-and-confer following Judge Major's order.

11       With respect to contempt, the Court is inclined to certify

12   facts to Judge Miller so that he can make a determination of

13   contempt.

14       At this point the Court is not convinced that a monetary

15   sanction will do any good because Kroger has shown repeatedly a

16   complete lack of respect for the Court's orders even though it

17   has already been forced to pay a monetary sanction.

18       So I'll ask the parties to address whether I can order

19   different sanctions than what's requested by the plaintiff, and

20   I'll also ask the Court if -- ask the parties if the Court can

21   find additional elements of prejudice inherent in the record.

22       So with that, I do have some specific questions.  I'd like

23   to ask my questions, and I'll give each side an opportunity to

24   supplement the record.

25       So first, I have a question for Kroger.  Did you ever

1    provide plaintiff a sworn statement from a Kroger witness, not

2    from an attorney, documenting the steps that they took -- that

3    Kroger took to obtain information from suppliers about which

4    products had PHO?

5            MR. HARPER:  Your Honor, this is David Harper.  I

6    believe we listed the steps in the third supplemental verified

7    responses.  I don't know that a declaration specifying steps or

8    obtaining information was made since I don't believe it was

9    asked for in discovery.  So that is the information that I have

10   on that, Your Honor.

11           THE COURT:  Okay.  So you think it might be in the

12   verified -- the third supplemental interrogatory responses?

13           MR. HARPER:  I believe it is.  I may defer to

14   Ms. Canner.  She has more information on whether -- where in

15   particular in the third supplemental responses that information

16   would come.

17           THE COURT:  With respect to previous issues,

18   Mr. Weston, do you agree that California law applies as -- or

19   governs the issue of previous --

20           MR. WESTON:  Yes, I do.

21           THE COURT:  And, Mr. Harper, are you arguing that

22   Kroger shouldn't be required to provide more information on its

23   privilege log?

24           MR. HARPER:  No, Your Honor.  In fact, our opposition,

25   I believe, addressed some of the Court's concerns, which I

1   understand and appreciate, but quite the contrary.  We stated

2   repeatedly during the meet-and-confer process that occurred

3   after the last November telephonic conference that we would be

4   willing to supplement a privilege log, and as I recall, and as

5   I believe the meet-and-confer correspondence shows, we didn't

6   get a confirmation on whether that would be acceptable at this

7   point to a motion.

8           THE COURT:  The privilege log seems pretty clear on

9   its face to be inadequate.  Why wasn't a proper privilege log

10  provided in the first place?

11          MR. HARPER:  We believe the privilege log was

12  adequate, and we offered to discuss what, in particular, was

13  not adequate for Mr. Weston, and we tried to engage on that

14  several times.

15          THE COURT:  Why is a document that was produced to all

16  Kroger employees -- how many employees do they have,

17  Mr. Harper?

18          MR. HARPER:  500,000.

19          THE COURT:  Why is a document that was produced to

20  500,000 people included on the privilege log?

21          MR. HARPER:  There is information that is -- well, I'm

22  not sure which specific document Your Honor's referring to.

23          THE COURT:  My understanding is if there's --

24          MR. HARPER:  I do know --

25          THE COURT:  My understanding is there's at least two

1    documents on the privilege log that are -- that were sent to

2    every Kroger employee.

3              MR. HARPER:  Your Honor, I apologize for not knowing

4    which one -- oh, I see.  I'm looking at the privilege log now.

5    You're referring to Log Number 1 and Log Number 2.  It appears

6    this is the record retention policy and the list on the

7    privilege log for attorney-client privilege and attorney work

8    product, and they -- those two documents are documents that

9    were written and supplied by Kroger's in-house legal team and

10   then supplied to Kroger employees.  That seems to be clearly

11   attorney-client privilege and attorney work product

12   information.

13             THE COURT:  I absolutely disagree.  Attorney-client

14   privilege is a communication conveying attorney advice, and a

15   document policy that employers -- under your reading, sir, an

16   employee handbook, just because it was sent by a lawyer or

17   drafted by lawyers, would be a privileged document.

18        And it's that type of claim that gives the Court reason to

19   question the sincerity of many other objections that Kroger has

20   made.  If that's a document that tells employees of a large

21   corporation how long to hold documents, then as a general -- as

22   a matter of general business practice and policy, there

23   is -- that is not privileged.  If it is a memo to a manager who

24   had a question about whether he has a legal obligation to

25   retain documents past a certain amount of time, that may

1  arguably be privileged, but a document sent to 500,000 people

2  at every level of the organization is not a privileged

3  document, particularly if it relates to a general policy of the

4  company and is instructions to comply with that general policy.

5      So let me ask you, Mr. Harper, now that you understand and

6  agree that there are very legitimate concerns about the

7  privilege log, what's the best avenue for the Court to test the

8  sincerity of Kroger's placement of documents on that privilege

9  log?

10      MR. HARPER:  Well, Your Honor, California law, which

11  applies, advises that if there are questions about the adequacy

12  of the privilege log, then we would supplement the information

13  in the privilege log, and that's what we had offered to do, and

14  that's what we continue to offer to do.

15      THE COURT:  And then what if the Court's not convinced

16  that, for example, if you were to persist in your claim that a

17  document sent to 500,000 employees is privileged, what

18  if -- are there any other avenues or is the Court just stuck

19  with trusting you?

20      MR. HARPER:  I think that the -- it's sort of an

21  unripe point if we don't have the supplemental privilege log

22  yet.  I think it's -- at that point we address whether there

23  are legitimate claims.

24      I mean, I will tell you, Your Honor, that we will look with

25  a, you know, more -- very critically consider whether our

1    privileged information is sufficient, and if we don't believe

2    it's sufficient, then we will either supplement it or we will

3    remove it.

4        At this point I believe that our privilege log is accurate,

5    if not fulsome, in the detail that it suffices to provide the

6    Court with information about whether the document is actually

7    privileged.

8            THE COURT:  So I want to ask you again, Mr. Harper,

9    does Kroger contend that the products in 2010 to 2012 did not

10   contain PHO or just that Kroger can't confirm that through its

11   suppliers?

12           MR. HARPER:  The problem, Your Honor, is the -- Kroger

13   does not test the particular product, but it

14   has -- demonstrated in the documents that were produced, Kroger

15   has provided -- they call them spec sheets, and these spec

16   sheets tell Kroger, from the supplier, what is in the different

17   products.  But Kroger does not confirm, you know, if it

18   contains PHO or doesn't contain PHO or whatnot.

19       I think part of the issue here is there's a conception that

20   Kroger does everything here in-house, it has a lab that creates

21   tests, manufactures labels, and produces its private label

22   products, but Kroger, in fact, relies on the information that's

23   provided by the suppliers and does not -- I mean, it relies on

24   that, and that's the information that it has, but it does not

25   know for sure whether certain products actually have PHO, and

1   I'll give you one actual example of this, Your Honor, which may

2   have come up previously, but when PHO was removed -- and this

3   is my understanding from the client, and I think it was

4   discussed some in the 30(b)(6) deposition.  When PHO was

5   removed, I believe, in 2005 -- or 2015 or 2016, the

6   process -- there are two different processes involved.  One is

7   the ingredients themselves and the manufacturer of the

8   ingredients, and then there's the labeling of the ingredients

9   as well.

10      And so Kroger, in order to comply with the FDA's removal of

11  PHO requirements, it had conversations with suppliers, who I

12  understand were already in the process of removing the PHO, so

13  there was product that had PHO removed in 2015 and 2016, but

14  the label did not caught up there to the fact that the PHO had

15  been removed.  And so my understanding -- and I think this is

16  reflected in the documents as well -- is PHO was removed from

17  certain products that continues to have PHO on the labels and

18  in some cases on the spec sheet.

19      So that's -- and so that's an example where Kroger has

20  information on the label or from the supplier themselves that

21  say that they contain PHO when, in fact, they don't contain

22  PHO.

23      And I realize that Your Honor's asking about 2010 and 2012,

24  but that's a concrete example that I know of in which there's

25  a -- somewhat of a disparity between what's contained in the

```
 1    product and what is in the actual label, and when -- when
 2    Kroger was trying to answer those questions, we were trying to
 3    get answers with the -- we actually were trying to understand
 4    why there's a -- why there's a reluctance to just confirm that
 5    whatever the third-party suppliers indicate about what the
 6    products contain is something that they can say without -- with
 7    certainty that it was, and they were not comfortable doing
 8    that, and I understand why.
 9              THE COURT:  I don't understand why, because it's a
10    business that relies on a spec sheets to print a label that it
11    presents to consumers for its products to buy the product off
12    the shelf.  I think it seems to the Court that this was
13    something that was generated as a way to avoid discovery,
14    frankly.  I mean, I think Mr. Weston saw labels from Kroger
15    where Kroger represented on the labels to consumers throughout
16    the country what the ingredients in that product were, and at
17    that point in time, it was good enough for Kroger to rely on
18    those spec sheets, and so Mr. Weston drafted an interrogatory,
19    and he defined a product instead of -- I'm sure if he -- if he
20    could go back now, he would define "product" as anything that
21    Kroger labeled as having PHOs, but Kroger seized on the
22    definition of "product" to go back and create this false
23    narrative that, oh, we may not -- the supplier may not have
24    actually used PHOs, so we can't be 100 percent certain, so we
25    can't produce anything until we know for sure which products
```

1    contain PHOs, which, by the way, is belied by the fact that

2    Kroger produced things for Brekrums (phonetic) that don't

3    contain PHOs even on the label.

4         But anyway, this is a problem, Mr. Harper.

5         Let me go back to -- you're going to have a chance to

6    respond in full at the end, but did the products from 2010 to

7    2012 contain PHO?

8              MR. HARPER:  As far as I understand, they did, but,

9    again, there's not 100 percent certainty about the product

10   between 2010 and 2012 part because I understand there were

11   supplier changes, and some suppliers were using PHO and some

12   were not.

13             THE COURT:  Did Kroger tell consumers from 2010 to

14   2012 on its labels that the products contained PHO?

15             MR. HARPER:  Well, for two of the products, the two

16   that are at issue I believe in this case per the claim, Kroger

17   breadcrumbs and the Italian-style breadcrumbs, I believe that

18   is true, but the way that the interrogatory and the discovery

19   was styled, it was not limited to those two products.

20             THE COURT:  Again, we're going back, Mr. Harper, to

21   the reasonable reading of the interrogatory.  And instead of

22   trying to read it in a way so that you could sharpen your

23   pencil and your knife to cut through what you have to produce

24   to the thinnest amount possible, a reasonable reading would not

25   find there is a distinction.

1     Has Kroger produced all the labels, sales information, and

2   information requested regarding those KBC and Italian-style

3   breadcrumbs from 2010 and 2012?

4          MR. HARPER:  Yes, Your Honor, I believe it has.

5          THE COURT:  And have you produced all the vendor specs

6   for those products during that time frame?

7          MR. HARPER:  I believe Kroger's produced all the

8   vendor specs that it has, and it's produced the vendor specs

9   that it was able to obtain from its third party, and that was a

10  pretty extensive search.

11         THE COURT:  Okay.  Mr. Weston, do you believe that any

12  responses to RFP Number 8, which is -- deals with pricing, or

13  RFP Number 18, which deals with labels, are still outstanding

14  or just -- or are you -- is your motion just that the responses

15  weren't timely produced?

16         MR. WESTON:  I think it is still outstanding.  There

17  have been no documents relating to sales other than the

18  redacted printout spreadsheet, and the redactions were not on

19  the privilege log as Kroger explicitly claimed.

20     But can I turn to what Mr. Harper said about there

21  being -- there being PHO on the label, but he doesn't know if

22  there's PHO in the product?  He has said this multiple times,

23  including -- I'm really surprised he said it again today.  But

24  he said it many times before, so the 30(b)(6) topics 8, 9, 10

25  all dealt with that claim that he's made to the Court

1   repeatedly on the telephone and in the status reports, and

2   those topics are the efforts Kroger made to ensure that the

3   ingredient list reflects the actual ingredients, any instances

4   on any Kroger product where the ingredient list were not

5   accurate.  And then we went to the deposition, and I asked, so

6   any instance between 2008 and 2016 where the ingredient list

7   was not accurate?  And the answer was, no, I had no instance of

8   that ever happening.  And then I asked, if the supplier changes

9   the ingredient, do they have to tell you in advance?  And the

10  answer is yes.

11          And what they have been saying to the Court is we need to

12  hear from the supplier, but the supplier provides

13  contemporaneous lists of the ingredients so Kroger can design

14  the label itself, and so the idea that they have to go back and

15  ask again, they already got the information at the time from

16  the supplier, and they're going to ask again a second time.

17  Why would a supplier say anything differently?  I mean, it's

18  like asking in a labor case for payroll records to confirm

19  someone's really employed.  They're listed on the employee

20  list, they're listed in the payroll records, but maybe those

21  records are wrong, so I'm going to ask the supplier of the

22  records again to tell me, and until then, there's no discovery.

23  But --

24          MR. HARPER:  Your Honor --

25          MR. WESTON:  -- the part that I'm referencing is

1    the Bauer transcript, page 12, and she very clearly says she

2    knows of no instance of a label ingredient list not being

3    accurate, and this was a deposition topic that they were

4    required to prepare for, and she does not know a single

5    instance of the patent not on Kroger breadcrumbs, not on

6    anything.

7         And further, there was a spec sheet produced from 2009 that

8    says PHO was in the product.  They have no reason to doubt

9    that's true, and they can go and ask the supplier.  What's the

10   supplier going to do?  Go back to the spec sheet they provided

11   to Kroger and state the same thing.  But Kroger has this

12   information.  And the spec sheets also, by the way, did not

13   come from third parties.  I mean, they initially came from

14   third parties, but they were stored in a Kroger-owned computer

15   software system, and when we asked in the deposition, how did

16   you get these, it was just pulled up very quickly from the

17   different Kroger software programs that they have.

18             THE COURT:  So -- Mr. Weston, go ahead, sorry.

19             MR. WESTON:  And then if we can look at Interrogatory

20   1, Your Honor, they are not providing sales information.

21   There's something else that's not true in that.  The

22   supplemental response to Interrogatory Number 1 says the

23   following:  "In addition, Kroger does not maintain quarterly

24   records for unit sales or revenue for Kroger breadcrumbs."

25   That is just a false statement.  They provided what appears to

1    be a spreadsheet that has the unit sales and the revenue.

2        And they later provided it in a supplemental response.   So

3    this is just a false statement made in Kroger's interrogatory

4    responses.  We don't even keep our revenue records.

5            MR. HARPER:  Your Honor, that is not a Kroger

6    document.  That's a document from a third party that maintains

7    information for Kroger called PLM Marketing.

8            THE COURT:  Is that the third party that's closely

9    related to Kroger?

10           MR. HARPER:  It's a third party that -- it's the third

11   party that Kroger uses, but PL -- I believe PLM has other -- I

12   mean, it's not a -- sort of a captive company or anything like

13   that.  I mean, this isn't information that -- there's a

14   conception that, you know, there's a team that works on Kroger

15   breadcrumbs, and they have, you know, 100 percent access to

16   every single document there, but it's actually quite a -- kind

17   of a convoluted system of keeping a document, frankly.

18           THE COURT:  It actually sounds simple to me,

19   Mr. Harper.  Let me make sure I understand this.  You have

20   a -- it's a Private Label Marketing, right?

21           MR. HARPER:  Yes.

22           THE COURT:  And they gather information for Kroger

23   like, for example, the -- the sales and revenue information for

24   particular products.  Is that what I'm understanding?

25           MR. HARPER:  In general, I believe that's true.

1      THE COURT:  Okay.  And Kroger uses that information in

2  its business to make all the different business decisions.  Is

3  that correct?

4      MR. HARPER:  Contemporaneously it does, but for

5  historical records, it's a different story.

6      THE COURT:  In -- and that's the purpose of that,

7  correct, to get information so that it can make business

8  decisions --

9      MR. HARPER:  For current information, that's true.

10      THE COURT:  -- about this?

11      MR. HARPER:  But --

12      THE COURT:  Does PLM provide information to Kroger and

13  destroy it immediately thereafter?

14      MR. HARPER:  I don't think it does.

15      THE COURT:  I wouldn't think so either.

16      And so it shouldn't be -- in my opinion, it shouldn't be

17  hard at all for Kroger to reach out to that vendor who is

18  providing all that information and get that historical

19  information.

20      MR. WESTON:  Your Honor --

21      THE COURT:  Go ahead.  Go ahead, Mr. Weston.

22      MR. WESTON:  The document labeled TKC150 is a spec

23  sheet, and it says on the top "Confidential Information for

24  Kroger, Internal Use Only."  So this isn't a document that they

25  got from the supplier and had to wait for it.  This is a

1   document that Kroger's 30(b) has said we get from our computer

2   software system.  They -- I think they called it the blue

3   system.  And we talked about that for a moment.  It's dated

4   2009, and it shows Kroger breadcrumbs has PHO in it.  And

5   again --

6           MR. HARPER:  Your Honor --

7           MR. WESTON:  -- Kroger internal use only, and

8   Mr. Harper just said that he thought the spec sheet and they're

9   not stored in Kroger.

10          THE COURT:  I think --

11          MR. HARPER:  Your Honor --

12          THE COURT:  -- we might be conflating two issues,

13  Mr. Weston.  I was talking about sales information versus the

14  spec sheet, but I saw on that document that it was internal to

15  Kroger even though the information provided may have come from

16  a supplier, but, Mr. Harper, I'll let you respond.

17          MR. HARPER:  Thank you, Your Honor.

18      I think we're actually talking about two different sheets.

19  What Kroger refers to as tech specs or spec sheets are, for

20  example, Exhibit D to the deposition, which is TKC284 through

21  287.  This was a document that was -- this is an example of a

22  historical tech spec or a spec sheet.  That's the information

23  that -- it's essentially Kroger has a set of requested

24  information, and then the supplier provides that information to

25  Kroger, and the suppliers hold that information.  Kroger does

1    not have historical tech spec information such as that.  More

2    examples of them are -- give me one second, Your Honor.  I

3    apologize.

4         THE COURT:  Well, wouldn't in that case, Mr. Harper --

5    wouldn't if Kroger didn't keep that particular document --

6    wouldn't the best evidence of what had been in that document or

7    what was provided by the suppliers what was actually on the

8    label that Kroger put on products that it sold to consumers?

9         MR. HARPER:  I don't necessarily think so.  Again, it

10   would be -- it would be the tech spec sheet that came

11   from -- if the question is what is the best information that

12   Kroger has about what is contained in the documents, then I

13   suppose, yes, it would be labeled to the extent Kroger has

14   them, but, again, the label, as I believe Kim Bauer explained

15   in the 30(b)(6), our -- they're kept with third parties,

16   including a company called Stevenson.

17       And then the second area, the second document -- set of

18   documents that would have this document are the tech spec

19   sheets, which again, are documents that are held by the

20   third-party suppliers, and Kroger spent a long time trying to

21   get those and, in fact, finally did.

22       I'm looking at, for example, TKC156 through 157 -- I'm

23   sorry, TKC156 through 159, TKC132 through 137.  Those are the

24   sorts of sheets that are referred to as tech specs or spec

25   sheets.  Those come from the suppliers.  And

1    that -- that -- those are the sorts of documents that Kroger

2    has from the suppliers that identify what has PHO and what

3    doesn't to the best of Kroger's knowledge.

4         THE COURT:  Right, and the labels themselves would at

5    least, one would hope, accurately reflect what the vendors have

6    described as the ingredients in the product, correct?

7         MR. HARPER:  That would be the hope.

8         THE COURT:  And, in fact, I wouldn't think that Kroger

9    would want to argue that there's some reason why that would be

10   regularly inaccurate, particularly, let's say, for their

11   customers who might be gluten sensitive, that Kroger couldn't

12   rely on, so you can rely on those when it suits Kroger, but

13   when it helps you play games in discovery, you can pretend that

14   the ingredients on the label might be inaccurate in some way,

15   and now you have to go and ask all your suppliers all over

16   again just to be sure that they were totally accurate.  That's

17   my problem here, Mr. Harper.

18        MR. HARPER:  Your Honor, we're not playing games in

19   discovery.

20        THE COURT:  It's exactly what you were doing,

21   Mr. Harper, and it's time to stop it.  It's clear from the

22   record.  It's clear from the record.  It's an insult to this

23   Court that you come in again and again and try and claim that

24   you've acted in good faith.

25        MR. HARPER:  I'm very sorry that the Court feels that

1    way, but I -- there was no intention to play games or do

2    anything but provide the documents as best as Kroger was able,

3    and we've been trying to do that.  We met and conferred in good

4    faith over and over again trying to get these documents.  We

5    continued to try to get these documents from third parties.

6         You know, early on, there was a complaint or a worry that

7    Kroger was going to do a document dump of some kind by

8    providing every single document for every Kroger breadcrumb

9    product, whether it had trans fat or not trans fat, and

10   so -- and this was on one of the first telephonic conferences

11   that we had with Your Honor and Mr. Weston.  We took that to

12   heart, and we were trying to avoid doing a document dump of

13   some kind.

14            THE COURT:  You did exactly that, Mr. Harper.  You

15   dumped 5,000 pages of printed spreadsheets instead of

16   substantive information.

17            MR. HARPER:  And as --

18            THE COURT:  How is that not a document dump?  How is

19   that not a document dump?

20            MR. HARPER:  It was -- there were documents that

21   had -- there were a series of documents, including these

22   spreadsheets, that had information that -- information about

23   Kroger's sales information that I understand Mr. Weston wanted,

24   but it had also several hundred other products listed on there,

25   and, you know, early on, it seemed that it would not be an

1  efficient or useful piece of discovery to give Mr. Weston

2  because of his concern about a document dump.

3       So then we, you know -- there was a complaint that there

4  aren't enough documents and that we were trying to hide stuff,

5  and so we made a decision, well, maybe we should produce all of

6  it even if it has apparently minimal relevance except as to the

7  specific two products at issue in this case.  So we offered to

8  produce those for the sake of completion and trying to provide

9  a good-faith production that satisfies everybody.

10      I mean, in some ways we're kind of stuck between a rock and

11 a hard place trying to either parse through the documents that

12 were relevant and had the -- that pertain to the particular

13 types of breadcrumb products and trying to quell -- trying to

14 avoid a massive inefficient document dump of some kind.

15           THE COURT:  And that is exactly what you engaged in.

16 Why didn't you produce those spreadsheets as spreadsheets in

17 their native files?

18           MR. HARPER:  At the time, we didn't -- I still don't

19 think we have an agreement on natives, but I do believe that we

20 offered to produce them in natives at some point in the

21 meet-and-confer process, but we didn't get a -- an agreement on

22 that.

23           THE COURT:  But you were going to require that they

24 ask for it first instead of just producing it in the way that

25 Kroger actually uses the document.  Is that my understanding?

1   This is the problem.  Over and over again.  I see discovery is
2   not an opening offer, Mr. Harper.  It's not a let's throw a
3   bunch of objections out and make them come back and beg for the
4   information they need.  You have an affirmative obligation to
5   act in good faith to provide fulsome responses to discovery,
6   and producing over 5,000 pages of printed spreadsheets when you
7   know darn well as a seasoned litigator you don't have to wait
8   for some ESI program call to produce a native file.
9   That's -- it's an absurd argument.  And again, again, you seem
10  to take no responsibility for the role you played in needlessly
11  multiplying the discovery process here for all the parties and
12  the Court.
13          MR. HARPER:  Your Honor, I'm sorry, but I do disagree
14  with that.  I deeply apologize for taking the Court's time on
15  issues that Your Honor thinks that they're a waste.  I believe
16  that we were acting in good faith.  I strongly believe that,
17  and we're trying to deal with the realities of the documents
18  that are available to Kroger and the information that we
19  believed was going to be relevant and responsive to discovery
20  requests, and this isn't -- this is a little bit more
21  complicated than a -- if it were one in-house product, the
22  reality is that we have a number of third parties and
23  suppliers.  We have a number of different products, some of
24  which are relevant, some of which are not.  We have the
25  additional elements, some historical documents that are

1    involved here.  And again, I do deeply apologize to the Court
2    particularly.  If there's any conception or belief that we're
3    not acting in good faith or that we're playing games, we
4    actually are not, we have been working very hard with the
5    client, with all the client contacts, with third parties to try
6    to get this right, and the -- we -- at the end of the
7    November 13th call, we took Your Honor's suggestion to heart
8    that we try to meet and confer with Mr. Weston to get these
9    issues resolved.  We went through to figure out after we
10   received the meet-and-confer letter on November 19th, and
11   although it was, you know, late in the evening that we received
12   it, we -- we worked really hard to get some compromise to find
13   out what exactly Mr. Weston still believed he needed, and we
14   worked through those issues, got him a letter back in two days.
15   We -- he seemed to be in agreement with this, with our
16   proposals.  And we -- in exchange, we gave him a six-week
17   extension on the motion to compel because it seemed that we had
18   reached agreement on what satisfies these issues, and through
19   the subsequent meet-and-confer responses on databases 2,
20   December 3, on December 18, it seemed that we had an agreement
21   on these things, and we were working toward resolving them
22   because we believed that it would be far more efficient to get
23   these resolved to really understand what Mr. Weston believed
24   was not there than get -- you know, have more motion practice
25   on this, to have more delay and whatnot.  We had -- we worked

1    really hard with the client to gather this information, to go

2    to the third party, to go to the -- any possible source that

3    has this information, and we've done the best job that we could

4    to do it.

5         And I take my obligations to the Court extremely seriously,

6    including in discovery and including in a case that's very

7    busy, and I just -- I'm troubled that Your Honor, you know,

8    believes that we're not acting in good faith.  And I vigorously

9    dispute that, and -- but we're doing the best that we can, and

10   we have been doing the best that we can to resolve these

11   issues.

12            THE COURT:  Well, I can tell you, Mr. Harper, that

13   actions speak louder than words.

14       Mr. Weston, what sales data exactly are you missing?

15            MR. WESTON:  The class period -- let me just get the

16   response to Rog 1.

17            THE COURT:  I'm sorry, what did you just say, Rog 1?

18            MR. WESTON:  Yes, the response to Interrogatory Number

19   1.

20       So they provided it from the first quarter of 2013 through

21   the first quarter of 2015, so it would be all of 2010, 2011,

22   2012, and then the final three-quarters of 2015, and I guess

23   any period in 2016 when the product was still

24   being -- different things about when that period stopped.

25            THE COURT:  Okay.  So you still need the information

1    for those years?

2          MR. WESTON:  Yes, so all of 2010 through 2012 and then

3    the last three-quarters of 2015.

4          THE COURT:  Okay.  And then what documents are

5    outstanding, Mr. Weston?

6          MR. WESTON:  Well, it's hard for me to know because I

7    don't believe that they actually did a complete search, and I'm

8    just not trusting their representations about what they

9    searched and where they searched because they said things that

10   I don't believe are accurate.  So that's hard for me to answer

11   there.

12       In terms of the spec sheets and analysis of the product,

13   there seems to be a lot from 2017, 2018, a fair amount of

14   documents, but not all that much during the class period, and

15   that's one area where I was suspicious, and then when we talked

16   about where they looked for documents at the 30(b)(6)

17   deposition, it didn't seem very thorough to me.  I didn't have

18   enough time to address that in detail because the 30(b)(6) was

19   after our motion was filed.

20         THE COURT:  Okay.  Do you have documents regarding the

21   decision to add trans fat to the Kroger breadcrumbs?

22         MR. WESTON:  No, that's one very specific thing.  So

23   they gave us a fair number of documents about the decision to

24   remove it, but in terms of the discussion to add it, I don't

25   think they were forthcoming in the 30(b)(6) deposition, even

1   though that was one of the noticed topics, and we didn't get

2   any documents at all about the decision to add it.

3            THE COURT:  Okay.  And then what about, did you get

4   any documents about the decision to add "zero grams trans fat"

5   to the nutrient content claim I think on the label?

6            MR. WESTON:  That's what I was just addressing,

7   Your Honor.  I'm sorry, I misunderstood the prior question, but

8   that was what my answer was to.

9            THE COURT:  Okay.  I thought there was also -- you

10  were looking for documents regarding the discussion to add

11  trans fat to the breadcrumbs in the first place.

12           MR. WESTON:  Pardon me, no, we didn't get anything at

13  all about that, and we didn't get anything about the label

14  addition either.  So no, there was nothing about either one of

15  those decisions.

16           THE COURT:  Okay.  Now I'm going to go -- sorry.  Did

17  someone want to be heard?

18      Okay.  So let me go back to this issue about sanctions and

19  contempt.  First I'll hear from plaintiff first and then

20  Kroger.

21      In this case, if the Court orders monetary sanctions in the

22  form of attorney's fees incurred by plaintiff to file the

23  motion and meet-and-confer following Judge Major's order, can I

24  impose a sanctions only against Kroger or also against Kroger's

25  attorneys?

1          MR. WESTON:  I believe the punitive sanctions can be

2     awarded against both.  I don't know if the attorney's fees can

3     be awarded on both.  It seems like it does happen, but I don't

4     have specific authority as to that.

5          THE COURT:  Okay.  Mr. Harper.

6          MR. HARPER:  I don't have information in front of me

7     on that.  I would disagree with the imposition of sanctions,

8     but it doesn't sound like that's Your Honor's question.

9          THE COURT:  Mr. Harper, let me ask you this:  How else

10    is the Court going to get Kroger to start taking discovery

11    orders seriously?

12         MR. HARPER:  Well, I don't want to --

13         THE COURT:  Let me tell you this:  Judge Major entered

14    an order, right, and it's not -- just on the face of the record

15    before the Court, once you have a judge issue an over 30-page

16    order that includes sanctions, the notion that there would be a

17    lot of meet-and-confer, if any at all, is hard to swallow.

18        But it seemed like again Kroger took Judge Major's order,

19    even the order itself, as an opportunity to negotiate further

20    rather than, boy, I better get this done.  And the best example

21    of that is not even bothering to verify your supplemental

22    interrogatory responses for a month.  And another great example

23    is that you didn't even bother to provide a declaration that

24    was to your benefit to narrow the discovery period for months.

25    And then when you did provide a declaration, it's not with

1    personal knowledge.  So how is the Court supposed to guarantee

2    that what happened before won't happen again?

3            MR. HARPER:  Your Honor, I can only say that we, as

4    counsel, and Kroger have been -- have been working very hard to

5    get this done, and we take -- we took Judge Major's order

6    seriously, we took Your Honor's calls and strong suggestions

7    during the teleconferences very seriously.  And I don't know

8    what else we can do with the client to get more information.

9    It's not a matter or question about whether we're taking or

10   whether the client is taking the Court seriously or discovery

11   seriously or the case seriously.  It's certainly the opposite

12   is true.  And I don't -- I don't have an answer for you because

13   I don't know what we can further do to make this -- to make the

14   parties and the Court satisfied with the efforts that Kroger

15   has been taking to get this done.

16           THE COURT:  So how much of the efforts -- well, I

17   don't know if it's worth asking the question.

18       With respect to sanctions, is the Court limited to the

19   sanctions that Mr. Weston is requesting, Mr. Harper?

20           MR. HARPER:  I think that the sanctions are limited to

21   fees on the motion and the meet-and-confer efforts, although I

22   would -- I would suggest that Kroger has been trying to meet

23   and confer on these issues as well.  I -- for the reasons we

24   stated in our opposition, we don't think that the additional

25   sanctions requested, including evidence exclusion or per diem

1    fees or contempt, are warranted.

2            THE COURT:  And then with respect to prejudice, am I

3    limited to what plaintiff has raised or can the Court find

4    prejudice inherent in the record?

5            MR. HARPER:  Well, I think that it not only is the

6    Court -- I don't think that Mr. Weston has raised sufficient

7    prejudice, and I don't know that there is additional prejudice

8    in the record.  We've got a trial date in October.  The -- I

9    would note that Mr. Weston served his expert reports on or

10   about January 10th, which was more than two months before the

11   expert deadline was due, and did not submit any supplemental

12   expert reports or anything like that, which indicate to us that

13   he had whatever information he needed.

14       And I would remind Your Honor that he had an expert

15   dedicated to damages and financials, an expert dedicated to

16   trans fat effect, and a third expert.

17       Mr. Weston also submitted his pretty fulsome motion for

18   class certification and his reply, the discovery -- the fact

19   discovery cutoff has passed.  The day for motions for summary

20   judgment is not -- and other pretrial filings is not until the

21   end of May.  And, as we outlined in our opposition, there was

22   not really a showing of prejudice, and I think that -- I think

23   that the law says, but I am not certain of this, that it's

24   incumbent on the plaintiff to establish prejudice, and having

25   failed to do so, the sanctions requests are limited to that

 1   extent.

 2          THE COURT:  Okay.  So I am finished with my questions.

 3      Mr. Weston, this is your motion, so I'm going to let you go

 4   first with anything else you want to raise with the Court.

 5          MR. WESTON:  Well, the last topic that the Court

 6   inquired about -- can you hear me okay?

 7          THE COURT:  Yes.

 8          MR. WESTON:  The last topic was what are the Court's

 9   options, and this was something that I was trying to think

10   about.  I certainly saw a lot of cases where there was

11   terminating sanctions, but those don't actually do us a great

12   deal of good because we have a very strong case on the merits,

13   so they use trans fat, and they said it had zero grams, and

14   that wasn't true, and their last defense was preemption, and

15   they lost on that.

16      And then the other thing that would normally be a very

17   common discovery sanction are attorney's fees, and this is a

18   fee-shifting case anyway with strong merits, so it seems like

19   the two most common methods of sanction don't actually deter

20   very much for what's happened here.

21      And to address that, I think there can be a multiple on the

22   attorney's fees or there can be a punitive sanction that is

23   available to the Court, and to the extent that we didn't ask

24   for that, it certainly was in the Court's power.  And then the

25   only question is, did they have adequate notice of that?  And

1   the way to fix that would be to do an OSC, but it certainly is

2   within the Court's power to do those, and I'm just also

3   mentioning that to let the Court know why we didn't really

4   mention any further sanction beyond evidentiary exclusion,

5   which doesn't go very much, go very far.  And then just -- the

6   representations of good faith again and again, but I think

7   there are various versions of their response.  Interrogatory

8   Number 1 is pretty informative on this.  Interrogatory Number 1

9   was just your quarterly sales for the class period in Kroger

10   for Kroger breadcrumbs.  Their initial response was a complete

11   refusal to answer it.  Their first supplemental response is

12   nonsensical.  It's asking about revenue, and the response says,

13   "Defendant lacks information to show the unique number of

14   buyers of all breadcrumbs in California."  That is not even

15   remotely close to the question answered.

16      The second supplemental response said something that's just

17   not true.  It says, "In addition, Kroger does not maintain

18   quarterly records for unit sales or revenue for Kroger

19   breadcrumbs."

20      Their third supplemental response finally did have

21   precedence, but it said, we're not going to give you all of it

22   because we cannot hear back from our suppliers about what time

23   period had PHO.

24      And they also mentioned in -- kind of baited us into going

25   into a wild goose chase with companies that never made Kroger

1    breadcrumbs.  They made Private Selection panko crumbs, which
2    were never mentioned in the case, never mentioned in the
3    discovery requests, and never had trans fat, they're in a
4    different type container, and they mentioned the name of these
5    companies repeatedly in these requests and produced documents
6    related to them, and that is just another example of
7    misdirection in there, and this is all for a single discovery
8    request just asking for sales data.  And it was just repeated
9    again and again.
10       And again, talking about good faith and honest effort here,
11   Mr. Harper, again, said he doesn't know if he -- keeps, again,
12   capped out -- that the label -- that the ingredient list was
13   accurate.  Today he capped out on it.  There were three
14   different 30(b)(6) topics, 30(b)(6) deposition topics on this.
15   Kroger's witness was prepared for this or was required to be
16   prepared, and I asked this prepared witness, do you know of any
17   instance of this ever happening, and the answer was, no, I know
18   of no instance of this ever happening.  And then I asked, what
19   are the efforts that you undertake to ensure that it's
20   accurate?  And they said they received the information from the
21   suppliers in advance of any product -- any ingredient change so
22   they can update the label.
23       So I think the sanction -- or the contempt for the Court
24   even extends today with Mr. Harper's statements that were made
25   today.

1          And that's all I really have to say for the questions.

2               THE COURT:  No, but I'm going to give you, Mr. Harper,

3     a chance to respond and get a word in.

4               MR. HARPER:  Thank you, Your Honor.

5          There's not a lot I can say in response.  I disagree.

6     We're trying to work through this.  We're providing the

7     information that we have from Kroger at the time the

8     interrogatories were made.  You know, it was obviously an

9     evolving process as we -- you know, we get some information

10    from third-party suppliers, and we provide what we had at the

11    time, and then we get more information, and we supplement it.

12    That's the way the discovery process is supposed to work, and

13    that's what we've been doing.  And, you know, we -- there are

14    statements about, well, there are -- Kroger is not sure about

15    whether a particular label accurately represents a -- you know,

16    the ingredients, and I know that based on the information that

17    we had at the time that that was true, and as we dug deeper, in

18    some cases we found it looked like it was one supplier, and

19    they didn't change the ingredient, and then there were other

20    suppliers, and then sometimes the questions would change and go

21    from, well, all products -- at one point it meant all Kroger

22    breadcrumbs, and eventually through this case, it got narrowed

23    and then became traditional breadcrumbs and plain breadcrumbs

24    and garlic breadcrumbs.  And so naturally -- so then it wasn't

25    a wild goose chase or a misdirection.  It was the -- what

1   appeared to be the changing state of what the relevant products
2   were.  And then at one point after Ms. Hoffman's deposition on
3   January 3rd, it turned into -- it was just plain breadcrumbs
4   and Italian-style breadcrumbs and not the garlic breadcrumbs.
5   And we -- you know, on our side, we have to keep track of all
6   of this and do our best to make sure that we're providing the
7   accurate information and not doing anything that's going to
8   create burdens, and I realize that this process developed and
9   then the case develops, that the information changes, the
10  answers change based on the different products at issue, but
11  this is not an instance of misdirection or intentionally
12  sending anyone on wild goose chases.  This is like a -- it's an
13  evolving work in progress, and unfortunately, it's resulted in
14  a dissatisfied plaintiff and unhappy Court, and we -- you know,
15  we are deeply sorry about that, but I don't know what we
16  can -- what we could have done to do more in order to get the
17  information out as accurately and as timely as possible.  I
18  mean, I don't know what else I can say about it.

19          THE COURT:  Well, I think it's unfortunate that you
20  think that you're without any sort of culpability in this
21  matter, and the Court will have to take that into consideration
22  when I consider what I can do so that you're aware, more aware,
23  of your discovery obligations in the future.

24      This is not a case where I think that you can legitimately
25  or credibly on this record claim to have acted in good faith or

1   had certainly not to have been acting in an effort to ensure

2   that the other side had a fair shot at the information that

3   they need in the case, which essentially is what discovery is

4   about.  It's not about hiding the ball.  And that's what the

5   Court -- when the Court has to step in, that's what -- we're

6   just looking to make sure the playing field is level.  And

7   whether your client was brought along on this or directing it

8   or not, apparently the strategy in this case has been to

9   obfuscate so that you can hold out on relevant information.

10  And that's the opposite of what the discovery process is, and

11  at some point, even if it's to satisfy your client, you have an

12  obligation to the Court, as an officer to the Court, to conduct

13  yourself in a different way.

14       It's frustrating to the Court, but it's also a bit

15  unsurprising.  I can recall that I made it very clear to Kroger

16  that they had an obligation to comply with a document

17  production by October 7th, and according to the four corners of

18  Judge Major's order and that I was told, that we just have to

19  agree to disagree.  But that's not really how this works.

20       So here we are, months later, having spent far too much

21  time trying to avoid providing the most basic information in a

22  case on a second motion to compel, and it's very frustrating to

23  the Court, and unfortunately, it sounds like there's -- I don't

24  know that Kroger will conduct itself any differently, but the

25  Court will have to take that into consideration and consider

1   what needs to happen in order to make sure that discovery

2   proceeds as fairly as possible from this point forward.

3        I appreciate your time, and I will take the matter under

4   submission and issue a written order.  Thank you.

5             MR. HARPER:  Thank you, Your Honor.

6             THE CLERK:  The Court is now in recess.

7                       ---000---

8                  C-E-R-T-I-F-I-C-A-T-I-O-N

9

10       I hereby certify that the foregoing is a correct transcript

11  from the electronic sound recording of the proceedings in the

12  above-entitled matter.

13       Dated April 24, 2020, at San Diego, California.

14

15                      /Dana Peabody/
16                      Dana Peabody, Transcriber

17

18

19

20

21

22

23

24

25