KLINEDINST PC
Heather Linn Rosing (SBN 183986)
  *hrosing@klinedinstlaw.com*
Steven K. Berenson (SBN 216809)
  *sberenson@klinedinstlaw.com*
501 W. Broadway, Suite 600
San Diego, CA 92101
Telephone: (619) 239-8131
Attorneys for Counsel
DAVIS WRIGHT TREMAINE LLP

DAVIS WRIGHT TREMAINE LLP
Jacob M. Harper (SBN 259463)
  *jharper@dwt.com*
Nicole S. Phillis (SBN 291266)
  *nicolephillis@dwt.com*
Heather F. Canner (SBN 292837)
  *heathercanner@dwt.com*
865 South Figueroa Street, Suite 2400
Los Angeles, California 90017-2566
Telephone:  (213) 633-6800
Attorneys for Defendant
THE KROGER COMPANY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHAVONDA HAWKINS, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>THE KROGER COMPANY,<br><br>Defendant. | Case No. 3:15-cv-2320-JM-AHG<br>Assigned to Hon. Jeffrey T. Miller<br><br>**DECLARATION OF HEATHER F. CANNER IN SUPPORT OF OBJECTIONS TO ORDER GRANTING SANCTIONS**<br><br>Hearing Date:  June 8, 2020<br>Time:            10:00 a.m.<br>Crtrm.:          5D (5th Floor)<br><br>[*Notices of Objections and Objections; Joint MPA; Declaration of Jacob M. Harper in support filed concurrently*]<br><br>Action Filed:  October 15, 2015 |

## <u>DECLARATION OF HEATHER F. CANNER</u>

I, Heather F. Canner, declare and state as follows:

1.     I am an attorney with the law firm of Davis Wright Tremaine LLP, counsel for defendant The Kroger Company ("Kroger") in this matter.  I make this declaration in support of Kroger's Objection to the April 23, 2020 Order Granting Sanctions.  I have personal knowledge of the facts set forth in this declaration, and if called as a witness, I could and would competently testify to them.

2.     I submit this additional declaration to address the grounds upon which the Court concluded that myself and my colleague, Mr. Harper, acted in bad faith.  As described below, Kroger and its counsel acted diligently, and at all times in good faith, in carrying out its discovery obligations, including by engaging in a diligent and reasonable (often beyond that) effort to collect information and documents, and otherwise endeavoring to comply with the Court's September 16, 2019 Order.

### <u>Hawkins's First Set of Discovery Requests</u>

3.     Plaintiff Shavonda Hawkins served her first set of Interrogatories and Document Requests on May 15, 2019.  See Dkt. 6-2, Ex. 1 (Rogs), Ex. 2 (RFPs).

4.     Many of Hawkins's discovery requests sought information that is in the exclusive possession of Kroger's third-party suppliers.  As I explained in my previous declaration (Dkt. 99-1), the Kroger private-labeled bread crumbs at issue in this case were purchased pre-made and pre-packaged from third-party suppliers to sell in its Kroger grocery stores.  The third-party suppliers, who are not affiliated with, owned by, agents of, or otherwise related to Kroger (except as contracted vendors), are responsible for developing, manufacturing, packaging, and shipping the bread crumbs to Kroger's distribution center in ready-to-sell form.  Kroger is not involved in the development or manufacture of the product.  The bread crumb formulas are proprietary and in the exclusive ownership of the supplier—not Kroger—and suppliers generally only provide Kroger the information needed to

design an appropriate label (e.g., allergens in the product, nutrition information, compliance with FDA regulations), and work with Kroger on the label.

5.    Many of Hawkins's discovery requests sought discovery specific to what Hawkins defined as the "PRODUCT" (or "KROGER BREAD CRUMBS")— "Kroger Bread Crumbs containing partially hydrogenated oil(s)."  Dkt. 69-2, Ex. 1 (Rogs.) at Def. E, Ex. 2 (RFPs) at Def. 9.  For example, Hawkins seeks quarterly revenues in California for KROGER BREAD CRUMBS, *id.*, Ex. 1 (Rog. 1), which therefore requires Kroger to identify which specific bread crumb products—among Kroger's many bread crumb products sold over many years—actually "contain[ed] partially hydrogenated oil(s)."  Thus, answering Hawkins's interrogatories, and identifying the relevant documents for production, required identifying the products that actually contain partially hydrogenated oil ("PHO").

6.    Because of the supply chain structure, Kroger did not have in its possession much of the information and documents Hawkins sought, and even for documents in its possession regarding bread crumbs, Kroger was unable to identify which documents pertained to the PRODUCTS as defined by Hawkins.  Thus, in its initial responses timely served on June 17, 2019, Kroger initially objected to Hawkins's document requests because (among other things) the definition of "PRODUCTS" presupposed Kroger knew the manufacturing details of the products when, in fact, that information was in the possession of third-party suppliers outside of Kroger's possession, custody, and control.

### The September 16, 2019 Discovery Order (Dkt. 72)

7.    During June and July meet and confer discussions with Hawkins's counsel regarding this discovery, Kroger agreed to and did supplement its discovery responses, which further explained that Kroger did not have much of the requested information and documents, but instead it was likely in the possession of third-party suppliers.  Dkt. 69-2, Ex. 7 (Supp. Rog. Resps.), Ex. 8 (Supp. RFP Resps.).  Kroger

also agreed to produce and did produce product labels for a specified time period. Hawkins's counsel, Mr. Weston, did not ask Kroger to identify the suppliers at that time, nor did Hawkins otherwise seek to subpoena those suppliers. Instead, on July 25, 2019, Hawkins filed a motion to compel responses to several of her document requests and interrogatories, which Kroger opposed.

8.     On September 16, 2019, Judge Major issued an order granting the motion as to some of the requests, denying others, and limiting the relevant time period for discovery. Dkt. 72.

9.     With that order, the Court imposed three specific deadlines: Kroger would (1) serve supplemental responses to Hawkins's Requests for Production and Interrogatories on or before October 7, 2019; (2) pay Hawkins $9,837 for costs on or before October 4, 2019; and (3) file a declaration by defense counsel verifying the aforementioned payment on or before October 11, 2019. *Id.* at 34.

10.     In addition, with respect to Kroger's third-party suppliers, the Court ordered that in supplementing Kroger's document production, Kroger "conduct a diligent search and make reasonable inquiries, including of its agents and other entities over whom it has legal control, to obtain responsive documents and information." Dkt. 72 at 17. The Court appeared to acknowledge that Kroger may be unable to obtain discovery from those suppliers, and ordered that "[i]f after reaching out to its third party supplier and other appropriate entities, Defendant is unable to identify the manufacturer of the bread crumbs and respond to Plaintiff's discovery requests, Defendant must explain to Plaintiff the efforts that were made and why they were unsuccessful." *Id.*

11.     The Court also shortened the relevant time period for discovery, holding that the beginning date for discovery would be January 1, 2010. The Court noted that "it is unclear . . . whether Defendant stopped selling all relevant products in 2015[.]" Dkt. 72 at 12 & n.2 (noting "Defendant has not provided any evidence establishing that it has stopped selling the relevant products"). Thus, the Court

provided that "[i]f Defendant provides a declaration from a knowledgeable employee that Defendant stopped selling all relevant products, then the discovery end date will be the date the sales ended." *Id*.

12.    The Court also noted that to the extent Kroger withholds documents on the basis of privilege it must comply with Fed. R. Civ. P. 26, "which requires parties that seek to withhold documents due to privilege to 'expressly make the claim' and 'describe the nature of the documents, communications, or tangible things not produced or disclosed – and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Dkt. at 72 at 13.

13.    Because the Court's order did not specify a deadline for Kroger's document production, Kroger, my colleagues, and I understood the order to require it to produce the documents within a reasonable time after the order (i.e., as soon as Kroger obtained from third-party suppliers information allowing it to determine which "products" "contain[ed] partially hydrogenated oil"). Kroger, my colleagues, and I understood that there was a specific deadline for the written supplemental responses, but based on our experience, understood the Court's silence on the document production deadline as imposing a reasonable time for production, particularly given that much of the sought discovery would be in non-affiliated third parties' possession. Our understanding was further underscored by the Court's acknowledgement that Kroger may be unable to obtain information from the third parties. In addition, the Court's order distinguished between "responses" and "document production": "Defendant must produce responses for the time periods described above *and* must conduct a diligent search and make a reasonable inquiry to produce all responsive documents in its possession, custody, or control." Dkt. 72 at 34 (emphasis added).

14.    Kroger, my colleagues, and I further understood the Court's order regarding a declaration establishing the end date for discovery as an optional

provision without a specific deadline.  We understood that if we intended to limit production to the time period that Kroger sold the products at issue, we would need to provide evidence to that effect within a reasonable period of time.

### Kroger's Compliance with the Court's September 16 Order

15.     Kroger fully complied with the Court's September 16, 2019 Order.

16.     Regarding the items with specific deadlines, (1) Kroger paid the fee amount on October 4, 2019; (2) I filed a declaration verifying that payment on October 11, 2019 (Dkt. 78); and (3) Kroger served supplemental responses to Plaintiff's Interrogatories and Requests for Documents on October 7, 2019.

17.     Kroger's discovery investigation and collection was still ongoing when it served its October 7, 2019 supplemental interrogatory responses.  Kroger explained in its responses that it obtained the bread crumbs from third-party suppliers who were responsible for manufacturing the products, and disclosed the names of all suppliers for its Kroger private-label breadcrumbs (even though Kroger could not yet confirm which particular products were at issue).  Kroger also confirmed it had made efforts to obtain the requisite information from suppliers, but those suppliers had not yet provided any information or documents, and that Kroger would provide further responses as soon as it received such information.  Further, based on the information available at that time, Kroger explained that its best estimate of the end period for when Kroger ceased selling the products at issue was 2016.  Again, Kroger stated it would provide additional information once it obtained such discovery from the third-party suppliers.  A true and correct copy of Kroger's October 7, 2019 Second Supplemental Responses to Plaintiff's Requests for Production, and Second Supplemental Reponses to Plaintiff's Interrogatories are attached hereto as **Exhibits 1 and 2**, respectively.

18.     Meanwhile, Kroger undertook its extensive efforts to collect responsive information and documents from within its records, as well as from its

third-party suppliers, as discussed in Paragraphs 23 through 31 below.  Kroger did make its document production within a reasonable time—on Friday, November 8, 2019, along with its privilege log.   Kroger provided further verified supplemental responses to Plaintiff's interrogatories on November 12, 2019.

### The October 9 Discovery Conferences

19.     The same day the Court issued its September 16, 2019 Order, a new Magistrate Judge was assigned to the case.  Dkt. 73.  The parties had previously set a discovery conference to discuss Hawkins's deficient discovery responses.  On September 18, 2019, the new Magistrate Judge issued an order setting a telephonic conference for October 9 on that discovery dispute, and noted that she wanted to discuss the status of Kroger's production pursuant to the September 16 Order.  Dkt. 75.

20.     At the October 9 discovery conference, Kroger explained its ongoing and diligent efforts to identify relevant products and documents, and to obtain information and documents from third-party suppliers.  Kroger explained that until it received certain information from suppliers, it could not identify relevant documents within its possession, and that the suppliers themselves had much of the information and documents Hawkins had requested.  The Court and Plaintiff's counsel, Gregory Weston, expressed concern that Kroger would dump an unwieldy number of documents on Hawkins, and Kroger assured it would not, and that to address those concerns, its production would be tailored to Hawkins's requests and the relevant "PRODUCTS," as defined by Hawkins.

21.     Kroger stated that it anticipated it would be in a position to make its document production by the end of October, but that timing was in part dictated by the suppliers.  The Court set a further conference for October 30 to revisit Kroger's production status after it had additional time to work with suppliers.  Dkt. 77, 79.

### Kroger's Efforts to Collect Documents and Information from Third-Party Suppliers, and Its Internal Records

22.     In the weeks that followed, Kroger continued its efforts to gather information and documents from suppliers.

23.     Kroger contacted all four suppliers of the Kroger private-label products through various means in an effort to obtain responsive information and documents. Kroger's efforts to obtain discovery from third-party suppliers included calling them nearly every day, leaving voicemails, following up with emails, and scheduling calls with various personnel.  For example, Kroger called one supplier over seven times before it heard back at all (in addition to emailing and leaving voicemails).  For another supplier, Kroger called and emailed multiple times, was directed to call others at the company, and when Kroger finally got in touch with someone, that supplier directed Kroger to another supplier that apparently provided the products.   Kroger called that secondary supplier (the name of which Kroger also disclosed to Hawkins) several times at several different numbers, and left multiple voicemails, but was never able to get in touch with anyone who would help.

24.     Once Kroger got in touch with the suppliers (to the extent it could), it stressed the urgency of its requests to suppliers, but could do little to affect the suppliers' expediency (or lack thereof).  For example, once Kroger got in touch with one of its suppliers, that supplier did not provide any information until over two weeks later, despite Kroger following up with calls and emails.  In addition, getting the information and documents often required multiple conversations and follow up.  Most of the suppliers eventually provided some of the requested information and documents, though they often tried to provide as little information possible, and one supplier (mentioned above) was non-responsive.  The information ultimately gathered, however, was still insufficient to differentiate between all products containing PHO and products without.

7

25.     In the meantime, Kroger was simultaneously investigating for documents and information internally.  Because Kroger had not yet identified the relevant PRODUCTS at issue, it collected information and documents for all of Kroger's many private-label breadcrumbs sold from 2010 through 2016.

26.     Kroger's counsel interviewed and collected documents from the Senior Category Strategy Manager and Category Strategy Manager—the individuals who oversee the procurement and sales strategy of the category of Kroger-private label products that include Kroger private-label bread crumbs. These individuals also assisted with the document and information collection more broadly, including historical sales data, cost and pricing data, supplier data, sales and marketing strategy data, competitor data, and related records.

27.     Kroger and its counsel interviewed and collected documents from the Corporate Food Technology group and packaging department, which include food scientists and regulatory reviewers.  These departments work, in tandem with others, to review the packaging labels for Kroger private-label products, and obtains product specifications from suppliers, i.e., information necessary to confirm labels are accurate, like ingredient lists and nutritional information.  (As I explained, and as Kroger explained to the Court and Hawkins throughout discovery, the exact formula of the product is proprietary to the supplier, so Kroger obtains only the information necessary to confirm the label is accurate and the product is in compliance with applicable laws and regulations.)  Thus, these departments maintain materials (to the extent they still exist) regarding product specifications and product label designs and changes, among other categories.

28.     Kroger and its counsel also interviewed and investigated documents maintained by the branding department, which governs marketing and advertising. Kroger and its counsel consulted employees in both marketing and advertising, as well as employees that work for a third-party vendor that performs such marketing functions.  Over time, Kroger was able to eliminate some of the Kroger private-

label bread crumbs as not at issue (it eventually confirmed with suppliers that some of the products did not contain PHO during the relevant time period).  Eventually, Kroger was able to confirm through these investigations that Kroger did not engage in any marketing or advertising for the Kroger private-label products it believed were at issue.

29.     Kroger and its counsel also interviewed and collected records maintained by the customer affairs department, which handles customer comments, and relays customer comments as appropriate within Kroger and to third parties.

30.     Kroger also conducted searches of the emails of several custodians, and searched general document repositories for responsive information.

31.     Kroger went beyond the required "reasonable inquiry and diligent search" in collection responsive information and documents.

32.     As Kroger collected relevant information and documents from its suppliers and internal collection, it remained mindful of the Court's admonition that Kroger produce a manageable production with only relevant documents, and continued to endeavor to confirm with suppliers which of the products were relevant.

### The October 30 Discovery Conference & Order

33.     During Kroger's discovery efforts, the Court continued to hold intermittent discovery conferences.  At the October 30 conference, Kroger explained in detail to the Court and Mr. Weston the status of its collection from third-party suppliers, as well as the information it had gathered to date.  In particular, by that time, it learned that Kroger bread crumbs sourced from two of its four suppliers did not contain PHO during the relevant time period.  The third supplier confirmed PHO was an ingredient in bread crumbs they sold to Kroger from 2013 until early 2015.  That supplier explained that it could not identify the precise date the products ceased using PHO because the PHO is contained in a

bread component manufactured by hundreds of third-party bakeries, which the supplier would not identify on grounds of confidentiality and propriety.  The fourth supplier explained that another company actually supplied the bread crumbs sourced to Kroger.  Despite Kroger's substantial efforts to get in contact with the referenced supplier, it did not respond.  Though Kroger could still not parse all products with and without PHO, the Court stressed that Kroger should make a prompt production of the documents in its possession.

34.    The Court scheduled a further discovery conference for November 13, ordered Kroger to lodge a status report describing its compliance with each compelled discovery request, provide verifications for unverified interrogatory responses and extended Hawkins's time to file a class certification motion from December 6, 2019 to January 21, 2020.  Dkt. 81.

## Kroger's Production and Further Supplemental Responses

35.    Kroger continued to attempt to collect further documents and evidence from the suppliers, with little success.

36.    In recognition of the Court's directive that Kroger make a production soon, on November 8, Kroger produced documents it identified as potentially responsive—from both its own records and suppliers'—even though it may include non-relevant bread crumb products.

37.    On the same day, November 8, Kroger also produced a privilege log in compliance with the Court's September 16, 2019 Order (Dkt. 72 at 13), and verifications for its supplemental interrogatory responses.

38.    On November 12, Kroger served its Third Set of Supplemental Interrogatory Responses, which provided all the information Kroger gathered from suppliers to date—including identifying the specific PRODUCTS determined to date—and other information it collected internally based on now-available supplier information.  As the Court had directed in its September 16, 2019 Order (Dkt. 72 at

17), where Kroger could not obtain information, Kroger described why it did not have the information sought, and the effort it made to obtain the requested information from the supplier.  In addition, Kroger explained in its interrogatory responses that based on supplier information, it believed the Kroger private-label breadcrumbs sold from 2012-2015 no longer contained PHO by early 2015, and that based on its own records, the PHO was certainly removed by 2016.  A true and correct copy of Kroger's November 12 Third Supplemental Responses to Plaintiff's Interrogatories are attached as **Exhibit 3**.

39.     On November 12, Kroger also lodged with the Court an extensive status report describing in detail its efforts to collect discovery, request-by-request, pursuant to the Court's order (Dkt. 81).  Kroger simultaneously shared the status report with Hawkins's counsel, Mr. Weston.  This status report again explained to the Court and Hawkins the relationship between Kroger and its suppliers, why Kroger's suppliers possessed much of the information Hawkins sought, as well as information Kroger needed to identify relevant discovery, and the extensive lengths it had gone to obtain such information and records from the suppliers.  A true and correct copy of Kroger's Confidential Discovery Status Report is attached as **Exhibit 4**.

**The November 13 Discovery Conference & the Court's Order to Meet and Confer**

40.     At the November 13 discovery conference, Kroger informed the Court it had produced all responsive information and documents gathered to date, as well as information it could obtain from suppliers.  Despite Kroger having done all it could do to provide the compelled information, however, Hawkins's counsel insisted on filing a motion for further discovery and sanctions.  The Court set a November 22, 2019 deadline for Hawkins's discovery motion, but ordered that the parties must meet and confer before Hawkins could file any motion, and in doing so

must "make every effort to meaningfully engage and to make productive compromises on their disputes rather than treating the meet-and-confer requirement as a mere formality."  Dkt. 83.

41.    At this point, Kroger was in full compliance with the Court's September 16, 2019 discovery order (Dkt. 72).  Hawkins, however, wanted to seek further discovery and file another motion, which prompted the Court's order to meet and confer.

42.    The Magistrate Judge cited to Kroger's efforts to meet and confer pursuant to her order as one ground for her finding of bad faith.  Dkt. 140 at 54. Kroger, however, did make extensive efforts to resolve the issues with Mr. Weston, and offered various compromises, as discussed below.

## The Parties' Meet & Confer Efforts Pursuant to the Court's Order

43.    Mr. Weston did not send a meet and confer letter until two days before the November 22 discovery motion deadline, listing a number of purported discovery disputes, including for example that Kroger did not include metadata with its production, did not provide a literal declaration with an end date, the privilege log was untimely and insufficient, Kroger's claims the suppliers are uncooperative is "completely undocumented," and that Kroger should explain some of the handwriting on the documents it produced.  Dkt. 99-1 at Ex. A (Nov. 19 Letter). These included new issues that had not been previously raised, but that Kroger was willing to and ready to address.

44.    Kroger rushed to address the disputes before the November 22 filing deadline.  Kroger's letter addressed each issue Mr. Weston raised.  Kroger addressed and offered resolutions to each of Mr. Weston's claimed disputes— though it had no obligation—including to reproduce its production with metadata (also explaining that Kroger did not intentionally strip documents of metadata as Mr. Weston alleged), provide a declaration regarding the end date for PHO sales,

supplement its privilege log, and explain the handwriting on documents.  Kroger also offered to go beyond its obligations to run additional searches for e-mails, based on information Mr. Weston stated Hawkins seeks at discovery conferences and in the November 19 letter.   Dkt. 99-1 at Ex. B (Nov. 21 Letter).

45.     About a half an hour later, Hawkins's counsel, Mr. Weston, responded via email that "most of the compromises seem agreeable, and others are steps in that direction," and requested that we extend the time to file Hawkins's motion by six weeks "with the hope remaining issues can be resolved by your proposals in the course of further conferring."  Kroger agreed, conditioned on "the understanding that you and we will meet and confer in good faith to resolve the outstanding issues."  Mr. Weston again confirmed that he "agree[d] to further conferring during the intervening time," and said he would aim to respond before Thanksgiving." Dkt. 99-1 at Ex. C (Nov. 21 Email).

46.     That day, the parties filed a Joint Motion to modify the briefing schedule and extend Hawkins's filing deadline to January 10, 2020, reporting "Pursuant to the Court's order, the parties are pleased to report to the Court their meet and confer efforts have resulted in compromise on some issues and progress toward compromise on others."  Dkt. 84.

47.     Over a week passed with no response from Hawkins or her counsel. On December 2, Kroger sent a letter to Mr. Weston, simply asking for his response to Kroger's November 21 letter "to ensure we keep the process moving."  Dkt. 99-1 at Ex. D (Dec. 2 Letter).

48.     The next day, Mr. Weston sent a letter deeming "agreeable" most of Kroger's proposals, and making some additional requests.  Dkt. 99-1 at Ex. E (Dec. 3 Letter).

49.     After looking further into Mr. Weston's requests, Kroger followed up on December 18 with a comprehensive letter addressing the December 3 letter in its entirety.  Dkt. 99-1 at Ex. F (Dec. 18 Letter).

50.     On December 20, pursuant to the parties' agreements during the course of meet and confer discussions, Kroger reproduced its prior document production in a searchable format and with metadata, and made a supplemental email production. The production included spreadsheets with extensive sales and sales strategy information about Kroger's private-label products.

51.     Pursuant to the parties' agreements, after the holidays (when a declarant became available), Kroger produced a declaration regarding the end date for the sales of PHO products.  Dkt. 99-1 at Ex. G (Declaration of Joe Evans).

52.     Hawkins and her counsel did not respond to Kroger's December 18 letter, nor did they raise any issues with Kroger's supplemental productions and declaration.  On January 10, Hawkins filed her second discovery motion.

## The Court's April 23, 2020 Order Granting Sanctions

53.     On April 23, 2020, the Magistrate Judge granted Hawkins's motion and issued a sanctions order against my colleague, Jacob Harper, and me.  In particular, the Court invoked its inherent authority to issue sanctions, finding that Mr. Harper and I acted in "bad faith" based on seven grounds, each of which are addressed below.   Perhaps most pertinently, we went out of our way to offer solutions and compromises to what we understood to be the remaining discovery issues, and we believe they had all been resolved. This cannot in any instance constitute bad faith. The seven grounds are discussed each in turn:

54.     First, the Court references an obligation to provide a "declaration from an employee documenting the steps that Kroger took to obtain information from third-party suppliers," and that Kroger's counsel Jacob Harper said at the hearing that Plaintiff's counsel did not ask for one.  Dkt. 140 at 53–53.  But the Court's September 16, 2019 Order (Dkt. 72), which the Court appeared to reference, required only that "Defendant [] explain to Plaintiff the efforts that were made and why they were unsuccessful."  Dkt. 72 at 17.  Kroger did this many times, in its

Third Supplemental Responses to Interrogatories, which were verified, in multiple discovery conferences, and in the written Discovery Status Report shared with Mr. Weston and the Court. *See* Exs. 1–4. In each instance, Kroger explained why it did not have this information, its relationship with the suppliers, the names of the suppliers, and the efforts Kroger undertook to obtain the information and discovery from the suppliers. It disclosed the precise information the suppliers provided, and identified the information the suppliers did not provide. Also, Kroger did not withhold documents on the ground that it could not identify which products contained PHO—in an effort to make as complete a production as possible, as soon as possible, Kroger produced all documents on November 8 even if it could not confirm whether the document concerned a relevant PRODUCT.

55. Second, Order takes issue with the format of certain documents in Kroger's production. Dkt. 140 at 53. In particular, the Magistrate Judge found that Kroger's production of some excels (contained in its December 20 supplemental production) in image format, rather than in native format, demonstrated that Kroger's counsel acted in bad faith. *Id.* The parties, however, had not agreed on an ESI format, and Kroger otherwise did not have an obligation to produce the documents in native format; Kroger's production in image format was not made in bad faith but based on a reasonable understanding of its discovery obligations. Importantly, had Hawkins requested Kroger reproduce those documents in native form, it would have obliged. Kroger is now producing those documents in native format in response to the Court's April 23, 2020 order.

56. Third, the Magistrate Judge relied on Kroger's good faith efforts to comply with her order (Dkt. 83) to meet and confer on Plaintiff's motion, stating "Kroger's counsel improperly and unnecessarily multiplied the discovery process by requiring extensive back-and-forths to reach 'agreements' on basic discovery issues that were already covered by counsel's affirmative obligations under the Rules and the September 16 Order." Dkt. 140 at 54. As described in Paragraphs 43

through 52 *supra*, after Kroger complied with the Court's September 16, 2019 discovery order (Dkt. 72), Hawkins raised additional issues and sought to file another discovery motion.  The Court ordered the parties to meet and confer before Hawkins's November 22 filing deadline.  Dkt. 83.  In response to Hawkins's November 19 meet and confer letter, Kroger and its counsel acted in good faith, in agreeing to comply with many of Hawkins's requests (though it had no obligation to do so), and offering reasonable comprises for the remainder.  Dkt. 99-1 at Exs. A, B.  Hawkins's counsel, Mr. Weston, acknowledged that the parties were making progress on these meet and confer efforts, and the parties agreed to extend Hawkins's time to file the motion so they could continue to meet and confer and hopefully reach resolution.  Dkt. 84, 99-1 at Ex. C.  On December 2, Kroger sent another letter to follow up, as Mr. Weston had not yet responded.  Dkt. 99-1 at Ex. D.  Mr. Weston responded with another letter on December 3, deeming "agreeable" many of Kroger's offers, and adding some further requests.  Dkt. 99-1 at Ex. E. After investigating the requests, Kroger responded to the December 3 letter in its entirety with a letter, Dkt. 99-1 at Ex. F, to which Mr. Weston never responded. Kroger delivered on its agreements, including reproducing documents, providing a declaration regarding the end date for discovery, and supplementing its production, but Hawkins nevertheless filed her motion.  All of Kroger's and its counsel's conduct throughout these meet and confer discussions was made in good faith, and in a genuine attempt to resolve these discovery disputes and avoid another motion to compel. It is extremely difficult for me and our client to understand how this meet and confer process could ever rise to the level of bad faith.

57.     Fourth, the Magistrate Judge based her bad faith finding on an apparent "disregard for the Court-ordered requirement" of a declaration regarding the date when Kroger stopped selling Kroger private-label bread crumbs without PHO.  Dkt. 140 at 54–55.  As discussed in Paragraph 14, *supra*, Kroger and its counsel understood the Court's order regarding a declaration establishing the end date for

discovery as an optional provision without a specific deadline.  We understood that if we intended to limit production to the time period that Kroger sold the products at issue, we would need to provide evidence to that effect within a reasonable period of time.  Kroger provided that evidence in its November 8, 2019 Third Supplemental Response to Plaintiff's Interrogatory (in particular Interrogatory No. 8), which Kroger verified.  Kroger acted in good faith in relying on this verified statement to satisfy the Court order.  When Hawkins disputed the sufficiency of this declaration in her meet and confer letter, Dkt. 99-1 at Ex. A, Kroger offered to provide a literal declaration, as Hawkins requested, and did so, once Hawkins confirmed and Kroger was able to get the declaration signed (after the holidays).  Dkt. 99-1 at Ex. G.  The declaration is signed by an appropriate and knowledgeable employee.  While the declaration does mention that Kroger's supplier indicated the products were PHO-free by early 2015, the declarant confirmed that based on Kroger records—including the records that this employee uses regularly in his role as Senior Category Strategy Manager—that the product was PHO-free no later than 2016.  Kroger did produce information and documents through 2016 on that basis.  These efforts represent Kroger's good faith attempts to comply with the Court's order and meet and confer with Hawkins to resolve discovery disputes.

58.     Fifth, the April 23 Order finds bad faith because "Kroger's supplemental responses served on October 7, 2019 were not verified[.]"  Dkt. 140 at 55.  Kroger provided a verification for those responses on November 12, 2019, days after Hawkins's counsel noted they had not received the verification, once it was able to arrange for its signatory to review and sign the verification.  Kroger timely provided a verification with its November 12, 2019 supplemental responses.  Even if its verification was delayed, Kroger acted in good faith as evidenced by its provision of the verification for the October 7 responses and its timely verifications for subsequent supplemental responses.

DECLARATION OF HEATHER F. CANNER ISO OBJECTIONS TO ORDER GRANTING SANCTIONS

59.     Sixth, the April 23 Order states that Kroger "failed" to state in its discovery responses "whether any responsive materials are being withheld on the basis of an objection."  Dkt. 140 at 55.  <u>But Kroger did not withhold any responsive documents on the grounds of any objections</u>, other than what it listed on its November 8, 2019 privilege log, which identified the grounds for withholding (attorney-client privilege, attorney-work product, or personal consumer information).  Hawkins never raised this issue (as with many of the Magistrate Judge's grounds for her bad faith finding), and had she done so, Kroger would have made that clear.  As Kroger stated plainly in its October 7, 2019 Second Supplemental Responses to Plaintiff's Request for Production, and in compliance with the September 16, 2019 Order, it was producing all non-privileged responsive documents from 2010 through 2016 within its possession, custody, or control.  Kroger and its counsel acted in good faith in serving these responses.  *See* Ex. 1.

60.     Seventh, and last, the April 23 Order also takes issue with Mr. Harper's statements that some of the documents Kroger produced "are maintained or held by third parties" because that "does not determine whether such information is within Kroger's 'possession, custody, or control.'"  Dkt. 140 at 55–56.  Kroger, however, undertook a reasonable inquiry and diligent search (and beyond) for all responsive records, regardless of whether they were internal to Kroger or maintained by third parties.  Kroger is not withholding, nor has it withheld, any discovery on that basis (if that is what the Court is suggesting).  Kroger produced, for example, label documents and vendor specifications from both Kroger's internal records and third-party suppliers' records.  Kroger and its counsel acted in good faith in searching for and collecting responsive document from both internal sources and third-party vendors.

61.     Though the Order generally appeared to take issue with the timing and format of Kroger's document production, there is not explicitly a finding of bad faith on these grounds.  *See* Dkt. 140 at 50–51.  As explained above, Kroger made

its production on November 8, a reasonable period of time after the Court's September 16, 2019 Order.  In the interim, Kroger continually updated the Court and Hawkins regarding its expected timing for production and the status of its document collection, including in a detailed Confidential Discovery Status Report, its interrogatory responses served on October 7, 2019, and at multiple discovery conferences.  *See* Exs. 1–4.  Kroger also initially attempted to narrow its production rather than rushing to produce everything in an effort to heed the Court's October 9 advisement to make a tailored production to Hawkins; once the Court clarified that Kroger should make an immediate production (at the October 30 conference), it did so.  In addition, while the Court stated that Kroger redacted many documents not on the privilege log, all redacted documents except for one were listed on Kroger's privilege log; Kroger explained the single redacted document that did not appear on the log in meet and confer discussions with Hawkins.  Kroger and its counsel likewise acted in good faith in deciding the format and timing of its production.

62.    The Order also states – though not as a ground for bad faith – that "Kroger offers no acceptable justification for failing to respond to ROG No. 1 with sales and revenue data from 2010-2012 [in California]," and should have produced a declaration  "that its breadcrumbs sold between 2010-2012 . . . did not contain PHO."  Dkt. 140 at 19.  Kroger initially responded to this interrogatory based on the PRODUCTS it was able to identify that time, i.e., the particular PRODUCTS that contained PHO.  When those responses were served on November 8, 2019, Kroger was not able to confirm which Kroger private-label bread crumbs were PRODUCTS from 2010–2012, and it explained that lack of information, and the efforts undertaken to obtain that information.  In any event, Kroger's November 8, 2019 document production in fact included the requested quarterly unit sales and revenues in California from 2010 through 2016 for the products identified as relevant in 2013–2015.  Kroger repeatedly directed Hawkins to that information within its production.  Pursuant to the Court's April 23, 220 Order, and based on the

19

Court's revised PRODUCTS definition, Kroger will serve supplemental responses to the interrogatories to formally include the unit sales and revenue data in its discovery response.

63.     In the April 23, 2020 Order, the Court also compelled Kroger to supplement its responses to Interrogatories No. 1 and 5, and supplement its responses and make a further document production for Requests for Production No. 2, 5–8, 11, 18, and 20.  Dkt. 140 at 58.  The Court further ordered Kroger to produce excel spreadsheets previously produced in image form in native format, produce unredacted versions of redacted documents, and supplement its privilege log.  *Id.* at 59–60.

64.     At no time during the status conferences with the Magistrate Judge, nor in any of her orders or minute orders, did the Magistrate Judge ever warn Mr. Harper or me that she was considering imposing sanctions directly against Mr. Harper or me.  Nor did Plaintiff's counsel or Plaintiff seek personal sanctions.  I had no notice Judge Goddard was considering personal sanctions until the telephonic hearing on April 8, 2020.  A true and correct copy of the Hearing Transcript from the April 8, 2020 Hearing on Plaintiff's motion is attached as **Exhibit 5**.

## Compliance with the Magistrate Judge's April 23, 2020 Order

65.     Since the Magistrate Judge issued the April 23, 2020 Order compelling Kroger to supplement its discovery responses and production, Kroger and its counsel have been working to comply with the Order.

66.     In particular, though Kroger's prior discovery collection was extensive, Kroger and its counsel are revisiting its document collection, going well beyond Kroger's discovery obligations to locate any other responsive documents that might exist, and is again contacting third-party suppliers to see if they can provide any further information or records.

67.     Kroger and its counsel are again speaking with the Corporate Food Technology Department, including food scientists, regulatory review managers, and packaging managers to ensure no stone is left unturned.  Kroger and its counsel have had documents re-pulled from Kroger systems, and have gained access to remote archived data to search for any responsive documents.

68.     Kroger and its counsel have again spoken with the Senior Category Strategy Manager and Category Strategy Manager who oversee Kroger private-label bread crumbs.  In addition to the pricing data, cost data, supplier data, sales and marketing strategy data, and competitor data they collected through their investigation, Kroger's counsel are further investigating any other related documents that may be available.  Kroger's counsel has consulted with its pricing divisions, procurement department, and sourcing department, among others.

69.     Kroger's counsel met again with the branding department about any potential marketing and advertising records.  Kroger's counsel also met again with the customer affairs department, speaking with employees who work in the call center, as well as employees responsible for disseminating customer comments within Kroger and to third parties.

70.     Kroger and its counsel are speaking with individuals beyond those who work on the Kroger private-label products at issue, to ensure that they have not overlooked any responsive information or documents.

71.     Kroger served on May 7, 2020 its Third Supplemental Responses to Plaintiff's Requests for Production, in compliance with the Court's order, and based on the Court's new definition of PRODUCT and the end date for discovery.  Kroger also produced additional declarations regarding the end date for discovery under the Court's new definition, supplemented its document production based on the new definition and investigation described above, and reproduced excel spreadsheets previously produced in imaged format.  We expect to serve Kroger's supplemental privilege log, further supplemental production, and supplemental interrogatory

DECLARATION OF HEATHER F. CANNER ISO OBJECTIONS TO ORDER GRANTING SANCTIONS

responses the following week.  All these efforts have been difficult in light of the COVID-19 pandemic and attendant restrictions, but Kroger has continued to take its obligation to provide discovery and comply with all court Orders very seriously.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed this 7th day of May, 2020, at Los Angeles, California.

_____

Heather F. Canner

DECLARATION OF HEATHER F. CANNER ISO OBJECTIONS TO ORDER GRANTING SANCTIONS

# EXHIBIT 1

DAVIS WRIGHT TREMAINE LLP
Jacob M. Harper (SBN 259463)
  *jharper@dwt.com*
Nicole S. Phillis (SBN 291266)
  *nicolephillis@dwt.com*
Heather F. Canner (SBN 292837)
  *heathercanner@dwt.com*
865 South Figueroa Street, Suite 2400
Los Angeles, California 90017-2566
Telephone:  (213) 633-6800
Facsimile:  (213) 633-6899


Attorneys for Defendant
THE KROGER COMPANY


UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


| | |
|---|---|
| SHAVONDA HAWKINS, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>THE KROGER COMPANY,<br><br>Defendant. | Case No. 15CV2320 JM BLM<br><br>**SECOND SET OF SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS**<br><br>Action Filed:  October 15, 2015 |

PROPOUNDING PARTY:      Plaintiff SHAVONDA HAWKINS

RESPONDING PARTY:        Defendant THE KROGER COMPANY

SET NUMBER:                ONE

Defendant THE KROGER COMPANY ("Defendant") responds to plaintiff SHAVONDA HAWKINS'S ("Plaintiff") First Set of Requests for Production of Documents as follows:

### PRELIMINARY STATEMENT

The responses set forth below represent Defendant's present knowledge based on discovery, investigation, and case preparation to date.  Defendant has made reasonable efforts to locate responsive documents and the contents hereof are based on the information obtained from these efforts.  Defendant's investigation into this matter is, and will continue to be, ongoing.  Defendant may locate additional responsive documents at a later date, and may assert appropriate objections to the use of the documents identified herein.  Defendant, therefore, expressly reserves the right to rely on additional responsive documents, whether located in the course of its continuing investigation or in the course of discovery, at all future hearings and at trial, and the right to object on appropriate grounds to the use of any documents produced in response to this Request.  Similarly, Defendant expressly reserves the right to rely on any and all responsive documents already filed in this matter, and incorporates any and all such responsive documents herein by this reference.  Defendant also reserves the right to supplement this Response and any production in response to the Request in the future.

The production of any given document pursuant to the Request is not an admission or acknowledgment by Defendant that such document is relevant to any claim or defense in this action; is without prejudice to Defendant's right to contend at trial or in any other or subsequent proceeding in this action or otherwise that such document is inadmissible, irrelevant, immaterial, or not the proper basis for discovery; and is without prejudice to or waiver of any objection to any future use of such document which Defendant may be advised to make.

Many of the categories in the Request are duplicative or overlapping.  As a result, any document produced is, or potentially may be, responsive to more than

1

one category.  Nonetheless, Defendant may only produce each such document once and not each time it conceivably may be responsive to a given item in the Request. The circumstance that a document is produced only once is not an acknowledgment that it is potentially germane only to one category and is not a waiver of Defendant's right to use such document, if any, in any manner or on any point or subject as may be appropriate.

## GENERAL OBJECTIONS

1.      Defendant objects to the Requests, and to each and every item contained therein, to the extent that they attempt or purport to impose obligations beyond those set forth in the Code of Civil Procedure and the local rules of this Court.

2.      Defendant objects to the Requests, and to each and every item contained therein, to the extent that they attempt or purport to require disclosure of privileged or confidential communications between attorney and client, disclosure of documents or information protected by the attorney work-product doctrine, or disclosure of documents involved in any other applicable privilege.  If, due to the volume of a document involved or any other reason, a production by Defendant includes any document which is otherwise privileged or protected from discovery, the production of such document is inadvertent and unintentional, and Defendant does not intend thereby to waive said privilege or protection.  Defendant may also object to specific Requests on the ground that they seek documents protected by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege.  By making such specific objections, Defendant does not thereby waive this general objection.

3.      Defendant objects to the Requests, and to each and every item contained therein, to the extent that they seek confidential or proprietary trade secret and/or competitively sensitive information.  Defendant expressly reserves the right to produce non-privileged responsive documents containing such information only

SECOND SET OF SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF
REQUESTS FOR PRODUCTION OF DOCUMENTS

1   pursuant to a protective order appropriately limiting the control, use and disposition

2   of the documents.

3          4.     Defendant objects to the Requests, and to each and every item

4   contained therein, to the extent that they seek information that may be protected by

5   a right of privacy under either the United States Constitution, Article 1 of the

6   Constitution of the State of California, or any other applicable law.  Defendant

7   expressly reserves the right to produce responsive documents containing such

8   information only pursuant to a protective order appropriately limiting the control,

9   use and disposition of the documents.

10         5.     Defendant further objects to the definitions included within the

11   Requests to the extent they make the Requests compound, vague, ambiguous,

12   overbroad, unduly burdensome, and oppressive.

13         6.     Defendant has made a reasonable effort to gather documents

14   responsive to each Request as it understands and interprets each Request.  If

15   Plaintiff subsequently asserts a different interpretation, Defendant reserves the right

16   to supplement its responses and/or objections.

17         7.     Defendant objects to the Requests to the extent they purport to require

18   immediate production of all responsive documents concurrent with this Response.

19   Defendant will produce responsive documents concurrent with this Response to the

20   extent practicable, but reserves the right to produce further responsive documents

21   on a rolling basis going forward.

22         8.     Defendant objects to the Definition of "YOU" and "YOUR" as

23   overbroad, unduly burdensome, vague, and ambiguous.  Defendant responds to this

24   discovery only on behalf of Defendant The Kroger Company.

25         9.     Defendant objects to the time period of "January 1, 2006 to the

26   present" as overbroad, unduly burdensome, and calling for information that is

27   neither relevant to any issue in this litigation nor reasonably calculated to lead to the

28   discovery of admissible evidence.

10.     Defendant objects to the Definition of "Class Period," as it rests on the false assumption that Plaintiff can seek to certify a class with claims accruing after the date of the Complaint.

11.     These General Objections are incorporated by reference into each of the responses set forth below.

## SECOND SUPPLEMENTAL RESPONSES TO
## REQUESTS FOR PRODUCTION OF DOCUMENTS

REQUEST FOR PRODUCTION NO. 1:

Your written document retention policies and procedures.

RESPONSE TO REQUEST FOR PRODUCTION NO. 1:

Defendant incorporates herein by reference each of its General Objections. Defendant objects to this Request as calling for documents that are neither relevant to any issue in this litigation nor reasonably calculated to lead to the discovery of admissible evidence.  Defendant further objects to this Request as overbroad and unduly burdensome.  Defendant further objects to this Request to the extent it seeks documents protected by the attorney-client privilege and/or the attorney work-product doctrine.  Defendant objects that this Request is premature, as the Court has not yet decided whether to certify a class.  Defendant objects to this Request to the extent it calls for the production of confidential information, proprietary information, and/or trade secrets.  Defendant objects that this Request is not proportional to the needs of the case, including in that the burden and expense of producing the requested information outweighs its probative value.

SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 1:

Subject to and without waiving the foregoing objections, Defendant responds that in lieu of producing such policies and procedures, Defendant confirms that it is preserving records relevant to this lawsuit consistent with its legal obligations. Further, to the extent Defendant agrees to produce documents in response to any

SECOND SET OF SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF
REQUESTS FOR PRODUCTION OF DOCUMENTS

request, it will inform plaintiff if, after conducting a reasonable search, it does not locate responsive documents within its possession, custody, or control.

SECOND SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 1:

Subject to and without waiving the foregoing, Defendant will conduct a reasonable search for and produce non-privileged, responsive documents from 2010 through 2016 within its possession, custody, or control.[1]


REQUEST FOR PRODUCTION NO. 2:

All organization charts showing employees who, during the CLASS PERIOD, were involved in research, MARKETING, ADVERTISEMENT, manufacturing, or development of the PRODUCT.

RESPONSE TO REQUEST FOR PRODUCTION NO. 2:

Defendant incorporates herein by reference each of its General Objections. Defendant objects to this Request as calling for documents that are neither relevant to any issue in this litigation nor reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to this Request as overbroad and unduly burdensome. Defendant objects to this Request to the extent it calls for the production of confidential information, proprietary information, and/or trade secrets. Defendant objects that this Request is not proportional to the needs of the case, including in that the burden and expense of producing the requested information outweighs its probative value. Defendant further objects to this Request to the extent it seeks documents protected by the attorney-client privilege and/or the attorney work-product doctrine. Defendant objects that this Request is vague and ambiguous,

---

[1] In the Court's September 16, 2019 Order, the Court limited the period for all requests to 2010 through the date Defendant ceased selling the PRODUCT, which is 2016. Dkt. 72 at 12:17–19 & n.3, 13:11–12. A declaration regarding this end date is forthcoming. *See id.* at 12:17–19.

SECOND SET OF SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF
REQUESTS FOR PRODUCTION OF DOCUMENTS

including as to the terms "research" and "development," and fails to specify with reasonable particularity the documents it seeks.  Defendant objects to the Definition of "Class Period," as it rests on the false assumption that Plaintiff can seek to certify a class with claims accruing after the date of the Complaint.  Defendant objects that this Request is premature, as the Court has not yet decided whether to certify a class.

SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 2:

Subject to and without waiving the foregoing objections, Defendant responds that, after conducting a reasonable search, it has not located any non-privileged, responsive documents from 2011 through 2015 within its possession, custody, or control.

SECOND SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 2:

Subject to and without waiving the foregoing objections, Defendant responds that after conducting a reasonable search, it has not located any non-privileged, responsive documents from 2010 through 2016 within its possession, custody, or control.  Defendant further responds that it did not maintain organizational charts during the relevant time, and so has nothing to produce in response to this Request.

REQUEST FOR PRODUCTION NO. 3:

DOCUMENTS sufficient to show the IDENTITY of any PERSONS who, during the CLASS PERIOD, performed MARKETING, manufacturing, research, or development services RELATING TO any of the PRODUCTS.

RESPONSE TO REQUEST FOR PRODUCTION NO. 3:

Defendant incorporates herein by reference each of its General Objections. Defendant further objects to this Request as improper and duplicative of Request for Production No. 2.  Defendant incorporates its objections and responses to that request as though fully set forth herein.  Defendant further objects to this Request to the extent it seeks documents protected by the attorney-client privilege and/or the attorney work-

product doctrine.  Defendant objects to this Request as calling for documents that are neither relevant to any issue in this litigation nor reasonably calculated to lead to the discovery of admissible evidence.  Defendant objects to this Request to the extent it calls for the production of confidential information, proprietary information, and/or trade secrets.  Defendant objects that this Request is not proportional to the needs of the case, including in that the burden and expense of producing the requested information outweighs its probative value.  Defendant further objects to this Request as overbroad and unduly burdensome.  Defendant objects that this Request is vague and ambiguous, including as to the terms "research" and "development," and fails to specify with reasonable particularity the documents it seeks.  Defendant objects to the Definition of "Class Period," as it rests on the false assumption that Plaintiff can seek to certify a class with claims accruing after the date of the Complaint.  Defendant objects that this Request is premature, as the Court has not yet decided whether to certify a class.

SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 3:

Subject to and without waiving the foregoing objections, Defendant will conduct a reasonable search for and produce non-privileged, responsive documents sufficient to show the identity of persons who performed marketing and manufacturing services for the PRODUCT from 2010 through 2016 to the extent within its possession, custody, or control.

REQUEST FOR PRODUCTION NO. 4:

To the extent not produced in response to Request No. 3, DOCUMENTS sufficient to show all third parties with whom YOU contracted for services RELATING TO the MARKETING, ADVERTISEMENT, manufacture, development, distribution, or sale of the PRODUCT.

RESPONSE TO REQUEST FOR PRODUCTION NO. 4:

Defendant incorporates herein by reference each of its General Objections. Defendant objects to this Request as calling for documents that are neither relevant to any issue in this litigation nor reasonably calculated to lead to the discovery of admissible evidence.  Defendant further objects to this Request as overbroad and unduly burdensome.  Defendant objects to this Request to the extent it calls for the production of confidential information, proprietary information, and/or trade secrets. Defendant objects that this Request is not proportional to the needs of the case, including in that the burden and expense of producing the requested information outweighs its probative value.  Defendant objects that this Request is vague and ambiguous, including as to the term "development," and fails to specify with reasonable particularity the documents it seeks.  Defendant further objects to this Request to the extent the documents requested are exclusively in the possession, custody or control of third parties.  Defendant objects that this Request is premature, as the Court has not yet decided whether to certify a class.

SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 4:

Subject to and without waiving the foregoing, Defendant refers Plaintiff to its supplemental responses to Interrogatories No. 5 and 7.

SECOND SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 4:

Subject to and without waiving the foregoing, Defendant responds that it will conduct a reasonable search and produce non-privileged, responsive documents from 2010 thorough 2016 within its possession, custody, or control.


REQUEST FOR PRODUCTION NO. 5:

Exemplars of all LABELS, packaging, package inserts, and brochures RELATING TO the PRODUCT.

RESPONSE TO REQUEST FOR PRODUCTION NO. 5:

SECOND SET OF SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF
REQUESTS FOR PRODUCTION OF DOCUMENTS

Defendant incorporates herein by reference each of its General Objections. Defendant objects to this Request as calling for documents that are neither relevant to any issue in this litigation nor reasonably calculated to lead to the discovery of admissible evidence.  Defendant further objects to this Request as overbroad and unduly burdensome.  Defendant objects that this Request is vague and ambiguous, including as to the term "Exemplars," and fails to specify with reasonable particularity the documents it seeks.  Defendant objects to this Request to the extent it calls for the production of confidential information, proprietary information, and/or trade secrets.  Defendant objects that this Request is not proportional to the needs of the case, including in that the burden and expense of producing the requested information outweighs its probative value.  Defendant objects that this Request is premature, as the Court has not yet decided whether to certify a class.

SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 5:

Subject to and without waiving the foregoing objections, Defendant will conduct a reasonable search for and produce a copy of each of the packaging labels used for Kroger Bread Crumbs during 2011 through 2015, to the extent within its possession, custody, or control.

SECOND SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 5:

Subject to and without waiving the foregoing objections, Defendant will conduct a reasonable search for and produce non-privileged, responsive documents from 2010 through 2016 within its possession, custody, or control.

REQUEST FOR PRODUCTION NO. 6:

All DOCUMENTS showing the period of time during which each PRODUCT LABEL was introduced, used, and discontinued.

RESPONSE TO REQUEST FOR PRODUCTION NO. 6:

9

1   Defendant incorporates herein by reference each of its General Objections.

2   Defendant objects to this Request as calling for documents that are neither relevant

3   to any issue in this litigation nor reasonably calculated to lead to the discovery of

4   admissible evidence.  Defendant further objects to this Request as overbroad and

5   unduly burdensome.  Defendant objects to this Request to the extent it calls for the

6   production of confidential information, proprietary information, and/or trade

7   secrets.  Defendant objects that this Request is not proportional to the needs of the

8   case, including in that the burden and expense of producing the requested

9   information outweighs its probative value.  Defendant objects that this Request is

10  vague and ambiguous, including as to the term "introduced," and fails to specify

11  with reasonable particularity the documents it seeks.  Defendant further objects to

12  this Request to the extent it seeks documents protected by the attorney-client

13  privilege and/or the attorney work-product doctrine.  Defendant objects that this

14  Request is premature, as the Court has not yet decided whether to certify a class.

15  SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 6:

16  Subject to and without waiving the foregoing objections, Defendant will

17  conduct a reasonable search for and produce non-privileged documents sufficient to

18  identify the periods during which the packaging labels produced in response to

19  Request for Production No. 5 were used, to the extent such documents are within

20  Defendant's possession, custody, or control.

21  SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 6:

22  Subject to and without waiving the foregoing objections, Defendant will

23  conduct a reasonable search for and produce non-privileged, responsive documents

24  from 2010 through 2016 within its possession, custody, or control.

25

26  REQUEST FOR PRODUCTION NO. 7:

27

28

_____
SECOND SET OF SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF
REQUESTS FOR PRODUCTION OF DOCUMENTS

All DOCUMENTS CONCERNING any contemplated, potential, or actual changes, revisions, or modifications to the PRODUCTS' LABELS during the CLASS PERIOD, including drafts of such DOCUMENTS.

RESPONSE TO REQUEST FOR PRODUCTION NO. 7:

Defendant incorporates herein by reference each of its General Objections. Defendant objects to this Request as calling for documents that are neither relevant to any issue in this litigation nor reasonably calculated to lead to the discovery of admissible evidence.  Defendant further objects to this Request as overbroad and unduly burdensome.  Defendant further objects to this Request to the extent it seeks documents protected by the attorney-client privilege and/or the attorney work-product doctrine.  Defendant objects to this Request to the extent it calls for the production of confidential information, proprietary information, and/or trade secrets.  Defendant objects that this Request is not proportional to the needs of the case, including in that the burden and expense of producing the requested information outweighs its probative value.  Defendant objects to the Definition of "Class Period," as it rests on the false assumption that Plaintiff can seek to certify a class with claims accruing after the date of the Complaint.  Defendant objects that this Request is premature, as the Court has not yet decided whether to certify a class.

SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 7:

Subject to and without waiving the foregoing objections, Defendant will conduct a reasonable search for and produce a copy of each of the packaging labels used for Kroger Bread Crumbs during 2011 through 2015, to the extent within its possession, custody, or control.

SECOND SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 7:

1    Subject to and without waiving the foregoing objections, Defendant will

2   conduct a reasonable search for and produce non-privileged, responsive documents

3   from 2010 through 2016 within its possession, custody or control.

4

5   REQUEST FOR PRODUCTION NO. 8:

6    DOCUMENTS CONCERNING the reasons for, plans, proposals, and

7   motivations for any change to the LABEL of any PRODUCT.

8   RESPONSE TO REQUEST FOR PRODUCTION NO. 8:

9    Defendant incorporates herein by reference each of its General Objections.

10   Defendant objects to this Request as calling for documents that are neither relevant

11   to any issue in this litigation nor reasonably calculated to lead to the discovery of

12   admissible evidence.  Defendant objects that this Request is vague and ambiguous,

13   including as to the phrase "reasons for, plans, proposals, and motivations for," and

14   fails to specify with reasonable particularity the documents it seeks.  Defendant

15   further objects to this Request as overbroad and unduly burdensome, including in

16   that it seeks all documents concerning "any change" to the label, regardless of

17   whether they pertain to the subject matter of this action.  Defendant objects to this

18   Request to the extent it calls for the production of confidential information,

19   proprietary information, and/or trade secrets.  Defendant objects that this Request is

20   not proportional to the needs of the case, including in that the burden and expense

21   of producing the requested information outweighs its probative value.  Defendant

22   further objects to this Request to the extent it seeks documents protected by the

23   attorney-client privilege and/or the attorney work-product doctrine.  Defendant

24   objects that this Request is premature, as the Court has not yet decided whether to

25   certify a class.

26   SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 8:

27

28

SECOND SET OF SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF
REQUESTS FOR PRODUCTION OF DOCUMENTS

1    Subject to and without waiving the foregoing objections, Defendant will

2 conduct a reasonable search for and produce responsive documents from 2010

3 through 2016 within its possession, custody, or control.

4

5 REQUEST FOR PRODUCTION NO. 9:

6    All DOCUMENTS constituting ADVERTISING RELATING TO or

7 CONCERNING the PRODUCTS created, produced, used, or in effect during the

8 CLASS PERIOD, including without limitation all internet (including native form

9 HTML and images files used on YOUR website(s)), television and radio (including

10 transcriptions for each such ADVERTISEMENT), and print ADVERTISEMENTS,

11 sales materials, promotional materials, packaging, product labeling, direct mail,

12 coupons, circulars, fliers, handouts, point of sale literature, package inserts, and

13 informational brochures, which directly or indirectly refer to, depict, or discuss the

14 PRODUCT, and DOCUMENTS sufficient to show the period of time during which

15 any such ADVERTISEMENT was used or in effect.

16 RESPONSE TO REQUEST FOR PRODUCTION NO. 9:

17    Defendant incorporates herein by reference each of its General Objections.

18 Defendant further objects to this Request on grounds that the documents requested

19 are equally available to Plaintiff.  Defendant objects to this Request as calling for

20 documents that are neither relevant to any issue in this litigation nor reasonably

21 calculated to lead to the discovery of admissible evidence.  Defendant further

22 objects to this Request as overbroad and unduly burdensome.  Defendant objects to

23 this Request to the extent it calls for the production of confidential information,

24 proprietary information, and/or trade secrets.  Defendant objects that this Request is

25 not proportional to the needs of the case, including in that the burden and expense

26 of producing the requested information outweighs its probative value.  Defendant

27 objects that this Request is vague, ambiguous and unintelligible, and fails to specify

28 with reasonable particularity the documents it seeks.  Defendant further objects to

SECOND SET OF SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF
REQUESTS FOR PRODUCTION OF DOCUMENTS

this Request to the extent it seeks documents protected by the attorney-client privilege and/or the attorney work-product doctrine.  Defendant objects to the Definition of "Class Period," as it rests on the false assumption that Plaintiff can seek to certify a class with claims accruing after the date of the Complaint. Defendant objects that this Request is premature, as the Court has not yet decided whether to certify a class.

SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 9:

Subject to and without waiving the foregoing, Defendant will conduct a reasonable search for and produce non-privileged, responsive documents from 2010 through 2016 within its possession, custody, or control.


REQUEST FOR PRODUCTION NO. 10:

All DOCUMENTS CONCERNING YOUR strategy for MARKETING, ADVERTISING, or selling the PRODUCTS in the United States during the CLASS PERIOD.

RESPONSE TO REQUEST FOR PRODUCTION NO. 10:

Defendant incorporates herein by reference each of its General Objections. Defendant objects to this Request as calling for documents that are neither relevant to any issue in this litigation nor reasonably calculated to lead to the discovery of admissible evidence.  Defendant objects that this Request is vague and ambiguous, including as to the term "strategy," and fails to specify with reasonable particularity the documents it seeks.  Defendant further objects to this Request as overbroad and unduly burdensome.  Defendant objects to this Request to the extent it calls for the production of confidential information, proprietary information, and/or trade secrets. Defendant objects that this Request is not proportional to the needs of the case, including in that the burden and expense of producing the requested information outweighs its probative value.  Defendant further objects to this Request to the extent it seeks documents protected by the attorney-client privilege and/or the attorney work-

product doctrine.  Defendant objects to the Definition of "Class Period," as it rests on the false assumption that Plaintiff can seek to certify a class with claims accruing after the date of the Complaint.  Defendant objects that this Request is premature, as the Court has not yet decided whether to certify a class.

SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 10:

Subject to and without waiving the foregoing objections, Defendant will conduct a reasonable search for and produce non-privileged, responsive documents from 2010 through 2016 within its possession, custody, or control.

REQUEST FOR PRODUCTION NO. 11:

All DOCUMENTS referencing or reflecting any call center feedback for the PRODUCT.

RESPONSE TO REQUEST FOR PRODUCTION NO. 11:

Defendant incorporates herein by reference each of its General Objections. Defendant objects to this Request as calling for documents that are neither relevant to any issue in this litigation nor reasonably calculated to lead to the discovery of admissible evidence.  Defendant objects that this Request is vague and ambiguous, including as to the phrase "call center feedback."  Defendant further objects to this Request as overbroad and unduly burdensome.  Defendant further objects to this Request to the extent it seeks documents protected by the attorney-client privilege and/or the attorney work-product doctrine.  Defendant objects to this Request to the extent it calls for the production of confidential information, proprietary information, and/or trade secrets.  Defendant objects that this Request is not proportional to the needs of the case, including in that the burden and expense of producing the requested information outweighs its probative value.  Defendant objects that this Request is premature, as the Court has not yet decided whether to certify a class.

SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 11:

SECOND SET OF SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF
REQUESTS FOR PRODUCTION OF DOCUMENTS

Subject to and without waiving the foregoing objections, Defendant will conduct a reasonable search for and produce non-privileged, responsive documents concerning trans fat or PHO from 2010 through 2016 within its possession, custody, or control.  Dkt. 72 at 25:1–2.

REQUEST FOR PRODUCTION NO. 14:

DOCUMENTS sufficient to show the amount of PHO and trans fat used in the PRODUCT during the CLASS PERIOD, including any changes thereto, and the composition, source, and vendors for the partially hydrogenated oil used in the manufacture of the PRODUCT.

RESPONSE TO REQUEST FOR PRODUCTION NO. 14:

Defendant incorporates herein by reference each of its General Objections. Defendant objects to this Request as calling for documents that are neither relevant to any issue in this litigation nor reasonably calculated to lead to the discovery of admissible evidence.  Defendant further objects to this Request as overbroad and unduly burdensome, including in that it is not limited to the subject matter of the action.  Defendant objects that this Request is vague and ambiguous, including as to the terms "composition" and "source," and fails to specify with reasonable particularity the documents it seeks.  Defendant further objects to this Request to the extent it seeks documents protected by the attorney-client privilege and/or the attorney work-product doctrine.  Defendant further objects to this Request to the extent the documents requested are equally available to Plaintiff or exclusively in the possession, custody or control of third parties.  Defendant objects to the Definition of "Class Period," as it rests on the false assumption that Plaintiff can seek to certify a class with claims accruing after the date of the Complaint.  Defendant objects that this Request is premature, as the Court has not yet decided whether to certify a class.

SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 14:

SECOND SET OF SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF
REQUESTS FOR PRODUCTION OF DOCUMENTS

Subject to and without waiving the foregoing objections, Defendant refers Plaintiff to its supplemental responses to Interrogatories No. 5 and 8.

SECOND SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 14:

Subject to and without waiving the foregoing objections, Defendant will conduct a reasonable search for and produce non-privileged, responsive documents from 2010 through 2016 within its possession, custody, or control.

REQUEST FOR PRODUCTION NO. 15:

ALL DOCUMENTS RELATING TO the cost of any actual, potential, or proposed formulation changes to the PRODUCT during the CLASS PERIOD.

RESPONSE TO REQUEST FOR PRODUCTION NO. 15:

Defendant incorporates herein by reference each of its General Objections. Defendant further objects to this Request as overbroad and unduly burdensome, including in that it is not limited by the subject matter in this action.  Defendant objects to this Request as calling for documents that are neither relevant to any issue in this litigation nor reasonably calculated to lead to the discovery of admissible evidence.  Defendant objects that this Request is vague and ambiguous, including as to the phrase "formulation changes."  Defendant further objects to this Request on grounds that the documents requested are either equally available to Plaintiff or exclusively in the possession, custody or control of Plaintiff and other third parties. Defendant objects to this Request to the extent it calls for the production of confidential information, proprietary information, and/or trade secrets.  Defendant objects that this Request is not proportional to the needs of the case, including in that the burden and expense of producing the requested information outweighs its probative value.  Defendant further objects to this Request to the extent it seeks documents protected by the attorney-client privilege and/or the attorney work-product doctrine.  Defendant objects to the Definition of "Class Period," as it rests on the false

17

assumption that Plaintiff can seek to certify a class with claims accruing after the date of the Complaint.  Defendant objects that this Request is premature, as the Court has not yet decided whether to certify a class.

SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 15:

Subject to and without waiving the foregoing objections, Defendant refers Plaintiff to its supplemental responses to Interrogatories No. 5 and 8.

SECOND SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 15:

Subject to and without waiving the foregoing objections, Defendant will conduct a reasonable search for and produce non-privileged, responsive documents from 2010 through 2016 within its possession, custody, or control.

REQUEST FOR PRODUCTION NO. 16:

All DOCUMENTS which YOU contend support or substantiate the following statement used on PRODUCTS: "0g Trans Fat per serving."

RESPONSE TO REQUEST FOR PRODUCTION NO. 16:

Defendant incorporates herein by reference each of its General Objections. Defendant objects to this Request to the extent it implies or assumes that Defendant has an obligation to "substantiate" the quoted "statement."  Defendant objects to this Request to the extent it improperly calls for a legal conclusion.  Defendant objects that this Request is vague and ambiguous, including as to the terms "statement," "support," and "substantiate," and fails to specify with reasonable particularity the documents it seeks.  Defendant further objects to this Request on grounds that the documents requested are either equally available to Plaintiff or exclusively in the possession, custody or control of Plaintiff and other third parties.  Defendant objects to this Request to the extent it calls for the production of confidential information, proprietary information, and/or trade secrets.  Defendant objects that this Request is not proportional to the needs of the case, including in that the burden and expense of

18

1  producing the requested information outweighs its probative value.  Defendant further

2  objects to this Request to the extent it seeks documents protected by the attorney-

3  client privilege and/or the attorney work-product doctrine.  Defendant objects that this

4  Request is premature, as the Court has not yet decided whether to certify a class.

5  SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 16:

6          Subject to and without waiving the foregoing objections, Defendant will

7  conduct a reasonable search for and produce non-privileged, responsive documents

8  from 2010 through 2016 within its possession, custody, or control.

9

10  REQUEST FOR PRODUCTION NO. 18:

11          All DOCUMENTS which reflect, summarize, analyze, or discuss the pricing

12  of the PRODUCT, including wholesale or retail prices.

13  RESPONSE TO REQUEST FOR PRODUCTION NO. 18:

14          Defendant incorporates herein by reference each of its General Objections.

15  Defendant further objects to this Request as overbroad and unduly burdensome,

16  including in that it is not limited by the subject matter in this action.  Defendant

17  objects to this Request as calling for documents that are neither relevant to any issue

18  in this litigation nor reasonably calculated to lead to the discovery of admissible

19  evidence.  Defendant objects that this Request is vague and ambiguous, and fails to

20  specify with reasonable particularity the documents it seeks.  Defendant objects to this

21  Request to the extent it calls for the production of confidential information,

22  proprietary information, and/or trade secrets.  Defendant objects that this Request is

23  not proportional to the needs of the case, including in that the burden and expense of

24  producing the requested information outweighs its probative value.  Defendant further

25  objects to this Request on grounds that the documents requested are either equally

26  available to Plaintiff or exclusively in the possession, custody or control of Plaintiff

27  and other third parties.  Defendant further objects to this Request to the extent it seeks

28  documents protected by the attorney-client privilege and/or the attorney work-product

doctrine.  Defendant objects that this Request is premature, as the Court has not yet decided whether to certify a class.

SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 18:

Subject to and without waiving the foregoing objections, Defendant will conduct a reasonable search for and produce non-privileged, responsive documents from 2010 through 2016 within its possession, custody, or control.

REQUEST FOR PRODUCTION NO. 20:

Any COMMUNICATION between YOU and any customer in response to any complaint about the ingredients in the PRODUCT.

RESPONSE TO REQUEST FOR PRODUCTION NO. 20:

Defendant incorporates herein by reference each of its General Objections. Defendant objects to this Request as calling for documents that are neither relevant to any issue in this litigation nor reasonably calculated to lead to the discovery of admissible evidence.  Defendant objects that this Request is vague and ambiguous, including as to the term "complaint," and fails to specify with reasonable particularity the documents it seeks.  Defendant objects to this Request to the extent it calls for the production of confidential information, proprietary information, and/or trade secrets. Defendant objects that this Request is not proportional to the needs of the case, including in that the burden and expense of producing the requested information outweighs its probative value.  Defendant further objects to this Request as overbroad and unduly burdensome, including in that it seeks documents pertaining to any ingredient and is not limited by the subject matter of this action.  Defendant objects that this Request is premature, as the Court has not yet decided whether to certify a class.

SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 20:

Subject to and without waiving the foregoing objections, Defendant will conduct a reasonable search for and produce non-privileged, responsive documents

20

concerning trans fat or PHO from 2010 through 2016 within its possession, custody, or control.  Dkt. 72 at 25:1–2.

REQUEST FOR PRODUCTION NO. 24:

DOCUMENTS sufficient to show or calculate YOUR total revenue from the sale of the PRODUCT in California for each year in the CLASS PERIOD.

RESPONSE TO REQUEST FOR PRODUCTION NO. 24:

Defendant incorporates herein by reference each of its General Objections. Defendant further objects to this Request as overbroad and unduly burdensome, including in that it is not limited by the subject matter or even the product at issue in this action.  Defendant objects to this Request as calling for documents that are neither relevant to any issue in this litigation nor reasonably calculated to lead to the discovery of admissible evidence.  Defendant objects that this Request is vague and ambiguous, and does not describe with reasonable particularity the documents requested.  Defendant further objects to this Request—based on Defendant's understanding—as improper and duplicative of Request for Production No. 19. Defendant incorporates its objections and responses to that request as though fully set forth herein.  Defendant further objects to this Request to the extent it seeks documents protected by the attorney-client privilege and/or the attorney work-product doctrine.  Defendant objects to this Request to the extent it calls for the production of confidential information, proprietary information, and/or trade secrets.  Defendant objects that this Request is not proportional to the needs of the case, including in that the burden and expense of producing the requested information outweighs its probative value.  Defendant objects to the Definition of "Class Period," as it rests on the false assumption that Plaintiff can seek to certify a class with claims accruing after the date of the Complaint.  Defendant objects that this Request is premature, as the Court has not yet decided whether to certify a class.

_____
SECOND SET OF SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF
REQUESTS FOR PRODUCTION OF DOCUMENTS

SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 24:

Subject to and without waiving the foregoing objections, Defendant will conduct a reasonable search for and produce non-privileged, responsive documents from 2010 through 2016 within its possession, custody, or control.

REQUEST FOR PRODUCTION NO. 25:

All DOCUMENTS and COMMUNICATIONS RELATING TO YOUR December 4, 2006 press release titled "Kroger Using Trans Fat Free Oil to Prepare Fried Chicken."

RESPONSE TO REQUEST FOR PRODUCTION NO. 25:

Defendant incorporates herein by reference each of its General Objections. Defendant further objects to this Request as overbroad and unduly burdensome, including in that it is not limited by the subject matter or even the product at issue in this action. Defendant objects to this Request as calling for documents that are neither relevant to any issue in this litigation nor reasonably calculated to lead to the discovery of admissible evidence. Defendant objects that this Request is vague and ambiguous, and does not describe with reasonable particularity the documents requested. Defendant objects to this Request to the extent it calls for the production of confidential information, proprietary information, and/or trade secrets. Defendant objects that this Request is not proportional to the needs of the case, including in that the burden and expense of producing the requested information outweighs its probative value. Defendant further objects to this Request to the extent it seeks documents protected by the attorney-client privilege and/or the attorney work-product doctrine. Defendant objects that this Request is premature, as the Court has not yet decided whether to certify a class.

SECOND SET OF SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF
REQUESTS FOR PRODUCTION OF DOCUMENTS

1 | SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 25:

2 |       Subject to and without waiving the foregoing objections, Defendant will

3 | conduct a reasonable search for and produce non-privileged, responsive documents

4 | within its possession, custody, or control.

7 | DATED: October 7, 2019            Davis Wright Tremaine LLP

9 |                    By: /s/ Heather F. Canner

10 |                        Heather F. Canner

11 |                 Attorneys for Defendant
                THE KROGER COMPANY

SECOND SET OF SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF
REQUESTS FOR PRODUCTION OF DOCUMENTS

<u>PROOF OF SERVICE BY MAIL</u>

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is Davis Wright Tremaine LLP, Suite 2400, 865 South Figueroa Street, Los Angeles, California 90017-2566.

On October 7, 2019, I served the foregoing document(s) described as: **SECOND SET OF SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS** by placing a **true copy** of said document(s) enclosed in a sealed envelope(s) for each addressee named below, with the name and address of the person served shown on the envelope as follows:

The Weston Firm
Gregory S. Weston
Andrew C. Hamilton
1405 Morena Blvd., Suite 201
San Diego, CA  92110

I placed such envelope(s) with postage thereon fully prepaid for deposit in the United States Mail in accordance with the office practice of Davis Wright Tremaine LLP, for collecting and processing correspondence for mailing with the United States Postal Service.  I am familiar with the office practice of Davis Wright Tremaine LLP, for collecting and processing correspondence for mailing with the United States Postal Service, which practice is that when correspondence is deposited with the Davis Wright Tremaine LLP, personnel responsible for delivering correspondence to the United States Postal Service, such correspondence is delivered to the United States Postal Service that same day in the ordinary course of business.

Executed on October 7, 2019, at Los Angeles, California.

☐     State          I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct.

x     Federal      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

_____          _____
Lina Pearmain                                              Signature
Print Name

SECOND SET OF SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF
REQUESTS FOR PRODUCTION OF DOCUMENTS

# EXHIBIT 2

DAVIS WRIGHT TREMAINE LLP
Jacob M. Harper (SBN 259463)
  *jharper@dwt.com*
Nicole S. Phillis (SBN 291266)
  *nicolephillis@dwt.com*
Heather F. Canner (SBN 292837)
  *heathercanner@dwt.com*
865 South Figueroa Street, Suite 2400
Los Angeles, California 90017-2566
Telephone:  (213) 633-6800
Facsimile:  (213) 633-6899

Attorneys for Defendant
THE KROGER COMPANY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHAVONDA HAWKINS, on behalf of herself and all others similarly situated,<br><br>                    Plaintiff,<br><br>        vs.<br><br>THE KROGER COMPANY,<br><br>                    Defendant. | Case No. 15CV2320 JM BLM<br><br>**SECOND SET OF SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES**<br><br>Action Filed:  October 15, 2015 |

PROPOUNDING PARTY:      Plaintiff SHAVONDA HAWKINS

RESPONDING PARTY:       Defendant THE KROGER COMPANY

SET NUMBER:             ONE

Defendant THE KROGER COMPANY ("Defendant") responds to plaintiff SHAVONDA HAWKINS'S ("Plaintiff") First Set of Interrogatories as follows:

## PRELIMINARY STATEMENT

These responses are based upon Defendant's initial investigation to date. Defendant has not yet completed its investigation into the facts relating to this action and its analysis of such facts, both of which are continuing.  As Defendant's investigation and analysis progress, additional witnesses, facts, and evidence may be discovered and legal contentions developed which are not set forth in these responses and which may have been responsive to one or more Interrogatory.

In addition, the relevance, connection, or consequences of facts and evidence which are presently known may not be fully understood or appreciated until discovery is completed.  Accordingly, such facts and evidence may, in good faith, not be included in these responses.  Defendant reserves the right to use at trial and in any other proceedings in this action any such additional witnesses, facts, and evidence that may have been omitted from these responses for one of the foregoing reasons or otherwise and, without obligating itself to do so, to supplement these responses in the future as may be appropriate.

The response to any particular Interrogatory is not an admission or acknowledgment by Defendant that such response is relevant to any claim or defense in this action; is without prejudice to the right of Defendant to contend at trial or in any other or subsequent proceeding in this action or otherwise that such response is inadmissible, irrelevant, or immaterial; and is without prejudice to or waiver of any objection to any future use of such response which Defendant may be advised to make.

## GENERAL OBJECTIONS AND QUALIFICATIONS

1.     Defendant objects to these Interrogatories to the extent that they attempt or purport to impose obligations beyond those set forth in the California Code of Civil Procedure.

1

2.      Defendant generally objects to the Interrogatories to the extent they purport to require a statement of literally "all documents," "all persons," and/or any other exhaustive listing in connection with certain subject matters, rather than the principal facts or persons or general factual contentions, on the grounds that they are unduly burdensome and oppressive, of little or no benefit to Plaintiff, premature, and propounded for purposes of harassment.  Defendant further specifically reserves the right to use and to rely upon facts contained in documents that have been or will be produced in this case, and the testimony of witnesses in this case without being limited by its responses to these Interrogatories.

3.      Defendant objects to these Interrogatories to the extent that they call for disclosure of information, documents or communications protected from discovery by the attorney-client privilege, the attorney work-product doctrine, or any other applicable privilege.  Without waiving this objection, Defendant will respond to each Interrogatory without disclosure of privileged or otherwise protected information, documents or communications.

4.      Defendant objects to these Interrogatories to the extent they seek information protected by the right to privacy under the U.S. Constitution, federal law, the California State Constitution, state law or any other privacy right.

5.      Defendant objects to these Interrogatories to the extent that they seek discovery of matters that are not relevant to the claims or defenses in this action.

6.      Defendant expressly reserves the right to make any and all evidentiary objections to the Interrogatories and any information contained in the following responses if such information is offered at trial or at any other proceeding in this action.

7.      Defendant objects to the Definition of "YOU" and "YOUR" as overbroad, unduly burdensome, vague, and ambiguous.  Defendant responds to this discovery only on behalf of Defendant The Kroger Company.

8.      Defendant objects to the time period of "January 1, 2006 to the present" as overbroad, unduly burdensome, and calling for information that is neither relevant to any issue in this litigation nor reasonably calculated to lead to the discovery of admissible evidence.

9.      Defendant objects to the Definition of "Class Period," as it rests on the false assumption that Plaintiff can seek to certify a class with claims accruing after the date of the Complaint.

10.      Specific objections to each Interrogatory are made on an individual basis in the responses below.  These General Objections and Qualifications are incorporated by reference into each of the responses set forth below.  The failure to mention one of the foregoing objections and qualifications in any of the responses set forth below shall not be deemed a waiver of such objection or qualification.

**SUPPLEMENTAL RESPONSES TO INTERROGATORIES**

INTERROGATORY NO. 1:

IDENTIFY, for California, for each quarter of the CLASS PERIOD, your unit sales of each of the KROGER BREAD CRUMBS SKUs and the total revenue YOU derived the sale of the PRODUCT.

RESPONSE TO INTERROGATORY NO. 1:

Defendant incorporates herein by reference each of its General Objections. Defendant objects to this Interrogatory as calling for information that is neither relevant to any issue in this litigation nor reasonably calculated to lead to the discovery of admissible evidence.  Defendant further objects to this Interrogatory as being overbroad and unduly burdensome, including in that it is not limited to the subject matter of this action.  Defendant further objects to this Interrogatory as compound, disjunctive and/or conjunctive.  Defendant further objects to this Interrogatory on the ground that it is vague and ambiguous, including but not limited to its use of the term "total revenue YOU derived the sale."  Defendant objects to this Interrogatory to the extent it calls for the production of confidential

information, proprietary information, and/or trade secrets.  Defendant objects that this Interrogatory is not proportional to the needs of the case, including in that the burden and expense of producing the requested information outweighs its probative value.  Defendant objects to this Interrogatory as premature and improperly seeking expert discovery.  Defendant objects to the Definition of "Class Period," as it rests on the false assumption that Plaintiff can seek to certify a class with claims accruing after the date of the Complaint.  Defendant objects that this Interrogatory is premature, as the Court has not yet decided whether to certify a class.

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:

Subject to and without waiving the foregoing objections, Defendant responds that after conducting a reasonable search, Defendant lacks information within its possession, custody, or control to show the unique number of buyers of all bread Crumbs in California, and is not able to provide a verified response to that effect.

SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:

Subject to and without waiving the foregoing objections, Defendant responds as follows:  Kroger does not maintain information about which specific products— whether by SKU or otherwise—contained PHO during the relevant time period; instead, Kroger believes its third-party suppliers maintain this information.  In addition, Kroger does not maintain quarterly records for unit sales or revenue for Kroger Bread Crumbs.  That notwithstanding, Kroger is making reasonable and diligent efforts to obtain specific information about which Kroger Bread Crumb products contained PHO during the relevant time period from its third-party suppliers ████████████████████████████████████ ███████████████.  Once it has this information, it will provide amended responses in which it will provide unit and revenue information for the relevant period for Kroger Bread Crumbs that contained PHO and were sold during the relevant period.

INTERROGATORY NO. 3:

IDENTIFY products that YOU consider, or have considered at different times during the CLASS PERIOD, to be the primary competitors to the PRODUCT.

RESPONSE TO INTERROGATORY NO. 3:

Defendant incorporates herein by reference each of its General Objections. Defendant objects to this Interrogatory as calling for information that is neither relevant to any issue in this litigation nor reasonably calculated to lead to the discovery of admissible evidence.  Defendant further objects to this Interrogatory as being overbroad and unduly burdensome, including in that it is not limited to the subject matter of this action.  Defendant further objects to this Interrogatory as compound, disjunctive and/or conjunctive.  Defendant further objects to this Interrogatory on the ground that it is vague and ambiguous, including but not limited to its use of the phrase "primary competitors."  Defendant further objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege and/or the attorney work-product doctrine.  Defendant objects to this Interrogatory to the extent it calls for the production of confidential information, proprietary information, and/or trade secrets.  Defendant objects that this Interrogatory is not proportional to the needs of the case, including in that the burden and expense of producing the requested information outweighs its probative value.  Defendant objects to the Definition of "Class Period," as it rests on the false assumption that Plaintiff can seek to certify a class with claims accruing after the date of the Complaint.  Defendant objects that this Interrogatory is premature, as the Court has not yet decided whether to certify a class.

1  SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3:

2         Subject to and without waiving the foregoing objections, Defendant responds:

3  Defendant used the following products as benchmarks for Kroger Bread Crumbs

4  during the relevant period: ████████████████████████████████████████

5  ████████████████████████████████.

6

7  INTERROGATORY NO. 4:

8         IDENTIFY the manufacturer of and amount of PHO per 100g used in the

9  PRODUCT, e.g., "Cargill Olympic S-100 Partially Hydrogenated Soybean Oil 16g

10 per 100g of Kroger Bread Crumbs."

11 RESPONSE TO INTERROGATORY NO. 4:

12        Defendant incorporates herein by reference each of its General Objections.

13 Defendant objects to this Interrogatory as calling for information that is neither

14 relevant to any issue in this litigation nor reasonably calculated to lead to the

15 discovery of admissible evidence.  Defendant further objects to this Interrogatory as

16 being overbroad and unduly burdensome.  Defendant further objects to this

17 Interrogatory as compound, disjunctive and/or conjunctive.  Defendant further

18 objects to this Interrogatory on the ground that it is vague and ambiguous.

19 Defendant further objects to this Interrogatory to the extent it seeks information

20 protected by the attorney-client privilege and/or the attorney work-product doctrine.

21 Defendant objects to this Interrogatory to the extent it calls for the production of

22 confidential information, proprietary information, and/or trade secrets.  Defendant

23 objects that this Interrogatory is not proportional to the needs of the case, including

24 in that the burden and expense of producing the requested information outweighs its

25 probative value.  Defendant objects to the Definition of "Class Period," as it rests on

26 the false assumption that Plaintiff can seek to certify a class with claims accruing

27 after the date of the Complaint.  Defendant objects that this Interrogatory is

28 premature, as the Court has not yet decided whether to certify a class.

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 4:

Subject to and without waiving the foregoing objections, Defendant responds that Kroger Bread Crumbs during the 2011 through 2015 timeframe contained less than 0.5 grams of trans fat per serving, as stated on the label.  Defendant further responds that Defendant sold containers of Kroger Bread Crumbs between 2011 and 2015 but did not manufacture them.  Defendant is not aware of the precise individual or company that "manufactured" them and is not able to provide a verified response to that effect.

SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 4:

Subject to and without waiving the foregoing objections, Defendant responds: Kroger does not have knowledge or information regarding the manufacturer and PHO used in each product.  To the best of Kroger's knowledge, this information is maintained by Kroger's third-party suppliers.  Kroger is making reasonable and diligent efforts to obtain this information from its third-party suppliers ███████ █████████████████████████████████████████████████████, but has not obtained this information as of the date of these Responses.  Kroger is obtaining this information from these third-party suppliers, but different suppliers provided different products at different times, and Kroger is in the process of identifying the particular relevant products.  In addition, each of the suppliers worked with different manufacturers at different times, so obtaining a complete response will require procuring year-by-year information from each supplier.  Kroger is using its best efforts to obtain this information as soon as possible.  Kroger will provide amended responses when it obtains such information, or if it confirms it is unable to obtain such information, Kroger will provide an amended response in compliance with Section G of the Court's Sept. 16, 2019 Order (Dkt. 72).

INTERROGATORY NO. 5:

IDENTIFY the period of time during which YOU manufactured, distributed, or sold the PRODUCT, and if YOU contracted with outside companies to manufacture the PRODUCT, IDENTIFY them and the time period YOU contracted with them.

RESPONSE TO INTERROGATORY NO. 5:

Defendant incorporates herein by reference each of its General Objections. Defendant objects to this Interrogatory as calling for information that is neither relevant to any issue in this litigation nor reasonably calculated to lead to the discovery of admissible evidence.  Defendant further objects to this Interrogatory as

being overbroad and unduly burdensome, including in that it is not limited by time or the subject matter of this action.  Defendant further objects to this Interrogatory as compound, disjunctive and/or conjunctive.  Defendant further objects to this Interrogatory on the ground that it is vague and ambiguous.  Defendant further objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege and/or the attorney work-product doctrine.  Defendant objects to this Interrogatory to the extent it calls for the production of confidential information, proprietary information, and/or trade secrets.  Defendant objects that this Interrogatory is not proportional to the needs of the case, including in that the burden and expense of producing the requested information outweighs its probative value.  Defendant objects that this Interrogatory is premature, as the Court has not yet decided whether to certify a class.

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5:

Subject to and without waiving the foregoing objections, Defendant responds that Defendant sold containers of Kroger Bread Crumbs between 2011 and 2015 but did not manufacture them.  Defendant further responds that it purchased the Kroger Bread Crumbs through a third party but is not aware of the precise individual or company that "manufactured" them and is not able to provide a verified response to that effect.

SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5:

Subject to and without waiving the foregoing objections, Defendant responds that it sold containers of Kroger Bread Crumbs between 2010 and 2016, but did not manufacture them.  Kroger obtained Kroger Bread Crumbs from third-party suppliers, packaged, and shipped the Kroger Bread Crumbs; Kroger did not manufacture or contract to manufacture the Kroger Bread Crumbs.  To the best of Kroger's knowledge, third-party suppliers contracted with other upstream suppliers to create the Kroger Bread Crumbs.  Kroger is making reasonable and diligent efforts to obtain manufacturing information from its third-party suppliers

██████████████████████████████████████████████████████████, but has not obtained this information as of the date of these Responses.  Kroger is obtaining this information from these third parties, but different suppliers provided different products at different times, and Kroger is in the process of identifying the particular relevant products.  In addition, each of the suppliers worked with different manufacturers at different times, so obtaining a complete response will require procuring year-by-year information from each supplier.  Kroger is using its best efforts to obtain this information as soon as possible.  Kroger will provide amended responses when it obtains such information, or if it confirms it is unable to obtain such information, Kroger will provide an amended response in compliance with Section G of the Court's Sept. 16, 2019 Order (Dkt. 72).

INTERROGATORY NO. 7:

        IDENTIFY the locations, including the full address and your internal name for the facility, where the PRODUCT was manufactured.

RESPONSE TO INTERROGATORY NO. 7:

        Defendant incorporates herein by reference each of its General Objections. Defendant objects to this Interrogatory as calling for information that is neither relevant to any issue in this litigation nor reasonably calculated to lead to the discovery of admissible evidence.  Defendant further objects to this Interrogatory as being overbroad and unduly burdensome, including in that it is not limited by time or the subject matter of this action.  Defendant further objects to this Interrogatory as compound, disjunctive and/or conjunctive.  Defendant objects to this Interrogatory to the extent it calls for the production of confidential information, proprietary information, and/or trade secrets.  Defendant objects that this Interrogatory is not proportional to the needs of the case, including in that the burden and expense of producing the requested information outweighs its probative value.  Defendant further objects to this Interrogatory on the ground that it is vague

1  and ambiguous.  Defendant further objects to this Interrogatory to the extent it seeks

2  information protected by the attorney-client privilege and/or the attorney work-

3  product doctrine.  Defendant objects that this Interrogatory is premature, as the

4  Court has not yet decided whether to certify a class.

5  SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 7:

6      Subject to and without waiving the foregoing objections, Defendant responds

7  that Defendant sold containers of Kroger Bread Crumbs between 2011 and 2015 but

8  did not manufacture them.  Defendant further responds that it purchased the Kroger

9  Bread Crumbs through a third party but is not aware of the precise individual or

10  company that "manufactured" them and is not able to provide a verified response to

11  that effect.

12  SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 7:

13      Subject to and without waiving the foregoing objections, Defendant responds:

14  As detailed in response to Interrogatory No. 7, Kroger sold containers of Kroger

15  Bread Crumbs between 2010 and 2016, but did not manufacture them.  Kroger

16  obtained Kroger Bread Crumbs from third-party suppliers, packaged, and shipped

17  the Kroger Bread Crumbs; Kroger did not manufacture or contract to manufacture

18  the Kroger Bread Crumbs.  To the best of Kroger's knowledge, third-party suppliers

19  contracted with other upstream suppliers to create the Kroger Bread Crumbs.

20  Kroger is making reasonable and diligent efforts to obtain manufacturing

21  information from its third-party suppliers ███████████████████████

22  ████████████████████████████, but has not obtained this

23  information as of the date of these Responses.  Kroger is obtaining this information

24  from these third parties, but different suppliers provided different products at

25  different times, and Kroger is in the process of identifying the particular relevant

26  products.  In addition, each of the suppliers worked with different manufacturers at

27  different times, so obtaining a complete response will require procuring year-by-

28  year information from each supplier.  Kroger is using its best efforts to obtain this

information as soon as possible.  Kroger will provide amended responses when it obtains such information, or if it confirms it is unable to obtain such information, Kroger will provide an amended response in compliance with Section G of the Court's Sept. 16, 2019 Order (Dkt. 72).

INTERROGATORY NO. 8:

For each KROGER BREAD CRUMBS SKU, state the date that YOU stopped using PHO in its manufacture and separately when you stopped selling it.

RESPONSE TO INTERROGATORY NO. 8:

Defendant incorporates herein by reference each of its General Objections. Defendant objects to this Interrogatory as calling for information that is neither relevant to any issue in this litigation nor reasonably calculated to lead to the discovery of admissible evidence.  Defendant further objects to this Interrogatory as being overbroad, unduly burdensome, and oppressive, including in that it is not limited by time or the subject matter of this action.  Defendant further objects to this Interrogatory as compound, disjunctive and/or conjunctive.  Defendant objects to this Interrogatory to the extent it calls for the production of confidential information, proprietary information, and/or trade secrets.  Defendant objects that this Interrogatory is not proportional to the needs of the case, including in that the burden and expense of producing the requested information outweighs its probative value.  Defendant further objects to this Interrogatory on the ground that it is vague and ambiguous.  Defendant further objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege and/or the attorney work-product doctrine.  Defendant objects that this Interrogatory is premature, as the Court has not yet decided whether to certify a class.

SECOND SET OF SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8:

Subject to and without waiving the foregoing objections, Defendant responds that Defendant sold containers of Kroger Bread Crumbs between 2011 and 2015 but did not manufacture them.  Defendant therefore lacks information regarding the date specific ingredients were added to or removed from products and is not able to provide a verified response to that effect.

SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8:

Subject to and without waiving the foregoing objections, Defendant responds that Kroger did not manufacture Kroger Bread Crumbs.  As for sales, Kroger does not have SKU-specific information about when Kroger Bread Crumbs that were sold ceased to contain PHOs.  Kroger's best estimate of the date on which it stopped selling Kroger Bread Crumbs with PHO is 2016, but has no more specific information.  Kroger is making reasonable and diligent efforts to obtain information about the date on which manufacturers ceased including PHO in source bread crumbs from its third-party suppliers ████████████████████████ ██████████████████████████.  Kroger is obtaining this information from these third parties, but different suppliers provided different products at different times, and Kroger is in the process of identifying the particular relevant products.  In addition, each of the suppliers worked with different manufacturers at different times, so obtaining a complete response will require procuring year-by-year information from each supplier.  Kroger is using its best efforts to obtain this information as soon as possible.  Kroger will provide amended responses when it obtains such information, or if it confirms it is unable to obtain such information, Kroger will provide an amended response in compliance with Section G of the Court's Sept. 16, 2019 Order (Dkt. 72).

DATED: October 7, 2019

DAVIS WRIGHT TREMAINE LLP

By: /s/ Heather F. Canner

Heather F. Canner

Attorneys for Defendant
THE KROGER COMPANY

<u>PROOF OF SERVICE BY MAIL</u>

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is Davis Wright Tremaine LLP, Suite 2400, 865 South Figueroa Street, Los Angeles, California 90017-2566.

On October 7, 2019, I served the foregoing document(s) described as: **SECOND SET OF SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES** by placing a **true copy** of said document(s) enclosed in a sealed envelope(s) for each addressee named below, with the name and address of the person served shown on the envelope as follows:

The Weston Firm
Gregory S. Weston
Andrew C. Hamilton
1405 Morena Blvd., Suite 201
San Diego, CA  92110

I placed such envelope(s) with postage thereon fully prepaid for deposit in the United States Mail in accordance with the office practice of Davis Wright Tremaine LLP, for collecting and processing correspondence for mailing with the United States Postal Service.  I am familiar with the office practice of Davis Wright Tremaine LLP, for collecting and processing correspondence for mailing with the United States Postal Service, which practice is that when correspondence is deposited with the Davis Wright Tremaine LLP, personnel responsible for delivering correspondence to the United States Postal Service, such correspondence is delivered to the United States Postal Service that same day in the ordinary course of business.

Executed on October 7, 2019, at Los Angeles, California.

☐   State       I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct.

x    Federal     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

| Lina Pearmain | |
| --- | --- |
| Print Name | Signature |

**VERIFICATION**

I, Allie Arrowood, depose and say:

I am a Category Strategy Manager for Defendant The Kroger Company ("Defendant"). I am duly authorized by the The Kroger Company to verify the following: SECOND SET OF SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, on its behalf and hereby do so. The facts and matters stated therein are not within my personal knowledge or of any one individual at Defendant; rather, the facts stated therein have been assembled, on behalf of Defendant and with assistance of counsel, by authorized employees and/or counsel of Defendant with personal knowledge of the subject matter of the response and/or information and belief as to the truth and/or accuracy thereof.

Subject to the terms of this verification, Defendant declares, under penalty of perjury, that the foregoing responses are true and correct to the best of its knowledge and belief.

Executed at Cincinnati, Ohio, this 8th day of November 2019.

By: Allie Arrowood

Title: Category Strategy Manager

VERIFICATION - SECOND SUPPLEMENTAL
RESPONSES TO SET ONE OF INTERROGATORIES
4834-9462-0332v.1 0108587-000027

<u>PROOF OF SERVICE BY ELECTRONIC MAIL</u>

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Davis Wright Tremaine LLP, 865 South Figueroa Street, Suite 2400, Los Angeles, California 90017-2566.

On November 8, 2019, I served the foregoing document(s) described as: **VERIFICATION TO SECOND SET OF SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES** by forwarding a portable document file to the electronic mail address(es) below:

| | |
|---|---|
| Gregory S. Weston<br>David Elliot<br>The Weston Firm<br>1405 Morena Blvd., Ste. 201<br>San Diego, CA 92110<br>*Counsel for Plaintiff* | Tel: 619-798-2006<br>Fax: 313-293-7071<br>Email:<br>greg@westonfirm.com<br>david@westonfirm.com |

**(FROM ELECTRONIC MAIL ADDRESS heathercanner@dwt.com)** at 865 South Figueroa Street, Suite 2400, Los Angeles, California.

Executed on November 8, 2019, at Los Angeles, California.

X        State     I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct.

☐        Federal     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

| | |
|---|---|
| **Heather Canner** | */S/ Heather Canner* |
| Print Name | Signature |

PROOF OF SERVICE<br>DWT 24240669v1 0085000-008010

i

**DAVIS WRIGHT TREMAINE** LLP<br>865 S. FIGUEROA ST, SUITE 2400<br>LOS ANGELES, CALIFORNIA 90017-2566<br>(213) 633-6800<br>Fax: (213) 633-6899

# EXHIBIT 3

DAVIS WRIGHT TREMAINE LLP
Jacob M. Harper (SBN 259463)
  *jharper@dwt.com*
Nicole S. Phillis (SBN 291266)
  *nicolephillis@dwt.com*
Heather F. Canner (SBN 292837)
  *heathercanner@dwt.com*
865 South Figueroa Street, Suite 2400
Los Angeles, California 90017-2566
Telephone:  (213) 633-6800
Facsimile:  (213) 633-6899

Attorneys for Defendant
THE KROGER COMPANY

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHAVONDA HAWKINS, on behalf of herself and all others similarly situated,<br><br>　　　　　　Plaintiff,<br><br>　　vs.<br><br>THE KROGER COMPANY,<br><br>　　　　　　Defendant. | Case No. 15CV2320 JM AHG<br><br>**THIRD SET OF SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES**<br><br>***CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER***<br><br>Action Filed:  October 15, 2015 |

PROPOUNDING PARTY:　　Plaintiff SHAVONDA HAWKINS

RESPONDING PARTY:　　Defendant THE KROGER COMPANY

SET NUMBER:　　　　　ONE

Defendant THE KROGER COMPANY ("Defendant") responds to plaintiff SHAVONDA HAWKINS'S ("Plaintiff") First Set of Interrogatories as follows:

## PRELIMINARY STATEMENT

These responses are based upon Defendant's initial investigation to date. Defendant has not yet completed its investigation into the facts relating to this action and its analysis of such facts, both of which are continuing.  As Defendant's investigation and analysis progress, additional witnesses, facts, and evidence may be discovered and legal contentions developed which are not set forth in these responses and which may have been responsive to one or more Interrogatory.

In addition, the relevance, connection, or consequences of facts and evidence which are presently known may not be fully understood or appreciated until discovery is completed.  Accordingly, such facts and evidence may, in good faith, not be included in these responses.  Defendant reserves the right to use at trial and in any other proceedings in this action any such additional witnesses, facts, and evidence that may have been omitted from these responses for one of the foregoing reasons or otherwise and, without obligating itself to do so, to supplement these responses in the future as may be appropriate.

The response to any particular Interrogatory is not an admission or acknowledgment by Defendant that such response is relevant to any claim or defense in this action; is without prejudice to the right of Defendant to contend at trial or in any other or subsequent proceeding in this action or otherwise that such response is inadmissible, irrelevant, or immaterial; and is without prejudice to or waiver of any objection to any future use of such response which Defendant may be advised to make.

## GENERAL OBJECTIONS AND QUALIFICATIONS

1.     Defendant objects to these Interrogatories to the extent that they attempt or purport to impose obligations beyond those set forth in the California Code of Civil Procedure.

1

THIRD SET OF SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES
**CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER**

2.      Defendant generally objects to the Interrogatories to the extent they purport to require a statement of literally "all documents," "all persons," and/or any other exhaustive listing in connection with certain subject matters, rather than the principal facts or persons or general factual contentions, on the grounds that they are unduly burdensome and oppressive, of little or no benefit to Plaintiff, premature, and propounded for purposes of harassment.  Defendant further specifically reserves the right to use and to rely upon facts contained in documents that have been or will be produced in this case, and the testimony of witnesses in this case without being limited by its responses to these Interrogatories.

3.      Defendant objects to these Interrogatories to the extent that they call for disclosure of information, documents or communications protected from discovery by the attorney-client privilege, the attorney work-product doctrine, or any other applicable privilege.  Without waiving this objection, Defendant will respond to each Interrogatory without disclosure of privileged or otherwise protected information, documents or communications.

4.      Defendant objects to these Interrogatories to the extent they seek information protected by the right to privacy under the U.S. Constitution, federal law, the California State Constitution, state law or any other privacy right.

5.      Defendant objects to these Interrogatories to the extent that they seek discovery of matters that are not relevant to the claims or defenses in this action.

6.      Defendant expressly reserves the right to make any and all evidentiary objections to the Interrogatories and any information contained in the following responses if such information is offered at trial or at any other proceeding in this action.

7.      Defendant objects to the Definition of "YOU" and "YOUR" as overbroad, unduly burdensome, vague, and ambiguous.  Defendant responds to this discovery only on behalf of Defendant The Kroger Company.

THIRD SET OF SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES
**CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER**

8.     Defendant objects to the time period of "January 1, 2006 to the present" as overbroad, unduly burdensome, and calling for information that is neither relevant to any issue in this litigation nor reasonably calculated to lead to the discovery of admissible evidence.

9.     Defendant objects to the Definition of "Class Period," as it rests on the false assumption that Plaintiff can seek to certify a class with claims accruing after the date of the Complaint.

10.     Specific objections to each Interrogatory are made on an individual basis in the responses below.  These General Objections and Qualifications are incorporated by reference into each of the responses set forth below.  The failure to mention one of the foregoing objections and qualifications in any of the responses set forth below shall not be deemed a waiver of such objection or qualification.

**SUPPLEMENTAL RESPONSES TO INTERROGATORIES**

INTERROGATORY NO. 1:

IDENTIFY, for California, for each quarter of the CLASS PERIOD, your unit sales of each of the KROGER BREAD CRUMBS SKUs and the total revenue YOU derived the sale of the PRODUCT.

RESPONSE TO INTERROGATORY NO. 1:

Defendant incorporates herein by reference each of its General Objections. Defendant objects to this Interrogatory as calling for information that is neither relevant to any issue in this litigation nor reasonably calculated to lead to the discovery of admissible evidence.  Defendant further objects to this Interrogatory as being overbroad and unduly burdensome, including in that it is not limited to the subject matter of this action.  Defendant further objects to this Interrogatory as compound, disjunctive and/or conjunctive.  Defendant further objects to this Interrogatory on the ground that it is vague and ambiguous, including but not limited to its use of the term "total revenue YOU derived the sale."  Defendant objects to this Interrogatory to the extent it calls for the production of confidential

information, proprietary information, and/or trade secrets.  Defendant objects that
this Interrogatory is not proportional to the needs of the case, including in that the
burden and expense of producing the requested information outweighs its probative
value.  Defendant objects to this Interrogatory as premature and improperly seeking
expert discovery.  Defendant objects to the Definition of "Class Period," as it rests
on the false assumption that Plaintiff can seek to certify a class with claims accruing
after the date of the Complaint.  Defendant objects that this Interrogatory is
premature, as the Court has not yet decided whether to certify a class.

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:

Subject to and without waiving the foregoing objections, Defendant responds
that after conducting a reasonable search, Defendant lacks information within its
possession, custody, or control to show the unique number of buyers of all bread
Crumbs in California, and is not able to provide a verified response to that effect.

SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:

Subject to and without waiving the foregoing objections, Defendant responds
as follows:  Kroger does not maintain information about which specific products—
whether by SKU or otherwise—contained PHO during the relevant time period;
instead, Kroger believes its third-party suppliers maintain this information.  In
addition, Kroger does not maintain quarterly records for unit sales or revenue for
Kroger Bread Crumbs.  That notwithstanding, Kroger is making reasonable and
diligent efforts to obtain specific information about which Kroger Bread Crumb
products contained PHO during the relevant time period from its third-party
suppliers ██████████████████████████████████████████████
████████████████.  Once it has this information, it will provide amended responses
in which it will provide unit and revenue information for the relevant period for
Kroger Bread Crumbs that contained PHO and were sold during the relevant period.

_____
THIRD SET OF SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES
**CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER**

THIRD SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:

Defendant responds as follows, based on its understanding after a diligent search and investigation:  As Kroger has previously explained, Kroger purchased bread crumbs during the relevant time period in pre-made and pre-packaged form from third-party suppliers. Those third-party suppliers develop their own proprietary formulas for the breadcrumbs, which they own, and have their own manufacturer or manufacturers.  Without information in the suppliers' exclusive possession, Kroger was not able to identify the PRODUCTS, as Plaintiff defines them, nor provide much of the information Plaintiff seeks.  Pursuant to the Court's September 16, 2019 Order (Dkt. 72), Kroger has expended extensive efforts to obtain responsive information from its suppliers of Kroger bread crumbs.

Through those efforts, Kroger has confirmed that Kroger bread crumb products purchased from two of its four suppliers of breadcrumbs—███████ ██████████████████████████—did not contain PHO during the relevant time period, to the best of their knowledge.  Breadcrumb products sourced from those suppliers therefore did not contain PHO, and as a result documents and information regarding products sourced from these suppliers do not come within the scope of documents and information sought in this case, which are defined as "Kroger Bread Crumbs containing partially hydrogenated oil(s)."

The remaining two suppliers—███████████████████████—both sold the same Kroger bread crumbs products: Kroger Italian Style Bread Crumbs (UPC 1111081877), Kroger Plain Style Bread Crumbs (UPC 1111081878), and Kroger Roasted Garlic Bread Crumbs (UPC 1111090787).  Despite Kroger's extensive efforts to obtain information regarding the bread crumbs sourced from ██████ █████ has not provided any information to Kroger, other than to say a third-party supplier ████████ actually provided the bread crumbs.  Although Kroger contacted ██████████ dozens of times, and repeatedly contacted ██████, neither

5

1  ███████ nor ███████ has cooperated in providing any further information about

2  Kroger bread crumbs.

3      After weeks of attempts to obtain information from ███████████████,

4  it responded with some information about the Kroger Bread products it sold to

5  Kroger—namely, Kroger Italian Breadcrumbs (UPC 1111081877), Kroger Plain

6  Breadcrumbs (UPC 1111081878), and Kroger Roasted Garlic Breadcrumbs (UPC

7  1111090787). ███████████████ was not the exclusive supplier for all of

8  those products. ███████████████ stated the products it supplied contained

9  PHO during 2013 through 2014, and that by the end of the first quarter of 2015, the

10  products no longer contained PHO.  It further stated it would have sold and shipped

11  the final products with PHO to Kroger within approximately 30 days of production.

12  ███████████████ could not identify the precise date when its products

13  ceased including PHO, because the bread component of its products was

14  manufactured by hundreds of third-party bakeries, which ███████████████

15  would not identify on the basis of confidentiality.  ███████████████

16  explained that it processed different types of breads from multiple third-party

17  bakeries into bread crumbs for each product.  The bread crumbs are not made to a

18  particular formula such that ███████████████ would know the exact amount

19  of ingredients or the names of individual suppliers of ingredients.

20      In sum, several third parties confirmed their products did not contain PHO

21  (███████████████████████████), only one supplier has stated

22  its products contained PHO (███████████████), and another has not

23  provided information (███████).

24      For 2010, 2011, and 2012, and potentially part of 2013, Kroger is not able to

25  determine which products contain breadcrumbs sourced from suppliers that did or

26  did not use PHO.  As noted above, one of the suppliers during 2010 to 2012 (and

27  potentially 2013) has not provided any information to Kroger (despite Kroger's

28  more than diligent efforts to obtain such information).  In addition, Kroger cannot

6

THIRD SET OF SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES
**CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER**

1   determine the supplier based on UPC because multiple suppliers provided

2   breadcrumbs for the same UPC in at least one year (e.g., both ▮▮▮▮▮▮▮▮

3   ▮▮▮▮▮▮▮▮▮▮▮▮▮ appear to have produced products with UPCs

4   1111081877 and 1111081878 in 2013).  Because revenue information is maintained

5   per UPC code, without information regarding the content of its products, Kroger

6   cannot specify the revenue of relevant products (containing PHO) during at least

7   2013.

8       Kroger will continue to seek information from its suppliers to determine

9   whether the products Kroger obtained from ▮▮▮▮▮▮▮▮▮ contained PHO,

10  and other responsive information, and will amend these responses if and when

11  additional responsive information becomes available.

12

13  <u>Kroger Italian Bread Crumbs</u> (California)

14  These unit sales and revenues in California are for UPC 1111081877.  As set forth

15  above, the figures for 2013 and 2015 may include sales of Kroger bread crumbs that

16  do not contain PHO.  Kroger will continue to investigate, as stated above, and will

17  amend these figures and supplement its responses should further information

18  become available.

19  ▮▮▮▮▮▮▮▮▮▮▮▮

20  ▮▮▮▮▮▮▮▮▮▮▮▮

21  ▮▮▮▮▮▮▮▮▮▮▮▮

22  ▮▮▮▮▮▮▮▮▮▮▮▮

23  ▮▮▮▮▮▮▮▮▮▮▮▮

24  ▮▮▮▮▮▮▮▮▮▮▮▮

25  ▮▮▮▮▮▮▮▮▮▮▮▮

26  ▮▮▮▮▮▮▮▮▮▮▮▮

27  ▮▮▮▮▮▮▮▮▮▮▮▮

28

THIRD SET OF SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES
**CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER**

Kroger Plain Bread Crumbs (California)

These unit sales and revenues in California are for UPC 1111081878.  As set forth above, the figures for 2013 and 2015 may include sales of Kroger bread crumbs that do not contain PHO.  Kroger will continue to investigate, as stated above, and will amend these figures and supplement its responses should further information become available.

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

Regarding the Roasted Garlic Bread Crumbs product (UPC 11110907879), Kroger has conducted a reasonable search for but has not located unit sales or revenue information for this product in California.  Based on the information available, and to the best of Kroger's knowledge, it appears that this product was not sold in California during the relevant time period.

INTERROGATORY NO. 3:

IDENTIFY products that YOU consider, or have considered at different times during the CLASS PERIOD, to be the primary competitors to the PRODUCT.

RESPONSE TO INTERROGATORY NO. 3:

Defendant incorporates herein by reference each of its General Objections. Defendant objects to this Interrogatory as calling for information that is neither

relevant to any issue in this litigation nor reasonably calculated to lead to the discovery of admissible evidence.  Defendant further objects to this Interrogatory as being overbroad and unduly burdensome, including in that it is not limited to the subject matter of this action.  Defendant further objects to this Interrogatory as compound, disjunctive and/or conjunctive.  Defendant further objects to this Interrogatory on the ground that it is vague and ambiguous, including but not limited to its use of the phrase "primary competitors."  Defendant further objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege and/or the attorney work-product doctrine.  Defendant objects to this Interrogatory to the extent it calls for the production of confidential information, proprietary information, and/or trade secrets.  Defendant objects that this Interrogatory is not proportional to the needs of the case, including in that the burden and expense of producing the requested information outweighs its probative value.  Defendant objects to the Definition of "Class Period," as it rests on the false assumption that Plaintiff can seek to certify a class with claims accruing after the date of the Complaint.  Defendant objects that this Interrogatory is premature, as the Court has not yet decided whether to certify a class.

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3:

Subject to and without waiving the foregoing objections, Defendant responds: Defendant used the following products as benchmarks for Kroger Bread Crumbs during the relevant period: █████████████████████████████████████ ████████████████████████████████████

INTERROGATORY NO. 4:

IDENTIFY the manufacturer of and amount of PHO per 100g used in the PRODUCT, e.g., "Cargill Olympic S-100 Partially Hydrogenated Soybean Oil 16g per 100g of Kroger Bread Crumbs."

THIRD SET OF SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES
**CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER**

RESPONSE TO INTERROGATORY NO. 4:

Defendant incorporates herein by reference each of its General Objections. Defendant objects to this Interrogatory as calling for information that is neither relevant to any issue in this litigation nor reasonably calculated to lead to the discovery of admissible evidence.  Defendant further objects to this Interrogatory as being overbroad and unduly burdensome.  Defendant further objects to this Interrogatory as compound, disjunctive and/or conjunctive.  Defendant further objects to this Interrogatory on the ground that it is vague and ambiguous. Defendant further objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege and/or the attorney work-product doctrine. Defendant objects to this Interrogatory to the extent it calls for the production of confidential information, proprietary information, and/or trade secrets.  Defendant objects that this Interrogatory is not proportional to the needs of the case, including in that the burden and expense of producing the requested information outweighs its probative value.  Defendant objects to the Definition of "Class Period," as it rests on the false assumption that Plaintiff can seek to certify a class with claims accruing after the date of the Complaint.  Defendant objects that this Interrogatory is premature, as the Court has not yet decided whether to certify a class.

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 4:

Subject to and without waiving the foregoing objections, Defendant responds that Kroger Bread Crumbs during the 2011 through 2015 timeframe contained less than 0.5 grams of trans fat per serving, as stated on the label.  Defendant further responds that Defendant sold containers of Kroger Bread Crumbs between 2011 and 2015 but did not manufacture them.  Defendant is not aware of the precise individual or company that "manufactured" them and is not able to provide a verified response to that effect.

10

THIRD SET OF SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES
**CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER**

SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 4:

Subject to and without waiving the foregoing objections, Defendant responds: Kroger does not have knowledge or information regarding the manufacturer and PHO used in each product.  To the best of Kroger's knowledge, this information is maintained by Kroger's third-party suppliers.  Kroger is making reasonable and diligent efforts to obtain this information from its third-party suppliers ████ ███████████████████████████████████████████████████████████████, but has not obtained this information as of the date of these Responses.  Kroger is obtaining this information from these third-party suppliers, but different suppliers provided different products at different times, and Kroger is in the process of identifying the particular relevant products.  In addition, each of the suppliers worked with different manufacturers at different times, so obtaining a complete response will require procuring year-by-year information from each supplier.  Kroger is using its best efforts to obtain this information as soon as possible.  Kroger will provide amended responses when it obtains such information, or if it confirms it is unable to obtain such information, Kroger will provide an amended response in compliance with Section G of the Court's Sept. 16, 2019 Order (Dkt. 72).

THIRD SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 4:

Defendant responds as follows, based on its understanding after a diligent search and investigation:  As Kroger has previously explained, Kroger purchased bread crumbs during the relevant time period in pre-made and pre-packaged form from third-party suppliers. Those third-party suppliers develop their own proprietary formulas for the breadcrumbs, which they own, and have their own manufacturer or manufacturers.  Without information in the suppliers' exclusive possession, Kroger was not able to identify the PRODUCTS, as Plaintiff defines them, nor provide much of the information Plaintiff seeks.  Pursuant to the Court's September 16, 2019 Order (Dkt. 72), Kroger has expended extensive efforts to obtain responsive information from its suppliers of Kroger Bread Crumbs.

**CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER**

1   Through those efforts, Kroger has confirmed that Kroger bread crumb

2   products purchased from two of its four suppliers of breadcrumbs—█████████

3   ████████████████████████████—did not contain PHO during the relevant

4   time period, to the best of their knowledge.  Breadcrumb products sourced from

5   those suppliers therefore did not contain PHO, and as a result documents and

6   information regarding products sourced from these suppliers do not come within the

7   scope of documents and information sought in this case, which are defined as

8   "Kroger Bread Crumbs containing partially hydrogenated oil(s)."

9   The remaining two suppliers—█████████████████████—

10  both sold the same Kroger bread crumbs products: Kroger Italian Style

11  Bread Crumbs (UPC 1111081877), Kroger Plain Style Bread Crumbs (UPC

12  1111081878), and Kroger Roasted Garlic Bread Crumbs (UPC

13  1111090787).  Despite Kroger's extensive efforts to obtain information

14  regarding the bread crumbs sourced from ████████████ has not provided

15  any information to Kroger, other than to say a third-party supplier, ████

16  ████, actually provided the bread crumbs.  Although Kroger contacted

17  ████████ dozens of times, and repeatedly contacted ██████, neither

18  ████████████████ has cooperated in providing any further

19  information about Kroger bread crumbs.

20  After weeks of attempts to obtain information from █████████████,

21  it responded with some information about the Kroger Bread products it sold to

22  Kroger—namely, Kroger Italian Breadcrumbs (UPC 1111081877), Kroger Plain

23  Breadcrumbs (UPC 1111081878), and Kroger Roasted Garlic Breadcrumbs (UPC

24  1111090787).  ████████████████ was not the exclusive supplier for all of

25  those products.  ████████████████ stated the products it supplied contained

26  PHO during 2013 through 2014, and that by the end of the first quarter of 2015, the

27  products no longer contained PHO.  It further stated it would have sold and shipped

28  the final products with PHO to Kroger within approximately 30 days of production.

THIRD SET OF SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES
**CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER**

███████████████ could not, however, identify the manufacturer(s) of the PHO, as the bread component of its products was manufactured by hundreds of third-party bakeries, which ████████████████ would not identify on the basis of confidentiality.  ████████████████ processed different types of breads from multiple third-party bakeries into bread crumbs for each product.  Further, ████████████████ explained that the bread crumbs are not made to a particular formula such that ████████████████ would know the precise amount of ingredients or the names of individual suppliers of ingredients for a particular product.

In sum, several third-parties confirmed their products did not contain PHO (█████████████████████████████████), only one supplier has stated its products contained PHO (████████████████), and another has not provided information (████████).  Kroger will continue to seek information from ████████████████ to determine whether the products sourced from them contained PHO, as well as to obtain other responsive information, and will amend these responses should any additional responsive information become available.

INTERROGATORY NO. 5:

IDENTIFY the period of time during which YOU manufactured, distributed, or sold the PRODUCT, and if YOU contracted with outside companies to manufacture the PRODUCT, IDENTIFY them and the time period YOU contracted with them.

RESPONSE TO INTERROGATORY NO. 5:

Defendant incorporates herein by reference each of its General Objections. Defendant objects to this Interrogatory as calling for information that is neither relevant to any issue in this litigation nor reasonably calculated to lead to the discovery of admissible evidence.  Defendant further objects to this Interrogatory as being overbroad and unduly burdensome, including in that it is not limited by time

THIRD SET OF SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES
**CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER**

or the subject matter of this action.  Defendant further objects to this Interrogatory as compound, disjunctive and/or conjunctive.  Defendant further objects to this Interrogatory on the ground that it is vague and ambiguous.  Defendant further objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege and/or the attorney work-product doctrine.  Defendant objects to this Interrogatory to the extent it calls for the production of confidential information, proprietary information, and/or trade secrets.  Defendant objects that this Interrogatory is not proportional to the needs of the case, including in that the burden and expense of producing the requested information outweighs its probative value.  Defendant objects that this Interrogatory is premature, as the Court has not yet decided whether to certify a class.

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5:

Subject to and without waiving the foregoing objections, Defendant responds that Defendant sold containers of Kroger Bread Crumbs between 2011 and 2015 but did not manufacture them.  Defendant further responds that it purchased the Kroger Bread Crumbs through a third party but is not aware of the precise individual or company that "manufactured" them and is not able to provide a verified response to that effect.

SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5:

Subject to and without waiving the foregoing objections, Defendant responds that it sold containers of Kroger Bread Crumbs between 2010 and 2016, but did not manufacture them.  Kroger obtained Kroger Bread Crumbs from third-party suppliers, packaged, and shipped the Kroger Bread Crumbs; Kroger did not manufacture or contract to manufacture the Kroger Bread Crumbs.  To the best of Kroger's knowledge, third-party suppliers contracted with other upstream suppliers to create the Kroger Bread Crumbs.  Kroger is making reasonable and diligent efforts to obtain manufacturing information from its third-party suppliers █████, but

14

has not obtained this information as of the date of these Responses.  Kroger is

obtaining this information from these third parties, but different suppliers provided

different products at different times, and Kroger is in the process of identifying the

particular relevant products.  In addition, each of the suppliers worked with

different manufacturers at different times, so obtaining a complete response will

require procuring year-by-year information from each supplier.  Kroger is using its

best efforts to obtain this information as soon as possible.  Kroger will provide

amended responses when it obtains such information, or if it confirms it is unable to

obtain such information, Kroger will provide an amended response in compliance

with Section G of the Court's Sept. 16, 2019 Order (Dkt. 72).

THIRD SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5:

Defendant responds as follows, based on its understanding after a diligent

search and investigation:  As Kroger has previously explained, Kroger purchased

bread crumbs during the relevant time period in pre-made and pre-packaged form

from third-party suppliers. Those third-party suppliers develop their own

proprietary formulas for the breadcrumbs, which they own, and have their own

manufacturer or manufacturers.  Without information in the suppliers' exclusive

possession, Kroger was not able to identify the PRODUCTS, as Plaintiff defines

them, nor provide much of the information Plaintiff seeks.  Pursuant to the Court's

September 16, 2019 Order (Dkt. 72), Kroger has expended extensive efforts to

obtain responsive information from its suppliers of Kroger Bread Crumbs.

Through those efforts, Kroger has confirmed that Kroger bread crumb

products purchased from two of its four suppliers of breadcrumbs—███████

██████████████████████████—did not contain PHO during the relevant

time period, to the best of their knowledge.  Breadcrumb products sourced from

those suppliers therefore did not contain PHO, and as a result documents and

information regarding products sourced from these suppliers do not come within the

15

_____
THIRD SET OF SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES
**CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER**

1   scope of documents and information sought in this case, which are defined as

2   "Kroger Bread Crumbs containing partially hydrogenated oil(s)."

3       The remaining two suppliers— ███████████████████████ —

4   both sold the same Kroger bread crumbs products: Kroger Italian Style

5   Bread Crumbs (UPC 1111081877), Kroger Plain Style Bread Crumbs (UPC

6   1111081878), and Kroger Roasted Garlic Bread Crumbs (UPC

7   1111090787).  Despite Kroger's extensive efforts to obtain information

8   regarding the bread crumbs sourced from ████████████ has not provided

9   any information to Kroger, other than to say a third-party supplier, ████

10  ████ actually provided the bread crumbs.  Although Kroger contacted

11  ████████ dozens of times, and repeatedly contacted ██████, neither

12  ███████████████ has cooperated in providing any further

13  information about Kroger bread crumbs.

14      After weeks of attempts to obtain information from ████████████████,

15  it responded with some information about the Kroger Bread products it sold to

16  Kroger—namely, Kroger Italian Breadcrumbs (UPC 1111081877), Kroger Plain

17  Breadcrumbs (UPC 1111081878), and Kroger Roasted Garlic Breadcrumbs (UPC

18  1111090787).  ████████████ was not the exclusive supplier for all of

19  those products.  ████████████ stated the products it supplied contained

20  PHO during 2013 through 2014, and that by the end of the first quarter of 2015, the

21  products no longer contained PHO.  Kroger sold the PRODUCTS purchased from

22  ████████████ during that time.  ████████████ further stated it

23  would have sold and shipped the final products with PHO to Kroger's distribution

24  center within approximately 30 days of production.  ████████████ could

25  not, however, identify the manufacturer(s) of the PHO, as the bread component of

26  its products was manufactured by hundreds of third-party bakeries, which ████

27  ████████████ would not identify on the basis of confidentiality.  ████████

28  ████████ explained that the information necessary to identify an exact date would be

THIRD SET OF SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

1    within those manufacturers' possession.  Further, ███████████████

2    explained that the bread crumbs are not made to a particular formula such that

3    ███████████████████ would know the precise amount of ingredients or the

4    names of individual suppliers of ingredients for a particular product.

5           Kroger will continue to seek information from ████████████████ to

6    determine whether the products sourced from them contained PHO, as well as to

7    obtain other responsive information, and will amend these responses should any

8    additional responsive information become available.

9

10   INTERROGATORY NO. 7:

11          IDENTIFY the locations, including the full address and your internal name

12   for the facility, where the PRODUCT was manufactured.

13   RESPONSE TO INTERROGATORY NO. 7:

14          Defendant incorporates herein by reference each of its General Objections.

15   Defendant objects to this Interrogatory as calling for information that is neither

16   relevant to any issue in this litigation nor reasonably calculated to lead to the

17   discovery of admissible evidence.  Defendant further objects to this Interrogatory as

18   being overbroad and unduly burdensome, including in that it is not limited by time

19   or the subject matter of this action.  Defendant further objects to this Interrogatory

20   as compound, disjunctive and/or conjunctive.  Defendant objects to this

21   Interrogatory to the extent it calls for the production of confidential information,

22   proprietary information, and/or trade secrets.  Defendant objects that this

23   Interrogatory is not proportional to the needs of the case, including in that the

24   burden and expense of producing the requested information outweighs its probative

25   value.  Defendant further objects to this Interrogatory on the ground that it is vague

26   and ambiguous.  Defendant further objects to this Interrogatory to the extent it seeks

27   information protected by the attorney-client privilege and/or the attorney work-

28

17

product doctrine.  Defendant objects that this Interrogatory is premature, as the Court has not yet decided whether to certify a class.

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 7:

Subject to and without waiving the foregoing objections, Defendant responds that Defendant sold containers of Kroger Bread Crumbs between 2011 and 2015 but did not manufacture them.  Defendant further responds that it purchased the Kroger Bread Crumbs through a third party but is not aware of the precise individual or company that "manufactured" them and is not able to provide a verified response to that effect.

SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 7:

Subject to and without waiving the foregoing objections, Defendant responds: As detailed in response to Interrogatory No. 7, Kroger sold containers of Kroger Bread Crumbs between 2010 and 2016, but did not manufacture them.  Kroger obtained Kroger Bread Crumbs from third-party suppliers, packaged, and shipped the Kroger Bread Crumbs; Kroger did not manufacture or contract to manufacture the Kroger Bread Crumbs.  To the best of Kroger's knowledge, third-party suppliers contracted with other upstream suppliers to create the Kroger Bread Crumbs. Kroger is making reasonable and diligent efforts to obtain manufacturing information from its third-party suppliers ████████████████████████ ████████████████████████████████, but has not obtained this information as of the date of these Responses.  Kroger is obtaining this information from these third parties, but different suppliers provided different products at different times, and Kroger is in the process of identifying the particular relevant products.  In addition, each of the suppliers worked with different manufacturers at different times, so obtaining a complete response will require procuring year-by-year information from each supplier.  Kroger is using its best efforts to obtain this information as soon as possible.  Kroger will provide amended responses when it obtains such information, or if it confirms it is unable to obtain such information,

18

1  Kroger will provide an amended response in compliance with Section G of the

2  Court's Sept. 16, 2019 Order (Dkt. 72).

3  <u>THIRD SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 7</u>:

4  Defendant responds as follows, based on its understanding after a diligent

5  search and investigation:  As Kroger has previously explained, Kroger purchased

6  bread crumbs during the relevant time period in pre-made and pre-packaged form

7  from third-party suppliers. Those third-party suppliers develop their own

8  proprietary formulas for the breadcrumbs, which they own, and have their own

9  manufacturer or manufacturers.  Without information in the suppliers' exclusive

10  possession, Kroger was not able to identify the PRODUCTS, as Plaintiff defines

11  them, nor provide much of the information Plaintiff seeks.  Pursuant to the Court's

12  September 16, 2019 Order (Dkt. 72), Kroger has expended extensive efforts to

13  obtain responsive information from its suppliers of Kroger Bread Crumbs.

14  Through those efforts, Kroger has confirmed that Kroger bread crumb

15  products purchased from two of its four suppliers of breadcrumbs—▮▮▮▮▮

16  ▮▮▮▮▮▮▮▮▮▮—did not contain PHO during the relevant

17  time period, to the best of their knowledge.  Breadcrumb products sourced from

18  those suppliers therefore did not contain PHO, and as a result documents and

19  information regarding products sourced from these suppliers do not come within the

20  scope of documents and information sought in this case, which are defined as

21  "Kroger Bread Crumbs containing partially hydrogenated oil(s)."

22  The remaining two suppliers—▮▮▮▮▮▮▮▮▮▮▮—

23  both sold the same Kroger bread crumbs products: Kroger Italian Style

24  Bread Crumbs (UPC 1111081877), Kroger Plain Style Bread Crumbs (UPC

25  1111081878), and Kroger Roasted Garlic Bread Crumbs (UPC

26  1111090787).  Despite Kroger's extensive efforts to obtain information

27  regarding the bread crumbs sourced from ▮▮▮▮▮▮ has not provided

28  any information to Kroger, other than to say a third-party supplier, ▮▮▮

19

1     ████, actually provided the bread crumbs.  Although Kroger contacted

2     ██████ dozens of times, and repeatedly contacted █████ neither

3     ██████ nor ████████ has cooperated in providing any further

4     information about Kroger bread crumbs.

5         After weeks of attempts to obtain information from ████████████████,

6     it responded with some information about the Kroger Bread products it sold to

7     Kroger—namely, Kroger Italian Breadcrumbs (UPC 1111081877), Kroger Plain

8     Breadcrumbs (UPC 1111081878), and Kroger Roasted Garlic Breadcrumbs (UPC

9     1111090787).  ████████████ was not the exclusive supplier for all of

10    those products.  ██████████████ stated the products it supplied contained

11    PHO during 2013 through 2014, and that by the end of the first quarter of 2015, the

12    products no longer contained PHO.  ████████████ manufactured the

13    products at its facility located at 24 Ironside Ct, Willingboro, NJ 08046.  █████

14    ██████████ explained that the bread component of the product, however, was

15    manufactured by hundreds of third-party bakeries, which █████████████

16    would not identify on the basis of confidentiality.  ████████████████ further

17    explained that it processed different types of breads from multiple third-party

18    bakeries into bread crumbs for each product.  The PRODUCTS sourced from

19    ███████████████ are not made to a particular formula such that ██████

20    ██████████████ would know the names of individual suppliers of ingredients for a

21    particular product.

22         Kroger will continue to seek information from ████████████ to

23    determine whether the products sourced from them contained PHO, as well as to

24    obtain other responsive information, and will amend these responses should any

25    additional responsive information become available.

26

27

28

THIRD SET OF SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES
**CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER**

1  INTERROGATORY NO. 8:

2      For each KROGER BREAD CRUMBS SKU, state the date that YOU

3  stopped using PHO in its manufacture and separately when you stopped selling it.

4  RESPONSE TO INTERROGATORY NO. 8:

5      Defendant incorporates herein by reference each of its General Objections.

6  Defendant objects to this Interrogatory as calling for information that is neither

7  relevant to any issue in this litigation nor reasonably calculated to lead to the

8  discovery of admissible evidence.  Defendant further objects to this Interrogatory as

9  being overbroad, unduly burdensome, and oppressive, including in that it is not

10 limited by time or the subject matter of this action.  Defendant further objects to this

11 Interrogatory as compound, disjunctive and/or conjunctive.  Defendant objects to

12 this Interrogatory to the extent it calls for the production of confidential

13 information, proprietary information, and/or trade secrets.  Defendant objects that

14 this Interrogatory is not proportional to the needs of the case, including in that the

15 burden and expense of producing the requested information outweighs its probative

16 value.  Defendant further objects to this Interrogatory on the ground that it is vague

17 and ambiguous.  Defendant further objects to this Interrogatory to the extent it seeks

18 information protected by the attorney-client privilege and/or the attorney work-

19 product doctrine.  Defendant objects that this Interrogatory is premature, as the

20 Court has not yet decided whether to certify a class.

21

22

23

24

25

26

27

28

THIRD SET OF SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES
**CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER**

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8:

Subject to and without waiving the foregoing objections, Defendant responds that Defendant sold containers of Kroger Bread Crumbs between 2011 and 2015 but did not manufacture them.  Defendant therefore lacks information regarding the date specific ingredients were added to or removed from products and is not able to provide a verified response to that effect.

SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8:

Subject to and without waiving the foregoing objections, Defendant responds that Kroger did not manufacture Kroger Bread Crumbs.  As for sales, Kroger does not have SKU-specific information about when Kroger Bread Crumbs that were sold ceased to contain PHOs.  Kroger's best estimate of the date on which it stopped selling Kroger Bread Crumbs with PHO is 2016, but has no more specific information.  Kroger is making reasonable and diligent efforts to obtain information about the date on which manufacturers ceased including PHO in source bread crumbs from its third-party suppliers ███████████████████████████████████████████████████.  Kroger is obtaining this information from these third parties, but different suppliers provided different products at different times, and Kroger is in the process of identifying the particular relevant products.  In addition, each of the suppliers worked with different manufacturers at different times, so obtaining a complete response will require procuring year-by-year information from each supplier.  Kroger is using its best efforts to obtain this information as soon as possible.  Kroger will provide amended responses when it obtains such information, or if it confirms it is unable to obtain such information, Kroger will provide an amended response in compliance with Section G of the Court's Sept. 16, 2019 Order (Dkt. 72).

THIRD SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8:

Defendant responds as follows, based on its understanding after a diligent search and investigation:  As Kroger has previously explained, Kroger purchased

THIRD SET OF SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES
**CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER**

bread crumbs during the relevant time period in pre-made and pre-packaged form from third-party suppliers. Those third-party suppliers develop their own proprietary formulas for the breadcrumbs, which they own, and have their own manufacturer or manufacturers.  Without information in the suppliers' exclusive possession, Kroger was not able to identify the PRODUCTS, as Plaintiff defines them, nor provide much of the information Plaintiff seeks.  Pursuant to the Court's September 16, 2019 Order (Dkt. 72), Kroger has expended extensive efforts to obtain responsive information from its suppliers of Kroger Bread Crumbs.

Through those efforts, Kroger has confirmed that Kroger bread crumb products purchased from two of its four suppliers of breadcrumbs—████████ ████████████████████—did not contain PHO during the relevant time period, to the best of their knowledge.  Breadcrumb products sourced from those suppliers therefore did not contain PHO, and as a result documents and information regarding products sourced from these suppliers do not come within the scope of documents and information sought in this case, which are defined as "Kroger Bread Crumbs containing partially hydrogenated oil(s)."

The remaining two suppliers—████████████████████— both sold the same Kroger bread crumbs products: Kroger Italian Style Bread Crumbs (UPC 1111081877), Kroger Plain Style Bread Crumbs (UPC 1111081878), and Kroger Roasted Garlic Bread Crumbs (UPC 1111090787).  Despite Kroger's extensive efforts to obtain information regarding the bread crumbs sourced from ████████ has not provided any information to Kroger, other than to say a third-party supplier, ███ █████, actually provided the bread crumbs.  Although Kroger contacted ████████ dozens of times, and repeatedly contacted ██████ neither ██████ nor ███████ has cooperated in providing any further information about Kroger bread crumbs.

THIRD SET OF SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES
**CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER**

After weeks of attempts to obtain information from █████████████,
it responded with some information about the Kroger Bread products it sold to
Kroger—namely, Kroger Italian Breadcrumbs (UPC 1111081877), Kroger Plain
Breadcrumbs (UPC 1111081878), and Kroger Roasted Garlic Breadcrumbs (UPC
1111090787). ████████████████ was not the exclusive supplier for all of
those products. ████████████████ stated the products it supplied contained
PHO during 2013 through 2014, and that by the end of the first quarter of 2015, the
products no longer contained PHO.  It further stated it would have sold and shipped
the final products with PHO to Kroger within approximately 30 days of production.
Kroger, in turn, would likely have sold such products within 60 days. ████████
██████████ explained that the bread component of its products was
manufactured by hundreds of third-party bakeries, which ████████████████
would not identify on the basis of confidentiality. ████████████████
processed different types of breads from multiple third-party bakeries into bread
crumbs for each product. ████████████████ explained that the information
necessary to identify an exact date that the use of PHO ceased would theoretically
be within those manufacturers' possession.  However, ████████████████
bread crumbs are not made to a particular formula such that ████████████
████████ would know the precise amount of ingredients or the names of individual
suppliers of ingredients for a particular product. ████████████████
confirmed, however, that sometime in the first quarter of 2015, the use of PHO in
its breadcrumbs products ceased.

Kroger undertook a formal initiative in 2016 to ensure PHO was removed
from its products.

As explained above, while Kroger can identify the UPCs of the three Kroger
bread crumbs products sourced from ████████████████, those UPCs are also
assigned to products ████████████████ purportedly sold to Kroger.  As noted,
Kroger—despite its more than diligent efforts—has been unable to get in contact

with ████████████ to confirm whether its bread crumbs products contained PHO, and if so, when.  Kroger will continue to seek information from ████████████ to determine whether the products sourced from them contained PHO, as well as to obtain other responsive information, and will amend these responses should any additional responsive information become available.

DATED: November 12, 2019

DAVIS  WRIGHT  TREMAINE  LLP
JACOB M. HARPER
NICOLE S. PHILLIS
HEATHER F. CANNER

By: /s/ *Heather F. Canner*
        Heather F. Canner

Attorneys for Defendant
THE KROGER COMPANY

THIRD SET OF SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES
**CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER**

**VERIFICATION**

I, Allie Arrowood, depose and say:

I am a Category Strategy Manager for Defendant The Kroger Company ("Defendant").  I am duly authorized by the The Kroger Company to verify the following: THIRD SET OF SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, on its behalf, and hereby do so.  The facts and matters stated therein are not within my personal knowledge or of any one individual at Defendant; rather, the facts stated therein have been assembled, on behalf of Defendant and with assistance of counsel, by authorized employees and/or counsel of Defendant and/or third parties with personal knowledge of the subject matter of the response and/or information and belief as to the truth and/or accuracy thereof.

Subject to the terms of this verification, Defendant declares, under penalty of perjury, that the foregoing responses are true and correct to the best of its knowledge and belief.

Executed at Cincinnati, Ohio _____, this 11th day of November 2019.

By: _____Allie Arrowood_____

Title: __Category Strategy Manager_____

VERIFICATION - THIRD SUPPLEMENTAL
RESPONSES TO INTERROGATORIES, SET ONE

1        <u>PROOF OF SERVICE BY MAIL AND EMAIL</u>

2            I am employed in the County of Los Angeles, State of California.  I am over the age of 18

3 and not a party to the within action.  My business address is Davis Wright Tremaine LLP, Suite 2400, 865 South Figueroa Street, Los Angeles, California 90017-2566.

4            On November 12, 2019, I served the foregoing document(s) described as: **THIRD SET OF SUPPLEMENTAL RESPONSES AND OBJECTIONS TO**

5 **PLAINTIFF'S FIRST SET OF INTERROGATORIES** by placing a **true copy** of said document(s) enclosed in a sealed envelope(s) for each addressee named

6 below, with the name and address of the person served shown on the envelope as follows:

7

8 The Weston Firm
Gregory S. Weston
Andrew C. Hamilton

9 1405 Morena Blvd., Suite 201
San Diego, CA  92110

10 Email:  greg@westonfirm.com

11 <u>**U.S. MAIL**</u>    I placed such envelope(s) with postage thereon fully prepaid for deposit in the United States Mail in accordance with the office practice of Davis Wright Tremaine LLP, for

12 collecting and processing correspondence for mailing with the United States Postal Service.  I am familiar with the office practice of Davis Wright Tremaine LLP, for collecting and processing

13 correspondence for mailing with the United States Postal Service, which practice is that when correspondence is deposited with the Davis Wright Tremaine LLP, personnel responsible for

14 delivering correspondence to the United States Postal Service, such correspondence is delivered to the United States Postal Service that same day in the ordinary course of business.

15

16 <u>**E-MAIL**</u>    I caused the foregoing document to be served by e-mail transmission, in PDF Format, to each of the interested parties at the e-mail address shown above.

17            Executed on November 12, 2019, at Los Angeles, California.

18 ☐    State         I declare under penalty of perjury, under the laws of the State of California,
19                     that the foregoing is true and correct.

20 x     Federal      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the

21                     office of a member of the bar of this Court at whose direction the service was made.

22

23         Lina Pearmain
           Print Name                           Signature

24

25

26

27

28

THIRD SET OF SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES
**CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER**

# EXHIBIT 4

DAVIS WRIGHT TREMAINE LLP
Jacob M. Harper (SBN 259463)
 *jharper@dwt.com*
Nicole S. Phillis (SBN 291266)
 *nicolephillis@dwt.com*
Heather F. Canner (SBN 292837)
 *heathercanner@dwt.com*
865 South Figueroa Street, Suite 2400
Los Angeles, California 90017-2566
Telephone:  (213) 633-6800
Facsimile:  (213) 633-6899

Attorneys for Defendant
THE KROGER COMPANY

**CONFIDENTIAL—CONTAINS
CONFIDENTIAL INFORMATION
PURSUANT TO PROTECTIVE
ORDER**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHAVONDA HAWKINS, on behalf of herself and all others similarly situated,<br><br>               Plaintiff,<br><br>    vs.<br><br>THE KROGER COMPANY,<br><br>               Defendant. | Case No. 15CV2320 JM AHG<br>Assigned to Hon. Jeffrey T. Miller<br>Assigned to Magistrate Judge Hon. Allison H. Goddard<br><br>**CONFIDENTIAL DISCOVERY STATUS REPORT PURSUANT TO NOVEMBER 1, 2019 ORDER**<br><br>**[LODGED ONLY; NOT FILED]**<br><br>Action Filed:  October 15, 2015 |

CONFIDENTIAL—CONTAINS CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER

# TABLE OF CONTENTS

I.  GENERAL COMPLIANCE WITH SEPTEMBER 16, 2019 ORDER ................................................................................ 1

II. BACKGROUND SURROUNDING KROGER'S EXTENSIVE AND DILIGENT COMPLIANCE WITH DISCOVERY ORDER ........... 2

    A.  Plaintiff's Discovery Required Identification of Specific Products "Containing Partially Hydrogenated Oil(s)," Which Only Suppliers Knew. ...................................................... 2

    B.  The Court's September 16, 2019 Order on Plaintiff's Motion to Compel ........................................................................... 5

    C.  Kroger's Compliance With Deadlines in the Order ................ 7

III. COMPLIANCE TO DATE WITH SPECIFIC  DISCOVERY REQUESTS ........................................................................ 8

    A.  Interrogatory No. 1 and Request for Production No. 24 ...................... 9

    B.  Request for Production No. 18 ................................................ 11

    C.  Interrogatory No. 3 ................................................................. 12

    D.  Interrogatories No. 4, 5, 7, and 8 ........................................... 12

    E.  Requests for Production No. 14 and 15 ................................... 14

    F.  Request for Production No. 1 ................................................... 15

    G.  Requests for Production No. 11 and 20 ................................... 15

    H.  Requests for Production No. 2 and 3 (granted in part) ........... 16

    I.  Request for Production No. 4 ................................................... 17

    J.  Requests for Production No. 5–8 ............................................. 18

    K.  Request for Production No. 10 ................................................ 19

    L.  Request for Production No. 25 ................................................ 20

    M.  Request for Production No. 16 ................................................ 20

IV. CONCLUSION ......................................................................... 20

i

CONFIDENTIAL—CONTAINS CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER

Pursuant to Magistrate Judge Allison H. Goddard's November 1, 2019 Order (Dkt. 81), Defendant The Kroger Company ("Kroger") hereby submits the following Discovery Status Report setting forth its status of compliance with the Court's September 16, 2019 Order (Dkt. 72).[1]  As requested, Kroger explains (I) its overall compliance with the September 16 Order as of today; (II) the background surrounding its compliance efforts to date; and (III) request-by-request reports on its compliance with the September 16 Order.

## I.   GENERAL COMPLIANCE WITH SEPTEMBER 16, 2019 ORDER

As an initial matter, Kroger is in full compliance with the Court's September 16, 2019 order. (Dkt. 72.)  As further detailed below, Kroger has, based on extensive efforts to obtain necessary information from third-party suppliers, contractors, and others (as well as its own employees), as of today:

- Provided the required *supplemental responses to Requests for Production* without objection (October 7, 2019);

- Provided further *supplemental responses to Special Interrogatories* without objection (Second Supplement, October 7, 2019; Third Supplement, November 12, 2019);

- Provided required *verifications* (First and Second Supplements, November 8, 2019; Third Supplement, November 12, 2019);

- Produced *documents* in Kroger's possession, custody, and control (July 26, 2019; November 8, 2019);[2]

---

[1] Kroger addresses the discovery requests generally as grouped in the Court's September 16, 2019 Order.  *See* Dkt. 72 at 33–34.

[2] Despite Kroger's limited involvement in the development and manufacture of the bread crumbs products (as detailed below), Kroger is in compliance with the September 16 Order.  To that end, Kroger has collected and produced numerous responsive and sensitive documents (both its own and those provided by suppliers), including but not limited to draft and final labels; internal labeling comments; internal correspondence between Kroger and suppliers; internal marketing and pricing strategy plans for all private label bread and flour products (which includes bread crumbs); technical specifications for bread crumbs products; revenue and

1

CONFIDENTIAL—CONTAINS CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER

- Produced *third-party documents* supplied by third-party suppliers (November 8, 2019);

- Produced the required *privilege log* identifying the limited documents and information that have been withheld on privilege or work product grounds, as required (November 8); and

- Lodged this Status Report, which details below Kroger's efforts to comply, including Request-by-Request report on compliance.

As the Court requested, Kroger has detailed its extensive efforts at compliance and execution of compliance below.  In addition, Kroger provides concurrently with this report, for the Court's convenience and served in compliance with the September 16, 2019 Order: a copy of the Second Supplemental Responses to Requests for Production, served October 7, 2019 (Ex. A); Second Supplemental Responses to Interrogatories, served October 7, 2019, with verifications (Ex. B); and Third Supplemental Responses to Interrogatories, with verifications, served November 8 (Ex. C).

## II.    BACKGROUND SURROUNDING KROGER'S EXTENSIVE AND DILIGENT COMPLIANCE WITH DISCOVERY ORDER

For context regarding Kroger's document and information collection efforts, Kroger provides this background.

## A.    Plaintiff's Discovery Required Identification of Specific Products "Containing Partially Hydrogenated Oil(s)," Which Only Suppliers Knew.

The primary document and information collection issue concerns the following predicate question:  Which bread crumb products contain partially hydrogenated oils? Plaintiff's discovery requests seek various documents and information concerning what Plaintiff's specially defined "PRODUCTS," which

---

sales data; internal personnel assignments; various charts, spreadsheets, and regulatory reviews; and supplier contracts.

CONFIDENTIAL DISCOVERY STATUS REPORT PURSUANT TO NOVEMBER 1, 2019 ORDER

Plaintiff defines as "Kroger Bread Crumbs containing partially hydrogenated oil(s)."  (Pl.'s Interrogs., Set One, Definition E; Pl.'s Doc. Requests, Set One, Definition 9.)  For example, Plaintiff seeks documents regarding "marketing materials" and similar specific items "related to PRODUCTS," which therefore requires Kroger to identify which specific bread crumb products actually "contain[ed] partially hydrogenated oil(s)" to answer the request and produce relevant documents and information.  Thus, answering these questions, and producing relevant documents, required identifying specific PHO-containing products in the first place.

Contrary to assumptions, Kroger does not, in fact, actually know this information without cooperation from third-party suppliers, which exclusively hold that information.

The reason stems from the supply chain for the Kroger-labeled bread crumb products.  For the relevant period, the Kroger-labeled breadcrumb products were purchased pre-made and pre-packaged from third-party suppliers to sell in its Kroger grocery stores.  The third-party suppliers, who are not affiliated with, owned by, agents of, or otherwise related to Kroger (except as contracted vendors), are responsible for developing, manufacturing, packaging, and shipping the bread crumbs to Kroger's distribution center in ready-to-sell form.  Kroger is not involved in the development or manufacture of the product.

As detailed in supplemental interrogatories served since the September 16 Order, Kroger's involvement (at a high level) was limited, and generally occurred in a few stages.[3]

***First***, Kroger's involvement in the products was initiated when the product was first conceived.  In the case of the Kroger bread crumbs, these products were

---

[3] This description is based on counsel's understanding as confirmed by Kroger employees, suppliers, and contractors.

CONFIDENTIAL—CONTAINS CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER

first developed in approximately the mid-2000s (and in some cases earlier).  During that time (more than a decade ago), Kroger would identify a supplier from whom it wished to purchase bread crumbs, confirming that supplier has capacity to sell to Kroger, and confirming the supplier has the necessary food safety certifications and meets Kroger's supplier standards.  At this point, the third-party supplier had already independently developed and was manufacturing the bread crumb product Kroger was interested in purchasing.  Kroger would test the product to ensure it met a variety of quality requirements, e.g., taste, smell, appearance.  Kroger would also request the technical specifications of the product, which requires the supplier to provide nutritional information for the product and any other information necessary to create the label for the product (plus some).  Because the bread crumb formulas are proprietary and in the exclusive ownership of the supplier—*and not Kroger*— suppliers generally provide Kroger with only the information needed to design an appropriate label for the product (e.g., allergens in the product, nutrition information, compliance with FDA regulations).  Kroger has produced all of these technical specifications and related documents within its possession as well as those collected from suppliers, as discussed below.

*Second*, after Kroger decided to order from the supplier, and the supplier provided the technical specifications, Kroger would then work with the supplier to develop an appropriate product label.  Kroger has produced all non-privileged documents in its possession regarding the draft labels, label reviews, and labeling changes for Kroger bread crumbs during the relevant time period.

*Third*, after Kroger submitted its order, the supplier would send the shipment of pre-made and pre-packaged breadcrumbs in ready-to-sell retail form directly to Kroger's distribution center.  In other words, suppliers sent the bread crumbs already in the individual package, with labeling, in the very form an individual consumer would purchase from a store.  Again, Kroger's involvement was limited: other than receiving the already-manufactured, -labeled, and -packaged product

CONFIDENTIAL DISCOVERY STATUS REPORT PURSUANT TO NOVEMBER 1, 2019 ORDER

CONFIDENTIAL—CONTAINS CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER

1  from the suppliers, Kroger did not deal with the content of the product.  Kroger then
2  sent the bread crumbs to its various Kroger grocers for retail sale.

3       As described above, because suppliers are the owners of the bread crumb
4  formula and handle the development and manufacturing of the product (and Kroger
5  does not), Kroger did not have in its possession nearly all of the information and
6  much of the documents Plaintiff sought.

7       For these reasons, when Kroger initially received Plaintiff's discovery
8  requests, its initial factual investigation revealed that Kroger was not in possession
9  of the requested information, and that third-party suppliers, who are outside the
10 control of Kroger, had such information.  Kroger therefore initially objected to
11 Plaintiff's document requests because (among other things) the definition of
12 "PRODUCTS" presupposed Kroger knew the manufacturing details of the bread
13 crumb products when, in fact, that information was in the possession of third-party
14 suppliers outside of Kroger's possession, custody, and control.

15 **B.    The Court's September 16, 2019 Order on Plaintiff's Motion to Compel**

16      At the end of July 2019, Plaintiff moved to compel responses to various
17 Requests for Production and Interrogatories,[4] after Kroger explained that (among
18 other objections) nearly all of the information and documents Plaintiff was seeking
19 was either in the exclusive possession of Kroger's third-party suppliers, the
20 information was burdensome to obtain, and that information from those suppliers
21 was required to identify the relevant PRODUCTS, and therefore the relevant
22 documents and information.  (*See* Def.'s Supp. Resp. to Rogs., Set One (July 11,
23 2019); Def.'s Supp. Resps. to Doc. Requests, Set One (July 11, 2019).)  Kroger also
24 objected that the expansive time period for which Plaintiff sought discovery was
25 overbroad and unduly burdensome (among other objections).  (*Id.*)

26
27
28

---

[4] Plaintiff moved to compel Requests for Production Nos. 1–8, 10, 11, 13–18, 20, 24, and 25 and Interrogatory Nos. 1–8.  (*See* Dkt. 70 (Opp. to Mot. to Compel).)

CONFIDENTIAL—CONTAINS CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER

The Court's September 16 Order granted Plaintiff's motion in part, ordering Kroger to provide supplemental responses to the certain discovery requests and interrogatories and supplement its associated document production; however, the order was qualified in three important respects to account for Kroger's objections.[5] (Dkt. 72.)

*First*, as for the information and documents within third-party suppliers' possession, the Court acknowledged Kroger's objection, but ordered Kroger to identify the third-party suppliers and "conduct a diligent search and make reasonable inquiries, including of its agents and other entities over whom it has legal control," to the extent it had not already done so.  (*Id.* at 17:17–23.)  The Court contemplated that Kroger may not be able to obtain the requested information from third parties, and if that were the case, "Defendant must explain to Plaintiff the efforts that were made and why they were unsuccessful."  (*Id.*)

*Second*, the Court narrowed the relevant period of discovery many years, to span only from 2010 to the date the sales of Kroger bread crumbs with PHO ended.  (Dkt. 72 at 12:17–19 & n.3, 13:11–12.)

*Third*, the Court declined to compel several categories of requests, including requests regarding the preparation of discovery responses (*id.* at 19:6–21), Kroger products other than bread crumbs (*id.* at 19:22–20:13), documents regarding employees involved in "research" and "development" (*id.* at 27:2–5), and requests seeking all documents regarding trans fat or PHO and its health effects (*id.* at 28:28–29:21).  The Court also noted that if Kroger withholds any documents on the basis of privilege, it must provide a privilege log.  (*Id.* at 13:14–2.)

(With respect to document production, the Court did not explicitly include a deadline for production of documents; however, Kroger interpreted the order as

---

[5] The Court specifically ordered Kroger to supplement its responses to Requests for Production Nos. 1, 2, 3 (in part), 4–8, 10, 11, 14–16, 18, 20, 24, and 25, and Interrogatory Nos. 1, 3–5, 7, and 8.  (Dkt. 72 at 33–34.)

CONFIDENTIAL—CONTAINS CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER

meaning that documents should be provided as soon as possible (i.e., as soon as Kroger had obtained from third-party suppliers information allowing it to determine which "products" "contain[ed] partially hydrogenated oil" and which did not).)

With that order, the Court imposed three deadlines: Kroger would (1) serve supplemental responses to Plaintiff's Requests for Production and Interrogatories on or before October 7, 2019; (2) pay Plaintiff $9,837 for costs on or before October 4, 2019; and (3) file a declaration by defense counsel verifying the aforementioned payment on or before October 11, 2019.  (Dkt. 72.)

## C.  Kroger's Compliance With Deadlines in the Order

Kroger diligently complied with the deadlines outlined in Court's Order.

First, regarding supplemental responses, Kroger served its supplemental responses to Plaintiff's Interrogatories and Requests for Production on October 7, 2019.  (*See* Second Supp. Resps. to Rogs., Set One (Oct. 7, 2019), and verification thereto; Second Supp. Resps. to Doc. Requests, Set One (Oct. 7, 2019).)  These responses identified Kroger's third-party suppliers, as well as the end date for the relevant discovery period–no later than 2016.  (*See* Second Supp. Resps. to Interrogatory Nos. 8 (Oct. 7, 2019) and verification thereto.)[6]

Second, Kroger also made the required payment on October 4, 2019.  (Dkt. 78.)

Third, Kroger filed a declaration by defense counsel on October 11, 2019 verifying that payment.  (*Id*.)

In addition, although the September 16 Order did not set a date for production of documents, Kroger diligently pursued third-party suppliers for the necessary information to produce such documents, as well as the documents themselves, and is now in compliance.  As of today, Kroger has now also produced all documents

---

[6] Kroger has also provided verifications of these responses, which are submitted herewith.

CONFIDENTIAL—CONTAINS CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER

1  consistent with its requests, based on the information Kroger has been able to gather

2  notwithstanding some difficulties in obtaining cooperation with third-party

3  suppliers and contractors.[7]

## III.   COMPLIANCE TO DATE WITH SPECIFIC DISCOVERY REQUESTS

6      Since the Court's September 16, 2019 Order and the October 7 date to submit

7  supplemental discovery responses, Kroger has undertaken extensive efforts to

8  contact and gather information from its third-party suppliers, as necessary to

9  complete its discovery obligations.  Kroger has produced all documents based on

10  the information it has gathered,[8] as well as supplemented interrogatories where

11  appropriate.

12      Most, but not all, of the suppliers have been cooperative—some more than

13  others.  Following numerous attempts at gathering necessary information (including

14  identification of specific PHO-containing products), Kroger made a substantial

15  document production to Plaintiff; provided further verified, supplemental responses

16  to Plaintiff that provide all the responsive information Kroger has gathered to date,

17  as well as explains the outstanding and/or unavailable information; and produced a

18  privilege log for the documents withheld or redacted on the basis of privilege, work

19  product, or consumer personal information.

---

[7] As Kroger previously explained, Kroger initially prioritized identifying the relevant products (i.e., those containing PHO) so that it could produce a meaningful and manageable population of documents for Plaintiff, since Plaintiff only sought and Kroger was only compelled to produce such documents and information, and to address the Court's concern that an overbroad production would be unmanageable and an unduly burden to Plaintiff.  At the last status conference, however, the Court stressed that Kroger should make an immediate production, and so in the interest of expediency, has in some instances produced documents and information that does or may bear on irrelevant products.  Kroger has listed the relevant products identified to date in its Third Supplemental Interrogatory Responses to assist Plaintiff with locating the responsive information and documents.

[8] Kroger has one document that has not been produced yet due to technical issues, which Kroger is working to correct, and expects to produce shortly.

CONFIDENTIAL—CONTAINS CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER

Below, Kroger sets forth in more detail its status with respect to each of the discovery requests listed on pages 33–34 of the Court's September 16 order (Dkt. 72). For the Court's convenience, these are listed in the same order as the Court listed them in the Order.

## A. Interrogatory No. 1 and Request for Production No. 24

<u>Interrogatory No. 1</u>: IDENTIFY, for California, for each quarter of the CLASS PERIOD, your unit sales of each of the KROGER BREAD CRUMBS SKUs and the total revenue YOU derived the sale of the PRODUCT.

<u>Request for Production No. 24</u>: DOCUMENTS sufficient to show or calculate YOUR total revenue from the sale of the PRODUCT in California for each year in the CLASS PERIOD.

These requests seek information and documents regarding the quarterly or annual revenue from the sales of the PRODUCT (which is defined as "Kroger Bread Crumbs containing partially hydrogenated oil(s)") in California, as well as the quarter unit sales for PRODUCTS in California. Responding to these requests required Kroger to identify the relevant PRODUCTS, which includes only those bread crumb products that contained partially hydrogenated oil during the relevant time period. (*See* Pl.'s Doc. Requests, Set One (Definition E); Pl.'s Interrogs., Set One (Definition 9).)

As Kroger has explained, Kroger purchased its bread crumb products pre-made and pre-packaged from third-party suppliers, who have exclusive possession of their own proprietary formulas for the bread crumbs and have their own manufacturer or manufacturers. Thus, to determine the specific composition of each product for the relevant time periods—which is necessary to identify the relevant PRODUCTS—as well as respond to Plaintiff's other interrogatories regarding the development and manufacture of the product, Kroger would need to obtain that information from the third-party suppliers, who are generally under no obligation or deadline to produce such information.

CONFIDENTIAL DISCOVERY STATUS REPORT PURSUANT TO NOVEMBER 1, 2019 ORDER

CONFIDENTIAL—CONTAINS CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER

1   After weeks of more than diligent efforts contacting suppliers and collecting
2   their information (to the extent such suppliers were responsive), Kroger was able to
3   determine that two of its four suppliers— ████████████████████████████
4   ██████—did not use any PHO in their Kroger bread crumb products during the
5   relevant time period.  Thus, none of the Kroger bread crumbs products sourced
6   from those suppliers constitute PRODUCTS at issue in this litigation, and none of
7   their information or documents fall within the scope of Plaintiff's discovery
8   requests.

9   The remaining two suppliers— █████████████████████████—both
10   sold the same Kroger bread crumbs products: Kroger Italian Style Bread Crumbs
11   (UPC 1111081877), Kroger Plain Style Bread Crumbs (UPC 1111081878), and
12   Kroger Roasted Garlic Bread Crumbs (UPC 1111090787).  Despite Kroger's
13   extensive efforts to obtain information regarding the bread crumbs ██████
14   supplied, ██████ has not provided any information to Kroger, other than to say a
15   third-party supplier, ██████████, actually provided the bread crumbs.  Kroger has
16   contacted ████████ dozens of times, and repeatedly contacted ████████
17   requesting more information, but neither ████████ nor ████████ has cooperated in
18   providing any further information.

19   ████████████████████, however, has confirmed that the Kroger Italian
20   Style Bread Crumbs (UPC 1111081877), Kroger Plain Style Bread Crumbs (UPC
21   1111081878), and Kroger Roasted Garlic Bread Crumbs (UPC 1111090787) it
22   supplied did contain PHO at least for the years 2013 and 2014.  The three products
23   sourced from ████████████████ ceased containing PHO in the first quarter of
24   2015.  Based on this information, Kroger has supplemented its interrogatory
25   responses providing the quarter unit sales and revenue in California for these
26   products in 2013, 2014, and the first quarter of 2015; Kroger must qualify its
27   responses to note that the 2013 numbers may contain products sold from ████████
28   which may or may not contain PHO.

Thus, to date, Kroger has produced the responsive unit sales and revenue information available to date for the relevant PRODUCTS it has been able to identify, pursuant to Interrogatory No. 1.  Kroger provided a supplemental interrogatory response providing these figures, as well as a verification on November 12, 2019.

Kroger also produced documents responsive to Request for Production No. 24.  For example, Kroger produced the document reflecting the quarter unit sales and revenues in California for the aforementioned bread crumb products from the years 2010 through 2016 (despite this range including periods during which the product did not contain PHO).

**B.    Request for Production No. 18**

Request for Production No. 18: All DOCUMENTS which reflect, summarize, analyze, or discuss the pricing of the PRODUCT, including wholesale or retail prices.

This Request seeks documents regarding pricing of the relevant PRODUCTS. As discussed above, Kroger has been diligently communicating with third-party suppliers to obtain information about Kroger bread crumbs necessary to identify the relevant PRODUCTS.  After weeks of requesting information from suppliers, Kroger has identified three relevant PRODUCTS sold during 2013 through 2014 that contained PHO: Kroger Italian Style Bread Crumbs (UPC 1111081877), Kroger Plain Style Bread Crumbs (UPC 1111081878), and Kroger Roasted Garlic Bread Crumbs (UPC 1111090787).  The products ceased containing PHO in approximately the first quarter of 2015.

Kroger has conducted a reasonable search for and produced documents regarding pricing of the identified PRODUCTS (among other bread crumbs products and other products).  For example, Kroger produced all proprietary comprehensive marketing and pricing strategy plans for the 2010 to 2016 period[9];

---

[9] Kroger experienced technical issues with one of the plans, which it is working to correct and will produce shortly.

11

CONFIDENTIAL—CONTAINS CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER

because bread crumbs are only a small subset of a product category (bread and flour), Kroger produced the entire plan as it is kept in the ordinary course of business.  (There is no department or division dedicated to bread crumbs.)  To the extent Kroger locates additional documents (if, for example, ▇▇▇▇ or another supplier reveal additional information that will allow for further document searches), Kroger will produce those immediately.

**C.    Interrogatory No. 3**

> Interrogatory No. 3: IDENTIFY products that YOU consider, or have considered at different times during the CLASS PERIOD, to be the primary competitors to the PRODUCT.

Kroger supplemented its interrogatory responses on October 7, 2019 to disclose benchmark products for Kroger bread crumbs.  Kroger has also voluntarily produced records reflecting benchmark products information for all Kroger bread crumbs during the relevant time period.

**D.    Interrogatories No. 4, 5, 7, and 8**

> Interrogatory No. 4:  IDENTIFY the manufacturer of and amount of PHO per 100g used in the PRODUCT, e.g., "Cargill Olympic S-100 Partially Hydrogenated Soybean Oil 16g per 100g of Kroger Bread Crumbs."

> Interrogatory No. 5:  IDENTIFY the period of time during which YOU manufactured, distributed, or sold the PRODUCT, and if YOU contracted with outside companies to manufacture the PRODUCT, IDENTIFY them and the time period YOU contracted with them.

> Interrogatory No. 7:  IDENTIFY the locations, including the full address and your internal name for the facility, where the PRODUCT was manufactured.

> Interrogatory No. 8:  For each KROGER BREAD CRUMBS SKU, state the date that YOU stopped using PHO in its manufacture and separately when you stopped selling it.

CONFIDENTIAL DISCOVERY STATUS REPORT PURSUANT TO NOVEMBER 1, 2019 ORDER

CONFIDENTIAL—CONTAINS CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER

These requests seek information regarding the manufacturer and manufacturing location of the PRODUCTS, the amount of PHO used in the PRODUCTS, the manufacturer of the PHO used in the PRODUCTS, and the date when the use of PHO in the PRODUCTS ceased.  As discussed above, because Kroger purchased the PRODUCTS pre-made and pre-packaged from third-party suppliers, was not involved in their development or manufacture, and ingredient and formulation information is owned by and proprietary to those suppliers, Kroger was not in possession of the information necessary to respond to these requests.

Pursuant to the Court's September 16, 2019 Order (Dkt. 72), Kroger has made extensive efforts to collect responsive information from third-party suppliers.  As noted, although Kroger has not been able to obtain responsive information from all four suppliers, it did confirm that two suppliers—███████████████████████—did not use PHO in any Kroger bread crumbs products during the relevant period.  Kroger has served verified, supplemental interrogatory responses reflecting this information.

The remaining two suppliers—█████████████████████—both supplied the same Kroger bread crumbs products to Kroger: Kroger Italian Style Bread Crumbs (UPC 1111081877), Kroger Plain Style Bread Crumbs (UPC 1111081878), and Kroger Roasted Garlic Bread Crumbs (UPC 1111090787).  Despite Kroger's extensive efforts to obtain information regarding the bread crumbs █████ supplied, ████████ has not provided any information to Kroger, other than to say a third-party supplier, ██████████, actually provided the ████ bread crumbs.  Kroger has called ███████████ dozens of times, as well as followed up with ████████ for more information, but neither █████████████████s has cooperated in providing any further information.  Kroger disclosed these efforts in its verified, supplemental interrogatory responses.

The last supplier, ████████████████ has confirmed that the Kroger Italian Style Bread Crumbs (UPC 1111081877), Kroger Plain Style Bread Crumbs

(UPC 1111081878), and Kroger Roasted Garlic Bread Crumbs (UPC 1111090787) it supplied did contain PHO at least for the years 2013 and 2014.  The three products ceased containing PHO in the first quarter of 2015.  ███████████ ██████, however, also explained that because the bread component of its bread crumbs (which would contain the PHO) came from hundreds of bakeries (which ███████████████████ would not identify on proprietary grounds), and that its products were not made to exact specifications, it could not provide much of the information Plaintiff sought.  Kroger obtained all of the responsive information it could from ████████████████ regarding these products during the relevant time period, and provided that information in verified, supplemental interrogatory responses.  Kroger has further identified in its responses the information that ████████████████ was unable or unwilling to provide.

In sum, Kroger has supplemented its responses to Interrogatory Nos. 4, 5, 7, and 8 to provide all responsive information it was able to obtain from third-party suppliers and its own records.

**E.  Requests for Production No. 14 and 15**

> Request for Production No. 14: DOCUMENTS sufficient to show the amount of PHO and trans fat used in the PRODUCT during the CLASS PERIOD, including any changes thereto, and the composition, source, and vendors for the partially hydrogenated oil used in the manufacture of the PRODUCT.
>
> Request for Production No. 15: ALL DOCUMENTS RELATING TO the cost of any actual, potential, or proposed formulation changes to the PRODUCT during the CLASS PERIOD.

These Requests seek documents regarding the amount of PHO and trans fat used in the PRODUCT, the contemplated and actual changes thereto, and the vendors for PHO.  As Kroger has explained throughout discovery and above, Kroger purchased the bread crumbs pre-made and pre-packaged from third-party suppliers, who each developed and manufactured the product, and owned their own

proprietary formula for the bread crumbs.  Much of the information and documents regarding the composition of the PRODUCTS, changes thereto, and source of the PHO (to the extent available) is therefore in the third-party suppliers' possession.

Kroger has conducted extensive searches for and produced non-privileged, responsive documents within its possession, custody, or control to Requests for Production No. 14 and 15.  For example, Kroger has produced all of the technical specifications completed by the suppliers of Kroger bread crumbs within its possession (including those beyond the relevant time frame, when Kroger initially began purchasing products), which captures all the formula/ingredient information that suppliers provided to Kroger.  Kroger also produced documentation relating to the technical specifications within its possession.  Further, as described above, Kroger has undertaken extensive efforts to obtain such information and documents from third-party suppliers.  Kroger has produced all responsive documents it was able to obtain from third-party suppliers as well, which includes technical specifications as well as analytical testing results.

**F.      Request for Production No. 1**

Request for Production No. 1: Your written document retention policies and procedures.

Kroger supplemented its responses to Request for Production No. 1 on October 7, 2019 confirming that it would conduct a reasonable search for all retention policies and procedures and produce non-privileged, responsive documents.  Kroger has done so.  On November 8, Kroger provided a privilege log reflecting two responsive documents withheld from production on the grounds of attorney-client privilege and attorney work product.

**G.      Requests for Production No. 11 and 20**

Request for Production No. 11: All DOCUMENTS referencing or reflecting any call center feedback for the PRODUCT.

Request for Production No. 12: Any COMMUNICATION between YOU and any customer in response to any complaint about the ingredients in the PRODUCT.

Pursuant to the Court's September 16, 2019 Order (Dkt. 72 at 25:1–2), Kroger supplemented its responses to Plaintiff's requests for production to confirm it would conduct a reasonable search for and produce non-privileged, responsive documents concerning trans fat or PHO for the relevant period.

Kroger has conducted an extensive search for such documents, and on November 8 produced non-privileged, responsive documents in response to these requests. For example, Kroger produced all documents regarding the customer complaints it received. To the extent Kroger locates additional documents, it will produce those as soon as possible.

## H.   Requests for Production No. 2 and 3 (granted in part)

Request for Production No. 2: All organization charts showing employees who, during the CLASS PERIOD, were involved in research, MARKETING, ADVERTISEMENT, manufacturing, or development of the PRODUCT.

Request for Production No. 3: DOCUMENTS sufficient to show the IDENTITY of any PERSONS who, during the CLASS PERIOD, performed MARKETING, manufacturing, research, or development services RELATING TO any of the PRODUCTS.

Pursuant to the Court's September 16, 2019 Order (Dkt. 72), Kroger served supplemental responses to these Requests on October 7, 2019. For Request No. 2, Kroger reiterated that it did not maintain organizational charts and therefore did not possess responsive documents. For Request No. 3, the Court narrowed the request to seek only documents sufficient to identify "persons" who "performed marketing [and] manufacturing" services relating the PRODUCTS. As Kroger has explained, Kroger did not manufacture the products, but rather purchased the PRODUCTS pre-made and pre-packaged from third-party suppliers who were responsible for manufacturing. Kroger has identified those suppliers in its interrogatory responses.

CONFIDENTIAL—CONTAINS CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER

Kroger has also conducted an extensive search for documents responsive to this request and has produced responsive, non-privileged documents.  For example, although Kroger does not maintain organizational charts, on November 8 it produced all similar documents that contain information Kroger estimates Plaintiff is seeking, including (for example), a spreadsheet that list individuals who oversaw the relevant product category during the relevant period (again, Kroger groups products together under the flour product category, and does not have employees or divisions dedicated to bread crumbs alone).  Other records Kroger produced, e.g., comprehensive planning strategy spreadsheets, also reflect employees involved with the Kroger bread crumbs products.

As with all requests, if other documents are discovered, Kroger will produce them immediately.

## I.   Request for Production No. 4

> Request for Production No. 4: To the extent not produced in response to Request No. 3, DOCUMENTS sufficient to show all third parties with whom YOU contracted for services RELATING TO the MARKETING, ADVERTISEMENT, manufacture, development, distribution, or sale of the PRODUCT.

Pursuant to the Court's September 16, 2019 Order (Dkt. 72), Kroger supplemented its responses to this Request on October 7, 2019, stating that it would conduct a reasonable search for and produce non-privileged, responsive documents. Kroger has conducted a reasonable search for all such marketing, advertisement, manufacturing, development, and related documents, and on November 8 produced non-privileged, responsive documents to this Request.

For example, although far more comprehensive than the bread crumb products, Kroger produced its comprehensive planning strategy spreadsheets for bread and flour products—which it produced for each year of the relevant period (except for one with a technical error Kroger is addressing)—reflecting the third-party suppliers from whom Kroger sourced Kroger bread crumbs.  As discussed

CONFIDENTIAL—CONTAINS CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER

above (and in Kroger's supplemental interrogatory responses), these suppliers manufactured and developed the bread crumbs.  To the best of its knowledge, Kroger did not use third parties to market or advertise Kroger bread crumbs (there was no advertising of the bread crumbs, and very little, if any, marketing).  As noted, Kroger was solely the retail seller of the Kroger bread crumbs and distributed them to its individual grocers.

As with all requests, if other documents are discovered, Kroger will produce them immediately.

**J.     Requests for Production No. 5–8**

Request for Production No. 5: Exemplars of all LABELS, packaging, package inserts, and brochures RELATING TO the PRODUCT.

Request for Production No. 6: All DOCUMENTS showing the period of time during which each PRODUCT LABEL was introduced, used, and discontinued.

Request for Production No. 7: All DOCUMENTS CONCERNING any contemplated, potential, or actual changes, revisions, or modifications to the PRODUCTS' LABELS during the CLASS PERIOD, including drafts of such DOCUMENTS.

Request for Production No. 8: DOCUMENTS CONCERNING the reasons for, plans, proposals, and motivations for any change to the LABEL of any PRODUCT.

These Requests seek documents regarding the label of the PRODUCTS and changes to such labels.  Prior to the Court's order on Plaintiff's motion to compel, Kroger had produced product labels for bread crumbs for the period 2011 through 2015.  Pursuant to the Court's September 16, 2019 Order (Dkt. 72), Kroger supplemented its responses on October 7, 2019, stating that it would conduct a reasonable search for and produce responsive, non-privileged documents to these Requests.

CONFIDENTIAL—CONTAINS CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER

Kroger has conducted extensive searches for and produced non-privileged, responsive documents. For example, Kroger has produced all documents in its possession regarding the label design for Kroger bread crumbs products during the relevant period, including drafts and communications with the supplier and Kroger employees regarding changes to the labels, as well as comments and non-privileged regulatory reviews of label changes. Further, as described above, Kroger has undertaken extensive effort to obtain additional information and documents from third-party suppliers. Kroger has produced all responsive documents it was able to obtain from third-party suppliers regarding the Kroger bread crumbs labels as well.

If Kroger discovers additional non-privileged documents, it will produce them.

**K.     Request for Production No. 10**

Request for Production No. 10: All DOCUMENTS CONCERNING YOUR strategy for MARKETING, ADVERTISING, or selling the PRODUCTS in the United States during the CLASS PERIOD.

Pursuant to the Court's September 16, 2019 Order (Dkt. 72), Kroger served a supplemental response to this Request on October 7, 2019, confirming that Kroger would conduct a reasonable search for and produce non-privileged, responsive documents.

Kroger has, again, produced all responsive documents. For example, Kroger produced its comprehensive marketing and pricing strategy plan for the product category that includes Kroger bread crumbs for the relevant time period (one is still forthcoming due to technical issues). As Kroger explained above, Kroger did not advertise Kroger bread crumbs during the relevant period, and Kroger did little, if any, marketing of the product.

On November 8, Kroger learned from a contractor that "coupons" may have been issued for some of these products, and Kroger is seeking to confirm whether this is the case and, if so, produce any such documents. If Kroger learns of other documents, it will produce them.

**L.    Request for Production No. 25**

> Request for Production No. 25: All DOCUMENTS and COMMUNICATIONS RELATING TO YOUR December 4, 2006 press release titled "Kroger Using Trans Fat Free Oil to Prepare Fried Chicken."

Pursuant to the Court's September 16, 2019 Order (Dkt. 72), Kroger served a supplemental response to this Request on October 7, 2019 confirming that it would conduct a reasonable search for and produce responsive, non-privileged documents.

Kroger has conducted a reasonable search for responsive documents, and does not believe it has any such documents within its possession, custody, or control.  Kroger is confirming this with final searches, but to the extent it locates such documents, will produce them as soon as possible.

**M.    Request for Production No. 16**

> Request for Production No. 16: All DOCUMENTS which YOU contend support or substantiate the following statement used on PRODUCTS: "0g Trans Fat per serving."

Pursuant to the Court's September 16, 2019 Order (Dkt. 72), Kroger served a supplemental response to this Request on October 7, 2019 confirming that it would conduct a reasonable search for and produce responsive, non-privileged documents. Kroger has conducted a reasonable search for and produced all non-privileged documents within its possession, custody, or control.[10]

## IV.    CONCLUSION

As set forth in detail above, Kroger has remained in compliance with the Court's September 16, 2019 Order since it was issued, by timely serving the ordered responses; timely making payment of costs and filing a declaration verifying such payment; undertaking extensive efforts to collect information and documents from non-affiliated, third-party suppliers; producing a privilege log;

---

[10] As discovery is ongoing, Kroger reserves the right to supplement its production to the extent any documents become relevant under Rule 26 during the course of discovery, or Kroger comes into possession of any responsive documents.

CONFIDENTIAL—CONTAINS CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER

making a production of all or substantially all non-privileged, responsive documents within its possession, custody, or control; producing information and documents from and identifying its third-party suppliers; and explaining to Plaintiff the steps it has taken to collect third-party information.  As Kroger is continuing to pursue third-party suppliers and contractors for additional information (namely, ███████ █████████, it will supplement its responses as appropriate and produce any and all non-privileged responsive documents.

DATED: November 12, 2019       DAVIS WRIGHT TREMAINE LLP

By: /s/ *Jacob M. Harper*
Jacob M. Harper

Attorneys for Defendant
THE KROGER COMPANY

CONFIDENTIAL DISCOVERY STATUS REPORT PURSUANT TO NOVEMBER 1, 2019 ORDER

CONFIDENTIAL—CONTAINS CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER

## PROOF OF SERVICE BY ELECTRONIC MAIL

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is Davis Wright Tremaine LLP, Suite 2400, 865 South Figueroa Street, Los Angeles, California 90017-2566.

On November 12, 2019, I served the foregoing document(s) described as: **CONFIDENTIAL DISCOVERY STATUS REPORT PURSUANT TO NOVEMBER 1, 2019 ORDER** by forwarding a portable document file to the electronic mail addresses below:

Honorable Allison H. Goddard
United States Magistrate Judge
U.S. District Court for the
Southern District of California
Efile_goddard@uscourts.gov

The Weston Firm
Gregory S. Weston
Andrew C. Hamilton
1405 Morena Blvd., Suite 201
San Diego, CA  92110
greg@westonfirm.com
david@westonfirm.com

From electronic mail address heathercanner@dwt.com, at 865 South Figueroa Street, Suite 2400, Los Angeles, California.

Executed on November 12, 2019, at Los Angeles, California.

☐      State      I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct.

x      Federal      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

| Heather F. Canner | /s/ *Heather F. Canner* |
|---|---|
| Print Name | Signature |

# EXHIBIT 5

1           United States District Court

2         for the Southern District of California

3
                                    )
4   SHAVONDA HAWKINS, etc.,         )
                                    )   No. 15cv2320-JM-AHG
5         Plaintiff,                )
                                    )   April 8, 2020
6           v.                      )
                                    )
7   THE KROGER COMPANY,             )   San Diego, California
                                    )
8         Defendant.                )
                                    )
9

10              Transcript of Court Proceedings
            BEFORE THE HONORABLE ALLISON H. GODDARD
11              United States Magistrate Judge

12  APPEARANCES:

13  For the Plaintiff:      THE WESTON FIRM
                            GREGORY S. WESTON
14                          ATTORNEY AT LAW

15  For the Defendant:      DAVIS WRIGHT TREMAINE LLP
                            JACOB HARPER
16                          HEATHER CANNER
                            ATTORNEYS AT LAW

17

18

19

20

21  Transcriber:            Dana Peabody, RDR, CRR
                            District Court Clerk's Office
22                          333 West Broadway, Suite 420
                            San Diego, California, 92101
23
    (Transcript prepared from a recording)
24

25

1           San Diego, California, April 8, 2020

2                        *   *   *

3           THE COURT:  Before I talk about where I am with the

4    tentative, I guess my first comment is we are all

5    officers -- you are all officers of the Court.  And when you

6    become an attorney, you swear to a duty -- you agree to a duty,

7    candor with the Court, but you also agree to conduct yourself

8    in proceedings before the Court in a reasonable and good-faith

9    manner and not to unnecessarily duplicate the proceedings of

10   the Court or use the discovery process as a way to actually

11   avoid discovery.  In fact, discovery is supposed to be

12   self-executing.

13       And in order for that to happen, attorneys need to

14   interpret discovery requests reasonably.  Kroger's approach to

15   discovery in this case has been just the opposite of that.

16   Instead, Kroger has interpreted the request in a narrow and

17   technical manner in an effort to take discovery -- to take the

18   discovery process entirely off course.

19       Examples of this include rather than providing responses

20   for all products that Kroger labeled based on Kroger's label as

21   containing PHO, Kroger engaged in a fiction that it needed to

22   go to suppliers to confirm independently whether each product

23   has PHO in spite of what Kroger put on the label.

24       The documents ultimately produced by Kroger after many

25   months, and late, show, as you would expect, that Kroger relies

1    on suppliers to provide the ingredients to products at the

2    outset.  And it's not clear to the Court why Kroger couldn't

3    likewise rely on this information instead of engaging in a

4    multi-month wild goose chase to try and confirm whether what

5    Kroger had put on its labels was, in fact, correct.

6        Another example, Kroger claimed that it was entitled to

7    avoid discovery because suppliers are different from

8    manufacturers, but it would be self-evident to any lawyer who

9    was actually seeking to satisfy discovery obligations in good

10   faith that plaintiff was seeking information about where Kroger

11   gets the product.  And that kind of gets to the heart of this.

12   Instead of actually taking a reasonable approach, 95 percent of

13   plaintiff's requests seek information that is glaringly

14   obvious -- glaringly obviously relevant in this case given the

15   claims of the plaintiff.

16       And Kroger engaged multiple times in activities to avoid

17   providing any information, even the most relevant, without

18   plaintiff having to go through multiple unnecessary steps in

19   order to get that basic information.

20       And what's worse, we're now on the second motion to compel

21   where Kroger has also involved the Court in this trying to get

22   the Court to sanction its unreasonable actions with discovery.

23   All of plaintiff's requests were reasonable and geared towards

24   obvious issues in the case, and to the extent they were

25   overbroad, it was Kroger's obligation to be reasonable and meet

4

 1   and confer in good faith.

 2       I'll give you some other examples of the Court's issues

 3   with Kroger's responses, including the responses to this

 4   motion.  Kroger continues to insist, incredibly, that

 5   Judge Major's order included no deadline to complete production

 6   even though I specifically informed Kroger's counsel on

 7   multiple occasions that that is what the order said.  That

 8   insistence continues today.

 9       Kroger should be apologetic for the delays it caused, and

10   instead it has doubled down showing no shame or concern for the

11   burden it's now placed on two different magistrate judges.

12       Kroger relied on Judge Major's allowance for a declaration

13   from a knowledgeable employee to limit the discovery period,

14   but then only provided the declaration months late and then

15   provided it by a declaration -- an employee who had no personal

16   knowledge.

17       Kroger failed to serve verifications to its subliminal

18   discovery responses that were due on October 8th.  Inexplicably

19   these verifications were not provided until November 8th,

20   again, requiring plaintiff to actually ask for what Kroger

21   should have done in the first place.

22       Kroger did not produce a privilege log until November 8th

23   with no explanation.  Kroger failed to produce documents by

24   October 7th that were clearly within Kroger's power to produce.

25       I'm going to list some, but the list is too long in this

1   hearing for me to go through them all because the Court has

2   reviewed Kroger's entire production.

3       For example, RFP Number 1 sought Kroger's written document

4   retention policies and procedures.  RFP Numbers 11 and 20

5   sought call center complaints or consumer feedback.  RFP

6   Numbers 2 and 3 sought identification of personnel involved in

7   marketing, manufacturing, and research.  There are multiple

8   other categories of requests where this is the case.

9       Moreover, Kroger claimed that the delay was needed because

10  it was -- it was because it needed to confirm which products

11  contained PHOs, but the insincerity behind this claim is shown

12  by the fact that at the end of the day, Kroger produced

13  documents for breadcrumbs that clearly did not contain PHOs.

14      Of the documents that were produced, almost every document

15  was an internal Kroger document.  Many of the documents

16  included these products that aren't at issue, so it belies

17  Kroger's claim that they had to situate for suppliers to

18  confirm whether PHO was in a product before producing any

19  documents.

20      And worse, worse, 5,186 pages, 92.5 percent of the

21  production were printed spreadsheets.  It's unbelievable to the

22  Court that that would occur in today's age when it's clear to

23  any attorney who is actually trying to fulfill their discovery

24  obligations in good faith that they would produce a spreadsheet

25  as a printed document in a way that is clearly unusable and

1    certainly not how Kroger would use it to do its business.

2         The Court's tentative is to grant the motion to compel.

3         It's not clear, Mr. Weston, and I'll seek clarification

4    later in the hearing, about what exactly is left to produce,

5    but at a minimum, Kroger will need to supplement its response

6    to the RFPs to specify if any documents are being withheld.

7         The Court will grant the motion for sanctions.  At a

8    minimum, the Court will award attorney's fees that the

9    plaintiff incurred in preparing this motion and the

10   meet-and-confer following Judge Major's order.

11        With respect to contempt, the Court is inclined to certify

12   facts to Judge Miller so that he can make a determination of

13   contempt.

14        At this point the Court is not convinced that a monetary

15   sanction will do any good because Kroger has shown repeatedly a

16   complete lack of respect for the Court's orders even though it

17   has already been forced to pay a monetary sanction.

18        So I'll ask the parties to address whether I can order

19   different sanctions than what's requested by the plaintiff, and

20   I'll also ask the Court if -- ask the parties if the Court can

21   find additional elements of prejudice inherent in the record.

22        So with that, I do have some specific questions.  I'd like

23   to ask my questions, and I'll give each side an opportunity to

24   supplement the record.

25        So first, I have a question for Kroger.  Did you ever

1   provide plaintiff a sworn statement from a Kroger witness, not

2   from an attorney, documenting the steps that they took -- that

3   Kroger took to obtain information from suppliers about which

4   products had PHO?

5          MR. HARPER:  Your Honor, this is David Harper.  I

6   believe we listed the steps in the third supplemental verified

7   responses.  I don't know that a declaration specifying steps or

8   obtaining information was made since I don't believe it was

9   asked for in discovery.  So that is the information that I have

10  on that, Your Honor.

11         THE COURT:  Okay.  So you think it might be in the

12  verified -- the third supplemental interrogatory responses?

13         MR. HARPER:  I believe it is.  I may defer to

14  Ms. Canner.  She has more information on whether -- where in

15  particular in the third supplemental responses that information

16  would come.

17         THE COURT:  With respect to previous issues,

18  Mr. Weston, do you agree that California law applies as -- or

19  governs the issue of previous --

20         MR. WESTON:  Yes, I do.

21         THE COURT:  And, Mr. Harper, are you arguing that

22  Kroger shouldn't be required to provide more information on its

23  privilege log?

24         MR. HARPER:  No, Your Honor.  In fact, our opposition,

25  I believe, addressed some of the Court's concerns, which I

8

1    understand and appreciate, but quite the contrary.  We stated

2    repeatedly during the meet-and-confer process that occurred

3    after the last November telephonic conference that we would be

4    willing to supplement a privilege log, and as I recall, and as

5    I believe the meet-and-confer correspondence shows, we didn't

6    get a confirmation on whether that would be acceptable at this

7    point to a motion.

8              THE COURT:  The privilege log seems pretty clear on

9    its face to be inadequate.  Why wasn't a proper privilege log

10   provided in the first place?

11             MR. HARPER:  We believe the privilege log was

12   adequate, and we offered to discuss what, in particular, was

13   not adequate for Mr. Weston, and we tried to engage on that

14   several times.

15             THE COURT:  Why is a document that was produced to all

16   Kroger employees -- how many employees do they have,

17   Mr. Harper?

18             MR. HARPER:  500,000.

19             THE COURT:  Why is a document that was produced to

20   500,000 people included on the privilege log?

21             MR. HARPER:  There is information that is -- well, I'm

22   not sure which specific document Your Honor's referring to.

23             THE COURT:  My understanding is if there's --

24             MR. HARPER:  I do know --

25             THE COURT:  My understanding is there's at least two

1    documents on the privilege log that are -- that were sent to

2    every Kroger employee.

3           MR. HARPER:  Your Honor, I apologize for not knowing

4    which one -- oh, I see.  I'm looking at the privilege log now.

5    You're referring to Log Number 1 and Log Number 2.  It appears

6    this is the record retention policy and the list on the

7    privilege log for attorney-client privilege and attorney work

8    product, and they -- those two documents are documents that

9    were written and supplied by Kroger's in-house legal team and

10   then supplied to Kroger employees.  That seems to be clearly

11   attorney-client privilege and attorney work product

12   information.

13          THE COURT:  I absolutely disagree.  Attorney-client

14   privilege is a communication conveying attorney advice, and a

15   document policy that employers -- under your reading, sir, an

16   employee handbook, just because it was sent by a lawyer or

17   drafted by lawyers, would be a privileged document.

18       And it's that type of claim that gives the Court reason to

19   question the sincerity of many other objections that Kroger has

20   made.  If that's a document that tells employees of a large

21   corporation how long to hold documents, then as a general -- as

22   a matter of general business practice and policy, there

23   is -- that is not privileged.  If it is a memo to a manager who

24   had a question about whether he has a legal obligation to

25   retain documents past a certain amount of time, that may

1    arguably be privileged, but a document sent to 500,000 people

2    at every level of the organization is not a privileged

3    document, particularly if it relates to a general policy of the

4    company and is instructions to comply with that general policy.

5        So let me ask you, Mr. Harper, now that you understand and

6    agree that there are very legitimate concerns about the

7    privilege log, what's the best avenue for the Court to test the

8    sincerity of Kroger's placement of documents on that privilege

9    log?

10            MR. HARPER:  Well, Your Honor, California law, which

11   applies, advises that if there are questions about the adequacy

12   of the privilege log, then we would supplement the information

13   in the privilege log, and that's what we had offered to do, and

14   that's what we continue to offer to do.

15            THE COURT:  And then what if the Court's not convinced

16   that, for example, if you were to persist in your claim that a

17   document sent to 500,000 employees is privileged, what

18   if -- are there any other avenues or is the Court just stuck

19   with trusting you?

20            MR. HARPER:  I think that the -- it's sort of an

21   unripe point if we don't have the supplemental privilege log

22   yet.  I think it's -- at that point we address whether there

23   are legitimate claims.

24       I mean, I will tell you, Your Honor, that we will look with

25   a, you know, more -- very critically consider whether our

1   privileged information is sufficient, and if we don't believe

2   it's sufficient, then we will either supplement it or we will

3   remove it.

4        At this point I believe that our privilege log is accurate,

5   if not fulsome, in the detail that it suffices to provide the

6   Court with information about whether the document is actually

7   privileged.

8            THE COURT:  So I want to ask you again, Mr. Harper,

9   does Kroger contend that the products in 2010 to 2012 did not

10  contain PHO or just that Kroger can't confirm that through its

11  suppliers?

12           MR. HARPER:  The problem, Your Honor, is the -- Kroger

13  does not test the particular product, but it

14  has -- demonstrated in the documents that were produced, Kroger

15  has provided -- they call them spec sheets, and these spec

16  sheets tell Kroger, from the supplier, what is in the different

17  products.  But Kroger does not confirm, you know, if it

18  contains PHO or doesn't contain PHO or whatnot.

19       I think part of the issue here is there's a conception that

20  Kroger does everything here in-house, it has a lab that creates

21  tests, manufactures labels, and produces its private label

22  products, but Kroger, in fact, relies on the information that's

23  provided by the suppliers and does not -- I mean, it relies on

24  that, and that's the information that it has, but it does not

25  know for sure whether certain products actually have PHO, and

1    I'll give you one actual example of this, Your Honor, which may

2    have come up previously, but when PHO was removed -- and this

3    is my understanding from the client, and I think it was

4    discussed some in the 30(b)(6) deposition.  When PHO was

5    removed, I believe, in 2005 -- or 2015 or 2016, the

6    process -- there are two different processes involved.  One is

7    the ingredients themselves and the manufacturer of the

8    ingredients, and then there's the labeling of the ingredients

9    as well.

10    And so Kroger, in order to comply with the FDA's removal of

11    PHO requirements, it had conversations with suppliers, who I

12    understand were already in the process of removing the PHO, so

13    there was product that had PHO removed in 2015 and 2016, but

14    the label did not caught up there to the fact that the PHO had

15    been removed.  And so my understanding -- and I think this is

16    reflected in the documents as well -- is PHO was removed from

17    certain products that continues to have PHO on the labels and

18    in some cases on the spec sheet.

19    So that's -- and so that's an example where Kroger has

20    information on the label or from the supplier themselves that

21    say that they contain PHO when, in fact, they don't contain

22    PHO.

23    And I realize that Your Honor's asking about 2010 and 2012,

24    but that's a concrete example that I know of in which there's

25    a -- somewhat of a disparity between what's contained in the

1   product and what is in the actual label, and when -- when

2   Kroger was trying to answer those questions, we were trying to

3   get answers with the -- we actually were trying to understand

4   why there's a -- why there's a reluctance to just confirm that

5   whatever the third-party suppliers indicate about what the

6   products contain is something that they can say without -- with

7   certainty that it was, and they were not comfortable doing

8   that, and I understand why.

9          THE COURT:  I don't understand why, because it's a

10  business that relies on a spec sheets to print a label that it

11  presents to consumers for its products to buy the product off

12  the shelf.  I think it seems to the Court that this was

13  something that was generated as a way to avoid discovery,

14  frankly.  I mean, I think Mr. Weston saw labels from Kroger

15  where Kroger represented on the labels to consumers throughout

16  the country what the ingredients in that product were, and at

17  that point in time, it was good enough for Kroger to rely on

18  those spec sheets, and so Mr. Weston drafted an interrogatory,

19  and he defined a product instead of -- I'm sure if he -- if he

20  could go back now, he would define "product" as anything that

21  Kroger labeled as having PHOs, but Kroger seized on the

22  definition of "product" to go back and create this false

23  narrative that, oh, we may not -- the supplier may not have

24  actually used PHOs, so we can't be 100 percent certain, so we

25  can't produce anything until we know for sure which products

 1   contain PHOs, which, by the way, is belied by the fact that
 2   Kroger produced things for Brekrums (phonetic) that don't
 3   contain PHOs even on the label.
 4        But anyway, this is a problem, Mr. Harper.
 5        Let me go back to -- you're going to have a chance to
 6   respond in full at the end, but did the products from 2010 to
 7   2012 contain PHO?
 8             MR. HARPER:  As far as I understand, they did, but,
 9   again, there's not 100 percent certainty about the product
10   between 2010 and 2012 part because I understand there were
11   supplier changes, and some suppliers were using PHO and some
12   were not.
13             THE COURT:  Did Kroger tell consumers from 2010 to
14   2012 on its labels that the products contained PHO?
15             MR. HARPER:  Well, for two of the products, the two
16   that are at issue I believe in this case per the claim, Kroger
17   breadcrumbs and the Italian-style breadcrumbs, I believe that
18   is true, but the way that the interrogatory and the discovery
19   was styled, it was not limited to those two products.
20             THE COURT:  Again, we're going back, Mr. Harper, to
21   the reasonable reading of the interrogatory.  And instead of
22   trying to read it in a way so that you could sharpen your
23   pencil and your knife to cut through what you have to produce
24   to the thinnest amount possible, a reasonable reading would not
25   find there is a distinction.

1      Has Kroger produced all the labels, sales information, and

2   information requested regarding those KBC and Italian-style

3   breadcrumbs from 2010 and 2012?

4          MR. HARPER:  Yes, Your Honor, I believe it has.

5          THE COURT:  And have you produced all the vendor specs

6   for those products during that time frame?

7          MR. HARPER:  I believe Kroger's produced all the

8   vendor specs that it has, and it's produced the vendor specs

9   that it was able to obtain from its third party, and that was a

10  pretty extensive search.

11         THE COURT:  Okay.  Mr. Weston, do you believe that any

12  responses to RFP Number 8, which is -- deals with pricing, or

13  RFP Number 18, which deals with labels, are still outstanding

14  or just -- or are you -- is your motion just that the responses

15  weren't timely produced?

16         MR. WESTON:  I think it is still outstanding.  There

17  have been no documents relating to sales other than the

18  redacted printout spreadsheet, and the redactions were not on

19  the privilege log as Kroger explicitly claimed.

20     But can I turn to what Mr. Harper said about there

21  being -- there being PHO on the label, but he doesn't know if

22  there's PHO in the product?  He has said this multiple times,

23  including -- I'm really surprised he said it again today.  But

24  he said it many times before, so the 30(b)(6) topics 8, 9, 10

25  all dealt with that claim that he's made to the Court

 1    repeatedly on the telephone and in the status reports, and

 2    those topics are the efforts Kroger made to ensure that the

 3    ingredient list reflects the actual ingredients, any instances

 4    on any Kroger product where the ingredient list were not

 5    accurate.  And then we went to the deposition, and I asked, so

 6    any instance between 2008 and 2016 where the ingredient list

 7    was not accurate?  And the answer was, no, I had no instance of

 8    that ever happening.  And then I asked, if the supplier changes

 9    the ingredient, do they have to tell you in advance?  And the

10    answer is yes.

11            And what they have been saying to the Court is we need to

12    hear from the supplier, but the supplier provides

13    contemporaneous lists of the ingredients so Kroger can design

14    the label itself, and so the idea that they have to go back and

15    ask again, they already got the information at the time from

16    the supplier, and they're going to ask again a second time.

17    Why would a supplier say anything differently?  I mean, it's

18    like asking in a labor case for payroll records to confirm

19    someone's really employed.  They're listed on the employee

20    list, they're listed in the payroll records, but maybe those

21    records are wrong, so I'm going to ask the supplier of the

22    records again to tell me, and until then, there's no discovery.

23    But --

24            MR. HARPER:  Your Honor --

25            MR. WESTON:  -- the part that I'm referencing is

1    the Bauer transcript, page 12, and she very clearly says she

2    knows of no instance of a label ingredient list not being

3    accurate, and this was a deposition topic that they were

4    required to prepare for, and she does not know a single

5    instance of the patent not on Kroger breadcrumbs, not on

6    anything.

7         And further, there was a spec sheet produced from 2009 that

8    says PHO was in the product.  They have no reason to doubt

9    that's true, and they can go and ask the supplier.  What's the

10   supplier going to do?  Go back to the spec sheet they provided

11   to Kroger and state the same thing.  But Kroger has this

12   information.  And the spec sheets also, by the way, did not

13   come from third parties.  I mean, they initially came from

14   third parties, but they were stored in a Kroger-owned computer

15   software system, and when we asked in the deposition, how did

16   you get these, it was just pulled up very quickly from the

17   different Kroger software programs that they have.

18              THE COURT:  So -- Mr. Weston, go ahead, sorry.

19              MR. WESTON:  And then if we can look at Interrogatory

20   1, Your Honor, they are not providing sales information.

21   There's something else that's not true in that.  The

22   supplemental response to Interrogatory Number 1 says the

23   following:  "In addition, Kroger does not maintain quarterly

24   records for unit sales or revenue for Kroger breadcrumbs."

25   That is just a false statement.  They provided what appears to

1    be a spreadsheet that has the unit sales and the revenue.

2        And they later provided it in a supplemental response.  So

3    this is just a false statement made in Kroger's interrogatory

4    responses.  We don't even keep our revenue records.

5            MR. HARPER:  Your Honor, that is not a Kroger

6    document.  That's a document from a third party that maintains

7    information for Kroger called PLM Marketing.

8            THE COURT:  Is that the third party that's closely

9    related to Kroger?

10           MR. HARPER:  It's a third party that -- it's the third

11   party that Kroger uses, but PL -- I believe PLM has other -- I

12   mean, it's not a -- sort of a captive company or anything like

13   that.  I mean, this isn't information that -- there's a

14   conception that, you know, there's a team that works on Kroger

15   breadcrumbs, and they have, you know, 100 percent access to

16   every single document there, but it's actually quite a -- kind

17   of a convoluted system of keeping a document, frankly.

18           THE COURT:  It actually sounds simple to me,

19   Mr. Harper.  Let me make sure I understand this.  You have

20   a -- it's a Private Label Marketing, right?

21           MR. HARPER:  Yes.

22           THE COURT:  And they gather information for Kroger

23   like, for example, the -- the sales and revenue information for

24   particular products.  Is that what I'm understanding?

25           MR. HARPER:  In general, I believe that's true.

 1          THE COURT:  Okay.  And Kroger uses that information in
 2   its business to make all the different business decisions.  Is
 3   that correct?
 4          MR. HARPER:  Contemporaneously it does, but for
 5   historical records, it's a different story.
 6          THE COURT:  In -- and that's the purpose of that,
 7   correct, to get information so that it can make business
 8   decisions --
 9          MR. HARPER:  For current information, that's true.
10          THE COURT:  -- about this?
11          MR. HARPER:  But --
12          THE COURT:  Does PLM provide information to Kroger and
13   destroy it immediately thereafter?
14          MR. HARPER:  I don't think it does.
15          THE COURT:  I wouldn't think so either.
16      And so it shouldn't be -- in my opinion, it shouldn't be
17   hard at all for Kroger to reach out to that vendor who is
18   providing all that information and get that historical
19   information.
20          MR. WESTON:  Your Honor --
21          THE COURT:  Go ahead.  Go ahead, Mr. Weston.
22          MR. WESTON:  The document labeled TKC150 is a spec
23   sheet, and it says on the top "Confidential Information for
24   Kroger, Internal Use Only."  So this isn't a document that they
25   got from the supplier and had to wait for it.  This is a

1   document that Kroger's 30(b) has said we get from our computer

2   software system.  They -- I think they called it the blue

3   system.  And we talked about that for a moment.  It's dated

4   2009, and it shows Kroger breadcrumbs has PHO in it.  And

5   again --

6                   MR. HARPER:  Your Honor --

7                   MR. WESTON:  -- Kroger internal use only, and

8   Mr. Harper just said that he thought the spec sheet and they're

9   not stored in Kroger.

10                  THE COURT:  I think --

11                  MR. HARPER:  Your Honor --

12                  THE COURT:  -- we might be conflating two issues,

13  Mr. Weston.  I was talking about sales information versus the

14  spec sheet, but I saw on that document that it was internal to

15  Kroger even though the information provided may have come from

16  a supplier, but, Mr. Harper, I'll let you respond.

17                  MR. HARPER:  Thank you, Your Honor.

18      I think we're actually talking about two different sheets.

19  What Kroger refers to as tech specs or spec sheets are, for

20  example, Exhibit D to the deposition, which is TKC284 through

21  287.  This was a document that was -- this is an example of a

22  historical tech spec or a spec sheet.  That's the information

23  that -- it's essentially Kroger has a set of requested

24  information, and then the supplier provides that information to

25  Kroger, and the suppliers hold that information.  Kroger does

 1   not have historical tech spec information such as that.  More
 2   examples of them are -- give me one second, Your Honor.  I
 3   apologize.
 4          THE COURT:  Well, wouldn't in that case, Mr. Harper --
 5   wouldn't if Kroger didn't keep that particular document --
 6   wouldn't the best evidence of what had been in that document or
 7   what was provided by the suppliers what was actually on the
 8   label that Kroger put on products that it sold to consumers?
 9          MR. HARPER:  I don't necessarily think so.  Again, it
10   would be -- it would be the tech spec sheet that came
11   from -- if the question is what is the best information that
12   Kroger has about what is contained in the documents, then I
13   suppose, yes, it would be labeled to the extent Kroger has
14   them, but, again, the label, as I believe Kim Bauer explained
15   in the 30(b)(6), our -- they're kept with third parties,
16   including a company called Stevenson.
17      And then the second area, the second document -- set of
18   documents that would have this document are the tech spec
19   sheets, which again, are documents that are held by the
20   third-party suppliers, and Kroger spent a long time trying to
21   get those and, in fact, finally did.
22      I'm looking at, for example, TKC156 through 157 -- I'm
23   sorry, TKC156 through 159, TKC132 through 137.  Those are the
24   sorts of sheets that are referred to as tech specs or spec
25   sheets.  Those come from the suppliers.  And

1    that -- that -- those are the sorts of documents that Kroger

2    has from the suppliers that identify what has PHO and what

3    doesn't to the best of Kroger's knowledge.

4          THE COURT:  Right, and the labels themselves would at

5    least, one would hope, accurately reflect what the vendors have

6    described as the ingredients in the product, correct?

7          MR. HARPER:  That would be the hope.

8          THE COURT:  And, in fact, I wouldn't think that Kroger

9    would want to argue that there's some reason why that would be

10   regularly inaccurate, particularly, let's say, for their

11   customers who might be gluten sensitive, that Kroger couldn't

12   rely on, so you can rely on those when it suits Kroger, but

13   when it helps you play games in discovery, you can pretend that

14   the ingredients on the label might be inaccurate in some way,

15   and now you have to go and ask all your suppliers all over

16   again just to be sure that they were totally accurate.  That's

17   my problem here, Mr. Harper.

18         MR. HARPER:  Your Honor, we're not playing games in

19   discovery.

20         THE COURT:  It's exactly what you were doing,

21   Mr. Harper, and it's time to stop it.  It's clear from the

22   record.  It's clear from the record.  It's an insult to this

23   Court that you come in again and again and try and claim that

24   you've acted in good faith.

25         MR. HARPER:  I'm very sorry that the Court feels that

 1   way, but I -- there was no intention to play games or do

 2   anything but provide the documents as best as Kroger was able,

 3   and we've been trying to do that.  We met and conferred in good

 4   faith over and over again trying to get these documents.  We

 5   continued to try to get these documents from third parties.

 6        You know, early on, there was a complaint or a worry that

 7   Kroger was going to do a document dump of some kind by

 8   providing every single document for every Kroger breadcrumb

 9   product, whether it had trans fat or not trans fat, and

10   so -- and this was on one of the first telephonic conferences

11   that we had with Your Honor and Mr. Weston.  We took that to

12   heart, and we were trying to avoid doing a document dump of

13   some kind.

14             THE COURT:  You did exactly that, Mr. Harper.  You

15   dumped 5,000 pages of printed spreadsheets instead of

16   substantive information.

17             MR. HARPER:  And as --

18             THE COURT:  How is that not a document dump?  How is

19   that not a document dump?

20             MR. HARPER:  It was -- there were documents that

21   had -- there were a series of documents, including these

22   spreadsheets, that had information that -- information about

23   Kroger's sales information that I understand Mr. Weston wanted,

24   but it had also several hundred other products listed on there,

25   and, you know, early on, it seemed that it would not be an

24

1    efficient or useful piece of discovery to give Mr. Weston

2    because of his concern about a document dump.

3        So then we, you know -- there was a complaint that there

4    aren't enough documents and that we were trying to hide stuff,

5    and so we made a decision, well, maybe we should produce all of

6    it even if it has apparently minimal relevance except as to the

7    specific two products at issue in this case.  So we offered to

8    produce those for the sake of completion and trying to provide

9    a good-faith production that satisfies everybody.

10       I mean, in some ways we're kind of stuck between a rock and

11   a hard place trying to either parse through the documents that

12   were relevant and had the -- that pertain to the particular

13   types of breadcrumb products and trying to quell -- trying to

14   avoid a massive inefficient document dump of some kind.

15            THE COURT:  And that is exactly what you engaged in.

16   Why didn't you produce those spreadsheets as spreadsheets in

17   their native files?

18            MR. HARPER:  At the time, we didn't -- I still don't

19   think we have an agreement on natives, but I do believe that we

20   offered to produce them in natives at some point in the

21   meet-and-confer process, but we didn't get a -- an agreement on

22   that.

23            THE COURT:  But you were going to require that they

24   ask for it first instead of just producing it in the way that

25   Kroger actually uses the document.  Is that my understanding?

25

1   This is the problem.  Over and over again.  I see discovery is

2   not an opening offer, Mr. Harper.  It's not a let's throw a

3   bunch of objections out and make them come back and beg for the

4   information they need.  You have an affirmative obligation to

5   act in good faith to provide fulsome responses to discovery,

6   and producing over 5,000 pages of printed spreadsheets when you

7   know darn well as a seasoned litigator you don't have to wait

8   for some ESI program call to produce a native file.

9   That's -- it's an absurd argument.  And again, again, you seem

10  to take no responsibility for the role you played in needlessly

11  multiplying the discovery process here for all the parties and

12  the Court.

13          MR. HARPER:  Your Honor, I'm sorry, but I do disagree

14  with that.  I deeply apologize for taking the Court's time on

15  issues that Your Honor thinks that they're a waste.  I believe

16  that we were acting in good faith.  I strongly believe that,

17  and we're trying to deal with the realities of the documents

18  that are available to Kroger and the information that we

19  believed was going to be relevant and responsive to discovery

20  requests, and this isn't -- this is a little bit more

21  complicated than a -- if it were one in-house product, the

22  reality is that we have a number of third parties and

23  suppliers.  We have a number of different products, some of

24  which are relevant, some of which are not.  We have the

25  additional elements, some historical documents that are

1   involved here.  And again, I do deeply apologize to the Court
2   particularly.  If there's any conception or belief that we're
3   not acting in good faith or that we're playing games, we
4   actually are not, we have been working very hard with the
5   client, with all the client contacts, with third parties to try
6   to get this right, and the -- we -- at the end of the
7   November 13th call, we took Your Honor's suggestion to heart
8   that we try to meet and confer with Mr. Weston to get these
9   issues resolved.  We went through to figure out after we
10  received the meet-and-confer letter on November 19th, and
11  although it was, you know, late in the evening that we received
12  it, we -- we worked really hard to get some compromise to find
13  out what exactly Mr. Weston still believed he needed, and we
14  worked through those issues, got him a letter back in two days.
15  We -- he seemed to be in agreement with this, with our
16  proposals.  And we -- in exchange, we gave him a six-week
17  extension on the motion to compel because it seemed that we had
18  reached agreement on what satisfies these issues, and through
19  the subsequent meet-and-confer responses on databases 2,
20  December 3, on December 18, it seemed that we had an agreement
21  on these things, and we were working toward resolving them
22  because we believed that it would be far more efficient to get
23  these resolved to really understand what Mr. Weston believed
24  was not there than get -- you know, have more motion practice
25  on this, to have more delay and whatnot.  We had -- we worked

1   really hard with the client to gather this information, to go

2   to the third party, to go to the -- any possible source that

3   has this information, and we've done the best job that we could

4   to do it.

5       And I take my obligations to the Court extremely seriously,

6   including in discovery and including in a case that's very

7   busy, and I just -- I'm troubled that Your Honor, you know,

8   believes that we're not acting in good faith.  And I vigorously

9   dispute that, and -- but we're doing the best that we can, and

10  we have been doing the best that we can to resolve these

11  issues.

12          THE COURT:  Well, I can tell you, Mr. Harper, that

13  actions speak louder than words.

14      Mr. Weston, what sales data exactly are you missing?

15          MR. WESTON:  The class period -- let me just get the

16  response to Rog 1.

17          THE COURT:  I'm sorry, what did you just say, Rog 1?

18          MR. WESTON:  Yes, the response to Interrogatory Number

19  1.

20      So they provided it from the first quarter of 2013 through

21  the first quarter of 2015, so it would be all of 2010, 2011,

22  2012, and then the final three-quarters of 2015, and I guess

23  any period in 2016 when the product was still

24  being -- different things about when that period stopped.

25          THE COURT:  Okay.  So you still need the information

 1     for those years?

 2          MR. WESTON:  Yes, so all of 2010 through 2012 and then

 3     the last three-quarters of 2015.

 4          THE COURT:  Okay.  And then what documents are

 5     outstanding, Mr. Weston?

 6          MR. WESTON:  Well, it's hard for me to know because I

 7     don't believe that they actually did a complete search, and I'm

 8     just not trusting their representations about what they

 9     searched and where they searched because they said things that

10     I don't believe are accurate.  So that's hard for me to answer

11     there.

12          In terms of the spec sheets and analysis of the product,

13     there seems to be a lot from 2017, 2018, a fair amount of

14     documents, but not all that much during the class period, and

15     that's one area where I was suspicious, and then when we talked

16     about where they looked for documents at the 30(b)(6)

17     deposition, it didn't seem very thorough to me.  I didn't have

18     enough time to address that in detail because the 30(b)(6) was

19     after our motion was filed.

20          THE COURT:  Okay.  Do you have documents regarding the

21     decision to add trans fat to the Kroger breadcrumbs?

22          MR. WESTON:  No, that's one very specific thing.  So

23     they gave us a fair number of documents about the decision to

24     remove it, but in terms of the discussion to add it, I don't

25     think they were forthcoming in the 30(b)(6) deposition, even

1    though that was one of the noticed topics, and we didn't get

2    any documents at all about the decision to add it.

3              THE COURT:  Okay.  And then what about, did you get

4    any documents about the decision to add "zero grams trans fat"

5    to the nutrient content claim I think on the label?

6              MR. WESTON:  That's what I was just addressing,

7    Your Honor.  I'm sorry, I misunderstood the prior question, but

8    that was what my answer was to.

9              THE COURT:  Okay.  I thought there was also -- you

10   were looking for documents regarding the discussion to add

11   trans fat to the breadcrumbs in the first place.

12             MR. WESTON:  Pardon me, no, we didn't get anything at

13   all about that, and we didn't get anything about the label

14   addition either.  So no, there was nothing about either one of

15   those decisions.

16             THE COURT:  Okay.  Now I'm going to go -- sorry.  Did

17   someone want to be heard?

18        Okay.  So let me go back to this issue about sanctions and

19   contempt.  First I'll hear from plaintiff first and then

20   Kroger.

21        In this case, if the Court orders monetary sanctions in the

22   form of attorney's fees incurred by plaintiff to file the

23   motion and meet-and-confer following Judge Major's order, can I

24   impose a sanctions only against Kroger or also against Kroger's

25   attorneys?

1         MR. WESTON:  I believe the punitive sanctions can be

2   awarded against both.  I don't know if the attorney's fees can

3   be awarded on both.  It seems like it does happen, but I don't

4   have specific authority as to that.

5         THE COURT:  Okay.  Mr. Harper.

6         MR. HARPER:  I don't have information in front of me

7   on that.  I would disagree with the imposition of sanctions,

8   but it doesn't sound like that's Your Honor's question.

9         THE COURT:  Mr. Harper, let me ask you this:  How else

10  is the Court going to get Kroger to start taking discovery

11  orders seriously?

12        MR. HARPER:  Well, I don't want to --

13        THE COURT:  Let me tell you this:  Judge Major entered

14  an order, right, and it's not -- just on the face of the record

15  before the Court, once you have a judge issue an over 30-page

16  order that includes sanctions, the notion that there would be a

17  lot of meet-and-confer, if any at all, is hard to swallow.

18     But it seemed like again Kroger took Judge Major's order,

19  even the order itself, as an opportunity to negotiate further

20  rather than, boy, I better get this done.  And the best example

21  of that is not even bothering to verify your supplemental

22  interrogatory responses for a month.  And another great example

23  is that you didn't even bother to provide a declaration that

24  was to your benefit to narrow the discovery period for months.

25  And then when you did provide a declaration, it's not with

 1   personal knowledge.  So how is the Court supposed to guarantee

 2   that what happened before won't happen again?

 3          MR. HARPER:  Your Honor, I can only say that we, as

 4   counsel, and Kroger have been -- have been working very hard to

 5   get this done, and we take -- we took Judge Major's order

 6   seriously, we took Your Honor's calls and strong suggestions

 7   during the teleconferences very seriously.  And I don't know

 8   what else we can do with the client to get more information.

 9   It's not a matter or question about whether we're taking or

10   whether the client is taking the Court seriously or discovery

11   seriously or the case seriously.  It's certainly the opposite

12   is true.  And I don't -- I don't have an answer for you because

13   I don't know what we can further do to make this -- to make the

14   parties and the Court satisfied with the efforts that Kroger

15   has been taking to get this done.

16          THE COURT:  So how much of the efforts -- well, I

17   don't know if it's worth asking the question.

18       With respect to sanctions, is the Court limited to the

19   sanctions that Mr. Weston is requesting, Mr. Harper?

20          MR. HARPER:  I think that the sanctions are limited to

21   fees on the motion and the meet-and-confer efforts, although I

22   would -- I would suggest that Kroger has been trying to meet

23   and confer on these issues as well.  I -- for the reasons we

24   stated in our opposition, we don't think that the additional

25   sanctions requested, including evidence exclusion or per diem

1    fees or contempt, are warranted.

2           THE COURT:  And then with respect to prejudice, am I

3    limited to what plaintiff has raised or can the Court find

4    prejudice inherent in the record?

5           MR. HARPER:  Well, I think that it not only is the

6    Court -- I don't think that Mr. Weston has raised sufficient

7    prejudice, and I don't know that there is additional prejudice

8    in the record.  We've got a trial date in October.  The -- I

9    would note that Mr. Weston served his expert reports on or

10   about January 10th, which was more than two months before the

11   expert deadline was due, and did not submit any supplemental

12   expert reports or anything like that, which indicate to us that

13   he had whatever information he needed.

14      And I would remind Your Honor that he had an expert

15   dedicated to damages and financials, an expert dedicated to

16   trans fat effect, and a third expert.

17      Mr. Weston also submitted his pretty fulsome motion for

18   class certification and his reply, the discovery -- the fact

19   discovery cutoff has passed.  The day for motions for summary

20   judgment is not -- and other pretrial filings is not until the

21   end of May.  And, as we outlined in our opposition, there was

22   not really a showing of prejudice, and I think that -- I think

23   that the law says, but I am not certain of this, that it's

24   incumbent on the plaintiff to establish prejudice, and having

25   failed to do so, the sanctions requests are limited to that

1    extent.

2         THE COURT:  Okay.  So I am finished with my questions.

3      Mr. Weston, this is your motion, so I'm going to let you go

4    first with anything else you want to raise with the Court.

5         MR. WESTON:  Well, the last topic that the Court

6    inquired about -- can you hear me okay?

7         THE COURT:  Yes.

8         MR. WESTON:  The last topic was what are the Court's

9    options, and this was something that I was trying to think

10   about.  I certainly saw a lot of cases where there was

11   terminating sanctions, but those don't actually do us a great

12   deal of good because we have a very strong case on the merits,

13   so they use trans fat, and they said it had zero grams, and

14   that wasn't true, and their last defense was preemption, and

15   they lost on that.

16      And then the other thing that would normally be a very

17   common discovery sanction are attorney's fees, and this is a

18   fee-shifting case anyway with strong merits, so it seems like

19   the two most common methods of sanction don't actually deter

20   very much for what's happened here.

21      And to address that, I think there can be a multiple on the

22   attorney's fees or there can be a punitive sanction that is

23   available to the Court, and to the extent that we didn't ask

24   for that, it certainly was in the Court's power.  And then the

25   only question is, did they have adequate notice of that?  And

1   the way to fix that would be to do an OSC, but it certainly is
2   within the Court's power to do those, and I'm just also
3   mentioning that to let the Court know why we didn't really
4   mention any further sanction beyond evidentiary exclusion,
5   which doesn't go very much, go very far.  And then just -- the
6   representations of good faith again and again, but I think
7   there are various versions of their response.  Interrogatory
8   Number 1 is pretty informative on this.  Interrogatory Number 1
9   was just your quarterly sales for the class period in Kroger
10  for Kroger breadcrumbs.  Their initial response was a complete
11  refusal to answer it.  Their first supplemental response is
12  nonsensical.  It's asking about revenue, and the response says,
13  "Defendant lacks information to show the unique number of
14  buyers of all breadcrumbs in California."  That is not even
15  remotely close to the question answered.
16      The second supplemental response said something that's just
17  not true.  It says, "In addition, Kroger does not maintain
18  quarterly records for unit sales or revenue for Kroger
19  breadcrumbs."
20      Their third supplemental response finally did have
21  precedence, but it said, we're not going to give you all of it
22  because we cannot hear back from our suppliers about what time
23  period had PHO.
24      And they also mentioned in -- kind of baited us into going
25  into a wild goose chase with companies that never made Kroger

1    breadcrumbs.  They made Private Selection panko crumbs, which

2    were never mentioned in the case, never mentioned in the

3    discovery requests, and never had trans fat, they're in a

4    different type container, and they mentioned the name of these

5    companies repeatedly in these requests and produced documents

6    related to them, and that is just another example of

7    misdirection in there, and this is all for a single discovery

8    request just asking for sales data.  And it was just repeated

9    again and again.

10        And again, talking about good faith and honest effort here,

11   Mr. Harper, again, said he doesn't know if he -- keeps, again,

12   capped out -- that the label -- that the ingredient list was

13   accurate.  Today he capped out on it.  There were three

14   different 30(b)(6) topics, 30(b)(6) deposition topics on this.

15   Kroger's witness was prepared for this or was required to be

16   prepared, and I asked this prepared witness, do you know of any

17   instance of this ever happening, and the answer was, no, I know

18   of no instance of this ever happening.  And then I asked, what

19   are the efforts that you undertake to ensure that it's

20   accurate?  And they said they received the information from the

21   suppliers in advance of any product -- any ingredient change so

22   they can update the label.

23        So I think the sanction -- or the contempt for the Court

24   even extends today with Mr. Harper's statements that were made

25   today.

1        And that's all I really have to say for the questions.

2            THE COURT:  No, but I'm going to give you, Mr. Harper,

3    a chance to respond and get a word in.

4            MR. HARPER:  Thank you, Your Honor.

5        There's not a lot I can say in response.  I disagree.

6    We're trying to work through this.  We're providing the

7    information that we have from Kroger at the time the

8    interrogatories were made.  You know, it was obviously an

9    evolving process as we -- you know, we get some information

10   from third-party suppliers, and we provide what we had at the

11   time, and then we get more information, and we supplement it.

12   That's the way the discovery process is supposed to work, and

13   that's what we've been doing.  And, you know, we -- there are

14   statements about, well, there are -- Kroger is not sure about

15   whether a particular label accurately represents a -- you know,

16   the ingredients, and I know that based on the information that

17   we had at the time that that was true, and as we dug deeper, in

18   some cases we found it looked like it was one supplier, and

19   they didn't change the ingredient, and then there were other

20   suppliers, and then sometimes the questions would change and go

21   from, well, all products -- at one point it meant all Kroger

22   breadcrumbs, and eventually through this case, it got narrowed

23   and then became traditional breadcrumbs and plain breadcrumbs

24   and garlic breadcrumbs.  And so naturally -- so then it wasn't

25   a wild goose chase or a misdirection.  It was the -- what

1   appeared to be the changing state of what the relevant products

2   were.  And then at one point after Ms. Hoffman's deposition on

3   January 3rd, it turned into -- it was just plain breadcrumbs

4   and Italian-style breadcrumbs and not the garlic breadcrumbs.

5   And we -- you know, on our side, we have to keep track of all

6   of this and do our best to make sure that we're providing the

7   accurate information and not doing anything that's going to

8   create burdens, and I realize that this process developed and

9   then the case develops, that the information changes, the

10   answers change based on the different products at issue, but

11   this is not an instance of misdirection or intentionally

12   sending anyone on wild goose chases.  This is like a -- it's an

13   evolving work in progress, and unfortunately, it's resulted in

14   a dissatisfied plaintiff and unhappy Court, and we -- you know,

15   we are deeply sorry about that, but I don't know what we

16   can -- what we could have done to do more in order to get the

17   information out as accurately and as timely as possible.  I

18   mean, I don't know what else I can say about it.

19          THE COURT:  Well, I think it's unfortunate that you

20   think that you're without any sort of culpability in this

21   matter, and the Court will have to take that into consideration

22   when I consider what I can do so that you're aware, more aware,

23   of your discovery obligations in the future.

24     This is not a case where I think that you can legitimately

25   or credibly on this record claim to have acted in good faith or

1   had certainly not to have been acting in an effort to ensure

2   that the other side had a fair shot at the information that

3   they need in the case, which essentially is what discovery is

4   about.  It's not about hiding the ball.  And that's what the

5   Court -- when the Court has to step in, that's what -- we're

6   just looking to make sure the playing field is level.  And

7   whether your client was brought along on this or directing it

8   or not, apparently the strategy in this case has been to

9   obfuscate so that you can hold out on relevant information.

10  And that's the opposite of what the discovery process is, and

11  at some point, even if it's to satisfy your client, you have an

12  obligation to the Court, as an officer to the Court, to conduct

13  yourself in a different way.

14       It's frustrating to the Court, but it's also a bit

15  unsurprising.  I can recall that I made it very clear to Kroger

16  that they had an obligation to comply with a document

17  production by October 7th, and according to the four corners of

18  Judge Major's order and that I was told, that we just have to

19  agree to disagree.  But that's not really how this works.

20       So here we are, months later, having spent far too much

21  time trying to avoid providing the most basic information in a

22  case on a second motion to compel, and it's very frustrating to

23  the Court, and unfortunately, it sounds like there's -- I don't

24  know that Kroger will conduct itself any differently, but the

25  Court will have to take that into consideration and consider

1  what needs to happen in order to make sure that discovery

2  proceeds as fairly as possible from this point forward.

3      I appreciate your time, and I will take the matter under

4  submission and issue a written order.  Thank you.

5          MR. HARPER:  Thank you, Your Honor.

6          THE CLERK:  The Court is now in recess.

7                  ---o0o---

8              C-E-R-T-I-F-I-C-A-T-I-O-N

9

10     I hereby certify that the foregoing is a correct transcript

11  from the electronic sound recording of the proceedings in the

12  above-entitled matter.

13     Dated April 24, 2020, at San Diego, California.

14

15
                    /Dana Peabody/
16                  Dana Peabody, Transcriber

17

18

19

20

21

22

23

24

25

# CERTIFICATE OF SERVICE

*Shavonda Hawkins v. The Kroger Company*
U.S.D.C. Southern District of California Case No. 3:15-cv-2320-JM-BLM

I the undersigned, declare:

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 865 S. Figueroa Street, Suite 2400, Los Angeles, CA 90017.

On May 7, 2020, I served true copies of the following documents described as**:**

## DECLARATION OF HEATHER F. CANNER IN SUPPORT OF OBJECTION TO ORDER GRANTING SANCTIONS

on the interested parties in this action as follows:

**BY CM/ECF NOTICE OF ELECTRONIC FILING:** I electronically filed the documents with the Clerk of the Court by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system. Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on May 7, 2020, at Los Angeles, California.

/s/ Jacob M. Harper
Jacob M. Harper

DECLARATION OF HEATHER F. CANNER ISO OPPOSITION TO MOTION TO COMPEL FURTHER RESPONSES TO DISCOVERY REQUESTS