# EXHIBIT 2

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

SHAVONDA HAWKINS, on behalf of
all others similarly situated,

Plaintiff,

vs.

THE KROGER COMPANY,

Defendant.

Case No: 15CV2320 JM BLM

REBUTTAL DECLARATION OF RONALD T. WILCOX, PH.D

April 3, 2020

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

## Table of Contents

I.    Qualifications.................................................................................................... 1

II.   Background and Plaintiff's Allegations ............................................................. 2

III.  Assignment and Materials Relied Upon ............................................................ 3

IV.   Summary of Opinions........................................................................................ 4

V.    Analysis of Opinions......................................................................................... 5

    A.   Dr. Bowen's Model for Estimating Class-Wide Damages Is Inconsistent with the Economic Implications of Plaintiff's Damages Theories ......................................... 5

        1.   Introduction to Plaintiff's Alleged Theories of Harm and Dr. Bowen's Analysis........... 5

        2.   Dr. Bowen's Damages Model Does Not Estimate Reliable Class-Wide Economic Damages Under Plaintiff's Benefit of the Bargain Theory ...................................................... 8

        3.   Dr. Bowen's Model Does Not Estimate Reliable Class-Wide Economic Damages Under Plaintiff's Use Theory ............................................................................... 11

    B.   In Addition to Being Ungrounded in Economics, Dr. Bowen's Damages Estimates Ignore Available Data and Contain a Calculation Error..................................................... 14

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

## I.    Qualifications

1.    I am the NewMarket Corporation Professor of Business Administration at Darden
Graduate School of Business Administration at the University of Virginia, where I conduct
research and teach classes related to marketing.  From 2015 to 2019 I was also the Senior
Associate Dean for Degree Programs.  I received an Honors Bachelor of Arts degree in
Classics and Economics from Xavier University and a Ph.D. in Business Administration from
Washington University in St. Louis.  I have been at Darden since 2001.  Prior to that I was an
Assistant Professor of Industrial Administration at the Graduate School of Industrial
Administration (now Tepper School of Business) at Carnegie Mellon University.  I also served
as an economist at the U.S. Securities and Exchange Commission from 1999 to 2000 where I
conducted economic analysis of consumer decision making for financial services.

2.    Marketing is a discipline that is focused on the study of organizations' marketing
practices based on conceptual foundations of consumer behavior.  My research focuses on
economic analysis of marketing phenomena.  My general areas of expertise within marketing
are branding, consumer behavior, surveys, econometric modeling of consumer choice, and the
public policy implications of marketing.  I have published several articles on these phenomena
in leading journals such as the *Journal of Marketing Research*, *Marketing Science*,
*Management Science*, and *The Journal of Business*.  For example, for one of my papers, I
constructed a consumer survey and conducted economic analysis to determine the willingness
of individual consumers to purchase private-label products rather than national brands.[1]

3.    I have also authored or supervised numerous cases and technical notes, published by
Darden Business Publishing and used at other leading business schools, which focus on
practical business problems faced by companies, and frameworks and techniques for solving
these problems.  For instance, I supervised a case focused on consumers' responses to
packaging and promotions for Heinz Ketchup.[2]  I also authored a technical note that describes a
survey technique for measuring consumer preferences for multi-attribute products and

---

[1] Chakravarthi Narasimhan and Ronald T. Wilcox, "Private Labels and the Channel Relationship:  A Cross-
Category Analysis," *The Journal of Business* 71, no. 4, 1998, pp. 573–600.
[2] Rebecca Goldberg and Ronald T. Wilcox, "Heinz Ketchup:  Pricing the Product Line," *Darden Business
Publishing, University of Virginia*, Revised May 10, 2019, UVA-M-0777.

services.[3]  At Darden, I have taught MBA-level courses in marketing research and marketing intelligence.  I currently teach the required marketing course in the MBA and Executive MBA programs as well as the elective course on pricing.

4.      Outside of academic journals, my research and writing have appeared in The Wall Street Journal, The Washington Post, BusinessWeek, Fortune, Forbes, and The Weekly Standard.  I have also co-authored a book, Cutting-Edge Marketing Analytics: Real World Cases and Data Sets for Hands On Learning, published by Pearson FT Press in 2014, on the use of customer data to improve marketing decisions.  Another one of my books, Whatever Happened to Thrift? Why Americans Don't Save and What to Do about It, published by Yale University Press in 2008, was named a "Top 5 Business Book of the Year" by Kiplinger.  A copy of my curriculum vitae that provides a full list of my publications is attached as **Appendix 1**.

5.      I have served as a marketing consultant to a number of organizations such as Sikorsky, Pratt and Whitney, Johnson and Johnson, Visa, Talbots, Logistics Management International, and Illinois Tool Works.  I have also served as an expert witness in cases where I opined on issues relating to marketing.  A list of my testimony in the past four years is attached as **Appendix 2**.

## II.      Background and Plaintiff's Allegations

6.      The Kroger Company ("Kroger") operates thousands of stores under a collection of brands, providing supermarket, pharmacy, and fuel center services to customers.[4]  Kroger offers private-label items in its stores,[5] including Kroger bread crumbs—the product at issue in this litigation (the "Kroger Bread Crumbs" or the "at-issue products").  Some of these private-label items are produced by outside suppliers, such as Kroger Bread Crumbs.[6]

7.      Lead Plaintiff Shavonda Hawkins ("Plaintiff") alleges in the complaint (the "Complaint") that Kroger unlawfully sold private-label Kroger Bread Crumbs that contained some amount of partially hydrogenated oil ("PHO") after the U.S. Food and Drug Administration had

---

[3] Ronald T. Wilcox, "A Practical Guide to Conjoint Analysis," *Darden Business Publishing, University of Virginia,* Revised June 27, 2019, UV0406.

[4] The Kroger Co., Form 10-K for the Fiscal Year Ended February 2, 2019, filed April 2, 2019, p. 2.

[5] The Kroger Co., Form 10-K for the Fiscal Year Ended February 2, 2019, filed April 2, 2019, p. 3.

[6] Exhibit 4 to the 30(b)(6) Deposition of Joseph Evans, February 26, 2020 ("Evans Deposition"), Exhibit 4 (Third Set of Supplemental Responses and Objections to Plaintiff's First Set of Interrogatories), pp. 13–14.

determined PHO was no longer generally recognized as safe.[7] Ms. Hawkins further alleges that, because of the presence of PHO, the "0g Trans Fat" claim on the Kroger Bread Crumbs label falsely indicated that the at-issue products were free of trans fat.[8]

8.     Lead Plaintiff claims that, were she aware of Kroger's allegedly deceptive behavior, she and other putative class members would not have purchased the Kroger Bread Crumbs, and instead would have purchased a less expensive product or one that contained no artificial trans fat.[9] To that end, Plaintiff seeks damages for members of a proposed class consisting of California citizens who purchased Kroger Bread Crumbs packages containing PHO and bearing a front label claim of "0g Trans Fat" from January 1, 2010 through December 31, 2015 (the "Putative Class Period").[10]

9.     Plaintiff's expert Dr. Robert Bowen filed a report in which he estimates purported damages to putative class members under a full restitution model "based on the amount of money Kroger received from the sale of the bread crumbs at issue."[11]

## III.   Assignment and Materials Relied Upon

10.    I have been asked by counsel for Kroger to review the expert report submitted by Dr. Bowen and to evaluate whether his analysis is capable of reliably determining class-wide damages based on Plaintiff's theories of harm, as asserted in the Complaint.

11.    In performing my analyses, I reviewed the Bowen Report, case documents, as well as academic literature. I also relied on my knowledge and expertise in economics and marketing research that I have developed as an academic researcher. A complete list of materials upon which I relied in forming my opinions is shown in **Appendix 3** to this report. I reserve the right to amend or update the opinions in this report should additional information be made available to me.

12.    I am being compensated at my hourly rate of $850. I was assisted in my work by staff at Cornerstone Research who performed research and other support work for me in this matter. I

---

[7] Class Action Complaint, *Shavonda Hawkins, on behalf of herself and all others similarly situated, v. The Kroger Company*, October 15, 2015 ("Complaint"), ¶ 6.

[8] Complaint, ¶ 9.

[9] Complaint, ¶¶ 136, 158.

[10] Plaintiff's Memorandum of Points and Authorities in Support of Motion for Class Certification, p. 1.

[11] Expert Report of Professor Robert M. Bowen, January 10, 2020 ("Bowen Report"), ¶ 5.

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER                    Page 3

receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter. Neither Cornerstone Research's compensation nor mine is contingent upon the conclusions I reach or on the outcome of this or any other matter.

## IV.    Summary of Opinions

13.    In this report, I reach the following opinions:

- Dr. Bowen's damages methodology is not economically consistent with either of Plaintiff's alleged theories of harm.

- Dr. Bowen's damages model cannot estimate reliable class-wide economic damages under Plaintiff's benefit of the bargain theory, discussed in more detail in Section V.A.2. From an economic perspective, any purported economic damages under the benefit of the bargain theory should be measured as the difference between the price consumers paid for the at-issue products and the price consumers would have paid for the Kroger Bread Crumbs in a counterfactual world. Dr. Bowen makes no attempt to assess either demand for or supply of the at-issue products in the counterfactual world envisioned by Plaintiff; as a result, he cannot determine an equilibrium price in a counterfactual world to estimate damages under Plaintiff's benefit of the bargain theory. The only possible way in which his model could reflect reliable damages is if no putative class member would be willing to pay more than $0 for the Kroger Bread Crumbs absent the "0g Trans Fat" label. Dr. Bowen provides no evidence that this is the case for every, most, or even a typical putative class member. In fact, such an assumption is contradicted both by academic research on food purchasers generally and the testimony of the lead plaintiff in this case, Ms. Hawkins.

- Dr. Bowen's damages model also cannot estimate reliable class-wide economic damages under Plaintiff's use theory, discussed in more detail in Section V.A.3. Dr. Bowen simply accepts Plaintiff's contention that putative class members did not receive any value for the at-issue products; this assumption is likewise contradicted by academic research, the named plaintiff's testimony, the fact that the presence of PHO was disclosed on the Kroger Bread Crumbs ingredient list, and the availability of other products containing PHO.

- Beyond the fundamental flaws in his damages methodology, Dr. Bowen's approach is incorrectly executed. He ignores available data in 2015, instead relying on an unnecessary extrapolation that overstates sales of the at-issue products by more than $100,000. In addition, Dr. Bowen's calculations contain a calculation error.

## V.   Analysis of Opinions

### A.   Dr. Bowen's Model for Estimating Class-Wide Damages Is Inconsistent with the Economic Implications of Plaintiff's Damages Theories

#### 1.   Introduction to Plaintiff's Alleged Theories of Harm and Dr. Bowen's Analysis

14.   Plaintiff describes two separate claims, and hence theories of harm, in the Complaint.

15.   First, the Complaint asserts that Kroger "falsely marketed and falsely represented that the Kroger Bread Crumbs were free of trans fat" due to the presence of the "0g Trans Fat" label on the front of the Kroger Bread Crumbs package.[12] I will call this the "benefit of the bargain" theory as lead Plaintiff Hawkins claims that she and other putative class members were denied the "benefit of the bargain when [they] decided to purchase the Kroger Bread Crumbs over competitor products, which are less expensive or contain no artificial trans fat."[13] Plaintiff's allegations imply that, absent the "0g Trans Fat" label, putative class members either would have paid less for the Kroger Bread Crumbs, or would not have purchased the Kroger Bread Crumbs at all and instead would have purchased products that either were less expensive or did not contain PHO.[14] Under such a theory of harm, damages would be estimated as the difference between the price putative class members would have paid for the Kroger Bread Crumbs in a world in which the Kroger Bread Crumbs package did not contain the "0g Trans Fat" label, and the price that putative class members actually paid for the Kroger Bread Crumbs package with the "0g Trans Fat" label.

16.   Hence, a proper damages analysis for the benefit of the bargain theory would need to assess the price of the Kroger Bread Crumbs in the counterfactual world set forth by Plaintiff.

---

[12] Complaint, ¶ 9.
[13] Complaint, ¶¶ 135, 158, 165.
[14] Complaint, ¶¶ 105, 137.

In particular, a benefit of the bargain damages analysis would need to assess how the absence of the "0g Trans Fat" label would affect each putative class member's demand for the Kroger Bread Crumbs. It also would need to assess how the absence of the "0g Trans Fat" label would affect the supply of the at-issue products, especially to the extent that it affects competitor actions. Once both supply and demand have been analyzed in the counterfactual worlds, then the ensuing equilibrium price can be compared with the actual price(s) paid for the Kroger Bread Crumbs by putative class members to assess any damages.

17.   Plaintiff also articulates an alternative theory—namely that PHO was *illegally* included in the Kroger Bread Crumbs,[15] that the Kroger Bread Crumbs were "not fit for human consumption," and *therefore that their value was $0.*[16]  I understand that this theory has been referred to in this case as the "use theory" and I will use that term in this report. Associated with this theory, Plaintiff seeks damages in the form of the disgorgement and/or restitution of all revenue received by Kroger from the sale of the Kroger Bread Crumbs.[17]  I note that I am not providing any opinions as to whether this remedy is appropriate from a legal perspective, nor am I providing opinions on whether the presence of PHO in the Kroger Bread Crumbs was legal or illegal. However, from an economic perspective, disgorging all revenue associated with the Kroger Bread Crumbs would result in a windfall to the putative class members. This is because purchasers of the Kroger Bread Crumbs received value from their purchases of the product (as I discuss more in Section V.A.3). The framework for estimating damages associated with the use theory is similar to the framework from the benefit of the bargain theory. Economic damages would be equal to the difference between the value that putative class members received from the Kroger Bread Crumbs and the value that they would have received from the at-issue products absent the alleged illegal behavior.

18.   Dr. Bowen's analysis provides no economic analysis related to either of Plaintiff's theories of harm. In particular, Dr. Bowen makes no assessment of what the prices or value of the Kroger Bread Crumbs would be in the counterfactual worlds envisioned by Plaintiff. Instead, Dr. Bowen simply compiles sales figures (incorrectly, as I discuss in Section V.B), and calculates simple interest on those sales. Specifically, Dr. Bowen estimates all revenues

---

[15] Complaint, ¶ 6, Section IX.
[16] Complaint, ¶ 106.
[17] Complaint, ¶¶ 128, 139, 155, 161, 169, 173.

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

received by Kroger associated with the Kroger Bread Crumbs. To do so, Dr. Bowen relies on documentation of Kroger's quarterly sales of two Kroger Bread Crumb flavors ("Italian" and "Traditional"/"Plain") from 2010 through 2015,[18] and then calculates prejudgment interest on those sales.[19] Using that methodology, Dr. Bowen calculates total dollar sales of $2,012,712 and prejudgment interest of $951,934.34, based on a simple statutory rate.[20]

19.   Dr. Bowen provides no explanation as to why his approach allows him to estimate reliable economic damages for either Plaintiff's benefit of the bargain theory or use theory. Dr. Bowen's approach can only be economically consistent with Plaintiff's benefit of the bargain theory under one circumstance:  putative class members would have been willing to pay no more than $0 for the Kroger Bread Crumbs in the counterfactual world envisioned by Plaintiff. In other words, for Dr. Bowen's approach to be economically sound, he must demonstrate that putative class members would have paid $0 for the Kroger Bread Crumbs in the absence of the "0g Trans Fat" label (which he did not do). Similarly, Dr. Bowen's analysis can only be economically consistent with Plaintiff's use theory if putative class members did not receive any value from their purchases of the Kroger Bread Crumbs due to the alleged illegal conduct. Dr. Bowen has not demonstrated that every, most, or even some putative class members received no value from the other attributes of the Kroger Bread Crumbs they purchased.

20.   Dr. Bowen provides no rationale for why such assumptions are appropriate. First, it is self-evident that Kroger would be unwilling to sell its product for $0. Further, as I will discuss in the following subsections, these assumptions about putative class members' willingness to pay for and valuation of the Kroger Bread Crumbs in Plaintiff's counterfactual scenarios are ungrounded in academic research and even inconsistent with lead Plaintiff's own behavior.

---

[18] Bowen Report, ¶¶ 6–7, citing Bates Stamped document TKC 000054–63 (Evans Deposition, Exhibit 3) and Third Set of Supplemental Responses and Objections to Plaintiff's First Set of Interrogatories (Evans Deposition, Exhibit 4), Third Supplemental Response to Interrogatory No. 1. I understand that a third Kroger Bread Crumb flavor, Roasted Garlic, also contained PHO, but is not at issue in this case. As a result, it does not enter Dr. Bowen's damages calculation. Evans Deposition, Exhibit 4 (Third Set of Supplemental Responses and Objections to Plaintiff's First Set of Interrogatories), Third Supplemental Response to Interrogatory No. 1.
[19] Bowen Report, ¶¶ 8–10.
[20] Bowen Report, ¶¶ 8–10.

2.    **Dr. Bowen's Damages Model Does Not Estimate Reliable Class-Wide Economic Damages Under Plaintiff's Benefit of the Bargain Theory**

21.    Plaintiff's benefit of the bargain theory asserts in the Complaint that Kroger "falsely marketed and falsely represented that the Kroger Bread Crumbs were free of trans fat" due to the presence of the "0g Trans Fat" label on the front of the Kroger Bread Crumbs package.[21] As noted above, any alleged economic damages under Plaintiff's benefit of the bargain theory of harm should be measured as the difference in the actual price paid for the Kroger Bread Crumbs and the price putative class members would have paid for the Kroger Bread Crumbs in a world in which the "0g Trans Fat" label was removed from the Kroger Bread Crumbs package. Dr. Bowen undertook no such analysis. His damages methodology does not align with Plaintiff's asserted benefit of the bargain theory unless putative class members would have been willing to pay no more than $0 for a Kroger Bread Crumbs package without the "0g Trans Fat" label.[22] Dr. Bowen provides no evidence that this is the case.

22.    I am aware of no evidence that supports an assumption that every, most, or even some putative class members would have been unwilling to pay more than $0 for the Kroger Bread Crumbs absent the "0g Trans Fat" label. Instead, academic evidence and lead Plaintiff's own behavior indicate that consumers consider (and hence value) a variety of factors when purchasing foods, not just the presence of a "0g Trans Fat" label. Further, each consumer gives different weights to these factors, further complicating any analysis of how putative class members would have acted in a counterfactual world in which the Kroger Bread Crumbs did not include the "0g Trans Fat" label.

23.    Academic research indicates that food labels alone do not tend to drive consumer purchases of packaged foods. For one, research indicates that few people read product labeling without a specific reason and that labeling foods has a limited effect on the role nutritional content plays during product purchases.[23] Second, research shows that consumers consider and hence "value" many different facets of food when they make food-related purchases, and do

---

[21] Complaint, ¶ 9.

[22] As noted, it is self-evident that Kroger would not have been willing to sell the Kroger Bread Crumbs at $0.

[23] *See* D. Rawson et al., "Pilot Study to Investigate the Potential of Eye Tracking as a Technique for FSA Food Labelling Behaviour Research," *Eyetracker.co.uk*, https://www.fcrn.org.uk/sites/default/files/Food_Labelling_and_eyetracking.pdf; *see also* Gary Sacks et al., "Impact of Front-Of-Pack 'Traffic-Light' Nutrition Labelling On Consumer Food Purchases In The UK," *Health Promotion International* 24, no. 4 (20). These findings were also highlighted in a report that I reviewed by Professor Dominique Hanssens served in this case on March 13, 2020.

not rely only on the labels shown on product packaging.  For example, Asp (1999) finds that psychological factors such as taste are "among the strongest determinants of what foods an individual eats."[24]  In particular, taste is considered most important in food selection by 89% of respondents to the 1998 Food Marketing Institute Survey of Food Shoppers.[25]  Kroger itself has a rigorous taste-test process whenever a Kroger product is changed to ensure that "the quality is as good as – as the prior formulation – or the prior ingredients," evidence that Kroger perceives taste as an important consumer purchase factor.[26]

24.    Other factors that Asp (1999) points to include sensory attributes such as texture, color, shape, form, and non-sensory factors such as how food reflects one's identity and adherence to food trends.[27]  A literature review on consumer food purchasing behaviors by Castro et al. (2018) finds that other product-specific attributes like branding and in-store environmental factors such as food sampling and shelf display, in addition to nutritional labeling, among others, can also influence consumers' decisions.[28]

25.    Because taste is such an important factor in food purchase decisions, prior experience with a food product can strongly influence subsequent purchases.  Indeed, academic literature finds that consumers often purchase grocery items out of habit; that is, consumers may purchase a product because they have purchased it previously and were satisfied.[29]  For example, one study of the breakfast cereal market in Sweden found that "habits are an important determinant of breakfast cereal choices" and that "[t]here seems to be a strong element of habit persistence in breakfast cereal choices for all breakfast cereal types."[30]  Consistent with this finding in the literature, at deposition, lead Plaintiff Hawkins testified that

---

[24] Elaine H. Asp, "Factors affecting food decisions made by individual consumers," *Food Policy* 24, 1999: 287–294 ("Asp (1999)"), p. 289.

[25] Asp (1999), p. 289.

[26] Evans Deposition at 108:9–17 ("Q. Is that part of Kroger's process of approving a change to a Kroger product? A. That is one step in it. We also formally cut and formally panel, many times, the product to make sure the quality is as good as – as the prior formulation – or the prior ingredients. Q. By 'cut,' do you mean you open the product up and look at it?  A. And taste it.").

[27] Asp (1999), pp. 289–290.

[28] Iana A. Castro, Anuja Majmundar, Christine B. Williams, and Barbara Baquero, "Customer Purchase Intentions and Choice in Food Retail Environments: A Scoping Review," *International Journal of Environmental Research and Public Health* 15, 2018, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6266072/.

[29] Linda Thunström, "Preference Heterogeneity and Habit Persistence:  The Case of Breakfast Cereal Consumption," *Journal of Agricultural Economics* 61, no. 1, 2010, pp. 76–96 at 77 ("Habit persistence means past consumption reinforces the propensity to consume the same good over time.").

[30] Linda Thunström, "Preference Heterogeneity and Habit Persistence:  The Case of Breakfast Cereal Consumption," *Journal of Agricultural Economics* 61, no. 1, 2010, pp. 76–96 at p. 90.

she had purchased the Kroger Bread Crumbs and some other products, such as Cream of Wheat and oatmeal, for many years.[31]  Indeed, I note that Ms. Hawkins had been purchasing the at-issue products repeatedly for at least 15 years, including as I understand for several years before the introduction of the "0g Trans Fat" label in 2008,[32] suggesting that her purchase decisions may have been in part habit-related.[33]  When purchasing foods out of habit, consumers might not consider a product's labeling—such as the "0g Trans Fat" label on the Kroger Bread Crumbs—at all, or to a lesser degree than they would if purchasing a product for the first time.[34]

26.  The idea that putative class members would have been willing to pay no more than $0 for the Kroger Bread Crumbs absent the "0g Trans Fat" label is also seemingly inconsistent with lead Plaintiff's own testimony and behavior.  Ms. Hawkins appears to have considered numerous other factors beyond the package labeling in her repeated decisions to purchase the at-issue products.  According to the Complaint, Ms. Hawkins had purchased the at-issue products approximately six times per year for at least 15 years, including in the approximately eight-year period before Kroger had included the "0g Trans Fat" label on the Kroger Bread Crumbs.[35]  During that period, the "0g Trans Fat" label could not have been an impetus for her purchase of the Kroger Bread Crumbs.  Further, at deposition, Ms. Hawkins testified that she had been purchasing the at-issue products to use in meatloaf for her family, which she generally made at least once per week.[36]  She consistently purchased the Kroger Bread Crumbs, she explained in her deposition, because she liked the seasoning, liked the way the bread crumbs worked in her meatloaf dish, and felt her family appreciated the consistency of her dish.[37]  Ms. Hawkins also testified that she had no issues with the taste of the at-issue products, and that she detected no difference in taste when she switched to a competing bread

---

[31] Deposition of Shavonda L. Hawkins, January 3, 2020 ("Hawkins Deposition"), at 127:5–127:25.

[32] Declaration of Kim Bower, February 10, 2020, ¶¶ 7–10 (explaining that "the statement '0g Trans Fat' did not appear on the front of the label for [the Kroger Bread Crumbs on] store shelves until November 2008.").

[33] Complaint, ¶¶ 71–72.

[34] Linda Thunström, "Preference Heterogeneity and Habit Persistence:  The Case of Breakfast Cereal Consumption," *Journal of Agricultural Economics* 61, no. 1, 2010, pp. 76–96 at 77 ("If food consumption is habitual, consumption will be sticky in response to either additional information or price changes, at least in the short run.  The short run response to information or price changes will therefore differ from the long-term response (which also reflects adjustments of habits).")

[35] Complaint, ¶¶ 71–72; Declaration of Kim Bower, February 10, 2020, ¶¶ 7–10.

[36] Hawkins Deposition at 75:10–21, 102:4–6.

[37] Hawkins Deposition at 101:16–101:23.

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

crumb product.[38] Thus, Ms. Hawkins appreciated a number of aspects of the Kroger Bread Crumbs.

27.    But to the extent that it is indeed the case that Ms. Hawkins would have been unwilling to pay more than $0 for the Kroger Bread Crumbs in the absence of the "0g Trans Fat" label, Dr. Bowen has made no effort to assess whether her behavior and preferences can be generalized to putative class members, which include all purchasers of any Kroger Bread Crumbs that both contained PHO and included the "0g Trans Fat" label between January 1, 2010 and December 31, 2015.[39]

28.    In short, both lead Plaintiff Hawkins' experiences and academic research are at odds with Dr. Bowen's unfounded assumption that putative class members would have been willing to pay no more than $0 for the Kroger Bread Crumbs, absent the allegedly deceptive behavior. Indeed, research shows that consumers use a variety of factors when deciding which food products to buy. Dr. Bowen has not examined the factors underlying putative class members' purchase decisions and how they would influence purchase behavior absent the "0g Trans Fat" label. As a result, Dr. Bowen has not demonstrated that all, most, or even some putative class members would be willing to pay no more than $0 for the Kroger Bread Crumbs absent the allegedly deceptive behavior. This renders his analysis uninformative in estimating damages under Plaintiff's benefit of the bargain theory.

### 3.    Dr. Bowen's Model Does Not Estimate Reliable Class-Wide Economic Damages Under Plaintiff's Use Theory

29.    Plaintiff's use theory asserts in the Complaint that Kroger Bread Crumbs are "not fit for human consumption" and therefore "have a value of $0."[40] Dr. Bowen has provided no evidence that the presence of PHO in the Kroger Bread Crumbs means they "have a value of $0," but has apparently assumed that this is the case in his damages model, as his model reimburses putative class members for the full amount paid for the Kroger Bread Crumbs. Again, I am not offering an opinion on the legality of the sale of the at-issue products, nor am I providing an opinion as to the appropriate legal remedy for the sale of illegal products.

---

[38] Hawkins Deposition at 101:16–102:3, 103:4–11.
[39] Plaintiff's Memorandum of Points and Authorities in Support of Motion for Class Certification, p. 1.
[40] Complaint, ¶ 106.

However, from an economic perspective, reimbursing putative class members for the entire price paid in connection with the Kroger Bread Crumbs would provide them with a windfall. This is because the at-issue products provided value to putative class members.

30.    According to economic theory, any alleged economic damages under Plaintiff's use theory should be measured as the difference between the utility (or value) that putative class members received from the Kroger Bread Crumbs and the utility (or value) that they would have received absent the alleged illegal behavior.[41]  Such an approach is consistent with the *Reference Guide on Estimation of Economic Damages*, which notes that damages measurement "determines the plaintiff's hypothetical value in the but-for scenario. Economic damages are the difference between that value and the actual value that the plaintiff achieved."[42]  Therefore, any damages estimation under the use theory must account for the value that putative class members derived from their purchases. Dr. Bowen fails to do so, and as a result, his full restitution model is inappropriate for estimating class-wide damages under Plaintiff's use theory.

31.    Academic research indicates that putative class members likely derived some value from the Kroger Bread Crumbs.  As explained above, consumers consider (and therefore value) many factors when making food purchases.  A product such as the Kroger Bread Crumbs has a bundle of attributes (of which PHO content is just one), and consumers receive some level of utility (or value) from these characteristics.[43]  This certainly appears to be true in the case of the lead Plaintiff.  Ms. Hawkins purchased the at-issue products about six times per year for around 15 years (nearly 100 purchase occasions), primarily as an ingredient in meatloaf she prepared regularly for her family.[44]  She testified that she was satisfied with the taste and consistency of the Kroger Bread Crumbs in the meatloaf[45]—on each of these purchase dimensions (and likely others), she derived utility (or value) from her purchases.

32.    The idea that all or most putative class members received zero value for the Kroger Bread Crumbs suggests that consumers would not have purchased the Kroger Bread Crumbs in the

---

[41] As noted previously, I am not providing any opinions in this matter about whether it was legal for the Kroger Bread Crumbs to contain PHO.

[42] Mark Allen, Robert E. Hall, and Victoria A. Lazear, "Reference Guide on Estimation of Economic Damages" in *Reference Manual on Scientific Evidence*, 3rd edition, The National Academies Press, 2011, p. 432.

[43] Example of product attributes include taste, texture, and calorie count, among others.

[44] Complaint, ¶¶ 71–72; Hawkins Deposition at 75:10–21, 102:4–6.

[45] Hawkins Deposition at 101:16–102:3, 103:4–11.

event they were aware that the at-issue products contained PHO. First, I note that the presence of PHO was disclosed on the at-issue products' ingredients list;[46] some putative class members may therefore have been aware that the Kroger Bread Crumbs at the time of purchase. Second, PHO and trans fat were present in a wide variety of products at the time, which further undermines the notion that consumers only value the absence of trans fat in foods. If it were true that consumers based their purchase decisions for (and therefore valuation of) food products exclusively on the presence or absence of PHO, one would expect that no products containing PHO would have been sold during the Putative Class Period, because consumers would presumably have valued them at $0.[47] However, while the presence of artificial trans fat and PHO in food declined after the FDA's labeling requirement went into effect in 2006, products containing trans fat and PHO continued to be sold. For example, in a study of foods sold at a grocer in Minneapolis St-Paul, Minnesota, in 2006, researchers found that in some categories such as crackers and popcorn, over one-third of products contained more than 0.5g of trans fat, and hence, I understand, would be required to disclose a non-zero presence of trans fat on the Nutrition Facts label.[48] As late as 2012, one paper found that of 4,340 top-selling U.S. packaged food products that reported trans fat data, 9% contained PHO, spanning more than 30 product categories, and 16% of products containing PHO had more than 0.5g of trans fat per serving (and therefore would disclose a non-zero amount of trans fat in the Nutrition Facts label).[49] The presence of products that contain trans fat and/or PHO during the Putative Class Period shows that there are at least some consumers who place non-zero value on foods with trans fat disclosed on the Nutrition Facts label. Dr. Bowen has conducted no analysis to

---

[46] Indeed, at deposition Ms. Hawkins identified "partially hydrogenated vegetable oil" in the ingredients list on the label of the at-issue products. Hawkins Deposition at 97:5–12, Exhibit 9.

[47] The FDA has required that a product's Nutrition Label disclose the amount of trans fat present since January 2006. The FDA issued initial guidance that PHO was not generally recognized as safe in November 2013, in the middle of the Putative Class Period, and issued a final determination in June 2015. Entities were given until June 2018 to be in compliance with the FDA's determination. "Final Determination Regarding Partially Hydrogenated Oils (Removing Trans Fat)," *U.S. Food and Drug Administration*, https://www.fda.gov/food/food-additives-petitions/final-determination-regarding-partially-hydrogenated-oils-removing-trans-fat, accessed March 31, 2020.

[48] Matthew J. Albers, Lisa J. Harnack, Lyn M. Steffen, and David R. Jacobs, "2006 Marketplace Survey of *Trans*-Fatty Acid Content of Margarines and Butters, Cookies and Snack Cakes, and Savory Snacks," *Journal of the American Dietetic Association* 108, no. 2 (February 2008), pp. 367–370 at Table 1.

[49] Jennifer Clapp, Christine J. Curtis, Ann E. Middleton, and Gail P. Goldstein, "Prevalence of Partially Hydrogenated Oils in US Packaged Foods, 2012," *Preventing Chronic Disease: Public Health Research, Practice, and Policy* 11, no. 145 (August 2014).

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

determine whether purchasers of Kroger Bread Crumbs are fundamentally more concerned with the presence of PHO than these consumers.

**B.    In Addition to Being Ungrounded in Economics, Dr. Bowen's Damages Estimates Ignore Available Data and Contain a Calculation Error**

33.    Putting aside the fundamental economic flaws with Dr. Bowen's approach to damages, he executes his methodology incorrectly due to unnecessary assumptions and a calculation error.

34.    First, Dr. Bowen fails to use the full set of sales data available and performs unnecessary and biased extrapolation instead. For his analysis, Dr. Bowen relies on a document produced by Kroger listing quarterly sales of the "Italian" and "Plain" Kroger Bread Crumbs from 2010–2016,[50] as well as a Kroger interrogatory response which contains sales data from Q1 2013–Q1 2015.[51] He then takes the dollar sales for Q1 2015 reported in the interrogatory and "estimate[s] the sales for [the final three quarters of 2015] based on Kroger's Q1 sales in 2015" because there are no data available past Q1 2015 in the interrogatory response.[52] While this is true, full quarterly data for 2015 *do* exist in the Bates-stamped document Dr. Bowen considered.[53]

35.    As the data underlying Dr. Bowen's tables show, dollar sales of the at-issue products are almost always the highest in the first quarter of the year, including in 2015.[54] As a result, by ignoring the available 2015 data, Dr. Bowen overstates combined dollar sales by over $100,000 (5.3% of his total dollar sales estimate of $2,012,712), and his calculation of prejudgment interest is overstated by nearly $38,000 (4.0% of his total prejudgment interest estimate of $951,934.34).

36.    Additionally, Dr. Bowen's analysis contains an error apart from his assumption about 2015 dollar sales. To calculate prejudgment interest, Dr. Bowen first sums the total dollar

---

[50] Bowen Report, ¶¶ 6–7; Evans Deposition, Exhibit 3 (TKC 000054–63).
[51] Bowen Report, ¶¶ 6–7; Evans Deposition, Exhibit 4 (Third Set of Supplemental Responses and Objections to Plaintiff's First Set of Interrogatories), Third Supplemental Response to Interrogatory No. 1.
[52] Bowen Report, p. 3.
[53] Evans Deposition, Exhibit 3 (TKC 000054–63) at 61.
[54] Evans Deposition, Exhibit 3 (TKC 000054–63). Q1 sales are the highest in five of the six years from 2010–2015 for both "Italian" and "Plain" bread crumbs, with 2013 being the lone exception. For "Italian" bread crumbs, dollar sales were $83,904 in Q1 2015, and $56,254, $64,515, and $66,123 in Q2, Q3, and Q4 2015, respectively. For "Plain" bread crumbs, dollar sales were $58,333 in Q1 2015, and $39,333, $45,498, and $47,776 in Q2, Q3, and Q4 2015, respectively.

sales for "Italian" and "Plain" bread crumbs for each year.  In 2015, he does so incorrectly, resulting in an error that inflates Dr. Bowen's estimate of damages and prejudgment interest.[55]

Ronald T. Wilcox, Ph.D.

---

[55] Using his benchmarked 2015 sales figures, Dr. Bowen estimates "Italian" sales of $335,616 and "Plain" sales of $233,332 and arrives at a total sales figure of $569,948; the sum of these two numbers is actually $568,948.  Bowen Report, pp. 3–5.

# Appendix 1

**Ronald T. Wilcox**
Darden Graduate School of Business Administration
University of Virginia
100 Darden Blvd.
Charlottesville, VA 22906-6550
Phone (434) 243-5558  email:wilcoxR@darden.virginia.edu

## Current Position

NewMarket Corporation Professor of Business Administration, Darden School of Business, University of Virginia. March 2011- current.

## Previous Positions

Senior Associate Dean for Degree Programs, 2015-2019

Associate Dean of MBA for Executives and Chaired Professor (Darden), 2012-2015

Associate Professor - Professor of Business Administration (Darden), 2001 - 2011

Visiting Associate Professor of Business Administration, Cheung Kong Graduate School of Business, Shanghai, P.R. China, Summer 2004 and 2005.

Economist, U.S. Securities and Exchange Commission, 1999 - 2000.

Assistant Professor of Industrial Administration, Graduate School of Industrial Administration (now the Tepper School of Business), Carnegie Mellon University, 1996-2001 (on leave during Academic Year 99-00).

## Education

Ph.D. in Business Administration, Washington University, St. Louis, Missouri, December, 1996.

M.S. in Business Administration, Washington University, 1993.

Honors A.B. in Classics and Economics, Xavier University, 1990.

## Books

Venkatesan, Rajkumar, Paul W. Farris and Ronald T. Wilcox (2014), Cutting Edge Marketing Analytics: Real Word Cases and Data Sets for Hands-on Learning, *Pearson Education.*

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

# Appendix 1

Wilcox, Ronald T. (2009), "Private Enterprise's Role in Increasing Savings," in Franklin's Thrift: The History of a Lost American Virtue, B. Blankenhorn, B. Dafoe-Whitehead and S. Brophy Warren eds., *Templeton Press*, May 2009.

Wilcox, Ronald T. (2008), Whatever Happened to Thrift? Why Americans Don't Save and What to Do About It, *Yale University Press*, May 2008. [Reviewed by *Wall Street Journal* and *Business Week*, Named "Top 5 Business Book of the Year" by Kiplinger]

**Peer-reviewed Journal Articles**

Zhang, Yi, Ronald T. Wilcox and Amar Cheema (2019), "The Effect of Student Loan Debt on Spending: The Role of Perceived Payment Difficulty, *Journal of Public Policy and Marketing*, August, 1-14.

Sun, Baohong, Ronald T. Wilcox and Ting Zhu (2007), "Ignoring Your Best Customer? An Investigation of Customer Satisfaction, Customer Retention and Their Financial Impact, *Journal of Relationship Marketing*, 6(3/4), 87-116.

Kamakura, W., et. al. (2005), "Choice Models and Customer Relationship Management," *Marketing Letters,* 16(3/4), 279-291.

Li, S., B. Sun, and R.T. Wilcox (2005), "Cross-selling Naturally Ordered Services: An Application to Consumer Banking Services," *Journal of Marketing Research,* May, 42, 233-239. ("Top 5" cited papers in *JMR* for 2006 – 2011 time frame)

Wilcox, R.T. (2005), "Developing Better Fee Structures for Mutual Funds," *Journal of Investment Management*, April, 3(1), 1-17.

Wilcox, R. T. (2003), "Bargain Hunting or Star Gazing: Investors' Preferences for Stock Mutual Funds," *Journal of Business*, 76(4), 645-663.

Wilcox, R.T. (2001), "Advertising Mutual Fund Returns: A Critical Analysis of a U.S. Securities and Exchange Commission Proposal to Change Advertising Law," *Journal of Public Policy and Marketing,* 20(1), 1-9.

Hsu, A. and R.T. Wilcox (2000), "Stochastic Prediction in Multinomial Logit Models," *Management Science,* 46(8), 1137-1144.

Wilcox, R.T. (1999), "Experts and Amateurs: The Role of Experience in Internet Auctions," *Marketing Letters*, 11(4), 363-374

Chen Y., J.D. Hess, R.T. Wilcox, and Z. Zhang (1999), "Accounting Profits Versus Marketing Profits: A Relevant Metric for Category Management," *Marketing Science*, 18(3), 208-229.

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

# Appendix 1

Kim, B., K. Srinivasan, and R.T. Wilcox (1999), "Identifying Price Sensitive Consumers: The Relative Merits of Demographic Versus Purchase Pattern Information," *Journal of Retailing*, 75(2), 173-193.

Narasimhan C., and R.T. Wilcox (1998), "Private-Labels and the Channel Relationship: A Cross-Category Analysis," *Journal of Business*, 71(4), 573-600.

Chiang, J., and R.T. Wilcox (1997), "A Cross-Category Analysis of Shelf-Space Allocation, Product Variety and Retail Margins," *Marketing Letters*, 8(2), 183-191.

### Other Publications

"Pricing Strategy Optimization," (2017) with Boston Consulting Group, Four Course Specialization, *Coursera*. (https://www.coursera.org/specializations/uva-darden-bcg-pricing-strategy).

"How Heinz Got Retailers and Consumers to Accept a Larger Ketchup Bottle," *Washington Post*, April 3rd, 2015

"How the Portland Trailblazers Won Back Their Fans, *Washington Post,* July 14th, 2014.

"Should Chip Maker Nix Flavors to Up Efficiency," *Washington Post*, March 3rd, 2012.

"Why Some MBA's are Wildly Successful," *Forbes,* December, 2011.

"The Hidden Taxation of Wealthy Americans, *Forbes*, November, 2011

"The Complexity of Bidding for Government Contracts," *Washington Post*, September, 2011

"Understanding How to Value Customers," *Financial Times*, August, 2011

"How Close Can You Stand to a Software Giant?" *Washington Post*, August, 2011

"The Thrifty Gene," *Forbes,* March 24, 2009.

"Spending Won't Save Us," *Forbes*, Feb. 13, 2009.

"Increase Pay for Government Officials," *Forbes*, Dec. 10, 2008

"A Conservative for Obama," *Forbes*, Oct. 31, 2008

"American Optimists," *Forbes*, Nov. 21, 2008

"How to Save the Economy," *Forbes*, Nov. 11, 2008

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

# Appendix 1

"The Forgotten Issue," *Financial Week*, Nov. 20, 2008.

Laseter T., A. Taylor, and R.T. Wilcox (2003), "The Big, The Bad and the Beautiful, *Strategy + Business;* Booz, Allen, Hamilton, Winter.

"The Hidden Potential of Powerful Brands," *Batten Briefings*, The Batten Institute,   Fall.

"Using Conjoint Analysis to Develop Efficient Fee Structures," *Proceedings of the Sawtooth Software Conference on Quantitative Methods in Marketing Research.*

**Non-Published Papers**

"Comfortably Numb: The Impact of Student Loan Debt on Price Sensitivity for Major Purchases (2018), with Y. Zhang, *working paper*.

"Mine Matter Most: The Self-reference Effect in Memory for Brands," (2012) with K. Sharpe and S. Kesebir. *working paper*.

Wilcox R. and Raj Venkatesan (2010), "Strategies for Customer Win Back," *working paper*.

Wilcox, R. and Kathryn Sharpe (2010), "Understanding the Decision to Consume Luxury Brands." *working paper,*

Harris, R.S. and R.T. Wilcox (2009), "The Making of Business Leaders,"

**Published Teaching Material**

Patagonia Inc. (UVA-M-0857)

Legal Aspects of Pricing (UVA-M-0856)

Brand Positioning Statements (UVA-M-0827)

J.C. Penney: Think Big (Case: UVA-M-0841)

Product Line Pricing (Technical Note: UVA-M-0813)

Route 11 Chips (Field Case: UVA-M-0810; Teaching Note UVA-M-0810TN and Spreadsheet UVA-M-0810RX)

SmartOps: Forging Smart Alliances (Field Case: UVA-M-0797; Teaching Note UVA-M-0797TN; Portfolio: 0797TNF)

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

# Appendix 1

Parsons Brinckerhoff: The Second Avenue Subway (A) (Field Case: UVA-M-0793)

Parsons Brinckerhoff: The Second Avenue Subway (B) (Field Case: UVA-M-0794)

Parsons Brinckerhoff: The Second Avenue Subway (C) (Field Case: UVA-M-0795)

Parsons Brinckerhoff: The Second Avenue Subway (Teaching Note: UVA-M-0793TN)

The Influence of Social Media on Purchase Decisions in High Involvement Categories (Technical Note: UVA-M-0786)

Retail Relay (Field Case: UVA-M-0784; Teaching Note: UVA-M-0784-TN; Spreadsheet S-M-0784; Instructor Spreadsheet S-M-0784TN)

H. J. Heinz (Field Case: UVA-M-0777; Teaching Note: UVA-M-0777TN; Portfolio UVA-M-0777TNX)

Portland Trail Blazers (Field Case: UVA-M-0773; Teaching Note UVA-M-0773-TN)

Dragon Systems (A)  (Field Case: UVA-M-0724)

Dragon Systems (B)  (Field Case: UVA-M-0725)

Big O Tires (Field Case: UVA-M-0692)

Big O Tires Teaching Note (UVA-M-0692TN-M) [Multimedia Teaching Note]

XM Satellite Radio (Public Source Case: UVA-M-0708)

Fidelity Inc.: Pricing the Blue Chip Growth Fund (Field Case: UVA-M-0674) [*Wachovia Award for Pedagogical Excellence*]

Fidelity Inc.: Pricing the Blue Chip Growth Fund *Teaching Note* (Case: UVA-M-0674TN)

NorthStar Consulting (Field Case: UVA-M-0673)

Mass Mutual Inc. (Public Source Case: UVA-M-0672) [Multimedia Case]

A Practical Guide to Conjoint Analysis (Technical Note: UVA-M-0675)

Methods for Producing Perceptual Maps from Data (Technical Note: UVA-M-0665).

Marketing Economics: Break-even Analysis and Contribution Margin (Technical Note: UVA-M-0648).

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

# Appendix 1

**Professional Presentations**

2012 Winter American Marketing Association, "Developing Protocols for On-line Panels"

2011 Winter American Marketing Association, "Bringing Finance into the Marketing Classroom,"

2007-2011 Speeches on <u>Whatever Happened to Thrift? Why Americans Don't Save and What to Do About It,</u> *Yale University Press* for National Co-op Bank, Visa, Genworth Financial, Navy Federal Credit Union, Financial Planners Society of Virginia, AARP, United Technologies, and various chapters of the University of Virginia Alumni Association.

2008 United Technologies, "Using Conjoint Analysis to Predict the Demand for New Technologies."

2004 Investment Company Institute Symposium on Mutual Funds: Business Strategies and Public Policy, "Distribution Strategies for Mutual Funds."

2004 Marketing Science Conference (Rotterdam, The Netherlands), "Cross-selling Naturally Ordered Services: An Application to Consumer Banking."

2004 Boulder Invitational Choice Symposium, "The State of the Art in Customer Lifecycle Analysis."

2004 Wharton Mutual Fund Conference, discussant on "Advertising and Mutual Funds."

2004 Batten Institute (Northern Virginia Series), "The New Science of Behavioral Finance."

2002 Kenan-Flagler School of Business, University of North Carolina, "Individual-level Utility Estimation in Reduced-rank Experimental Designs: An Application to Mutual Fund Selection"

2002 Williams School of Business, Xavier University, "Rational Choice and the Mutual Fund Selection Decision."

2002 McIntire School of Commerce, University of Virginia, "Rational Choice and the Mutual Fund Selection Decision."

2001 Darden Graduate School of Business Administration, University of Virginia, "Understanding Investors Evaluation of Mutual Fund Fees."

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

# Appendix 1

2001 Marketing Science Conference (Frankfurt, Germany), "Understanding  Investors' Evaluation of Mutual Fund Fees."

2000 Heinz School of Public Policy, Carnegie Mellon University, "Advertising  Mutual Fund Returns: A Critical Analysis of a U.S. Securities and Exchange Commission Proposal to Change Advertising Law."

1999 Darden Graduate School of Business Administration, University of Virginia, "Bargain Hunting or Star Gazing? How Consumers Choose Mutual Funds."

1999 Kellogg School of Management, Northwestern University, "Bargain Hunting or Star Gazing? How Consumers Choose Mutual Funds."

1999 Sawtooth Software Advanced Research Forum (SanDiego), "Stochastic Prediction in Multinomial Logit Models: Applications to Conjoint Analysis."

1999 The U.S. Securities and Exchange Commission (Washington DC), "Bargain Hunting or Star Gazing? How Consumers Choose Mutual Funds."

1999 Association for Consumer Research Conference (Columbus), "Bargain Hunting or Star Gazing? How Consumers Choose Mutual Funds."

1999 Marketing Science Conference (Syracuse), "Stochastic Prediction in Multinomial Logit Models."

1998 Columbia Business School, Columbia University, "Efficient Fee Structures for Mutual Funds."

1998 Marketing Science Conference (INSEAD), "Efficient Fee Structures for Mutual Funds."

1997 Fall INFORMS Conference (Dallas), "A Cross-Category Analysis of Retailers' Promotional Strategies."

1997 Marketing Science Conference (Berkeley), "Signaling New Product Quality When Firms Have Reputations."

1996 Fall INFORMS Conference (New Orleans), "Private-Labels and the Channel Relationship: A Cross-Category Analysis."

1995 Marketing Science Conference (Tucson), "A Channel Theory of Private-Labels."

**Honors and Awards**

"Top 5 Business Books of 2008," *Kiplinger*

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

# Appendix 1

Wachovia Award for Excellence, Practitioner Publication (2008)
- In winning this award became only Darden faculty member to have received the faculty excellence award in three areas (peer-reviewed publication, practitioner publication and course materials)

Wachovia Award for Excellence, Publication in Peer-Reviewed Journal (2006)

Wachovia Award for Pedagogical Excellence in Course Materials,
The Darden School, University of Virginia (2003)

British Petroleum Term Chair in Management Science, Graduate School of Industrial Administration, Carnegie Mellon University (2000)

Runner-up, Davidson Award for the best paper published in the *Journal of Retailing* (1999)

Recipient of a *Marketing Science Institute* research grant. (1999)

Clayton Award, *Marketing Science Institute* (1996).

**Consulting Activity – Representative Firms**

Cornerstone Research
Jones Day, LLC
Latham & Watkins, LLC
Debevoise & Plimpton, LLC
IRS
Jenner & Block, LLC
Sidley Austin, LLC

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

# Appendix 2

**Ronald T. Wilcox, Ph.D.**                                      February 2020
NewMarket Corporation Professor of Business Administration
University of Virginia, Darden School of Business

# Prior Testimony in the Last Four Years[1]

*Infinity Sales Group, LLC v. Valassis Communications, Inc.*, United States District Court for Southern District of Florida, West Palm Beach Division, Case No. 9:15-cv-80463-Rosenberg/Hopkins. Deposed, June 2016.

*Morales et al. v. Kraft Food Group, Inc.*, United States District Court for the Central District of California, Case No. 2:14-cv-04387-JAK-PJW. Testified at evidentiary hearing, May 2017.

*Stephen Hadley et al. v. Kellogg Sales Company*, United States District Court for the Northern District of California, Case No. 5:16-cv-04995-LHK (HRL). Deposed, June 2018 and May 2019.

*Trinidad Lopez et al. v. Liberty Mutual Insurance Company*, United States District Court for the Central District of California, Case No. 2:14-cv-05576 BRO (JCx). Deposed, July 2018.

*Joyce Walker et. al. v. Life Insurance Company of the Southwest*, United States District Court for the Central District of California, Case No. CV-109198 JVS (RNBx). Deposed, October 2018.

*Monster Energy Ltd v. The Coca-Cola Company*, International Court of Arbitration, Case No. 01-18-0004-0759. Arbitration hearing, April–May 2019.

*Dennis Macdougal et. al. v. American Honda Motor Co. Inc. and Honda North America Inc.*, United States District Court for the Central District of California, Case No. 17-cv-1079. Deposed, May 2019.

*Seegert et. al. v. Rexall Sundown, Inc.*, United States District Court for the Southern District of California, Case No. 3:17-cv-01243-JAH-JLB. Deposed, June 2019.

*Hudock et. al. v. LG Electronics U.S.A, Inc.*, United States District Court, District of Minnesota, Case No. 16-cv-01220 JRT-KMM. Deposed, July 2019.

*Braverman et. al. v. BMW of North America, LLC.*, United States District Court for the Central District of California, Western Division. Case No. 8:16-CV-00966-TJH-SS. Deposed, September 2019.

*Paul Stockinger et. al. v. Toyota Motor Sales U.S.A Inc.*, United States District Court for the Central District of California. Case No: 17-cv-00035-VAP-KS. Deposed, November 2019.

---

[1] The party I worked for is underlined.

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

# Appendix 2

*Patrick McMorrow et. al. v. Mondelez International, Inc.*, United States District Court for the Southern District of California. Case No: 3:17-cv-02327-BAS-JLB.  Deposed, November 2019.

*Government of the United States Virgin Island v. Toyota Motor Corporation et al.*, In the Superior Court of the Virgin Islands Division of St. Thomas and St. John. Case No: ST-17-CV-218. Deposed, February 2020.

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

# Appendix 3
# Documents Relied Upon by Ronald T. Wilcox

| Document Title, Bates Numbers | Document Date |
|---|---|
| **Legal Pleadings** | |
| Class Action Complaint, *Shavonda Hawkins, on behalf of herself and all others similarly situated, v. The Kroger Company* | October 15, 2015 |
| Third Set of Supplemental Responses and Objections to Plaintiff's First Set of Interrogatories | November 12, 2019 |
| Plaintiff's Memorandum of Points and Authorities in Support of Motion for Class Certification | January 21, 2020 |
| Declaration of Kim Bower, with Exhibits A–B | February 10, 2020 |
| **Expert Reports** | |
| Expert Report of Professor Robert M. Bowen, with Exhibits A–B | January 10, 2020 |
| Affirmative Declaration of Dominique Hanssens, Ph.D., with Appendices A–C | March 13, 2020 |
| **Depositions** | |
| Deposition of Shavonda L. Hawkins, with Exhibits 1–12 | January 3, 2020 |
| 30(b)(6) Deposition of Joseph Evans, with Exhibits 1–11 *TKC 000054–63, TKC 000212–17, TKC 000277–87, TKC 000308–15,TKC 002532* | February 26, 2020 |
| **SEC Filings** | |
| The Kroger Co. Form 10-K for the Fiscal Year Ended February 2, 2019 | April 2, 2019 |
| **Academic Literature** | |
| Chakravarthi, Narasimhan and Ronald T. Wilcox, "Private Labels and the Channel Relationship: A Cross-Category Analysis," *The Journal of Business*, Vol. 71, No. 4, October 1998, pp. 573–600 | |
| Asp, Elaine H., "Factors Affecting Food Decisions Made by Individual Consumers," *Food Policy*, Vol. 24, 1999, pp. 287–294 | |
| Albers, Matthew, J., Lisa J. Harnack, Lyn M. Steffen, and David R. Jacobs, "2006 Marketplace Survey of Trans-Fatty Acid Content of Margarines and Butters, Cookies and Snack Cakes, and Savory Snacks," *Journal of the American Dietetic Association*, Vol. 108, No. 2, February 2008, pp. 367–370 | |
| Sacks, Gary, Mike Rayner, and Boyd Swinburn, "Impact of Front-Of-Pack 'Traffic-Light' Nutrition Labelling on Consumer Food Purchases in the UK," *Health Promotion International*, Vol. 24, No. 4, 2009, pp. 344–352 | |
| Thunström, Linda, "Preference Heterogeneity and Habit Persistence: The Case of Breakfast Cereal Consumption," *Journal of Agriculture Economics*, Vol. 61, No. 1, 2010 pp. 76–96 | |
| Allen, Mark A., Robert E. Hall, and Victoria A. Lazear, "Reference Guide on Estimation of Economic Damages," In *Reference Manual on Scientific Evidence*, Federal Judicial Center, 3rd ed., The National Academies Press, Washington, D.C., 2011 | |
| Clapp, Jennifer, Christine J. Curtis, Ann E. Middleton, and Gail P. Goldstein, "Prevalence of Partially Hydrogenated Oils in US Packaged Foods, 2012," *Preventing Chronic Disease Public Health Research, Practice, and Policy*, Vol. 11, E145, August 2014, pp. 1–3 | |
| Castro, Iana A., Anuja Majmundar, Christine B. Williams, and Barbara Baquero, "Customer Purchase Intentions and Choice in Food Retail Environments: A Scoping Review," *International Journal of Environmental Research and Public Health*, Vol. 15, 2018, pp. 1–19 | |
| Goldberg, Rebecca, and Ronald T. Wilcox, "Heinz Ketchup: Pricing the Product Line," *Darden Business Publishing, University of Virginia*, Revised May 10, 2019, UVA-M-0777 | |

| Document Title, Bates Numbers | Document Date |
| --- | --- |

Wilcox, Ronald T., "A Practical Guide to Conjoint Analysis," *Darden Business Publishing, University of Virginia*, Revised June 27, 2019, UV0406

**Additional Materials**

Rawson, D., I. Janes, and K. Jordan, Pilot Study to Investigate the Potential Eye Tracking as a Technique for FSA Food Labelling Behaviour Research, Eyetracker.co.uk, May 2008

"Final Determination Regarding Partially Hydrogenated Oils (Removing Trans Fat)," U.S. Food & Drug Administration, available at: https://www.fda.gov/food/food-additives-petitions/final-determination-regarding-partially-hydrogenated-oils-removing-trans-fat, accessed on March 31, 2020

**All other materials cited in this report.**

PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 865 S. Figueroa Street, Suite 2400, Los Angeles, CA 90017.

On April 3, 2020, I served the document described as "REBUTTAL DECLARATION OF RONALD T. WILCOX, PH.D" upon the interested parties in this action in a sealed envelope addressed as follows:

Gregory S. Weston
THE WESTON FIRM
1405 Morena Blvd., Suite 201
San Diego, CA 92110
Telephone: (619) 798-2006
Facsimile: (619) 343-2789



___X___ (VIA U.S. MAIL) I placed such envelope(s) with postage thereon fully prepaid for deposit in the United States Mail in accordance with the office practice of Davis Wright Tremaine LLP, for collecting and processing correspondence for mailing with the United States Postal Service. I am familiar with the office practice of Davis Wright Tremaine LLP, for collecting and processing correspondence for mailing with the United States Postal Service, which practice is that when correspondence is deposited with the Davis Wright Tremaine LLP, personnel responsible for delivering correspondence to the United States Postal Service, such correspondence is delivered to the United States Postal Service that same day in the ordinary course of business.

_____ (VIA PERSONAL SERVICE) I caused the above-named documents to be served on all other parties to this action by requesting that a messenger from GLOBAL NETWORK LEGAL SUPPORT deliver true copies of the above-named documents enclosed in sealed envelopes.

_____ (VIA ELECTRONIC MAIL) I served a true and correct copy by electronic delivery pursuant to C.C.P. 1010.6, calling for agreement to accept service by electronic delivery, to the interested parties in this action as indicated above.

_____ (VIA FACSIMILE) – I served a true and correct copy by facsimile pursuant to C.C.P. §1013(c), to the interested parties in this action as indicated above.

_____ (VIA OVERNIGHT DELIVERY) by placing a true copy or original in a separate envelope for each addressee named above, with the name and address of the person served shown above on the envelope, sealing the envelope and placing it for collection and delivery by FEDERAL EXPRESS with delivery fees paid or provided for in accordance with ordinary business practices.

Executed on April 3, 2020, Los Angeles, California.

____   (State)  I declare under penalty of perjury under the laws of the State of California that
the above is true and correct.

__X__   Federal    I declare under penalty of perjury under the laws of the United States of
America that the foregoing is true and correct and that I am employed in the office of a
member of the bar of this Court at whose direction the service was made.

LINA PEARMAIN

2