1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

11

SOUTHERN DISTRICT OF CALIFORNIA

12
13
14
15
16
17
18
19
20

SHAVONDA HAWKINS, on behalf of herself and all others similarly situated,

Plaintiff,

v.

THE KROGER COMPANY,

Defendant.

Case No.:  15cv2320 JM (AHG)


**ORDER ON MOTION FOR CLASS CERTIFICATION**

21
22
23
24
25

Shavonda Hawkins moves to certify the claims in her Complaint against Defendant, The Kroger Company ("Kroger"), for class treatment, and to appoint her as class representative and her attorneys as class counsel.  (Doc. No. 89-1.)[1]  The motion has been fully briefed, including supplemental briefing, and a hearing on the motion was held on November 2, 2020.  For the below reasons, the motion is **GRANTED.**

26
27
28

---

[1] All citations to documents in the record are to the unredacted versions.  All citations to page numbers are to the page numbers assigned by the court's CM/ECF system.

# I.      BACKGROUND

Plaintiff purchased Kroger breadcrumbs in San Diego about six times per year from 2000 to July of 2015.  (Compl. ¶¶ 16, 71-72.)  She purchased the breadcrumbs for use in her weekly family meatloaf.  (Doc. No. 104-1 at 43.)  "During much of the class period," the breadcrumbs were made with partially hydrogenated oil ("PHO"), but displayed "0g Trans Fat" on the front label.  (Compl. ¶ 79; *see also* ¶ 9 (claiming that "[f]or years" Kroger falsely marketed and represented that the breadcrumbs were free of trans fat by stating "0g Trans Fat" on the front label).)  PHO is artificial trans fat.  (*Id.* ¶ 17.)  Kroger admits that because the breadcrumbs contained PHO, they contained "trace amounts" of trans fat.  (Doc. No. 104 at 9.)  Kroger also claims, and Plaintiff does not dispute, that the back label of the breadcrumbs listed PHO as an ingredient as early as 2005.  (*Id.* at 23.)

On October 15, 2015, Plaintiff filed a putative class action in federal  court under the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d)(2).  She alleges violations of California's False Advertising law ("the FAL"), CAL. BUS. & PROF. CODE §§ 17500-501, Unfair Competition Law ("the UCL"), *id.* § 17200, and the Consumers Legal Remedies Act ("the CLRA"), CAL. CIV. CODE §§ 1750-1785.  She also brings claims for breach of the implied warranty of merchantability and breach of express warranty.

On March 17, 2016, the court granted Kroger's motion to dismiss, with prejudice, under Federal Rule of Civil Procedure 12(b)(6).  (Doc. No. 19.)  The court found that Plaintiff lacked standing, and, alternatively, her labeling claims were preempted by federal law.  On November 16, 2018, the Ninth Circuit reversed and remanded the case.  *See Hawkins v. Kroger Co.*, 906 F.3d 763 (9th Cir. 2018).  On November 8, 2019, Kroger filed a second motion to dismiss under Rule 12(b)(6), (Doc. No. 34), which the court denied on April 4, 2019, (Doc. No. 40).  On January 21, 2020, Plaintiff filed the instant motion for class certification.  (Doc. No. 89-1.)  The court requested additional briefing on June 15, 2020, to which the parties responded on July 16, 2020 and July 27, 2020, respectively.  (Doc. Nos. 223, 227.)  With leave of court, Plaintiff also submitted a reply to Kroger's supplemental briefing.  (Doc. No. 232.)

## II.    LEGAL STANDARDS

The decision to certify a class is discretionary.  *Bouman v. Block*, 940 F.2d 1211, 1232 (9th Cir. 1991).  Federal Rule of Civil Procedure 23(a) requires the plaintiff to demonstrate that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).  District courts must perform a "rigorous analysis" to ensure the prerequisites of Rule 23(a) have been satisfied.  *Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 581 (9th Cir. 2010) (en banc), *rev'd on other grounds*, 564 U.S. 338 (2011).  This does not mean that a district court must conduct a full-blown trial on the merits, but "[a] district court's analysis will often, though not always, require looking behind the pleadings, even to issues overlapping with the merits of the underlying claims."  *Id.*  "Although courts are prohibited at the class certification stage from making determinations on the merits that do not overlap with the Rule 23 inquiry, they must determine that each requirement of Rule 23 is actually met to grant certification."  *Id.* at 582.

In addition to satisfying the requirements of Rule 23(a), plaintiffs must also satisfy at least one of the types of class actions identified in Rule 23(b).  Fed. R. Civ. P. 23(b).  Rule 23(b)(3) requires the plaintiff to demonstrate that (1) common questions of law or fact predominate over any questions affecting only individual members, and (2) class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  If the plaintiff fails to show that all elements of class certification are satisfied, class certification should be denied.  *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982).  The burden is on the party seeking certification to show, by a preponderance of the evidence, that the prerequisites have been met.  *See Dukes*, 564 U.S. at 350; *Conn. Ret. Plans & Trust Funds v. Amgen Inc.*, 660 F.3d 1170, 1175 (9th Cir. 2011).

### III.    DISCUSSION

#### A.    Class Definition

In the instant motion, Plaintiff seeks to certify a much narrower class than stated in her Complaint.  In her Complaint, Plaintiff initially sought to certify the following two classes:

> **PHO Class (Causes of Action One to Three)**
> All persons who purchased in the United States, on or after January 1, 2008, Kroger bread crumb products containing partially hydrogenated oil.
>
> **0g Trans Fat Claim Subclass (All Causes of Action)**
> All persons who purchased in the United States, on or after January 1, 2008, Kroger bread crumb products containing the front labeling claim "0g Trans Fat" and containing partially hydrogenated oil.

(Compl. ¶ 114.)

In the instant motion, however, Plaintiff narrows the geographic scope of the class and the class period to the following:

> All citizens of California who purchased, between January 1, 2010 and December 31, 2015, Kroger Bread Crumb containing partially hydrogenated oil and the front label claim "0g Trans Fat."

(Doc. No. 89-1 at 12.)  In her reply, Plaintiff acknowledges, without further explanation, that she "decided to move for a California-only class rather than a national class."  (Doc. No. 115 at 7.)  Plaintiff did not seek leave to amend her Complaint, and the deadline for filing a motion to amend the Complaint has long passed.  (*See* Doc. No. 58 ¶ 2.)

The Ninth Circuit has not addressed whether plaintiffs can narrow the scope of the class they seek to represent in a motion for class certification without seeking leave to file an amended complaint.  District courts in this circuit agree that plaintiffs cannot *broaden* the class definition.  *See*, *e.g.*, *Costelo v. Chertoff*, 258 F.R.D. 600, 604-05 (C.D. Cal. 2009) ("The Court is bound to class definitions provided in the complaint and, absent an amended complaint, will not consider certification beyond it."); *Baker v. Big Lots Stores, Inc.*, Case No. CV 08-1450 GAF (FMOx), 2009 WL 10673045, at *3 (C.D. Cal. Aug. 25, 2009)

("Plaintiff has devoted each of his [class certification] briefs to discussing the merits of certifying two separate classes, neither of which can be considered by the Court because neither are the class defined in the operative complaint.").

District courts, especially those in this district, also generally agree that plaintiffs may *narrow* the class definition without seeking leave to amend. *See*, *e.g.*, *McCurley v. Royal Seas Cruises, Inc.*, 331 F.R.D. 142, 162 (S.D. Cal. 2019) ("A plaintiff may properly narrow the class for which it seeks class certification even in a reply brief."); *Gold v. Lumber Liquidators Inc.*, Case No. 14-cv-05373-TEH, 2017 WL 2688077, at *4 (N.D. Cal. June 22, 2017) ("[G]iven that courts frequently allow plaintiffs to seek certification of narrowed classes without amending their complaint, and given that district courts are tasked with ensuring class definitions are properly tailored, it would not make sense to prohibit a plaintiff from narrowing their class definition, especially when they are seeking leave to do so[.]"); *Bee, Denning, Inc. v. Capital All. Grp.*, 310 F.R.D. 614, 621 (S.D. Cal. 2015) ("The primary exception to this principle [that the court is bound by the complaint] is when a plaintiff proposes a new class definition that is narrower than the class definition originally proposed, and does not involve a new claim for relief."); *but see Banks v. N. Tr. Corp.*, Case No. CV 16-9141-JFW (JCx), 2019 WL 8231758, at *5 n.6 (C.D. Cal. Dec. 6, 2019) (denying class certification motion because plaintiff "limited" the class without seeking leave to amend the complaint prior to the deadline for doing so).

Here, Plaintiff provides no explanation for why she waited over four years to disclose that she was not actually pursuing a nationwide class, why she was unable to move to amend her complaint prior to the deadline for doing so, or why she chose not to initially bring a California-wide class action. Rather, she merely states that she "should not be penalized for focusing on her strong case for a California class and deciding not to burden the Court by pressing the weaker case for a national class." (*See* Doc. No. 223 at 21.) She also cites no case in which the plaintiff, at the eleventh hour, abandoned her attempt to

certify a nationwide class in favor of a statewide class.[2]  Surely, this tactic created at least some minimal work for Kroger in initially defending against a nationwide class. Accordingly, Kroger argues "her new class fundamentally changes the nature of this action from an interstate, high-stakes action (which CAFA was designed to bring into federal court) into a simple intrastate case with low-value, state law claims."  (Doc. No. 227 at 24.)

Kroger does not argue, however, that it was prejudiced by the change to the putative class definition.[3]  Moreover, the change does not, as Kroger argues, fundamentally alter the nature of the claim.  Rather, the change narrows the number of members in the class and the amount in controversy, albeit drastically so.  Given that courts are empowered to narrow class definitions at the class certification stage, it is only fair that plaintiffs should be allowed to voluntarily request that the court do so.  *See Sandoval v. Cty. of Sonoma*, Case No. 11-cv-05817-TEH, 2015 WL 1926269, at *2 (N.D. Cal. Apr. 27, 2015) ("In class action litigation, the class is defined by the order granting certification.  There is no rule that the definition of a certified class must exactly match the definition contained in a complaint.") (internal citation omitted).  As pointed out by Plaintiff, "it is quite common for a court to certify a class smaller than the proposed class sought by the Plaintiff."  (Doc.

---

[2] Instead, Plaintiff claims that *Broadway Grill, Inc. v. Visa Inc.*, 856 F.3d 1274 (9th Cir. 2017) supports her argument that the only thing that matters in determining jurisdiction under CAFA is what Plaintiff said in her Complaint.  (Doc. No. 223 at 19.)  Plaintiff is incorrect.  In *Broadway Grill*, the court held that once a case is removed to federal court, the plaintiff may not change the definition of the class so as to eliminate minimal diversity. 856 F.3d at 1275.  The situation here is different, of course, because the case was not removed, and Plaintiff is not seeking to avoid federal jurisdiction.  Also, Kroger concedes that it is not a citizen of California, but rather Ohio and Delaware, and thus minimal diversity exists.  (*See* Doc. No. 227 at 11.)

[3] Federal Rule of Civil Procedure 15(a)(2) instructs that leave to amend pleadings "shall be freely given when justice so requires."  "[T]his policy is to be applied with extreme liberality."  *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001). Prejudice to the opposing party is the most important factor in deciding to deny leave to amend.  *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

No. 223 at 21.)  Accordingly, notwithstanding Plaintiff's counsel's lack of diligence, the court will assess the class definition as stated in the instant motion without requiring Plaintiff to amend her Complaint.

### B.    CAFA Jurisdiction

Under CAFA, federal district courts have original jurisdiction to hear class actions if the parties are minimally diverse, the amount in controversy exceeds $5,000,000, and the class has more than 100 members.  *Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 592 (2013) (citing 28 U.S.C. §§ 1332(d)(2), (d)(5)(B)); *Kuxhausen v. BMW Fin. Servs. NA LLC*, 707 F.3d 1136, 1139 n.1 (9th Cir. 2013) ("These elements are the full extent of what subject matter jurisdiction demands.") (citation omitted).  "'Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.'"  *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868)).  "Without jurisdiction the court cannot proceed at all in any cause."  *Id.* Accordingly, federal courts are under a continuing duty to confirm their jurisdictional power and are "obliged to inquire sua sponte whenever a doubt arises as to [its] existence[.]"  *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 278 (1977) (citations omitted).

### 1.    Minimal Diversity

Although the parties do not dispute that minimal diversity exists, there is an issue implicating minimal diversity that warrants discussion.  In her Complaint, Plaintiff alleges that she resides in California, and that Kroger is incorporated in Delaware with its principal place of business in California.  (Compl. ¶¶ 13, 16.)  In the instant motion, however, she alleges that Kroger's principal place of business is in Ohio, not California.  (Doc. No. 115 at 9:28.)  Plaintiff filed a declaration from her counsel stating, "[w]hen Plaintiff alleged that Kroger's principal place of business was California in her 2015 [C]omplaint, the basis for this was the now obsolete 'place of operations' test" and "[i]t is now clear that because Kroger's 'nerve center' is in Ohio that Ohio is its principal place of business."  (Doc. No.

223-1 ¶¶ 5-6.)  Regardless of the propriety of Plaintiff's counsel's choice to apply the day-to-day operations test over the nerve center test in determining Kroger's citizenship, *see Hertz Corp. v. Friend*, 559 U.S. 77, 90-93 (2010) (the nerve center test is the correct test), at no point did Plaintiff seek to amend her Complaint to correct Kroger's principal place of business.  Moreover, if Kroger is a citizen of California, as she alleges in her Complaint, and Plaintiff is now seeking to certify a class consisting solely of "citizens of California," Plaintiff and Kroger are not minimally diverse, and the court lacks original jurisdiction under CAFA.  *See*, *e.g.*, *Johnson v. Advance Am.*, 549 F.3d 932, 937 (4th Cir. 2008) (claim by class of South Carolina citizens against South Carolina company did not meet minimal diversity requirement under CAFA).  Kroger concedes, however, that it is not a citizen of California, but rather Ohio and Delaware.  (*See* Doc. No. 227 at 11 ("Kroger does not believe diversity of citizenship, in itself, is an issue for jurisdiction.  [Plaintiff] named only The Kroger Co., a corporation with its principal place of business in Ohio, and none of its California affiliate stores.").)  Therefore, there is sufficient evidence in the record to support minimal diversity under CAFA despite the inconsistency in Plaintiff's Complaint.

## 2.    Amount in Controversy

Although the parties do not dispute that minimal diversity exists, they dispute whether the $5,000,000 amount in controversy requirement under CAFA is met.  As noted above, in her Complaint, Plaintiff brings claims under California law for breach of the FAL, UCL, and CLRA, as well as for breach of the implied warranty of merchantability and breach of express warranty.  (Compl. ¶¶ 122-87.)  As to damages, Plaintiff demands restitution, actual damages, punitive damages, and attorneys' fees.  (*Id.* at 37-38.)  Generally, damages pled in good faith satisfy the amount in controversy.  *St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938).  Dismissal for failure to satisfy the amount in controversy is proper only if it appears to a "legal certainty" that the plaintiff could not obtain the requested amounts.  *Id.*

### a.     Restitution

Plaintiff primarily argues the $5,000,000 amount in controversy is satisfied based on restitution alone because, in her Complaint, she initially sought to certify a nationwide class, and thus sought restitution on a nationwide basis.[4]  (Doc. Nos. 115 at 7-9; 223 at 23-26.)  More specifically, Plaintiff argues the $5,000,000 threshold is met because Plaintiff's expert estimated the total revenue for sales of the breadcrumbs in California alone to be $2,011,712 and Plaintiff's decision, vis-à-vis the instant motion, to narrow the class to California citizens is merely a "post-filing development" that is not relevant to the amount in controversy.  (Doc. No. 115 at 8-9.)

Here, Plaintiff's decision to abandon her initial attempt to represent a nationwide class, and her refusal to seek leave to amend her Complaint to try to represent only a California-wide class, is not merely a "post-filing development" that must or should be disregarded in assessing the court's subject matter jurisdiction.  Plaintiff is correct that, generally, "the jurisdiction of the court depends upon the state of things at the time of the action brought."  *See Grupo Dataflux v. Atlas Global Grp., L.P.*, 541 U.S. 567, 570 (2004).  As noted by the Seventh Circuit, however, there are "exceptions to the principle that once jurisdiction, always jurisdiction[.]"  *See Cunningham Charter Corp. v. Learjet, Inc.*, 592 F.3d 805, 807 (7th Cir. 2010).  In *Learjet*, the court stated:

> [I]f the plaintiff amends away jurisdiction in a subsequent pleading, the case must be dismissed.  *Rockwell Int'l Corp. v. United States,* 549 U.S. 457, 473-74 (2007).  And likewise if after the case is filed it is discovered that there was no jurisdiction at the outset, *id.* at 473 – not that this is really an exception to the principle that jurisdiction, once it attaches, sticks; it is a case in which there never was federal jurisdiction. . . . These points are applicable to the Class Action Fairness Act[.]

*Id.* (citing Kevin M. Clermont, *Jurisdictional Fact*, 91 Cornell L. Rev. 973, 1016 (2006)).

---

[4] It is worth noting the inconsistency in Plaintiff's counsel's argument that asks the court to ignore the Complaint with respect to the parties' diversity of citizenship, but not with respect to the amount in controversy.

Other than referring to her Complaint, Plaintiff makes no attempt to show that she ever truly intended to seek restitution on a nationwide basis. Accordingly, this is a case that is closer to one in which the amount in controversy requirement was never satisfied (at least based solely on the amount of restitution sought), rather than one where ignorable "post-filing developments" changed the amount of restitution in controversy.

Additionally, the case upon which Plaintiff primarily relies to support her argument that her decision to no longer seek restitution on a nationwide basis is a mere "post-filing development" only serves to undermine her position. In *Petkevicius v. NBTY, Inc.*, Case No.: 3:14-cv-02616-CAB-(RBB), 2017 WL 1113295, at *2 (S.D. Cal. Mar. 24, 2017), the plaintiff invoked jurisdiction under CAFA and sought to certify both nationwide and California-wide classes. After the court dismissed the nationwide class for lack of standing, the plaintiff filed a motion to certify only the California-wide class. *Id.* The plaintiff's expert submitted a report estimating total sales of the products in California during the class period to be $3,128,725. *Id.* at *8. As pointed out by Plaintiff, the court stated that "[t]he only question here is whether the amount in controversy exceeded $5,000,000 when the lawsuit was filed." *Id.* at *3. Despite this language, *Petkevicius* in no way supports Plaintiff's argument. The *Petkevicius* court found that merely alleging in a complaint that "the amount in controversy exceeds the sum of $5,000,000, exclusive of interest and costs" is insufficient to establish subject matter jurisdiction. *Id.* at *4.[5]

As was the case in *Petkevicius*, Plaintiff broadly alleges that "[t]his [c]ourt has original jurisdiction over this action under 28 U.S.C. § 1332(d)(2) (the Class Action Fairness Act) because the matter in controversy exceeds the sum or value of $5,000,000

---

[5] In reaching its decision, the court rejected the plaintiff's argument that the plaintiff need only show that there is not a legal certainty that the class will not recover more than $5,000,000. *Petkevicius*, 2017 WL 1113295, at *4. Instead, the district court found that under *Ibarra v. Manheim Investments, Inc.*, 775 F.3d 1193, 1197 (9th Cir. 2015), when the amount in controversy is challenged, the party invoking federal jurisdiction must show by a preponderance of the evidence that the amount in controversy is satisfied, and jurisdiction cannot be based on speculation and conjecture.

exclusive of interest and costs[.]"[6]  (Comp. ¶ 1)  Therefore, even if the court were to go by what Plaintiff states in her Complaint, it is at least questionable whether the Plaintiff has adequately shown that the amount in controversy requirement is met.  *See Petkevicius*, 2017 WL 1113295, at *4 ("[S]imply stating that the amount in controversy exceeds $5,000,000, without any specific factual allegations as to the actual amount sought by the plaintiffs does not constitute a good faith allegation of the amount in controversy[.]"); *see also Kachi v. Natrol, Inc.*, No. 13cv0412 JM (MDD), 2014 WL 2925057, at *6 (S.D. Cal. June 19, 2014) (plaintiff's allegation in her complaint that "the combined claims of proposed [c]lass [m]embers exceed $5,000,000" is insufficient to satisfy the amount in controversy).  Accordingly, it is not, as Plaintiff argues, irrelevant to the amount in controversy that Plaintiff no longer seeks to certify a nationwide class because, as discussed below, the amount of restitution sought is based solely on sales in California.

Finally, Plaintiff's estimate of the potential restitution for California citizens is inflated.  Plaintiff's expert, Dr. Robert Bowen, calculates that the total revenue Kroger received from the sale of the breadcrumbs in California (both plain and Italian style) from 2010 through 2015 to be $2,011,712.  (Doc. No. 91 at 266-67 ¶¶ 6-7.)  Dr. Bowen states that this figure is based on a "full restitution model."  (*Id.* at 266 ¶ 5.)  Kroger argues that Dr. Bowen's $2,011,712 figure is inflated by $107,212 because Dr. Bowen estimated the 2015 revenue based on the first quarter of 2015, which was the highest quarter, instead of using the actual numbers.[7]  (Doc. No. 104 at 19 n.7.)  Here, Plaintiff does not dispute that

_____

[6] Plaintiff also cites *Visendi v. Bank of Am., N.A.*, 733 F.3d 863 (9th Cir. 2013), in which the court stated "[i]t is well settled that 'post-filing developments do not defeat jurisdiction if jurisdiction was properly invoked as of the time of filing.'"  *Id.* at 868 (citation omitted). This language in *Visendi* is not controlling or persuasive, however, because the case did not involve CAFA's $5,000,000 amount in controversy requirement, and did not involve a decision by the plaintiff to narrow her nationwide class action to a statewide class action in a manner that raised questions as to whether the court has, or ever had, jurisdiction.

[7] Dr. Bowen was apparently under the impression, mistaken or not, that Kroger had not disclosed all the 2015 figures.  (*See* Doc. No. 91 at 267 n.1.)

Dr. Bowen's damages are slightly inflated because he estimated the 2015 sales revenue based on the highest quarter. Had Dr. Bowen used the actual numbers, the total California sales figure would be $1,904,500. *Id.* Accordingly, Plaintiff does not satisfy CAFA's $5,000,000 amount in controversy requirement based solely on the amount of restitution she seeks.

### b.    Punitive Damages

Plaintiff argues that punitive damages in the same amount of restitution she seeks should be applied towards the amount in controversy. (Doc. No. 115 at 9.) Courts may consider punitive damages in determining the amount in controversy if punitive damages are recoverable under the applicable law.[8] *Bell v. Preferred Life Assur. Soc.*, 320 U.S. 238, 240 (1943); *Gibson v. Chrysler Corp.*, 261 F.3d 927, 945 (9th Cir. 2001). As noted above, when the amount in controversy is challenged, the party invoking federal jurisdiction must show by a preponderance of evidence that the amount in controversy is satisfied, and jurisdiction cannot be based on speculation and conjecture. *Ibarra*, 775 F.3d at 1197.[9] The CLRA allows plaintiffs to recover punitive damages. Cal. Civ. Code § 1780(a)(4); *Victorino v. FCA US LLC*, Case No. 16cv1617-GPC(JLB), 2016 WL 6441518, at *13 (S.D. Cal. Nov. 1, 2016) (citing Cal. Civ. Code § 1780(a)(4)).

---

[8] Punitive damages are not recoverable under the UCL or FAL. Cal. Bus. & Prof. Code § 17203; *Veera v. Banana Republic, LLC*, 6 Cal. App. 5th 907, 915 (Ct. App. 2016); *Clark v. Superior Court*, 50 Cal. 4th 605, 610 (2010). Punitive damages are also unavailable in claims for breach of express warranty. *Krieger v. Nick Alexander Imports, Inc.*, 234 Cal. App. 3d 205, 212 (Ct. App. 1991). The UCL permits awards of "money . . . . that defendants took directly from [class members]," *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1146-47 (2003), or indirectly through an intermediary retailer, *Shersher v. Super. Ct.*, 154 Cal. App. 4th 1491, 1499 (2007).

[9] Although *Ibarra* involved the evaluation of cases that were removed to federal court under CAFA, the district court in *Petkevicius* found the same reasoning applied to cases that were originally filed in federal court. 2017 WL 1113295, at *4.

District courts generally apply a 1 to 1 ratio for punitive damages in calculating the amount in controversy in consumer class actions, especially where there is evidence of jury verdicts including punitive damages. *See Sloan v. 1st Am. Auto. Sales Training*, Case No. 2:16-cv-05341-ODW (SK), 2017 WL 1395479, at *3 (C.D. Cal. Apr. 17, 2017) (alleging violation of the FAL, UCL, and CLRA); *Network Indus., Inc. v. Aktiengesellschaft*, No. 11CV49 DMS BLM, 2011 WL 2182606, at *3 (S.D. Cal. June 6, 2011) (defendant cited four cases awarding punitive damages in an amount equal to or greater than compensatory damages); *Tompkins v. Basic Research LL*, No. CIV. S-08-244 LKK/DAD, 2008 WL 1808316, at *4 (E.D. Cal. Apr. 22, 2008) (applying 1 to 1 ratio to plaintiff's "likely restitution" under a UCL claim); *see also Guglielmino v. McKee Foods Corp.*, 506 F.3d 696, 698 (9th Cir. 2007) (noting that the district court found the amount in controversy was satisfied by applying what the district court described as a "conservative" 1 to 1 ratio of punitive damages to economic damages); *Rhinehart v. Genworth Life & Annuity Ins. Co.*, 1:18-cv-01391-LJO-SAB, 2019 WL 295770, at *6 (E.D. Cal. Jan. 23, 2019) (interpreting *Guglielmino* to have "observed the district court's finding that the 1:1 ratio was a 'conservative' estimate in the face of the evidence of jury verdicts in analogous cases"); *Bayol v. Zipcar, Inc.*, Case No. 14-cv-02483-TEH, 2015 WL 4931756, *9 (N.D. Cal. Aug. 18, 2015) (interpreting *Guglielmino* to hold that a "conservative 1:1 ratio for punitive to compensatory damages" can be applied towards CAFA's $5,000,000 amount in controversy requirement); *but see Ming Zhao v. RelayRides, Inc.*, Case No. 17-cv-04099-JCS, 2017 WL 6336082, at *15 (N.D. Cal. Dec. 12, 2017) (finding the 1 to 1 ratio was reasonable, but declining to apply it towards the amount in controversy because "to the extent that the amount of punitive damages is based on [d]efendants' estimate of economic losses, [d]efendants' estimate of punitive damages is speculative"); *Walker v. Motricity Inc.*, 627 F. Supp. 2d 1137, 1143 (N.D. Cal. 2009) ("[C]alculating punitive damages when compensatory damages have not been established is putting the cart before the horse, and throwing yet another speculative figure onto its heap."), *rev'd in part on other grounds in Walker v. Morgan*, 386 F. App'x 601 (9th Cir. 2010); *Coren v. Mobile Entm't, Inc.*, No. C

08-05264 JF (PVT), 2009 WL 764883, at *2 (N.D. Cal. Mar. 19, 2009) ("[When] the amount of compensatory damages to which the class may be entitled is too speculative to be determined . . . . [a]dding punitive damages to the equation only increases the speculation.").

Additionally, the Ninth Circuit recently held that a defendant seeking to remove a case under CAFA based on potential punitive damages need only show that the punitive damages amount is "reasonably possible," not that punitive damages are probable or likely. *Greene v. Harley-Davidson, Inc.*, 965 F.3d 767, 769 (9th Cir. 2020). The court stated, "[o]ne way to meet this burden is to cite a case based on the same or a similar statute in which the jury or court awarded punitive damages based on the punitive-compensatory damages ratio relied upon by the defendant in its removal notice." *Id.* at 772. The court found the defendant met that burden by citing four cases in which juries awarded punitive damages at ratios higher than 1 to 1 for claims based on the CLRA. *Id.* The court specifically rejected the district court's requirement the defendant analogize or explain how the cited cases were similar. *Id.* at 773.

Here, Plaintiff's prayer for relief merely seeks "[a]n award of punitive damages in an amount to be proven at trial[.]" (Compl. at 37.) Plaintiff also concedes that the punitive damages she seeks are "unspecified." (Doc. No. 223 at 24.) In her eleventh hour reply in opposition to Kroger's supplemental brief, however, Plaintiff attempts to support the inclusion of punitive damages in the amount in controversy by citing the same four cases cited by the defendant in *Greene*.[10] (Doc. No. 232 at 2.) Plaintiff argues the cited cases support applying at least a 1 to 1 ratio because "both this case and *Greene* are CLRA class actions." *Id.* The plaintiff in *Greene* did not, however, cite the cases late in the litigation in order to show the court's original jurisdiction under CAFA. Rather, it was the defendant

---

[10] *Greene* was decided on July 14, 2020. *See* 965 F.3d 767. Plaintiff first cited *Greene* in her August 10, 2020 supplemental briefing, which was filed with the court's permission. (Doc. No. 232.)

in *Greene* who, at the very beginning of the litigation, cited the cases in order to show the court's removal jurisdiction under CAFA.

These differences between *Greene* and the instant case do not necessarily change the core holding from *Greene* that, by pointing to four CLRA cases in which a jury awarded punitive damages in an amount equal to or greater than the amount of compensatory damages sought, the defendant sufficiently showed (1) the "reasonable possibility" of the same ratio of punitive damages being awarded, and (2) that CAFA's amount in controversy was therefore met by a preponderance of evidence. *See* 965 F.3d at 769. Kroger concedes that Plaintiff's burden is to show that CAFA's amount in controversy is satisfied by a preponderance of evidence. (Doc. No. 227 at 25 (citing *Petkevicius*, 2017 WL 1113295, at *4).) Ultimately, *Greene* does not hold, and CAFA does not provide, that the standard for showing whether CAFA's amount in controversy requirement is met varies depending on which party wants the case to survive in federal court, or the stage in litigation when the amount in controversy is challenged. In relatively unusual cases like this one, where it is the plaintiff instead of the defendant that wants to be in federal court, and discovery has already been completed, perhaps plaintiffs should be held to a higher standard.[11] Kroger cites no case, however, and the court is not aware of one, suggesting plaintiffs can be held to a higher standard. Consequently, by citing the same four CLRA cases upon which the

_____

[11] In *Greene*, the court relied, in part, on the removal statute's requirement that notices of removal need only contain a "short and plain statement of the grounds for removal." 965 F.3d at 772 (citing 28 U.S.C. § 1446(a)). The court also reasoned that facts supporting an award of punitive damages are not likely available before discovery, *id.* at 773, which is not an issue here. Additionally, in claims originally filed in state court, plaintiffs have no incentive to inflate the amount in controversy for the purpose of showing federal jurisdiction. Also, the prejudice against out-of-state defendants that removal jurisdiction was theoretically designed to avoid is not present in cases originally brought in federal court. *See Grassi v. Ciba-Geigy, Ltd.*, 894 F.2d 181, 185 (5th Cir. 1990) ("Congress has created diversity jurisdiction and the right of removal . . . . for the purpose of protecting non-resident litigants from local prejudice.").

court relied in *Greene*, as dissimilar as they may be,[12] Plaintiff has shown a reasonable possibility of punitive damages of an award of punitive damages equal to or greater than $1,904,500.  Under *Greene*, this is sufficient to show by a preponderance of evidence that punitive damages should be included in the amount in controversy.

### c.    Attorneys' Fees

The CLRA authorizes an award of attorneys' fees to a prevailing plaintiff.  CAL. CIV. CODE § 1780(e).  The parties do not dispute that attorneys' fees should count towards the amount in controversy, or that courts have used a 25% multiplier to calculate attorneys' fees.  *See*, *e.g.*, *Petkevicius*, 2017 WL 1113295, at *11.  In *Fritsch v. Swift Transportation Co. of Arizona, LLC*, 899 F.3d 785, 796 (9th Cir. 2018), the Ninth Circuit declined to limit courts to using only a 25% multiplier in calculating attorneys' fees for amount in controversy purposes.  The *Fritsch* court also held, however, that the amount of attorneys' fees at stake must be shown by a preponderance of the evidence.  *Id.*

As discussed above, Plaintiff seeks $1,904,500 in restitution, and Plaintiff has shown by a preponderance of evidence that a reasonable possibility punitive damages could be included in the amount in controversy at a ratio of 1 to 1 or higher.  Applying punitive damages at a ratio of 1 to 1.15 gets Plaintiff over the $4,000,000 mark ($1,904,500 + ($1,904,500 x 1.15) = $4,094,675).  Adding 25% in attorneys' fees ($4,094,675 x .25 = $1,023,668.75) gets Plaintiff over CAFA's $5,000,000 amount in controversy requirement ($4,094,675 + $1,023,668.75 = $5,118,343.75).  Alternatively, using a 1 to 1 ratio for punitive damages ($1,904,500 x 2 = $3,809,000) and adding 32% in attorneys' fees ($3,809,000 x 0.32 = $1,218,880) gets Plaintiff over the $5,000,000 level ($3,809,000 + $1,218,880 = $5,027,880).  Accordingly, Plaintiff has satisfied CAFA's amount in controversy requirement.

---

[12] *Greene* clearly cautions courts against delving deeply (or even superficially) into the similarity of comparator cases used to support the inclusion of punitive damages in the amount in controversy.  The court found it sufficient that the cases involved "the same or a similar statute."  965 F.3d at 772.

#### d.   Traditional Diversity Jurisdiction

In her motion, Plaintiff argues for the first time that regardless of CAFA, diversity jurisdiction exists under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, and because Plaintiff is a resident of California and Kroger is a resident of Ohio and Delaware.  (Doc. 115 at 9.)  In a class action brought outside of CAFA, at least one named plaintiff in the class must satisfy the $75,000 amount in controversy requirement. *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 549 (2005); *see also Lewis v. Verizon Commc'ns, Inc.*, 627 F.3d 395, 398 (9th Cir. 2010) ("Prior to CAFA, a class action could be heard in federal court under diversity jurisdiction only if there was complete diversity, i.e., all class representatives were diverse from all defendants, and if at least one named plaintiff satisfied the amount in controversy requirement of more than $75,000.").

Plaintiff alleges she purchased Kroger breadcrumbs for personal use approximately six times per year from 2000 to July of 2015, (Compl. ¶¶ 71-72), but Plaintiff does not state how much she spent on the breadcrumbs.  Kroger claims, and Plaintiff does not dispute, that her claimed restitution is no more than $60 based on a price of $2 per can purchased six times a year during 2010 through 2015. (Doc. No. 227 at 27.)  Instead, Plaintiff argues, in her second supplemental brief, that the $75,000 amount in controversy is satisfied because she sought injunctive relief in the form of an "order requiring Kroger to engage in a corrective advertising campaign" and an "order enjoining Kroger's deceptive, unconscionable, fraudulent and  unfair practices." (Doc. No. 232 at 4 (citing Compl. at 35).)  Although pecuniary value of injunctive relief can be included in the amount in controversy, *Gonzales v. CarMax Auto Superstores, LLC*, 840 F.3d 644, 649 (9th Cir. 2016), Plaintiff conspicuously fails to acknowledge that she previously abandoned her claim for injunctive relief.  In her opposition to Kroger's supplemental motion to dismiss, Plaintiff states that  her "claim for injunctive relief is now moot and she consents to the striking of this part of her prayer for relief." (*See* Doc. No. 36 at 32.)  Accordingly, Plaintiff's argument that the court possesses traditional diversity jurisdiction is unpersuasive.

## C.   Rule 23(a) Prerequisites

As noted above, in order for a named plaintiff to obtain class certification, the court must find: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation.  *Hanon*, 976 F.2d at 508.  Plaintiff bears the burden of establishing these four prerequisites under Rule 23(a).  *Id.*  For the below reasons, Plaintiff has met her burden.

### 1.   Numerosity

Rule 23(a)(1) requires the proposed class to be "so numerous that joinder of all members is impracticable."  Although there is no specific threshold, courts generally find numerosity satisfied when the class includes at least 40 members.  *See Gomez v. Rossi Concrete, Inc.*, 270 F.R.D. 579, 588 (S.D. Cal. 2010); *Celano v. Marriott Int'l, Inc.*, 242 F.R.D. 544, 549 (N.D. Cal. 2007) ("[C]ourts generally find that the numerosity factor is satisfied if the class comprises 40 or more members and will find that it has not been satisfied when the class comprises 21 or fewer.").

Here, Plaintiff's expert estimates total sales of Kroger breadcrumbs in California between 2010 through 2015 to be around $2 million.  (Doc. No. 91 at 266-67 ¶¶ 6-7.)  At about $2 per container, Plaintiff states, and Kroger does not dispute, that the total sales figure represents the sale of hundreds of thousands of containers of breadcrumbs.  (Doc. No. 89-1 at 18-19.)  Common sense dictates that the number of persons who purchased the breadcrumbs at issue between 2010 through 2015 is greater than 40.  *See Bruno v. Quten Research Inst., LLC*, 280 F.R.D. 524, 533 (C.D. Cal. 2011) ("Where the exact size of the proposed class is unknown, but general knowledge and common sense indicate it is large, the numerosity requirement is satisfied."); *Kuxhausen*, 707 F.3d at 1140 (numerosity satisfied merely by pleading that "hundreds" of consumers were affected).

### 2.   Commonality

Rule 23(a)(2) requires the named party to demonstrate there are "questions of law or fact common to the class."  "So long as there is 'even a single common question,' a would-be class can satisfy the commonality requirement[.]"  *Wang v. Chinese Daily News, Inc.*,

737 F.3d 538, 544 (9th Cir. 2013) (citing *Dukes*, 564 U.S. 338)).  "The commonality preconditions of Rule 23(a)(2) are less rigorous than the companion requirements of Rule 23(b)(3), that is, the predominance inquiry that requires that common questions present a significant aspect of the case."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) (citation and internal quotation marks omitted).

Plaintiff argues, and Kroger does not dispute, that at least one common question exists, i.e. whether the "0g Trans Fat" nutrient content claim was sufficiently deceptive to violate the FAL, UCL, CLRA, and express and implied warranties.  (Doc. No. 89-1 at 19.) Other district courts have found commonality to exist in comparable consumer class actions.  *See*, *e.g*, *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 973 (C.D. Cal. 2015) (finding that "whether ConAgra's '100% Natural' marketing and labeling of Wesson Oil products was false, unfair, deceptive, and/or misleading" is a common question), *aff'd in part in* 844 F.3d 1121 (9th Cir. 2017) *and* 674 F. App'x 654, 656 (9th Cir. 2017); *Farar v. Bayer AG*, Case No. 14-cv-04601-WHO, 2017 WL 5952876, at *5 (N.D. Cal. Nov. 15, 2017) (finding that "[w]hether Bayer marketed, advertised, labeled and sold [vitamins] using false, misleading or deceptive representations" was a common question).  To the extent the commonality issue overlaps with the predominance element and Kroger's arguments concerning unique defenses, those issues are discussed below.  *See ConAgra*, 90 F. Supp. 3d at 973 n.169 ("[Q]uestions of individualized reliance, causation, materiality, and damages are best addressed in conducting a Rule 23(b) predominance inquiry."); *id.* at 973-74 ("[I]n practice, the commonality and typicality requirements of Rule 23(a) tend to merge.") (citation and internal quotation marks omitted).

### 3.   Typicality

Rule 23(a)(3) requires the claims or defenses of the representative party to be typical of the claims or defenses of the class.  *Hanlon*, 150 F.3d at 1020.  "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical."  *Id.*  "The purpose of the typicality requirement is to assure that the interest of the named

representative aligns with the interests of the class." *Hanon*, 976 F.2d at 508 (citing *Weinberger v. Thornton*, 114 F.R.D. 599, 603 (S.D. Cal. 1986). "Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Id.* (internal quotation marks omitted). The test for typicality "'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Id.* (quoting *Schwartz v. Harp*, 108 F.R.D. 279, 282 (C.D. Cal. 1985)).

However, "a named plaintiff's motion for class certification should not be granted if 'there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.'" *Id.* (citation omitted). "To be typical, a class representative need not prove that she is immune from any possible defense, or that her claim will fail only if every other class member's claim also fails. Instead, she must establish that she is not subject to a defense that is not 'typical of the defenses which may be raised against other members of the proposed class.'" *ConAgra*, 90 F. Supp. 3d at 974 (citing *Hanon*).

The parties dispute whether Plaintiff's claims are typical of those of the class. Plaintiff argues her claims are typical because both she and the class members purchased Kroger breadcrumbs with the same labeling and were injured by the same course of conduct. (Doc. No. 89-1 at 21.) Kroger argues her claims are not typical because she is subject to unique defenses related to reliance/causation and the statute of limitations. (Doc. No. 104 at 21-25.)

### a.    Reliance/Causation

Kroger first argues that Plaintiff is uniquely susceptible to the defense that she admitted she did not rely on the "0g Trans Fat" label, and therefore any injury she suffered was not caused by the "0g Trans Fat" label, as required for her FAL, UCL, CLRA, and warranty claims. (Doc. No. 227 at 8.) Here, Plaintiff admits that she purchased the breadcrumbs about six times per year between 2000 and July of 2015, but she does not state when the "0g Trans Fat" label first appeared. In her Complaint, Plaintiff merely

alleges the label was present "[d]uring much of the class period," (Compl. ¶ 79), and the label was present "[f]or years," (*id.* ¶ 9).  According to Kroger, the "0g Trans Fat" statement appeared on the label in 2008; a fact Plaintiff does not dispute.  (Doc. No. 104 at 15.) Plaintiff does not state whether she remembers a time when the breadcrumbs did not contain the "0g Trans Fat" label, and if so, whether her reasons for purchasing the breadcrumbs changed.[13]   Instead, Plaintiff generally claims that the "0g Trans Fat" statement was a "substantial factor" in her decision to buy them without specifying whether the statement was always a substantial factor.  Accordingly, Kroger relies heavily on Plaintiff's admission that her buying habits "pretty much" stayed the same between 2000 and 2015, and that she did not buy more or less from year to year.  (*See id.* at 104-1 at 40:6-41:2.)  Kroger argues this admission by Plaintiff that her buying habits did not change proves, that for the period after 2008, she did not rely on the "0g Trans Fat" label.  (*See* Doc. No. 104 at 10, 16.)  Therefore, Plaintiff is susceptible to the defense that she did not rely on the "0g Trans Fat" label in her decision to purchase, or to continue purchasing, Kroger breadcrumbs after 2008 when the "0g Trans Fat" label first appeared.

Based on the record, however, Plaintiff is not so uniquely susceptible to a reliance/causation defense that she will be preoccupied with it to the detriment of absent class members.  First, the record as presented by Kroger in opposition to the instant motion does not support its claim that Plaintiff *admitted* that she did *not* rely on the "0g Trans Fat" label.  *See Hanon*, 976 F.2d at 508.  To the contrary, Plaintiff clearly and repeatedly states, under oath, that she relied on the "0g Trans Fat" label on Kroger's breadcrumbs in her decision to purchase them.[14]  The lack of details as to why, when, and how much she relied

---

[13] Based on the deposition excerpts provided by Kroger, however, Kroger never asked. (*See* Doc. No. 104-1.)

[14] In her Complaint, she alleges she "relied on Defendant's '0g trans fat' claim as a substantial factor in her purchases during the period Kroger made this . . . . nutrient content claim."  (Compl. ¶ 76.)   She also alleges that "on at least one occasion, [she] would not have purchased the [breadcrumbs] absent [Kroger's] misrepresentation."  (*Id.* ¶ 107; *see*

on the "0g Trans Fat" label is not a good enough reason to conclusively decide, in a motion for class certification, that Plaintiff is not credible, especially where Kroger apparently failed to develop the record on this issue. *See Harris v. Vector Mktg. Corp.*, 753 F. Supp. 2d 996, 1015 (N.D. Cal. 2010) ("Only when attacks on the credibility of the representative party are so sharp as to jeopardize the interest of absent class members should such attacks render a putative class representative inadequate."). Moreover, many class members will likely be susceptible to the same or similar defense because they were, like Plaintiff, habitual purchasers of breadcrumbs who did not spend much time contemplating how heavily the "0g Trans Fat" label weighed in their decision to purchase Kroger brand breadcrumbs. Although Plaintiff's testimony regarding her reliance on the "0g Trans Fat" label may not be entirely consistent, she did *not* admit that she did *not* rely on the "0g Trans Fat" label.

Second, the specific facts from which Plaintiff's claims arise do not determine typicality in a class action. *Hanon*, 976 F.2d at 508. Typicality exists between Plaintiff's

_____

*also id.* ¶ 100 ("When purchasing the Kroger Bread Crumbs, Plaintiff was seeking products of particular qualities, including products that did not negatively affect blood cholesterol levels or the health of her cardiovascular system, and products made with safe ingredients.").) Furthermore, in her deposition, she testified she purchased the breadcrumbs "for a very long time under the assumption that [the breadcrumbs] had zero trans fat because [she] just looked at the front label [which read] zero trans fat, and [she] just went about [her] way." (Doc. No. 104-1 at 30:4-7.) She also testified she generally looked for food by "look[ing] at the labeling, and if it sa[id] zero trans fat, then [she] assume[d] that [there was] zero trans fat in it." (*Id.* at 34:23-25; *see also id.* at 36:6-9 ("Q: And these are the statements that you contend caused you to purchase the bread crumbs when you would not otherwise have done so, correct? A: Yes."); 40:1-5 ("I assumed, when I, you know, looked at it, 'cause this is what you see sitting on the shelf – you don't see the back, you see the front – and so I assume at first glance, looking at it, oh, this is fine."); 41:3-6 ("Q: When did you stop purchasing the Kroger bread crumbs? A: As soon as I found that the zero trans fat statement wasn't accurate.").) Plaintiff also submitted a declaration in support of the instant motion stating, "[i]f I had known the '0g Trans Fat' claim wasn't true, I would have started buying those other brands instead of Kroger's such [sic] sooner" and "I never would have purchased Kroger Bread Crumbs had I known that they were not safe to consume." (Doc. No. 115-1 ¶ 4.)

claims and the putative class members' claims because they all allegedly relied on Kroger's "0g Trans Fat" label in their decision to purchase the breadcrumbs.  Although the physical injuries suffered by those who unwittingly consumed trans fat are likely to be near impossible to determine and highly disparate depending on numerous variables, Plaintiff's claims are not based on personal injury or tort.  They are consumer-based.  Thus, the alleged injury suffered by Plaintiff is typical of the class members in that she spent money on breadcrumbs falsely labeled as containing "0g Trans Fat."  Plaintiff's claims are clearly based on conduct which is not unique to her, i.e. the labeling of the breadcrumbs as containing "0g Trans Fat," and other class members were likely to be injured by the same course of conduct, i.e. other class members were misled into purchasing a product that was not exactly what it purported to be.

Third, although neither party cites a case involving a motion for class certification in which a food product was alleged to have been misleadingly labeled as *not* containing an unhealthy substance, there are multiple district court cases in which the named plaintiffs alleged that a food product was misleadingly labeled as "natural" or "healthy."  To the extent those cases are comparable to the instant one, a finding of typicality here is consistent with those cases in spite of Kroger's reliance/causation defense.  For example, in *ConAgra*, the named plaintiffs alleged that ConAgra misleadingly labeled Wesson cooking oils as "100% Natural" even though the oils contained non-organic GMO ingredients.  90 F. Supp. 3d at 967-68.  The named plaintiffs brought claims under the FAL, UCL, and CLRA, as well as for breach of warranties, and sought to certify a California-wide class.  *Id.* at 982-83.  The court found that typicality was satisfied where the named plaintiffs were all exposed to the "100% Natural" label and they all alleged that the claim was a material factor in their decisions to purchase the products.  *Id.* at 974.  In finding that typicality was satisfied, the court noted that "if the named plaintiffs' claims were subject to the unique defense that they did not rely on the '100% Natural' label in purchasing Wesson Oils, then as to any claims that require proof of individualized reliance, there might

be a concern about typicality."[15]  *Id.* at 975.  Furthermore, with respect to standing, the court rejected ConAgra's argument that the plaintiffs were not injured because they continued to purchase the products even after filing their lawsuit.  *Id.* at 967-69.  The court found it sufficient that the plaintiffs alleged they paid higher market prices for the products than they would have otherwise paid.  *Id.* at 968.  The court reasoned, "[a]lthough plaintiffs' subsequent purchase of products labeled 'natural' that contained GMO ingredients may seriously undercut their claim that their purchasing decision was influenced by the '100% Natural' label, the purchases do not deprive plaintiffs of standing to assert the claims they plead in this action."  *Id.* at 967.[16]

Additionally, in *Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523, 527 (N.D. Cal. 2012), the named plaintiffs accused the defendant of falsely labeling and advertising ice tea as "All Natural," "100% Natural," or "Natural," despite containing high fructose corn syrup and artificial citric acid.  The plaintiffs brought claims under the FAL, UCL, and CLRA.  *Id.* at 528.  One of the named plaintiffs claimed she purchased the ice tea one time, noticed it contained corn syrup and felt deceived, then threw it out.  *Id.* at 527.  The other named plaintiff claimed she purchased the ice tea repeatedly for at least five years. *Id.*  In finding that the named plaintiffs were injured and thus did not lack standing, the court reasoned that "[t]he focus of the UCL and FAL is on the actions of the defendants, not on the subjective state of mind of the class members" and "[a]ll of the proposed class members would have purchased the product bearing the alleged misrepresentations."  *Id.*

---

[15] In an unpublished portion of its decision, the Ninth Circuit affirmed the district court's finding with respect to typicality, stating that "[a]lthough ConAgra challenges the credibility of those declarations [that the named plaintiffs relied on the "100% Natural" label], the district court's holding was adequately supported by the record."  *ConAgra*, 674 F. App'x at 656.

[16] In its opposition to the instant motion, Kroger makes a cursory argument that Plaintiff lacks standing.  (*See* Doc. No. 227 at 18 ("[P]laintiffs . . . . are not adequate representatives where, as here, they lack standing.").)  Based on *ConAgra*, and the court's prior rulings on Kroger's motions to dismiss, Kroger's argument is not persuasive.

at 536.  In finding that typicality existed, the court reasoned that: (1) "[e]ven if it were true that putative class members relied to greater or lesser extents on defendants' representation that [the defendant's] products are "All Natural" or "100% Natural" . . . . the test for California's consumer protection statutes is objective, and does not turn on the claimant's particular state of mind;" (2) under *In re Tobacco II Cases*, 46 Cal. 4th 298, 326 (2009), the plaintiff need not show that the misrepresentation was the only factor in their decision to purchase the product, or even the predominant factor; and (3) even though one of the named plaintiffs had mixed motivations for purchasing the product, including price and taste, her claims are still reasonably co-extensive with those of absent class members if not substantially identical.  *Arizona Beverages*, 287 F.R.D at 539.  The court found that an "inference of common injury, deception, and reliance . . . . is appropriately drawn under the circumstances" and "[s]uch slight variation is inherent in consumer class actions, and will almost certainly not detain proceedings unduly."  *Id.*

For the above reasons, the typicality of Plaintiff's claim is not defeated by Kroger's reliance/causation defense.

### b.      Statute of Limitations

Kroger also argues that Plaintiff is uniquely susceptible to a statute of limitations defense.  (Doc. No. 104 at 24-25.)  Under California law, "the limitations period, the period in which a plaintiff must bring suit or be barred, runs from the moment a claim accrues." *Aryeh v. Canon Bus. Solutions, Inc.*, 55 Cal. 4th 1185, 1191 (2013); *Plumlee v. Pfizer, Inc.*, Case No.: 13-CV-00414-LHK, 2014 WL 695024, at *7 (N.D. Cal. Feb. 21, 2014). "Generally speaking, a cause of action accrues at 'the time when the cause of action is complete with all of its elements.'"  *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 806 (2005) (citations omitted).  "An important exception to the general rule of accrual is the 'discovery rule,' which postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action."  *Id.* at 807.  "A plaintiff has reason to discover a cause of action when he or she 'has reason at least to suspect a factual basis for its elements.'"  *Id.* (citation omitted).

The statute of limitations is three years for Plaintiff's FAL and CLRA claims, and four years for her UCL and breach of warranty claims.[17]  As discussed above, Plaintiff began regularly purchasing Kroger breadcrumbs in 2000.  (Compl. ¶¶ 71-72.)  As early as 2005, the ingredients listed PHO, which contains trans fat.  (Doc. No. 104 at 23.)  In 2008, the "0 Trans Fat" statement first appeared on the label.  (*Id.* at 15.)  Plaintiff claims that she "first discovered [Kroger's] unlawful acts . . . . in August 2015, when she learned that [the breadcrumbs] contained artificial trans fat, and caused heart disease, diabetes, cancer, and death."  (Compl. ¶ 74.)  She further states that she "did not discover that [Kroger's] labeling of the [breadcrumbs] was false, deceptive, or misleading until August 2015, when she learned the true extent of the dangers of consuming trans fat, and that [Kroger] was still selling the [breadcrumbs] despite their illegality."[18]  (*Id.* ¶ 111.)  She provides no explanation, however, as to why or how she made that discovery.[19]  She nonetheless claims she could not have made the discovery any earlier because: (1) "the association between PHO and trans fat and the details of the dangers of artificial trans fats were known to [Kroger], but not to Plaintiff," (*id.* ¶ 75); (2) "[l]ike most consumers, [Plaintiff] is a busy person and cannot reasonably inspect every ingredient of every food that she purchases for

---

[17] *See* CAL. CIV. PROC. CODE § 338(a) (in a FAL claim, "[a]n action upon a liability created by statute" must be brought within three years); *Cnty. of Fresno v. Lehman*, 229 Cal. App. 3d 340, 346 (1991) (applying three-year limitations period to FAL claim); CAL. CIV. CODE § 1783 (CLRA actions must be "commenced not more than three years from the date of the commission of [the] method, act, or practice"); CAL. BUS. & PROF. CODE § 17208 (UCL actions must be "commenced within four years after the cause of action accrued"); CAL. COM. CODE § 2725(1) ("An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued.").

[18] Plaintiff also testified during her deposition that she stopped purchasing Kroger breadcrumbs "as soon as [she] found that the zero trans fat statement wasn't accurate." (Doc. No. 104-1 at 41:3-6.)

[19] Based on the deposition excerpts provided by Kroger, however, she was not asked about the circumstances of her discovery.  (*See* Doc. No. 104-1.)

herself and her large family," (*id.* ¶ 108); (3) "Plaintiff is not a nutritionist, food expert, or food scientist, but rather a lay consumer who did not have the specialized knowledge that [Kroger] had which otherwise would have enabled her to associate PHO with artificial trans fat, and artificial trans fat with disease," (*id.* ¶¶ 75, 109); and (4) the "0g Trans Fat" labeling practice "actively impeded" her ability to discover the dangerous effects of the breadcrumbs, (*id.* ¶ 112). (*See also id.* ¶ 112 ("[L]ike nearly all consumers, she is not an expert on nutrition and does not typically read or have ready access to scholarly journals . . . . where the scientific evidence of artificial trans fat's dangers was published.").) On October 15, 2015, approximately three months after allegedly discovering that Kroger breadcrumbs contained trans fat, Plaintiff filed her Complaint. She seeks to certify a class period from January 1, 2010 to December 31, 2015. (Doc. No. 89-1 at 12.)

Here, Kroger argues that Plaintiff is uniquely susceptible to a statute of limitations defense because she admitted in her deposition that she should have known the breadcrumbs contained trans fat as early as 2005 because the list of ingredients on the back of the package included PHO. (*See*, *e.g.*, Doc. No. 104 at 13:22-16 ("Ms. Hawkins was first made aware of possible issues regarding [PHOs] starting in 2005, when Ms. Hawkins noted 'red flag[s]' about [PHOs] and trans fat from television commercials and information warning about overuse of trans fats."); 25:15-17 ("Doctor's warnings, television commercials, medical reviews – Ms. Hawkins had all she needed to suspect a factual basis for claiming [PHO] was wrongfully labeled or included in 2005.").) Once again, however, the record as provided by Kroger in opposition to the instant motion does not support its claim that Plaintiff made such an admission.

First, Kroger argues that Plaintiff admitted that beginning in 2005 her doctor told her to avoid trans fat and PHO. (*See* Doc. No. 104 at 23:9-11 (alleging that Plaintiff "[l]earn[ed] from her annual doctor visits, starting in 2005, about 'red flags' such as the presence of [PHOs] in packaged foods, which was listed on Kroger breadcrumbs at least as early as 2005."); *id.* at 25:4-6 ("[Plaintiff's] claims accrued no later than in 2005, when she was actively purchasing and consuming the product, and then instructed by her doctor

to avoid trans fat.").)  In fact, Plaintiff merely admitted that her doctor told her that trans fat "wasn't good and needed to be eliminated" and she "need[ed] to eat healthier." (Doc. No. 104-1 at 18:1-3.)  She also admitted that her doctor said "to try to avoid packaged food," (*id.* at 19:11-12), and told her about the dangers of trans fat prior to 2013, (*id.* at 19:21-25).  When asked if she recalled approximately how far prior to 2013 that would have been, however, Plaintiff replied, "I'd say maybe 2005, '6, '7, '8, '9." (*Id.* at 20:1-3.) Therefore, at most, Plaintiff admitted that her doctor told her to avoid trans fat, but not PHO, at some point prior to 2013.

Second, Kroger argues that Plaintiff admitted that she knew that PHO contained trans fat no later than 2005. (*See* Doc. No. 104 at 25:7 ("[S]he admits knowing at that time that PHO is a form of trans fat.").)  In fact, while Plaintiff apparently admitted that her doctor told her that PHO contained trans fat, (*see* Doc. No. 104-1 at 37:7-11 ("Q: And [PHO] is – that's the ingredient that your doctor told you contained trans fat?  A: That trans fat can come from – come from that, yes.")), she did not state that she was aware that PHO contained trans fat as early as 2005, (*see id.* at 37:15-24 (stating that the subject was discussed in "[j]ust different conversations over the years")).  In her deposition, Plaintiff stated, "I knew from already, like, talking to my doctor in different conversations that in my head I'm, like, I think that [PHO] has something to do with trans fat," and "then once I spoke to [my attorney], yeah, it was verified, because I'm, like, I know that the trans fat come from – off of that." (*Id.* at 36:21-37:3.)  At most, Plaintiff admitted that she knew that PHO contained trans fat, but not necessarily as early as 2005, and that at some point after speaking with her attorney, she knew that the breadcrumbs contained PHO and therefore trans fat.  Plaintiff does not admit, however, that she knew the breadcrumbs contained PHO, and that PHO contained trans fat, as early as 2005 or at any point prior to the beginning of the statute of limitations periods.

Third, Kroger argues that Plaintiff admitted she was advised by her doctor in 2005 to review ingredients for PHO before purchasing processed foods, but she did not do so. (*See* Doc. No. 104 at 13:26-28 ("As [Plaintiff] acknowledges, she was specifically

informed about the importance of reading ingredient labels by her physician, whom she was required to visit annually, starting in 2005[.]"); 14:12-15 ("She explained, moreover, that her doctor did not advise simply of 'trans fat' in general, but 'partially hydrogenated oil' in particular was an ingredient her physician advised her to search for on product labels."); 14:23-25 ("During these visits from 2005 on, she was advised 'to look at the nutritional-fact labeling and ingredients' for partially hydrogenated oil."); 15:1-3 ("[S]he admitted she did not look at the ingredients, including the 'partially hydrogenated oil' of which her physician and television commercials made her specifically aware."); 23:12-13 (alleging that Plaintiff "[f]ail[ed] to read ingredient statements despite physician warnings to review for partially hydrogenated oils.").)   In fact, Plaintiff merely testified that her doctor instructed her to "pay attention" to ingredients for trans fat as much as she could, (Doc. No. 104-1 at 21:2-3), but Plaintiff did not specify that she was told this in 2005, and Plaintiff did not say that she was told to look for PHO, (*see id.* at 21:4-7 ("Q: And do you recall what you were looking for when you were looking at ingredients?  A: Just that it didn't have trans fat in it, 'cause I knew it was bad.").)   Plaintiff also testified that she did not begin looking at the ingredient list until after she spoke to her attorney about "zero trans fat," and that was when she noticed the breadcrumbs' ingredients included PHO.  (*See id.* at 36:10-21.)   Additionally, Plaintiff testified that she "did, sometimes" look at the ingredients, (*id.* at 39:7), and that after being advised about PHO she "tried to pay as much attention to the, you know, front labeling when [she] looked at it," (*id.* at 39:24-25).  Based on the deposition excerpts provided by Kroger, Plaintiff does not admit that she was advised by her doctor in 2005 to review ingredients for PHO before purchasing the breadcrumbs, and that she refused to do so.

Fourth, Kroger argues that in 2005 television commercials started telling Plaintiff to avoid trans fat and PHO.  (*See* Doc. No. 104 at 13:22-16 ("Ms. Hawkins was first made aware of possible issues regarding [PHO] starting in 2005, when Ms. Hawkins noted 'red flag[s]' about partially hydrogenated oils and trans fat from television commercials and information warning about overuse of trans fats.").)   In fact, Plaintiff stated that it was

"probably around 2013" when she started seeing commercials "putting it out there that trans fat is not good for you." (Doc. No. 104-1 at 15:16-22.) Plaintiff does not admit that as early as 2005 she knew based on television commercials to avoid PHO.

Fifth, Kroger infers that Plaintiff admitted she did not look for PHO in the ingredients despite being told to do so by her attorney around 2011 or 2012. (*See id.* at 16:10-15 ("[Plaintiff] admits she did not bother to 'look at the ingredient list' until sometime after '[she] had spoke[en] to [her attorney],' meaning around 2011 or 2012 . . . . Yet, even after her counsel's warnings, she continued purchasing the products[.]"); *id.* at 23:17-18 (alleging that Plaintiff "[i]gnor[ed] television commercials and her own lawyers' advice to review ingredient statements.").)[20]   In fact, Plaintiff stated that she did not remember meeting her attorney for the first time, but thought it was "around 2011 or '12, somewhere in there." (*Id*. at 14:20-22.)  Plaintiff did not admit that her attorney told her to look at ingredient labels for PHO.

Finally, Kroger states that Plaintiff admitted "her buying habits did not change despite information about [PHO.]" (Doc. No. 104 at 13:17-18; *see also id.* at 23:7-11 ("Her 'buying habits stayed the same, 2000 all the way up to 2015' despite [l]earning from her annual doctor visits, starting 2005, about 'red flags' such as the presence of [PHO] in packaged foods, which was listed on Kroger breadcrumbs at least as early as 2005.").)  In fact, after Plaintiff admitted that her doctor warned her about the dangers of trans fat and the types of packaged food to avoid, she was asked, "[d]id you actually change your buying habits or anything after you . . . ," to which Plaintiff responded, "I did adjust my buying habits." (*Id.* at 20:6-8.)  She explained she adjusted her buying habits by "looking for stuff that I thought didn't have trans fat in it," (*id.* at 20:9-12), and "tr[ying] to avoid . . . . the stuff that had the trans fat in it," (*id.* at 20:20-22).

---

[20] Kroger also claims that Plaintiff "[c]ontinu[ed] to ignore ingredient labels even after beginning to serve as a professional plaintiff in at least three mislabeling lawsuits beginning in 2012." (Doc. No. 104 at 23:19-20.)

In sum, Kroger's argument that Plaintiff knew or should have known beginning in 2005 that, despite the breadcrumbs' "0g Trans Fat" label, the breadcrumbs contained trans fat because the ingredients listed PHO, is not persuasive, at this stage, to discredit her claim that she did not know the breadcrumbs contained trans fat.  To be sure, Plaintiff made some statements regarding the degree to which she knew or should have known that, if she wanted to avoid trans fat, she should have read the ingredients of processed foods to see if they contained PHO.  But these statements likely add to the typicality of her claims because other class members likely had their own reasons to more closely scrutinize the ingredients of the products they consumed, but failed to do so too.  Overall, Plaintiff's statements are not, as Kroger claims, an admission that Plaintiff was *not* deceived by the "0g Trans Fat" label simply by virtue of the fact that the ingredients disclosed the presence of PHO as early as 2005, or that she knew or should have known of the inaccuracy of the "0 Trans Fat" label as early as 2008, or at any point prior to the beginning of the statute of limitations period.  Plaintiff's pleadings and testimony are sufficient, at the class certification stage, to find that she did not know, and did not have sufficient reason to suspect, that the "0g Trans Fat" label was incorrect.  *See also Beck-Ellman v. Kaz USA, Inc.*, 283 F.R.D. 558, 566 (S.D. Cal. 2012) ("'Given a sufficient nucleus of common questions, the presence of the individual issue of compliance with the statute of limitations' need not bar class certification.") (quoting *Williams v. Sinclair*, 529 F.2d 1383, 1388 (9th Cir. 1975)).

### 4.   Adequacy

Rule 23(a)(4) permits certification of a class action if the representative party "will fairly and adequately protect the interests of the class."  "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  *Hanlon*, 150 F.3d at 1020 (citing *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978)).  "'Only conflicts that are fundamental to the suit and that go to the heart of the litigation prevent a plaintiff from meeting the Rule 23(a)(4) adequacy requirement.'  A conflict is fundamental

when it goes to the specific issues in controversy." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 942 (9th Cir. 2015) (citation omitted).

Here, Plaintiff contends, and Kroger does not dispute, that there is no apparent conflict between Plaintiff, her counsel, and the putative class, and that Plaintiff's counsel will prosecute the action vigorously on behalf of the class. (*See* Doc. No. 89-1 at 23 (citing multiple cases in which Plaintiff's counsel was appointed class counsel).)  The court agrees there is no apparent conflict of interest.  Also, despite the few moments of less than diligent conduct discussed above, the lengthy and contentious proceedings thus far demonstrate Plaintiff's counsel's vigorousness.

Kroger nonetheless argues that adequacy is lacking because Plaintiff abdicated supervision of the case to her attorney.  (Doc. No. 104 at 26-27.)  Specifically, Kroger argues that Plaintiff abdicated supervision over the case based on her testimony that: (1) she met with her counsel "maybe two, three times" over four years; (2)  she reviewed court filings "like, two or three times" despite more than 15 filings to date; and (3) she does not understand her fiduciary duties to other class members and has given her attorney "full authority to negotiate and settle the action on her behalf." (*Id*. at 27.)  Kroger also claims that Plaintiff failed to show up for a settlement conference. (*Id.*)

Plaintiff does not dispute the infrequency with which she has met with her counsel or reviewed filings.  Instead, Plaintiff argues that her statements about deferring to her attorney "shows good sense." (Doc. No. 115 at 12.)  Plaintiff also argues that she demonstrated her knowledge of the case by declaring that she, as class representative, "represent[s] anyone who has also experienced the same thing as [herself] and bought the Kroger bread crumbs under the impression that it had zero trans fat in them." (*Id*. at 11.) Finally, Plaintiff takes issue with Kroger's claim that she failed to show up for a settlement conference, explaining that "she merely asked to leave a bit early so she can drive her schoolbus's afternoon shift." (*Id.*)

Here, Plaintiff's lack of involvement in her case does not rise to the level that other courts (at least in the cases cited by Kroger) have found sufficient to deny adequacy.  *See*

*Welling v. Alexy*, 155 F.R.D. 654, 659 (N.D. Cal. 1994) (in a securities case, the named plaintiff, who appeared in 13 other securities class actions, admitted that his only role in the case was calling his attorney to say he "ha[d] a case for him"); *Rolex Employees Ret. Tr. v. Mentor Graphics Corp.*, 136 F.R.D. 658, 666 (D. Or. 1991) (in a securities case, the named plaintiff did not know what the allegations in the complaint were, and contributed nothing to the drafting of the complaint because he did not become involved in the case until after the basic groundwork had been laid). Based on the above, this is not a case where Plaintiff is "startlingly unfamiliar" with her case. *See Facebook Biometric Info. Privacy Litig.*, 326 F.R.D. 535, 543 (N.D. Cal. 2018), *aff'd*, 932 F.3d 1264 (9th Cir. 2019), *cert. denied*, 140 S. Ct. 937 (2020). Plaintiff showed an adequate understanding of the case, as well as her concern that Kroger falsely advertised her favorite family breadcrumbs as containing "0g Trans Fat" even though they contained PHO. Also, it is reasonable that objections to adequacy based on a named plaintiff's lack of knowledge about her complex class action, or her heavy reliance on experienced counsel, should generally be disfavored as grounds to find lack of adequate representation. *See id.* ("[O]bjections to adequacy based on a named representative's alleged ignorance are disfavored. Even if the named plaintiffs have relied heavily on the advice of attorneys and others, it is hardly a badge of inadequacy to seek help from those with relevant expertise, particularly in a complex case like this one."). Accordingly, the adequacy requirement is satisfied.

### D.    Rule 23(b)(3) Predominance

"The predominance analysis under Rule 23(b)(3) focuses on 'the relationship between the common and individual issues' in the case and 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Wang*, 737 F.3d at 544 (citation omitted). The predominance requirement ensures that "common questions present a significant aspect of the case" such that "there is clear justification" – in terms of efficiency and judicial economy – for resolving those questions in a single adjudication. *Hanlon*, 150 F.3d at 1022 (citation omitted). This requirement is satisfied when a common nucleus of facts and law is the central feature of the litigation, and when the "[p]laintiffs

have shown that there are plausible classwide methods of proof available to prove their claims."  *Wolph v. Acer Am. Corp.*, 272 F.R.D. 477, 487 (N.D. Cal. 2011) (citation omitted).

Here, the common and cohesive issue is whether Kroger wrongfully labeled its breadcrumbs as containing "0g Trans Fat."  This is the most significant aspect of the case, and constitutes a common nucleus of fact and law that is a central feature of the litigation. There is justification in terms of efficiency and judicial economy to resolve this question in a single adjudication, rather than having each individual who purchased an approximately $2 can of Kroger breadcrumbs to file suit on their own.  It is also plausible that classwide methods of proof are available to prove Plaintiff's claims.  *See In re Ferrero Litig.*, 278 F.R.D. 552, 560 (S.D. Cal. 2011) (finding superiority where "[p]laintiffs presents sufficient facts to show that all of the class members' claims share a common contention: namely, that [d]efendant made a material misrepresentation regarding the nutritious benefits of Nutella® that violated the UCL, FAL and the CLRA").

Kroger nonetheless argues that predominance is not satisfied because Plaintiff's claims are based on a full restitution model, and by admitting that she consistently purchased the breadcrumbs for use in her weekly meatloaf, Plaintiff admits she derived some value from the breadcrumbs.  (Doc. No. 104 at 28-29.)  Plaintiff does not dispute, that in cases where named plaintiffs seek damages based on a full restitution model, predominance is not satisfied if the named plaintiff or class members received some value from the product.  *See*, *e.g.*, *Caldera v. J.M. Smucker Co.*, No. CV 12-4936-GHK (VBKx), 2014 WL 1477400, at *1 (C.D. Cal. Apr. 15, 2014) (declining to certify the class because California sales data was not sufficient to show classwide damages where the plaintiffs admitted that she received some benefit from the food product).  Plaintiff also makes no attempt, through an expert report or otherwise, to account for the market value of the allegedly mislabeled breadcrumbs, or any value that she or any class member might have received from the breadcrumbs notwithstanding the "0g Trans Fat" label.  Instead, Plaintiff argues the breadcrumbs were "so dangerous" they had no value because they contained

PHO, and the expert reports of Dr. Wong and Dr. Golomb show that a reasonable jury could find the breadcrumbs had no value.  (Doc. No. 115 at 12.)

As the parties point out, some district courts have found that falsely advertised medicine or vitamins provide no value to consumers, which is cohesive with a claim for full restitution.  *See Farar*,  2017 WL 5952876, at *10 (suggesting that food, unlike vitamins, provides benefits like calories, satisfaction of hunger, tastiness, or hydration); *see also Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1173 (9th Cir. 2017), *rev'd and remanded*, 139 S. Ct. 710 (2019); *Allen v. Hyland's Inc.*, 300 F.R.D. 643, 671 (C.D. Cal. 2014).  Additionally, some courts have found that food products advertised to be healthier than they really were nonetheless provided some value to the consumer, which is not cohesive with a claim for full restitution.  *See In re POM Wonderful LLC*, No. ML 10-02199 DDP (RZx), 2014 WL 1225184, at *1 (C.D. Cal. Mar. 25, 2014) (claiming that pomegranate juice products provide various health benefits, and that millions of dollars of scientific research demonstrated these benefits); *Astiana v. Ben & Jerry's Homemade, Inc.*, No. C 10-4387 PJH, 2014 WL 60097, at *12 (N.D. Cal. Jan. 7, 2014) (claiming that ice cream products were falsely labeled and advertised as "all natural" even though they contained alkalized cocoa); *Red v. Kraft Foods, Inc.*, No. CV 10-1028-GW(AGRx), 2012 WL 8019257, at *11 (C.D. Cal. Apr. 12, 2012) (alleging that various snack foods were advertised as healthier than they were).  However, neither party cites a case in which the court addressed, in deciding a motion for class certification, whether a *food* product that was alleged to have been falsely advertised as *not* containing a specific unhealthy substance, such as trans fat, has value that defeats a class action based on a full restitution model.

As with any food, consuming Kroger breadcrumbs provided some value to the consumer at the time they were consumed.  Kroger admits, however, that even though the breadcrumbs were labeled "0 Trans Fat," they actually contained "trace amounts of trans fat."  (Doc. No. 104 at 9.)  Additionally, Plaintiff provides extensive support for her contention, correct or not, that trans fat is so harmful that any product containing PHO has

no value.  For example, Plaintiff devotes over 50 paragraphs of her Complaint, and two expert reports, describing the dangers of trans fat to human health.  Based on these allegations, it is reasonable to find at this stage in the litigation that Plaintiff has shown that any value she obtained by consuming the breadcrumbs was erased when she found out they contained trans fat, and that any value class members received will be erased when they find out the same.

Additionally, the district court's reasoning in *Johns v. Bayer Corp.*, 280 F.R.D. 551 (S.D. Cal. 2012) is persuasive even though the case involved vitamins, not food.  In *Johns*, the court found that predominating common issues existed over whether Bayer misrepresented that its vitamins "support prostate health," and whether the misrepresentations were likely to deceive a reasonable consumer.  *Id.* at 557.  The court reasoned that "these predominant questions are binary – advertisements were either misleading or not, and Bayer's prostate health claim is either true or false."  *Id.*  The court also reasoned that "California consumer protection laws take an objective approach of the reasonable consumer, not the particular consumer."  *Id.* (citations omitted).  The court rejected Bayer's argument that predominance was not satisfied because class members' reasons for purchasing the vitamins were individual.  *Id.* at 558.  The court stated, "at a minimum, everyone who purchased the [vitamins] would have been exposed to the prostate claim that appeared on every package from 2002 to 2009," and "[t]his [was] the predominant issue[.]"  *Id.*  With respect to damages, the court stated  "the amount of damages is often an individual question and does not defeat class action certification."[21]

---

[21] In *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013), the Court stated that a plaintiff's damages model must match her theory of liability and measure only those damages attributable to here theory of liability.  Plaintiff therefore suggests that by merely alleging that Kroger's breadcrumbs have no value, predominance cannot be defeated based on any value obtained by Plaintiff.  (*See* Doc. No. 115 at 13.)  Plaintiff cites no case, however, to support this interpretation of *Comcast*.  *But see McCrary v. Elations Co., LLC*, No. EDCV 13–00242 JGB (OPx), 2014 WL 1779243, at *15 (C.D. Cal. Jan. 13, 2014) ("Since [p]laintiff seeks no remedy that would require an award of damages unique to any

*Id.* at 559 (citations omitted); *see also Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) ("[T]he amount of damages is invariably an individual question and does not defeat class action treatment."); *Snipes v. Dollar Tree Distribution, Inc.*, No. 2:15-cv-00878-MCE-DB, 2017 WL 5754894, at *5 (E.D. Cal. Nov. 28, 2017) ("At the class certification stage, [p]laintiff need only propose a valid method for calculating class wide damages such that a trier of fact could accurately calculate damages.").  Accordingly, the predominance requirement under Rule 23(b)(3) is satisfied.

### E.   Rule 23(b)(3) Superiority

Rule 23(b)(3) requires the court to find that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  The pertinent considerations include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)-(D).  The superiority requirement tests whether "classwide litigation of common issues will reduce litigation costs and promote greater efficiency." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).

Here, given the relative inexpensiveness of the breadcrumbs, the monetary damages suffered by each putative class member are not large.  *See Astiana v. Kashi Co.*, 291 F.R.D. 493, 507 (S.D. Cal. 2013) ("Where a case involves multiple claims for relatively small individual sums, some plaintiffs may not be able to proceed as individuals because of the disparity between their litigation costs and what they hope to recover.").  It is more efficient to resolve the common questions regarding accuracy and materiality of the "0g Trans Fat"

---

particular class member, the Court determines that the potential recovery [of full restitution] is not an impediment to the requirement of predominance.").

label in a single proceeding rather than to have individual courts separately hear these cases.  *See Johns*, 280 F.R.D. at 559 ("Judicial economy weighs in favor of a class action where, as here, liability turns on whether advertisements were false or misleading. . . . It is far more efficient to resolve the common questions regarding materiality, scientific substantiation, and statutes of limitations in a single proceeding rather than to have individual courts separately hear these issues.").  The parties do not identify any other cases challenging Kroger's "0g Trans Fat" label under California's consumer protection statutes, and the proposed class involves only California citizens, making this forum desirable for the class.  Finally, the likely difficulties in managing this class appear no greater than in multiple other cases in which the class consisted of persons who purchased a product years prior to the litigation.  Accordingly, the superiority requirement is satisfied.

## IV.   CONCLUSION

Based on the foregoing, Plaintiff's Motion for Class Certification is **GRANTED**. Pursuant to Federal Rule of Civil Procedure 23(b)(3), the following class is certified:

> All citizens of California who purchased, between January 1, 2010 and December 31, 2015, Kroger Bread Crumb containing partially hydrogenated oil and the front label claim "0g Trans Fat."

Additionally, The Weston Firm is appointed as class counsel and Plaintiff Shavonda Hawkins is appointed as class representative.

IT IS SO ORDERED.

DATED: November 9, 2020

JEFFREY T. MILLER
United States District Judge